**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, PLYMOUTH COUNTY RETIREMENT SYSTEM, STATE-BOSTON RETIREMENT SYSTEM, and MICHAEL GOLDE, On Behalf of Themselves and All Others Similarly Situated, | Lead Case No. 06 Civ. 5797 (PAC) |
| Plaintiffs, | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS SEEKING MONEY DAMAGES AND EQUITABLE RELIEF** |
| v. | |
| SAFENET, INC., ANTHONY A. CAPUTO, KENNETH A. MUELLER, CAROLE D. ARGO, THOMAS A. BROOKS, IRA A. HUNT, Jr., BRUCE R. THAW, ARTHUR L. MONEY, SHELLEY A. HARRISON, and ANDREW E. CLARK | DEMAND FOR TRIAL BY JURY |
| Defendants. | |

# TABLE OF CONTENTS

Page

I. SUMMARY OF THE COMPLAINT ................................................................. 2

A. SUMMARY OF THE CLASS CLAIMS ........................................................ 2

B. SUMMARY OF THE RAINBOW ACQUISITION SUBCLASS CLAIMS .................... 8

II. JURISDICTION AND VENUE ................................................................. 10

III. THE PARTIES ................................................................................. 11

    A. Plaintiffs ................................................................................. 11

    B. SafeNet and the Officer Defendants ................................................ 12

    C. The Director Defendants (Including the Compensation Committee
        Defendants) .............................................................................. 15

    D. The Rainbow Acquisition Defendants ............................................... 18

IV. SAFENET'S WRONGFUL CONDUCT WITH RESPECT TO ITS
    ISSUANCE OF, AND ACCOUNTING FOR, BACKDATED STOCK
    OPTIONS ....................................................................................... 18

    A. Background on Stock Options and Relevant GAAP Principles
        Governing the Financial Reporting for Stock Options ........................ 18

    B. SafeNet's Practices with Respect to the Issuance of and
        Accounting For Stock Option Grants .............................................. 21

    C. Summary of Defendants' Wrongful Conduct and False Reporting
        For Stock Option Grants, Including Defendant Argo's Recent
        Guilty Plea to Felony Securities Fraud Charges Under §10(b) In
        Connection with  SafeNet's Options Misconduct ............................... 23

        1. Defendant Argo's Guilty Plea .................................................. 25

        2. Summary of SafeNet's Improperly Granted and Improperly
            Accounted For Stock Option Grants ........................................ 27

        3. SafeNet's Misrepresentations Concerning Its Stock Options
            Grants and Related Accounting ............................................... 43

V. SAFENET'S WRONGFUL CONDUCT WITH RESPECT TO
    REPORTING FRAUDULENTLY INFLATED REVENUE (AND
    FRAUDULENTLY UNDERSTATED EXPENSES) IN CONNECTION

    WITH THE SALE OF SAFENET'S GOODS AND SERVICES ................................... 45

    A.    Background Regarding SafeNet's Scheme to  Inflate Revenue and
          Manipulate Earnings ............................................................................. 45

    B.    SafeNet's Non-Options Accounting Manipulations ............................... 49

          1.    Improper Accounting for Long-Term Development
                Contracts ................................................................................ 49

          2.    Improper Revenue Recognition on "Bill and Hold"
                Transactions ........................................................................... 56

          3.    Improper Recognition of Revenue Upon Shipment of
                Unfinished Product or Product that was Otherwise  Not
                Ready To Be Shipped ............................................................. 59

          4.    Improper Recognition Of Revenue On Royalty Payments ...................... 61

VI.    CLASS PERIOD FALSE AND MISLEADING STATEMENTS ................................... 63

VII.   THE TRUTH CONCERNING SAFENET'S FRAUDULENT
       PRACTICES SLOWLY BEGINS TO EMERGE ........................................... 98

    A.    The February 2, 2006 Disclosure of SafeNet's Need To Restate Its
          Financials ............................................................................................. 98

    B.    The April 6, 2006 Disclosure of the Termination of Defendant
          Mueller .............................................................................................. 104

    C.    The May 18, 2006 Disclosure of Government's Backdating
          Investigation ....................................................................................... 105

VIII.  POST CLASS PERIOD EVENTS ............................................................. 108

IX.    SAFENET'S GAAP VIOLATIONS ........................................................... 112

X.     ADDITIONAL ALLEGATIONS PERTINENT TO THE OFFICER AND
       COMPENSATION DEFENDANTS' SCIENTER UNDER COUNTS I
       THROUGH IV ...................................................................................... 117

XI.    CLASS ACTION ALLEGATIONS ............................................................. 122

XII.   FRAUD-ON-THE-MARKET DOCTRINE ..................................................... 125

COUNT I AGAINST SAFENET, THE OFFICER DEFENDANTS AND THE
          COMPENSATION COMMITTEE DEFENDANTS FOR STOCK
          OPTION- RELATED MISREPRESENTATIONS IN VIOLATION OF

SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
PROMULGATED THEREUNDER ................................................................. 126

COUNT II AGAINST THE OFFICER DEFENDANTS AND THE COMPENSATION
COMMITTEE DEFENDANTS FOR VIOLATIONS OF SECTION 20(a)
OF THE EXCHANGE ACT ARISING FROM STOCK OPTION-
RELATED MISREPRESENTATIONS .............................................................. 130

COUNT III AGAINST SAFENET AND THE OFFICER DEFENDANTS FOR
MISREPRESENTATIONS ARISING FROM SAFENET'S NON-
OPTIONS RELATED ACCOUNTING FRAUD IN VIOLATION OF
SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
PROMULGATED THEREUNDER ................................................................. 131

COUNT IV AGAINST THE OFFICER DEFENDANTS FOR VIOLATIONS OF
SECTION 20(a) OF THE EXCHANGE ACT ARISING FROM
SAFENET'S NON-OPTIONS RELATED ACCOUNTING FRAUD ............. 134

COUNT V AGAINST SAFENET AND THE DIRECTOR DEFENDANTS FOR
MISREPRESENTATIONS CONTAINED IN SAFENET'S PROXY
STATEMENTS FOR THE YEARS 2003 THROUGH 2005 IN
VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND
RULE 14a-9 PROMULGATED THEREUNDER ............................................. 136

COUNT VI ON BEHALF OF THE RAINBOW SUBCLASS AGAINST SAFENET
AND THE RAINBOW ACQUISITION DEFENDANTS FOR
MISLEADING STATEMENTS CONTAINED IN THE RAINBOW
PROXY/PROSPECTUS IN VIOLATION OF SECTION 14(a) OF THE
EXCHANGE ACT AND RULE 14a-9 PROMULGATED
THEREUNDER ............................................................................................ 137

COUNT VII ON BEHALF OF THE RAINBOW SUBCLASS AGAINST SAFENET
AND THE RAINBOW ACQUISITION DEFENDANTS FOR
VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT ...................... 144

COUNT VIII ON BEHALF OF THE RAINBOW SUBCLASS AGAINST
DEFENDANTS SAFENET, CAPUTO AND ARGO FOR VIOLATIONS
OF SECTION 12(a)(2) OF THE SECURITIES ACT ..................................... 146

COUNT IX ON BEHALF OF THE RAINBOW SUBCLASS AGAINST THE
RAINBOW ACQUISITION DEFENDANTS FOR VIOLATIONS OF
SECTION 15 OF THE SECURITIES ACT ..................................................... 148

PRAYER FOR RELIEF ...................................................................................... 150

JURY DEMAND ................................................................................................ 151

Plaintiffs Police and Fire Retirement System of the City of Detroit, the Plymouth County Retirement System, the State-Boston Retirement System and Michael Golde ("Plaintiffs") bring this action for violation of the securities laws individually on behalf of themselves and as a class action on behalf of all persons or entities, other than Defendants and their affiliates,  who purchased or acquired the securities of SafeNet, Inc. ("SafeNet" or the "Company") during the period from March 31, 2003 through and including May 18, 2006 (the "Class Period").  Plaintiff Golde also sues on behalf of himself and a subclass of all former shareholders of Rainbow Technologies, Inc. ("Rainbow") whose Rainbow shares were converted into common shares of SafeNet pursuant to the registration statement and joint proxy statement/prospectus filed with the United States Securities and Exchange Commission ("SEC") in connection with the March 15, 2004 acquisition of Rainbow by SafeNet (the "Rainbow Acquisition") of all outstanding shares of Rainbow (the "Rainbow Subclass").  Plaintiffs also sue on behalf of themselves and a subclass of all persons or entities that were entitled to vote on the proxy statements filed by SafeNet with the SEC on or about April 30, 2003, February 12, 2004, April 29, 2004 and July 6, 2005 (the "Proxy Subclass").  Plaintiffs allege the following facts upon knowledge, with respect to their own acts, and with respect to all other facts based on an investigation conducted by counsel, including, among other things, a review of SafeNet's public filings and press releases, news and research reports about the Company, filings made in certain criminal and civil proceedings brought by the United States government (including the felony securities fraud guilty plea allocution by defendant Carole Argo ("Argo"), SafeNet's former President, Chief Financial Officer ("CFO") and Chief Operating Officer ("COO")), and from various confidential witnesses including former SafeNet officers and employees.

I.     **SUMMARY OF THE COMPLAINT**

      A.     **SUMMARY OF THE CLASS CLAIMS**

1.     This is a case of egregious and largely admitted multi-year accounting fraud which has already forced SafeNet to admit that its previously filed financial statements for the years 2000 through 2005 (and for the first quarter of 2006) were materially false and misleading, and which has already produced a guilty plea to felony securities fraud charges by SafeNet's former President, COO and CFO, defendant Argo, in connection with an ongoing Justice Department and SEC investigation.  As pled in detail below, throughout the Class Period defendant Argo and SafeNet's two other most senior executives, its Chief Executive Officer ("CEO"), defendant Anthony Caputo ("Caputo") and CFO (from 2004-2006), defendant Kenneth A. Mueller ("Mueller") (collectively, the "Officer Defendants") orchestrated and implemented widespread and systemic accounting improprieties at all levels of SafeNet's business, from its stock option grants and executive compensation policies to its revenue recognition practices -- all in flagrant disregard of Generally Accepted Accounting Principles ("GAAP") and their disclosure obligations to SafeNet's investors.  While manipulating SafeNet's reported earnings to make the Company appear materially more profitable than it was, the Officer Defendants were personally enriching themselves by awarding themselves millions of dollars of secretly back-dated stock options, and by reaping over $9.4 million in proceeds from illicit insider sales of their personal holdings of SafeNet stock at fraudulently inflated prices.  In contrast, SafeNet investors saw the value of their shares of SafeNet stock plummet as the truth concerning SafeNet's fraudulent accounting finally began to emerge.

2.     SafeNet is a company that develops, markets and sells a variety of information and data security products and services, including both hardware and software, that are used to protect and secure digital identities, communications and applications.  During the Class Period,

SafeNet and the Officer Defendants publicly reported financial results that created the false impression that the Company was achieving strong earnings and revenue growth.  For example, on April 22, 2003, SafeNet issued a press release announcing its first quarter 2003 results, in which defendant Caputo proclaimed that "we are very pleased with the strong growth in revenue, gross margins, and earnings, which we are reporting today…" and that the results for the quarter demonstrated "the progress we've made both in growing and diversifying our revenues and in building profitability."  The Company's self-proclaimed "strong" results during the Class Period propelled SafeNet's stock price to Class Period highs of over $40 per share, or more than double the Company's share price at the start of the Class Period.

3.     However, as the Company has since admitted, its purportedly strong financial results during the Class Period were materially false and artificially inflated SafeNet's reported performance.  SafeNet's fraudulent accounting included, *inter alia*:

- improperly accounting for **backdated stock option grants**;

- manipulating its recognition of costs, revenue and earnings in connection with its **improper accounting for long-term development contracts**;

- improperly recognizing revenue on **"bill and hold" transactions**;

- improperly recognizing revenue on **shipments of product that were unfinished** or otherwise not ready to be delivered; and

- improperly recognizing revenue on **accelerated royalty payments**.

As a result of SafeNet's false statements and fraudulent accounting, SafeNet's publicly traded securities traded at artificially inflated prices during the Class Period.

4.     As detailed below, options backdating involves a practice whereby a company issues options (and fixes their terms) on a given date, but the options -- instead of being given an "exercise" price (or "strike price") that is *equal* to the price of the company's stock on the date that the options are actually issued (so-called "*at* the money" options) -- are *backdated* to an

earlier date when the company's shares traded at a *lower* (and often much lower) price.  Options that are backdated so that their exercise price is below the stock's market price on the date of issuance are "*in* the money" options because, in contrast to "at the money" options (which can be exercised for a profit *only* if the value of the underlying stock increases), "in the money" options are issued with embedded intrinsic value.  This immediate benefit or "intrinsic value" is equal to the difference between (a) the exercise price (which has been backdated to a date when the stock was trading at a relatively low price) and (b) the market price on the date that the option was actually issued.

5.      Option grants are essentially used as currency to attract and retain valuable employees in a competitive marketplace.  However, because of the obvious difference between being issued, for example (x) an option to buy 25,000 shares at the current market price (say, $20) and (y) an option to buy the same 25,000 shares at a lower price (say $10) at which the shares had traded several weeks or months earlier, the SEC and GAAP require companies to give significantly different accounting treatment to grants of "at the money" vs. "in the money" options.  Specifically, issuance of "at the money" options to company employees or directors does not require a company to record a compensation expense; however, where a company issues "in the money" options, the SEC and GAAP consider the difference between the value of the option based on the "exercise price" and the value based on the price of the stock on the grant date to be a direct form of compensation to the option recipient that ***must*** be expensed and accounted for as compensation cost.  A company that fails to record this "intrinsic" value of an "in the money" option grant will therefore ***understate*** compensation cost and ***overstate*** earnings in the year of the grant, and in future years during the vesting period of the options (if the option vests over time).

6.        Nonetheless, prior to and during the Class Period, defendants Caputo, Argo and Mueller, with the approval of the Compensation Committee Defendants (as defined below) systematically caused SafeNet to issue backdated options and to fail to recognize compensation expense in connection with those option grants.  Indeed, to maximize the fruits of their back-dating activities and conceal them from SafeNet's auditors, analysts and investors, the Officer Defendants routinely backdated options grants by papering them as if they had been issued on prior "grant dates" on which SafeNet's stock price had closed at or near a periodic low point.

7.        The SafeNet directors who were members of SafeNet's Compensation Committee (the "Compensation Committee Defendants") were also actively complicit in, or at least recklessly indifferent to, Safenet's fraudulent backdating activities.  These defendants knowingly signed backdated "unanimous written consents" ("UWCs") that approved the issuance of similarly backdated stock options, and these directors were themselves -- as they knew or recklessly disregarded -- significant financial beneficiaries of various backdated options grants that purported to have been issued on remarkably "fortuitous" dates with suspiciously low exercise prices.  As members of SafeNet's Compensation Committee, they were also chargeable with knowledge of the contents of the Company's public SEC disclosures concerning SafeNet's options grants, which repeatedly (and falsely) represented that the options granted under SafeNet's options plans had exercise prices "equal to the market value of the underlying common stock on the date of the grant."  *See, e.g.,* SafeNet's Forms 10-K for 2002, 2003 and 2004, (signed by defendant Caputo, as well as defendant Argo (2002-2003), Mueller (2004) and Compensation Committee Defendants Brooks, Thaw, Hunt and/or Money).

8.        At the same time that SafeNet's undisclosed options backdating activities (and related practice of underreporting compensation expense) was going on, the Officer Defendants

were also falsifying SafeNet's reported financial results in a number of other ways. Specifically, SafeNet reported artificially inflated revenue and earnings to meet analysts' expectations by, *inter alia*, manipulating its accounting for long-term development contracts, engaging in "bill and hold" transactions, improperly recognizing revenue on shipments of product that were unfinished or otherwise not ready to be delivered, and by selling future royalty payments at a steep discount in order to bolster current earnings.  As described below, these tactics allowed defendants to hide SafeNet's deteriorating margins and other financial problems, and to deceive investors into believing that the Company was consistently meeting Wall Street's earnings expectations.   For example, according to a former senior accounting executive who reported to defendant Mueller, Mueller would regularly tell this executive to "go back and find new numbers" when the Company earnings figures presented by this source were not in line with expectations, and Mueller would "intervene … to get the numbers where [Mueller, Caputo and Argo] wanted."  Similarly, other confidential sources link defendants Caputo, Argo and Mueller to authorizing, for example, the improper recognition of millions of dollars of revenue on various "bill and hold" transactions and on shipments of unfinished SafeNet product that was not ready to be delivered.

9.     The truth concerning Defendants' fraudulent schemes and SafeNet's true financial condition and performance finally began to emerge on February 2, 2006, when the Company revealed, *inter alia*, that its previously reported financial statements for the second and third quarters of 2005 would need to be restated in connection with improper accounting for certain lease restructuring charges and long-term development contracts.   In the wake of this announcement, SafeNet's stock fell 15.2%, from $32.72 on February 2 to $27.75 on February 3, 2006.  These disclosures were soon followed by SafeNet's announcement on April 6, 2006 that

the Company would miss its prior earnings forecasts for the first quarter of 2006 and that defendant Mueller was being terminated as the Company's CFO.   In the wake of this announcement, SafeNet's stock fell a further 19.3%, from $25.97 on April 6 to $20.96 on April 7, 2006.  Finally, on May 18, 2006 -- the last day of the Class Period -- SafeNet announced that it had received a subpoena from the United States Attorney's Office for the Southern District of New York demanding information about the Company's stock option grants, and that the SEC had also launched an investigation into the Company's "stock option grants to directors and officers" and "certain accounting policies and practices."   In response to this latter news, SafeNet's stock suffered still further losses, falling another 21% from $19.21 on May 18 to $14.93 on May 19, 2006 – representing a staggering overall decline of well over 50% in just over four months.

10.     In the subsequent weeks and months, investors' fears concerning the nature and extent of the rot at SafeNet were confirmed.  For example, in July 2006, SafeNet confirmed that it had in fact engaged in improper accounting for stock option grants issued to its officers and directors, and that it would have to further restate its previously reported financial results going back to 2002 as a result of its prior backdating of stock option grants.  Two months later, in September 2006, SafeNet publicly announced that its stock option manipulations went back even earlier, to 2000, and that its ongoing "special committee" investigation had determined that grants between 2000 and 2005 likely had been improperly accounted for.  The Company also announced in September of 2006 that it intended to restate its financial statements for the years 2000 through 2005 and for the first quarter of 2006.  In January 2007, SafeNet reported additional details concerning its forthcoming restatement when it reported that – in addition to correcting the fraudulent accounting arising out of its options backdating practices – the

Company would *also* have to restate its financial statements for FY 2004, FY 2005 and the 1st quarter of 2006 because those financial statements had materially misstated the Company's reported revenue in numerous respects that did not involve options.

11.    Notwithstanding Defendants' repeated representations that SafeNet would restate its historical financial statements, SafeNet was ultimately able to avoid having to do so because its management was able to successfully cut a deal in the first quarter of 2007 to be acquired by a venture capital firm as part of a "going private" transaction that closed in April of 2007.

12.    SafeNet's success in "going private" has not, however, brought an end to the federal government's ongoing investigations of past fraudulent conduct at the most senior levels of the Company.  Indeed, in late 2007, SafeNet's former President, COO and CFO, defendant Carole Argo, pled guilty to felony securities fraud charges arising out of her role in knowingly and willfully preparing false financial statements that materially overstated SafeNet's reported earnings during the Class Period, and was sentenced to a prison term in 2008.  Having also charged defendant Argo with conspiracy, it would appear that the government's criminal investigation into the activities of Argo's un-named and as-yet unindicted co-conspirators -- who presumably include *at least* defendants Caputo and Mueller -- is ongoing.

13.    By this action, Lead Plaintiffs, on behalf of themselves and the members of the Class, seek to recover for the enormous damages that they have suffered as a result of Defendants' fraudulent conduct.

**B.    SUMMARY OF THE RAINBOW ACQUISITION SUBCLASS CLAIMS**

14.    This action also arises from matters relating to SafeNet's closing of a stock-based merger on March 15, 2004 with Rainbow Technologies in a deal valued at more than $450 million (the "Rainbow Acquisition") which closed after SafeNet obtained the affirmative votes from investors holding a majority of the common shares of Rainbow.  As a result of the Rainbow

Acquisition, Rainbow's shareholders exchanged each Rainbow share they owned for 0.374 SafeNet shares (the "Exchange Ratio"), thereby receiving 43% of the total shares of the combined entity.  On October 21, 2003, the day before the proposed Rainbow Acquisition was announced, SafeNet's stock price closed at $42.95 per share.  In the period immediately prior to the issuance of the registration statement and joint proxy statement/prospectus that were used to solicit Rainbow shareholders' approval of the Rainbow Acquisition, shares traded at approximately $40 per share.

15.     SafeNet and the Rainbow Acquisition Defendants – consisting of those Officer and Director Defendants who signed the relevant registration and proxy statement/prospectus for the transaction -- solicited the affirmative vote of Rainbow's shareholders in favor of the Rainbow Acquisition and caused the exchange described above by issuing a materially false and misleading registration statement, dated February 11, 2004, (the "Rainbow Registration Statement"), which incorporated a false and misleading joint proxy statement/prospectus, dated February 12, 2004, (the "Rainbow Proxy/Prospectus").  SafeNet and the Rainbow Acquisition Defendants issued the false and misleading Rainbow Registration Statement in violation of Sections 11 and 12(a)(2) of the Securities Act, 15 U.S.C. § 77k, and issued the false and misleading Rainbow Proxy/Prospectus in violation of the Section 11 of the Securities Act and Section 14(a) of the Exchange Act.

16.     None of the claims of the Rainbow Subclass in this Action alleges or sounds in fraud.  Instead, they are premised on the Rainbow Acquisition Defendants' strict liability for material misrepresentations and omissions in the Rainbow Registration Statement and Rainbow Proxy/Prospectus, and (in the case of claims under § 14(a)) on the Defendants' negligence in failing to recognize and correct these misrepresentations and omissions.  That the Rainbow

Registration Statement and Rainbow Proxy/Prospectus were materially false and misleading is established by, among other things, SafeNet's admissions that its financial statements for the fiscal periods from 2000 through the date of the issuance of the Rainbow Registration Statement and Rainbow Proxy/Prospectus cannot be relied upon and must be restated.

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. §§ 1331 and 1337.  The claims alleged herein arise under Sections 11, 12(a) and 15 of the Securities Act, Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading public statements and SEC filings, occurred in this District.

19.    In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail and the facilities of the NASDAQ, a national securities market located in this District.  Further, as described below, the Office of the United States Attorney for the Southern District of New York is conducting an ongoing investigation into the Company's wrongful conduct, which investigation has already resulted in defendant Argo's guilty plea to felony securities fraud in violation of §10(b) in criminal proceedings brought in this District.

III.   **THE PARTIES**

A.   **Plaintiffs**

20.    Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit Police and Fire") purchased 93,865 shares of common stock of SafeNet during the Class Period as set forth in its previously filed certification in this action, and suffered damages as a result of the violations of the federal securities laws pled herein.  Detroit Police and Fire is a public pension fund with more than $3.8 billion of net assets held in trust as of June 30, 2005 for the benefit of the active and retired police officers and firefighters of the City of Detroit, Michigan.

21.    Plaintiff Plymouth County Retirement System ("Plymouth") purchased 57,900 shares of common stock of SafeNet during the Class Period as set forth in its previously filed certification in this action, and suffered damages as a result of the violations of the federal securities laws pled herein.  Plymouth is a public pension fund with more than $636 million in net assets maintained for the benefit of active and retired public employees of Plymouth County, Massachusetts.

22.    Plaintiff State-Boston Retirement System ("Boston Retirement") purchased 112,100 shares of common stock of SafeNet during the Class Period as set forth in its previously filed certification in this action, and suffered damages as a result of the violations of the federal securities laws pled herein.  Boston Retirement is a public pension fund with more than $3.1 billion in net assets maintained for the benefit of the City of Boston's employees.

23.    Detroit Police and Fire, Plymouth and Boston Retirement (referred to collectively herein as "Lead Plaintiffs") were appointed Co-Lead Plaintiffs by Order of this Court entered February 22, 2007.

24.    Prior to the Rainbow Acquisition, plaintiff Michael J. Golde ("Golde") purchased shares of common stock of Rainbow as set forth in his previously filed certification in this

action.  Upon the closing of the Rainbow Acquisition on March 15, 2004, Plaintiff Golde's

Rainbow shares were converted into SafeNet shares in accordance with the Exchange Ratio.

Following the Rainbow Acquisition, plaintiff Golde purchased additional shares of SafeNet stock

in open market transactions as set forth in his previously filed certification in this action.

Plaintiff Golde suffered damages as a result of the violations of the federal securities laws pled

herein.

### B.        SafeNet and the Officer Defendants

25.        Defendant SafeNet develops, markets and sells a portfolio of hardware and

software information security products and services used to protect and secure digital identities,

communications and applications.  SafeNet is a Delaware corporation and is headquartered in

Belcamp, Maryland.  On March 5, 2007, SafeNet announced in a press release that it had agreed

to be acquired by Stealth Acquisition Corporation, a subsidiary of Vector Capital, pursuant to a

tender offer.  The transaction closed in April 2007, with the result that SafeNet is now a privately

held company and no longer has the obligation to publicly file current financial reports on Forms

10-K or 10-Q with the SEC.

26.        At all times relevant hereto, defendant Anthony A. Caputo ("Caputo") was the

Chief Executive Officer and Chairman of the Board of Directors (the "Board") of SafeNet.

During the Class Period, defendant Caputo improperly caused SafeNet to grant him 300,000 "in

the money" options to purchase SafeNet stock at low exercise prices ranging between $16.47 and

$29.70, and failed to properly disclose the nature of these grants to the investing public, and also

authorized or  approved the issuance of hundreds of thousands of other "in the money" SafeNet

stock option grants to other Company officers and directors at low exercise prices, and willfully,

intentionally and/or recklessly authorized or approved the issuance of false financial statements

by SafeNet as alleged herein.  Also, while in possession of material nonpublic information about

SafeNet's business, Caputo sold 275,000 shares of SafeNet stock during the Class Period at prices between $23.97 and $36.63 per share, reaping illicit insider selling proceeds of $7.87 million.  Defendant Caputo signed the Rainbow Registration Statement, all of the Class Period Form 10-Ks and all of the Class Period Form 10-Qs.  On October 18, 2006, SafeNet announced that defendant Caputo had agreed to resign from all positions held with the Company.

27.     From June 1999 through June 2004, defendant Carole D. Argo was Senior Vice President and Chief Financial Officer of SafeNet; in addition, from June 2004 through the end of the Class Period, defendant Argo served as SafeNet's President and Chief Operating Officer. After defendant Mueller resigned as CFO in April 2006, defendant Argo (in addition to serving as SafeNet's President and COO) also served as acting interim CFO until she resigned from all of her positions with the Company in October 2006.  Defendant Argo is a certified public accountant and has seven years of public accounting experience.  During the Class Period, Argo improperly caused SafeNet to grant her at least 250,000 "in the money" options to purchase SafeNet stock at exercise prices ranging between $16.47 and $31.78, and also authorized or approved the issuance of hundreds of thousands of other "in the money" SafeNet stock option grants to other Company officers and directors at low exercise prices, and willfully, intentionally and/or recklessly authorized or approved the issuance of false financial statements by SafeNet as alleged herein.  Also, while in possession of material nonpublic information about SafeNet's business, defendant Argo sold 30,000 shares of SafeNet stock during the Class Period at $36.01 per share, reaping total illicit insider selling proceeds of $1.08 million.  Defendant Argo signed the Rainbow Registration Statement, the 2002-2003 Form 10-Ks, the 2003 Form 10-Qs and the Form 10-Q for the first quarter of 2004.  On October 18, 2006, SafeNet announced that defendant Argo had agreed to resign from all positions held with the Company.

-13-

28.     From June 2004 until on or about April 6, 2006, defendant Kenneth A. Mueller ("Mueller") was Senior Vice President, Chief Financial Officer and Treasurer of SafeNet. During the Class Period, defendant Mueller improperly caused SafeNet to grant him at least 150,000 "in the money" options to purchase SafeNet stock at prices between $22.19 and $29.70, and also authorized or approved the issuance of hundreds of thousands of other "in the money" SafeNet stock option grants to other Company officers and directors at low exercise prices, and willfully, intentionally or recklessly authorized or approved the issuance of false financial statements by SafeNet as alleged herein.  Also, while in possession of material nonpublic information about SafeNet's business, Mueller sold 12,500 shares of SafeNet stock during the Class Period at $36.61 per share, reaping total illicit insider selling proceeds of $457,625. Defendant Mueller signed the 2004 Form 10-Qs for the second and third quarters, the 2004 Form 10-Ks and all of the Form 10-Qs and the Form 10-K for 2005.  On April 6, 2006, SafeNet announced that Mueller had resigned from the Company.

29.     Each of the defendants named in ¶¶ 26-28 above (collectively, the "Officer Defendants") had access to undisclosed material information about the Company's business, operations, products, operational trends, financial statements and future business prospects as a result of their access to internal corporate documents and their work with other SafeNet executives, officers and directors.

30.     The Officer Defendants were responsible for, participated in the preparation of, and were aware of, the false and misleading SEC filings, press releases, and other statements complained of herein at or about the time they were issued or circulated.  The Officer Defendants knew or recklessly disregarded the false and misleading nature of the statements complained of herein, and were in a position to control or influence their contents or otherwise cause corrective

or accurate disclosures to be made.  Because of their Board memberships and/or executive and senior managerial positions, each of the Officer Defendants was responsible for ensuring the truth and accuracy of the various statements contained in the Company's public statements and SEC filings.

C.    **The Director Defendants (Including the Compensation Committee Defendants)**

31.    At all relevant times hereto, defendant Thomas A Brooks ("Brooks") served as a director of the Company and a member of the Company's Compensation Committee and Audit Committee.  As a portion of his compensation for serving as a director, Brooks received stock options, as described below.  During the Class Period, Brooks signed each of the Company's During the Class Period, Mr. Brooks received at least 70,000 options to purchase SafeNet stock, many of which were "in the money" options, at strike prices ranging between $16.47 and $34.30, and sold 36,617 shares of SafeNet stock during the Class Period at prices between $26.20 and $36.21 per share for total proceeds of $1.09 million.  On July 3, 2006, SafeNet disclosed that Mr. Brooks failed to file Form 4 statements for certain option grants during the Class Period.  Mr. Brooks also signed the Rainbow Registration Statement.

32.    At all relevant times hereto, defendant Ira A. Hunt, Jr. ("Hunt") served as a director of the Company and a member of the Audit Committee and he served on the Company's Compensation Committee until 2004. As a portion of his compensation for serving as a director, Hunt received stock options, as described below.  During the Class Period, Hunt signed each of the Company's Form 10-Ks and authorized and permitted the use of his name in the 2003-2005 proxies.  During the Class Period, Mr. Hunt received at least 60,000 options to purchase SafeNet stock, many of which were "in the money" options, at strike prices ranging between $16.47 and $34.30, and sold 11,000 shares of SafeNet stock during the Class Period at prices between

$35.87 and $36.12 per share for total proceeds of $396,570.  On July 3, 2006, SafeNet disclosed that Mr. Hunt failed to file Form 4 statements for certain option grants during the Class Period. Mr. Hunt also signed the Rainbow Registration Statement.

33.     At all relevant times hereto, defendant Bruce R. Thaw ("Thaw") served as a director of the Company and has served on the Company's Compensation Committee since 2004. As a portion of his compensation for serving as a director, Thaw received stock options, as described below.  During the Class Period, Thaw signed each of the Company's Form 10-Ks and authorized and permitted the use of his name in the 2003-2005 proxies.  During the Class Period, Mr. Thaw received at least 60,000 options to purchase SafeNet stock, many of which were "in the money" options, at strike prices ranging between $16.47 and $34.30, and sold 41,667 shares of SafeNet stock during the Class Period at prices between $32.00 and $37.29 per share for total proceeds of $1.45 million.  On July 3, 2006, SafeNet disclosed that Mr. Thaw failed to file Form 4 statements for certain option grants during the Class Period.   Mr. Thaw also signed the Rainbow Registration Statement.

34.     Since March 16, 2004, Arthur L. Money ("Money") served as a director of the Company and as a member of the Company's Compensation Committee and Audit Committee. As a portion of his compensation for serving as a director, Money received stock options during the Class Period, some of which may have been "in the money" options, at stock prices ranging between $23.21 and $34.30.  Since joining the Company, Money signed the Company's Form 10-Ks and authorized and permitted the use of his name in the 2004-2005 proxies.  On July 3, 2006, SafeNet disclosed that Mr. Money failed to file Form 4 statements for certain option grants during the Class Period.

35.     At all relevant times hereto, defendant Shelley A. Harrison ("Harrison") served as a director of the Company.  Since May 1, 2003, Harrison has also served as a paid consultant to the Company.  During the Class Period, Harrison signed each of the Company's Form 10-Ks and authorized and permitted the use of his name in the 2003-2005 proxies. As a portion of his compensation for serving as a director and as a consultant during the Class Period, Mr. Harrison received at least 185,000 options to purchase SafeNet stock, many of which were "in the money" options, at strike prices ranging between $16.47 and $34.30, and sold 36,667 shares of SafeNet stock during the Class Period at prices between $31.85 and $36.82 per share for total proceeds of $1.26 million.   On July 3, 2006, SafeNet disclosed that Mr. Harrison failed to file Form 4 statements for certain option grants during the Class Period. Mr. Harrison also signed the Rainbow Registration Statement.

36.     At all relevant times hereto, defendant Andrew E. Clark ("Clark") served as a director of the Company.  During the Class Period, Clark signed the Company's 2004 and 2005 Form 10-Ks and authorized and permitted the use of his name in the 2003-2005 proxies.  As a portion of his compensation for serving as a director, Clark received stock options, as described below.   During the Class Period, Mr. Clark received at least 60,000 options to purchase SafeNet stock, many of which were "in the money" options, at strike prices ranging between $16.47 and $34.30, and sold 28,250 shares of SafeNet stock during the Class Period at prices between $23.68 and $36.68 per share for total proceeds of $883,393.  On July 3, 2006, SafeNet disclosed that Mr. Clark failed to file Form 4 statements for certain option grants during the Class Period. Mr. Clark also signed the Rainbow Registration Statement.

37.     Defendants Brooks, Hunt, Thaw and Money, collectively, constitute the "Compensation Committee Defendants."

38.     The Compensation Committee Defendants, together with defendants Harrison, and Clark, collectively, constitute the "Director Defendants."

39.     The Officer Defendants and Compensation Committee Defendants (collectively, the "Individual Defendants") were each controlling persons of SafeNet within the meaning of Section 20 of the Exchange Act by reason of their management positions in SafeNet and/or their membership on the Company's Board.   Because of their positions in the Company, these defendants had the power and influence to cause SafeNet to engage in the unlawful acts and conduct alleged herein.

D.     **The Rainbow Acquisition Defendants**

40.     Defendants Caputo, Argo, Brooks, Thaw, Hunt, Harrison and Clark, each of whom signed the Rainbow Registration Statement, constitute the "Rainbow Acquisition Defendants."

41.     The Rainbow Acquisition Defendants were each controlling persons of SafeNet within the meaning of Section 15 of the Securities Act by reason of their management positions in SafeNet and/or their membership on the Company's Board.   Because of their positions in the Company, the Rainbow Acquisition Defendants had the power and influence to cause SafeNet to engage in the improper acts and conduct alleged herein and to issue the false and misleading Rainbow Registration Statement and Rainbow Proxy/Prospectus.

IV.     **SAFENET'S WRONGFUL CONDUCT WITH RESPECT TO ITS ISSUANCE OF, AND ACCOUNTING FOR, BACKDATED STOCK OPTIONS**

A.     **Background on Stock Options and Relevant GAAP Principles Governing the Financial Reporting for Stock Options**

42.     Under certain circumstances, publicly traded companies may award their officers, employees and directors stock option grants as a means of increasing overall compensation in a competitive employment market.   A stock option grant provides an "optionee" with the right to

purchase shares of a company at a specific price -- the "exercise price" or "strike price" -- on or after a determined date.  For instance, if a company grants an employee 100 options with an exercise price of $5 per share, the employee can buy 100 shares for a total of $500, regardless of what the market price of the Company's stock is on the date the options are exercised.  When a company grants stock options to an employee or director, it must do so under a written stock option plan filed with the SEC and disclosed to the public.

43.     Under accounting rules in effect prior to approximately 2006, public companies in the United States were permitted to grant stock options to employees without recording a compensation expense, *provided that* the options' exercise price was at (in the case of "at the money" options), or above, the market's closing price for the stock on the day the options were granted.  However, if a publicly traded company issues options with an exercise price that is *less than* the market price of the company's stock on the date that the options are granted – so-called "in the money" options -- at all times relevant hereto, SEC regulations required the company to recognize and record the difference between the market price and the exercise price as a compensation expense in their financial statements. *See* Accounting Principles Board Opinion No. 25 ("APB No. 25"), superseded beginning on January 1, 2006 by FAS 123(R).  Pre-2006 accounting rules also required that companies recognize compensation expense in the same manner if "in the money" options were granted to non-employees, such as directors. Thus, although "in the money" stock options are obviously more valuable to those who receive them than "at the money" options, for a publicly traded company the issuance of "in the money options" (assuming they are properly accounted for) causes it to incur additional compensation expense, which in turn reduces the company's reported net income and earnings per share.[1]

---

[1] Another advantage for investors of issuing "at the money" options as compensation, as opposed to increasing cash compensation or issuing "in the money" options, discussed below, is that it ostensibly aligns the interests of

44.      Where an option has intrinsic value on the date of grant (*i.e.*, in the case of "in the money" options where the market price of the stock exceeds the option's exercise price on the date of grant), compensation cost is calculated by multiplying the total number of options granted by the difference between the exercise price of the option and the market price of the stock on the date of grant.  Compensation cost is then amortized and recognized as an expense over the option's vesting period.  SafeNet's option grants vested primarily over the span of four years, in equal amounts over that four year period.  A public company that treats an "in the money" options grant as if it were granted "at the money," and that fails accordingly to record and properly amortize the intrinsic value of an "in the money" option grant that vests over a period of years, will understate compensation cost and overstate net income not only in the year of grant, but also in each year thereafter as the option vests over time.

45.      To avoid any doubt as to what date should be used for purposes of determining whether an options grant is "in the money" and whether compensation cost must be recognized in connection with the grant, APB No. 25 also contains provisions defining a stock option's "measurement date."  Paragraph 10(b) of APB No. 25 clearly and specifically defines the "measurement date" as "the first date on which are known ***both*** (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price if any." (Emphasis added).  Accordingly, even if documents related to an award of options are dated as of an earlier date or otherwise manipulated to reflect an earlier date -- i.e., even if the options are backdated -- the "measurement date" as a matter of GAAP cannot and does not occur until the date that the terms of the options award, including both the number of options awarded and the options' exercise price, are actually known and determined.

_____

employees, management and/or directors who receive "at the money" option grants with the interests of the company's shareholders, in that the options can only be exercised for a profit if the company's stock price rises.

46.     At all relevant times, SafeNet falsely represented in its public filings with the SEC that it followed APB No. 25 when accounting for its stock option grants.

**B.     SafeNet's Practices with Respect to the Issuance of and Accounting For Stock Option Grants**

47.     At all relevant times, SafeNet purported to grant its options pursuant to various stock option plans (the "Stock Option Plans") that were ratified by the Company's board and approved by its shareholders.   The relevant Plans stated that the purpose of SafeNet's stock option program was "to promote the long-term growth and profitability of SafeNet . . . by (i) providing key people with incentives to improve stockholder value and to contribute to the growth and financial success of the Corporation, and (ii) enabling the Corporation to attract, retain and reward the best available persons for positions of substantial responsibility."   In public proxy filings with the SEC, SafeNet further stated that "[g]rants of stock options are designed to align the executive's interests with that of the stockholders of the Company,"   and that:

> ***No gain to the options [granted under the Plans] is possible without stock price appreciation, which will benefit all shareholders.***   If the stock price does not increase above the exercise price, compensation to the named executive will be zero.

SafeNet's Def. Proxy Statement, filed with the SEC on July 6, 2005, p. 10 (emphasis added); *see also* Def. Proxy Statement, filed July 28, 2006, Def. Proxy Statement, filed April 29, 2004; Def. Proxy Statement, filed April 30, 2003.

48.     SafeNet's Stock Option Plans were administered by SafeNet's Compensation Committee, consisting of the Compensation Committee Defendants, which had the ultimate authority to grant option awards.   The relevant Plans provided that the exercise price on an option grant "shall be determined by the Committee, but in no event shall be less than 100% of the fair market value of [SafeNet's] Common Stock on the Grant Date."   If SafeNet complied with the terms of its own Plans, then no stock options could be granted, including those to the

Officer Defendants and Director Defendants, without oversight and approval by the Compensation Committee.

49.     At all relevant times, the Compensation Committee approved option grants primarily through Unanimous Written Consents ("UWCs") signed by Committee members. Although the Compensation Committee had the authority to administer SafeNet's stock option programs under the relevant stock option plans, the Officer Defendants generally initiated and oversaw the option grant process as to Company officers and employees, provided the names of option recipients and the number of options granted, selected the purported "grant dates" (and thus the exercise prices), and facilitated the approval process for option grants by, among other things, obtaining the consent of the Compensation Committee Defendants for the option grants.

50.     SafeNet's and the Officer Defendants' statements regarding the Company's option granting policies and practices were important because investors and regulators view executive compensation as particularly material.  Consequently, SEC and accounting rules prescribe detailed and specific public disclosure of the compensation provided to corporate directors and executives.

51.     Applicable tax rules and regulations also contribute to the significance of accurate reporting of stock option grants and proper accounting of their effects on financial statements. U.S. tax rules treat option grants as either "qualified" or "nonqualified," with different tax ramifications for each.  The backdating of an option affects key tax determinations, including whether the option was granted at fair value, and whether the option was granted pursuant to a stock option plan validly authorized by shareholders.  Consequently, the secret backdating of options can have serious tax consequences for public companies.

52.     As further detailed below, defendants failed to properly disclose the manner in which SafeNet actually implemented its Stock Option Plan, failed to disclose that SafeNet granted stock options through various improper means and in violation of its Plan, and failed to disclose that in connection with its options grants the Company failed to recognize appropriate charges for compensation expense, and as a result issued materially false and misleading financial statements in violation of GAAP.

C.     **Summary of Defendants' Wrongful Conduct and False Reporting For Stock Option Grants, Including Defendant Argo's Recent Guilty Plea to Felony Securities Fraud Charges Under §10(b) In Connection with SafeNet's Options Misconduct**

53.     "Backdating" an option grant refers generally to setting an option's exercise date to a date that is both (a) earlier than the date on which the option was actually granted (the "measurement date" under APB 25) and (b) a date when the market price of the underlying stock was lower than the "measurement date" on which the option was actually granted.  Where, as in the case of SafeNet, the paperwork accompanying option grants is backdated so that it appears that the terms of the option were set and the options were issued earlier than they actually were, the backdating of the paperwork further facilitates a Company's ability to conceal the true nature of its stock option grants from others, such as the company's auditors.  Indeed, the backdating of such paperwork effectively serves no purpose other than to create a phony paper trail intended to fraudulently dress up and disguise "in the money" options as if they were *bona fide* "at the money" options granted at an earlier date that did not need to be expensed.

54.     As discussed above, the policy and financial incentives for SafeNet and its stock option recipients to engage in improper backdating are substantial because, assuming that the value of underlying stock has risen over time, it is obviously much more valuable for a recipient to receive "in the money" options that have been backdated with a low exercise price from an

earlier date than it is to receive "at the money" options that have a much higher exercise price. Moreover, at SafeNet each of the Officer Defendants also had substantial financial incentives to avoid properly accounting for backdated "in the money" options because, *inter alia,* (a) adverse investor reaction to disclosure that the company was issuing "in the money" grants, which would need to be expensed and would have reduced earnings, would have likely terminated the practice of issuing such options; and (b) given that the Officer Defendants' overall compensation was largely based on SafeNet's financial performance, properly accounting for SafeNet's options grants would have reduced SafeNet's reported earnings and, therefore, the Officer Defendants' performance based compensation.  If undetected, issuance of backdated "in the money" options also serves the interests of the issuing company (in the present case, SafeNet) in attracting and retaining employees while reporting artificially low compensation expense.

55.    A recurring pattern of incredibly well-timed stock option grants strongly supports the conclusion that the issuing corporation and the executives involved in the process or receiving those grants deliberately manipulated the process in order to attract and retain employees and to enrich themselves at the expense of the investing public.  As shown in section C.2 below, SafeNet's history of option grants to executives was so consistently suspicious, and so consistently provided its options recipients with abnormal and outsize favorable economic returns, that the only statistically reasonable conclusion is that Defendants improperly backdated option grants, and then failed to properly disclose the fact of those grants and their economic implications in SafeNet's public statements.[2]

---

[2]   Many companies issue stock options at the same time each year.  Such a practice greatly reduces and perhaps eliminates the potential for backdating.  As illustrated below, however, SafeNet's stock option grants during the relevant period did not follow any discernable regularity.  Rather, the timing of the options grants was purposefully set to coincide with low points in the Company's stock price

56.     Here, however, as detailed below, SafeNet has ***admitted*** that its stock option grants during the Class Period were improperly accounted for using incorrect measurement dates and that millions of dollars worth of non-cash, stock-based compensation expenses related to these option grants will have to be recorded.

### 1.     <u>Defendant Argo's Guilty Plea</u>

57.     Indeed, in the wake of recent criminal proceedings brought by the United States Attorney in the Southern District of New York, there can no longer be any serious dispute that SafeNet's backdating practices and related false accounting were the product of deliberate fraud on the part of SafeNet's senior managements, or that the Compensation Committee Defendants were at least recklessly indifferent to the Officer Defendants' backdating manipulations.

58.     For example, as Defendant Argo testified when allocuting before Judge Rakoff in admitting to her guilt on the government's felony securities fraud charges under §10(b):

> In mid-2000 I became responsible for overseeing SafeNet's process for granting and documenting stock options.  Sometime in December 2001 or early January 2002, SafeNet's compensation committee approved a grant of stock options to me and two other individuals, one of whom was the Company's CEO [defendant Caputo].  ***The CEO [defendant Caputo] asked me to report October 1, 2001, as the date on which his options had been approved.  SafeNet's stock price on October 1, 2001 was its lowest stock price in the quarter***.  I agreed to document the CEO's options as if they had been granted on October 1, 2001.  I did so, ***and the compensation committee approved this treatment***, even though I and others knew that the compensation committee had not granted the options on that date.  I similarly documented the options granted to me and the other individual as if they had been granted on October 1, 2001, even though I knew this was untrue.

> By using October 1 as the grant date, SafeNet avoided reporting any compensation expense.  I knew that if we had used the correct grant date with the October 1 exercise price, SafeNet would have been required to record the difference between the exercise price and the higher stock price on the actual grant date as a compensation expense in its financial statements.  As a result of

using October 1, 2001 as the grant date, SafeNet's public filings included inaccurate compensation expense information.… In causing these filings to be inaccurate, I acted willfully and with intent to defraud.

***In the following years, with respect to certain [additional option grants], I and others at SafeNet selected with hindsight grant dates with a low price from within the period when the grant was under consideration.*** As to these grants, the Company did not record a compensation expense. This was wrong, and as a result of my conduct the company's public filings were inaccurate in this respect....

*United States v. Argo,* 07 CR 683 (JSR) (S.D.N.Y.), Transcript of Plea Allocution

Proceedings, dated October 5, 2007 (emphasis added).

59.     Moreover, throughout the Class Period Defendants failed to timely disclose their

individual option grants. Specifically, in accordance with Section 403(a) of the Sarbanes-Oxley

Act of 2002, 15 U.S.C. §78p(c), Defendants were required to disclose option grants within two

days of any such grant by filing a Form 4 statement with the SEC. Although Defendants filed

hundreds of Form 4s during the Class Period, they failed to disclose on Form 4 the

overwhelming majority of the option grants at issue in this case. Shedding additional light on the

improprieties that underlie the SEC's and Department of Justice's investigations, in SafeNet's

Form 14A proxy statement, filed with the SEC on July 3, 2006, Defendants belatedly disclosed

their violations of Sarbanes-Oxley as follows:

As first reported in the Company's Form 10-K/A filed with the Securities and Exchange Commission on April 11, 2006, with respect to the fiscal year ended December 31, 2005, Messrs. Brooks, Harrison and Lesem and Ms. Argo each failed to file two Forms 4 during the year to report two separate grants of stock options, and Messrs. Clark, Hunt, Money, Straub, Thaw, Caputo, Mueller (a former executive officer of the Company) and Fedde each failed to file one Form 4 during the year to report one grant of stock options;

With respect to the fiscal year ended December 31, 2004, Mr. Harrison failed to file two Forms 4 during the year to report

two separate grants of stock options, and Messrs. Brooks, Clark, Hunt, Money, Straub, Thaw, Caputo, Fedde and Mueller and Ms. Argo each failed to file one Form 4 during the year to report one grant of stock options;

With respect to the fiscal year ended December 31, 2003, Messrs. Brooks, Clark, Harrison, Hunt, Thaw, Fedde and Ms. Argo each failed to file two Forms 4 during the year to report two separate grants of stock options, and Messrs. Caputo, Money and Straub each failed to file one Form 4 during the year to report one grant of stock options; and

With respect to the fiscal year ended December 31, 2002, Mr. Caputo failed to file one Form 4 to report one grant of stock options.

60.     By not informing the market of option grants within two days of the purported grant dates, Defendants helped prevent investors from learning when options were actually granted and thereby facilitated their efforts to engage in wrongful options backdating and related fraudulent accounting.

### 2. Summary of SafeNet's Improperly Granted and Improperly Accounted For Stock Option Grants

61.     SafeNet's stock option grants to executives and directors that had an impact on SafeNet's financial results during the Class Period, either through immediate or yearly vesting, include at least the following that are detailed below:

62.     **1999 Option Grants:**  The following chart shows the amounts and exercise prices of some of SafeNet's stock option grants to officers and employees during fiscal year 1999.

| Executive Name | Title | # Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal 1999 | Exercise Price Per Share | Grant Date |
|---|---|---|---|---|---|
| Carole D. Argo | SVP CFO | 30,000 | -- | 17.50 | 7/30/1999 |
| John F. Hembrough | SVP world wide sales | 50,000 | 16.2 | 9.25 | 1/6/1999 |

63.     The following graph illustrates the auspicious timing of some of the grants listed above:



64.    SafeNet's July 30, 1999 grant of 30,000 options to defendant Argo was backdated, as evidenced by the fact that they were "issued" on a date when SafeNet shares were trading at a conspicuously low point (after which the Company's stock price increased markedly).  From a closing price of $17.50 on the supposed date of the grant, the stock price increased to $23.06 on August 9, 1999, little more than a week after (and to $26.00 on August 25, 1999, approximately a month after) the supposed grant.

65.    **2000 Option Grants:**  The following chart shows the amounts and exercise prices of some of SafeNet's stock option grants to officers and employees during fiscal year 2000.

| Executive Name | Title | # Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal 2000 | Exercise Price Per Share | Grant Date |
|---|---|---|---|---|---|
| Anthony A. Caputo | CEO | 50,000 | 6.7 | 14.75 | 5/31/2000 |
| | | 30,000 | 4.0 | 24.125 | 10/11/2000 |
| Sean R. Price | SVP world sales | 1,750 | 0.2 | 20.50 | 1/1/2000 |
| | | 31,583 | 4.2 | 14.750 | 5/31/2000 |
| | | 20,000 | 2.7 | 24.125 | 10/11/2000 |
| William F. Geritz | SVP business develop | 80,000 | -- | 24.125 | 10/11/2000 |
| Carole D. Argo | SVP CFO | 8,500 | 1.1 | 20.50 | 1/1/2000 |
| | | 11,500 | 1.5 | 14.750 | 5/31/2000 |
| | | 13,000 | 1.7 | 24.125 | 10/11/2000 |
| Peter Reed | VP semiconductor | 5,000 | -- | 24.125 | 10/11/2000 |

-28-

| Executive Name | Title | # Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal 2000 | Exercise Price Per Share | Grant Date |
|---|---|---|---|---|---|
| | develop | | | | |
| Michael M. Kaplan | SVP CTO | 10,000 | 1.3 | 20.50 | 1/1/2000 |
| | | 50,000 | 6.7 | 14.75 | 5/31/2000 |

66.    The following graph illustrates the auspicious timing of some of the grants listed above:



67.    SafeNet's October 11, 2000 grants of at least 148,000 options to defendants Argo and Caputo, among others, were backdated, as evidenced by the fact that they were "issued" on a date when SafeNet shares were trading at a conspicuously low point (after which the Company's stock price increased markedly) -- indeed, the lowest closing price for the third quarter of 2000. From a closing price of $24.125 on the supposed date of the grants, SafeNet's stock price increased to $39.50 on October 19, 2000, little more than a week after (and to $53.00 on November 3, 2000, less than a month after) the supposed grants.

68.    **2001 Option Grants:** The following chart shows the amounts and exercise prices of some of SafeNet's stock option grants to officers and employees during fiscal year 2001.

| Executive Name | Title | # Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal 2001 | Exercise Price Per Share | Grant Date |
|---|---|---|---|---|---|
| Anthony A. Caputo | CEO | 25,000 | 3.0 | 8.531 | 4/03/2001 |
| | | 36,600 | 4.4 | 11.75 | 5/16/2001 |
| | | 150,000 | 18.2 | 5.85 | 10/01/2001 |
| Sean R. Price | SVP world sales | 22,000 | 2.7 | 11.75 | 5/16/2001 |
| William F. Geritz | SVP business develop | 22,000 | 2.7 | 11.75 | 5/16/2001 |
| Carole D. Argo | SVP CFO | 45,000 | 5.5 | 5.85 | 10/01/2001 |
| | | 17,000 | 2.1 | 11.75 | 5/16/2001 |
| Michael M. Kaplan | SVP CTO | 12,100 | 1.5 | 11.75 | 5/16/2001 |
| Chris Fedde | SVP enterprise security | 25,000 | -- | 8.531 | 4/03/2001 |
| Peter Reed | VP semiconductor develop | 5,000 | -- | 33.625 | 1/08/2001 |

69.    The following graphs illustrate the auspicious timing of some of the grants listed above:



70.    SafeNet's January 8, 2001 grant of at least 5,000 options to Vice President Peter Reed now appears to have been backdated, as the Company's stock price tumbled steadily before the grant and increased within days thereafter.  On January 1, 2001, SafeNet's stock price closed at $47.00, but on the purported grant date it closed well below that at $33.62.  The very next day,

the stock price rose to close at $34.00, then continued to rise steadily, without dropping, to hit a close of $47.00 just a little more than two weeks later.



71.     Both the SEC civil complaint and Argo's criminal indictment charged defendant Argo with securities fraud based on April 3, 2001 grants.  As set forth in these documents, the 25,000 options granted to defendant Caputo had been approved by the Compensation Committee on January 19, 2001 and ratified by the board of directors on January 22, 2001, but were "pocketed" until mid-April 2001 as SafeNet's share price dropped from over $46 to $8.53.  In mid-April, Argo and others re-priced the options as of April 3, 2001 so Caputo could receive a beneficial exercise price.  At that time in mid-April, at Argo's direction, a UWC for Caputo's grant was prepared and sent to the Compensation Committee, again, with a date of April 3, 2001. Both Argo and the Compensation Committee knew that the grant had been approved in January,

not April.  Defendant Caputo knew that his option package had been approved earlier in 2001, and therefore knew that his options should not have been dated with an exercise price as of April 3, 2001.



72.     SafeNet's May 16, 2001 grants of at least 109,700 options to Defendants Caputo, Argo and other SafeNet executives were backdated, as evidenced by the fact that they were issued on a date when SafeNet shares were trading at a conspicuously low point just after the Company's stock price tumbled dramatically, and just before it increased sharply.  SafeNet's stock closed at $16.20 on May 1, 2001 two weeks before the alleged grant date on May 16 -- the only day that month on which SafeNet shares closed below $12 (at $11.75).  In the days following the grants, SafeNet's stock price increased by more than 25%.



73.     Both the SEC civil complaint and Argo's criminal indictment also charged defendant Argo with securities fraud based on the October 1, 2001 grants.  During the allocution of her guilty plea, Argo admitted the following about the October 1 grants:

> In mid-2000 I became responsible for overseeing SafeNet's process for granting and documenting stock options.  Sometime in December 2001 or early January 2002, SafeNet's compensation committee approved a grant of stock options to me and two other individuals, one of whom was the company's CEO.  ***The CEO asked me to report October 1, 2001, as the date on which his options had been approved***.  SafeNet's stock price on October 1, 2001 was its lowest stock price in the quarter.  ***I agreed to document the CEO's options as if they have been granted on October 1, 2001.  I did so, and the compensation committee approved this treatment, even though I and others knew that the compensation committee had not granted the options on the date.  I similarly documented the options granted to me and the other individual as if they had been granted on October 1, 2001, even though I knew this was untrue***.
>
>          By using October 1 as the grant date, SafeNet avoided reporting any compensation expense.  I knew that if we had used the correct grant date with the October 1 exercise price, SafeNet would have been required to record the difference between the exercise price and the higher stock price on the actual grant date as

a compensation expense in its financial statements.  As a result of using October 1, 2001 as the grant date, SafeNet's public filings included inaccurate compensation expense information.   These filings included the 2002 10-K/A which I signed and certified as accurate, and which was filed with the SEC on April 29, 2003.  These filings were sent to investors around the country, including the Southern District of New York.  ***In causing these filings to be inaccurate, I acted willfully and with intent to defraud***.

74.     On December 30, 2006, SafeNet re-priced (to a higher level) the April 3 and October 1 options that had been issued to defendants Argo and Caputo, thereby effectively conceding that these options had been improperly backdated.

75.     **2002 Option Grants:**  The following chart shows the amounts and exercise prices of some of SafeNet's stock option grants to officers and employees during fiscal year 2002.

| Executive Name | Title | # Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal 2002 | Exercise Price Per Share | Grant Date |
|---|---|---|---|---|---|
| Anthony A. Caputo | CEO | 100,000 | 19.60 | 13.75 | 10/8/2002 |
| Sean R. Price | SVP world sales | 20,000 | 3.90 | 11.47 | 2/11/2002 |
| Chris Fedde | SVP enterprise security | 15,000 | 2.90 | 11.47 | 2/11/2002 |
| Cees Jan Koomen | SVP embed security | 25,000 | 4.90 | 13.46 | 4/10/2002 |
| | | 37,500 | 7.30 | 13.46 | 4/10/2002 |
| | | 37,500 | 7.30 | 13.75 | 10/8/2002 |

76.     The following graph, which marks the date of subsequently disclosed option grants against SafeNet's closing share prices, combined with Defendants' recent disclosures, illustrates that SafeNet's 2002 stock option grants were backdated.



77.     Based on Defendants' recent disclosures and the "fortuitous" timing of the purported grant date, SafeNet's February 11, 2002 grant of 20,000 options to Mr. Price and 15,000 to Senior Vice President Chris Fedde were clearly backdated, as the Company's stock price increased markedly in the days that followed, from a closing price of $11.47 on the supposed date of the grant to $14.48 on February 13, 2002, a mere two days after the supposed grant. SafeNet shares continued to trade higher over the next three months. SafeNet's grants to Senior Vice President Cees Jan Koomen on April 10, 2002 were similarly backdated, as evidenced by the fact that SafeNet's stock price increased from the $13.46 closing price on the supposed grant date to a closing price of $16.00 a mere seven days later, on April 17, 2002. Similarly, SafeNet's October 8, 2002 grant of 100,000 options to defendant Caputo and 37,500 options to Jan Koomen at an exercise price of $13.75 was backdated, as evidenced by the fact that the Company's stock price (having fallen in the two months preceding the grant) rose nearly 30% the 10 trading day immediately following the grant, reaching a high of $29.00 on November 29, 2002.

78.     Both the SEC civil complaint and Argo's criminal indictment, which she pled guilty to, also charged defendant Argo with securities fraud based on the October 8, 2002 grant. This grant was not actually approved by the Compensation Committee until on or about October 24, 2002.  The Compensation Committee knew that it implemented the October 8 grant, at a strike price of $13.75, by executing a UWC weeks later on October 24, 2002, when SafeNet's stock was trading at $18.75.

79.     The 2002 option grants further illustrate the extraordinarily suspicious pattern of SafeNet executives purportedly receiving options immediately in advance of upswings in SafeNet's stock price, and never receiving options in advance of serious declines, notwithstanding SafeNet's volatile stock price movements throughout the Class Period.

80.     **2003 Option Grants:**  The following chart shows the amounts and exercise prices of some of SafeNet's stock option grants to executives and directors during fiscal year 2003.

| Executive Name | Title | # Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal 2003 | Exercise Price Per Share | Grant Date |
|---|---|---|---|---|---|
| Anthony A. Caputo | CEO | 100,000 | 10.8 | $16.47 | 2/27/2003 |
| Carole D. Argo | SVP CFO | 40,000 | 4.30 | 16.47 | 2/27/2003 |
|  |  | 10,000 | 1.10 | 31.35 | 7/17/2003 |
| Sean R. Price | SVP world sales | 10,000 | 1.10 | 16.47 | 2/27/2003 |
|  |  | 10,000 | 1.10 | 31.35 | 7/17/2003 |
| Chris Fedde | SVP enterprise security | 30,000 | 3.2 | 16.47 | 2/27/2003 |
|  |  | 30,000 | 3.2 | 31.35 | 7/17/2003 |
| David Potts | SVP embed security | 100,000 | 10.8 | 20.97 | 4/14/2003 |
| Shelley Anderson | Director | 10,000 | -- | 16.47 | 2/27/2003 |
| Thomas A. Brooks | Director | 10,000 | -- | 16.47 | 2/27/2003 |
| Andrew E. Clark | Director | 10,000 | -- | 16.47 | 2/27/2003 |
| Shelley Harrison | Director | 10,000 | -- | 16.47 | 2/27/2003 |
|  |  | 50,000 | -- | 23.84 | 5/1/2003 |
|  |  | 10,000 | -- | 29.00 | 6/18/2003 |
| Ira Hunt | Director | 10,000 | -- | 16.47 | 2/27/2003 |
| Bruce R. Thaw | Director | 10,000 | -- | 16.47 | 2/27/2003 |

81.     The following graph, combined with Defendants' recent disclosures, illustrates that at least two of SafeNet's 2003 stock option grants were backdated.



82.   SafeNet's February 27, 2003 grant of 100,000 options to defendant Caputo and an additional 80,000 options among Senior Vice President Sean Price, Senior Vice President Fedde and defendants Argo were backdated. These options were priced at ***the lowest closing price for SafeNet's stock in all of 2003***. The Company's stock price rose significantly over the following few weeks. Further, the timing of the option grants bears no apparent relation to the timing of grants in prior years.

83.   Both the SEC civil complaint and Argo's criminal indictment, which she pled guilty to, also charged defendant Argo with securities fraud based on the February 27, 2003 grants. These grants were backdated after Argo pocketed a proposed compensation package for executive officers proposed by Caputo and approved by the Compensation Committee in January 2003, and cherry-picked a strike price based on the quarterly low on February 27, 2003 of $16.47. The Compensation Committee and defendant Caputo knew that the grants were not approved on February 27, 2003.

84.     Defendant Argo was also prosecuted by the SEC and United States Attorney for backdating the July 17, 2003 grants, which has an exercise price of $31.35. Specifically, on or about September 15, 2003, Argo e-mailed the Compensation Committee seeking approval for various grants and faxed a UWC to the committee backdated to July 17, 2003.  However, the UWC for the July 17, 2003 grants was not executed by the Compensation Committee until on or about September 16, 2003 when the closing price of SafeNet's stock had risen nearly 25% since July, to $38.85.

85.     On December 30, 2006, SafeNet increased the prices of the February 27 and July 17, 2001 options that had been issued to defendants Argo and Caputo; thereby effectively conceding that these options had been improperly backdated.

86.     **2004 Option Grants:**  The following chart shows the amounts and exercise prices of some of SafeNet's stock option grants during fiscal year 2004.

| Executive Name | Title | # Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal 2004 | Exercise Price Per Share | Grant Date |
|---|---|---|---|---|---|
| Anthony A. Caputo | CEO | 100,000 | 10.60 | 21.7 | 5/19/2004 |
| Carole D. Argo | President COO | 100,000 | 10.60 | 21.7 | 5/19/2004 |
| Kenneth A. Mueller | SVP CFO | 100,000 | 10.60 | 22.19 | 7/28/2004 |
| Chris Fedde | SVP enterprise security | 25,000 | 2.60 | 21.7 | 5/19/2004 |
| David Potts | SVP embed security | 10,000 | 1.10 | 21.7 | 5/19/2004 |
| Shelley A. Harrison | Director, Consultant | 50,000 | 1.95 | 21.7 | 5/19/2004 |
| | | 20,000 | -- | 24.35 | 6/3/2004 |

87.     The following graph, combined with Defendants' recent disclosures, illustrates that SafeNet's 2004 stock option grants were backdated.



88.    SafeNet's May 19, 2004 grants of 235,000 options, including 100,000 to defendant Caputo, 100,000 to defendant Argo, 25,000 to Fedde and an additional 10,000 to Senior Vice President David Potts, were all backdated.  These options were priced **_near the lowest closing price for SafeNet's stock in all of 2004_**, and SafeNet's stock price rose significantly in the weeks and months following these grants.  SafeNet's July 28, 2004 grant of 100,000 options to defendant Mueller was also backdated.  The options were "granted" at the low point for SafeNet stock for the third quarter of 2004, and immediately prior to SafeNet's second quarter 2004 earnings release, which was very favorable and which drove SafeNet's stock price up 26% from the July 28 closing price of $22.19 (which was the exercise price for Mueller's options) to a July 29 closing price of $27.96 just one day later.

89.    Argo was also criminally charged with securities fraud arising from the July 28, 2004 grant.  As alleged in the Indictment, in a September 15, 2004 e-mail to defendant Mueller, Argo instructed Mueller to backdate the options he received upon his hiring to the low price for the quarter, July 28, 2004.  The e-mail explained:

> *Our past practice has been to aggregate options for performance awards or new hires in the quarter and pick the best price after the hire date.*  We then send the unanimous consent to the comp committee and the options are approved.  I think this is a good practice because of the volatility of our stock price.  Who wants to have an option priced on your start date and then have the option underwater a month later when you are notified of the award price. (Emphasis added.)

The Compensation Committee subsequently approved the July grant by signing a UWC backdated to July 28, 2004.  The final committee member did not sign and return the UWC until on or about October 9, 2004, when SafeNet's stock price had risen to $28.45.

90.    As alleged in the Indictment, defendant Argo also backdated a large number of options to various employees in the third and fourth quarters of 2004, using mostly a date of September 27, 2004, when the stock was trading at $25.16.  The Compensation Committee did not approve these grants until about February 2005, by which time SafeNet's stock price had increased to more than 25% to $31.52.  However, these improperly backdated grants were discovered by SafeNet's outside auditors.  The auditors directed Argo and SafeNet to record and report a compensation charge for these grants.  Neither the Officer Defendants nor the Compensation Committee Defendants alerted the auditors to SafeNet's numerous prior backdated grants.

91.    On December 30, 2006, SafeNet increased the exercise prices of the May 19 and July 28 2004 options that had been issued to defendants Argo, Caputo and Mueller, thereby effectively conceding that the options had been improperly backdated.

92.    **2005 Option Grants:**  The following chart shows the amounts and exercise prices of some of SafeNet's stock option grants during fiscal year 2005.

| Executive Name | Title | # Securities Underlying Options Granted | % of Total Options Granted to Employees in Fiscal 2005 | Exercise Price Per Share | Grant Date |
|---|---|---|---|---|---|
| Anthony A. Caputo | CEO | 100,000 | 7.90 | 29.7 | 9/29/2005 |
| Carole D. Argo | President COO | 50,000 | 3.90 | 29.7 | 9/29/2005 |
| | | 50,000 | -- | 31.78 | 6/1/2005 |
| Kenneth A. Mueller | SVP CFO | 50,000 | 3.90 | 29.7 | 9/29/2005 |
| Chris Fedde | SVP enterprise security | 25,000 | 1.95 | 29.7 | 9/29/2005 |
| Steve Lesem | SVP worldwide sales | 100,000 | 7.90 | 31.78 | 6/1/2005 |
| | | 15,000 | 1.20 | 29.7 | 9/29/2005 |
| Shelley A. Harrison | Director, Consultant | 25,000 | 3.90 | 29.7 | 9/29/2005 |
| | | 20,000 | -- | 34.30 | 8/1/2005 |

93.    The following graph illustrates SafeNet's 2005 backdated stock option grants.



94.    SafeNet's June 1, 2005 grant of 150,000 options to defendant Argo and Senior Vice President Steve Lessem now appears to have been backdated, as the Company's stock price increased from a close of $31.78 on the date of the grant to $34.06 by the end of the month. SafeNet's backdating of grants of options to September 29, 2005 was even more egregious for the following reasons:  On September 29, 2005, SafeNet announced a $150 million contract with the Department of Defense to deliver its new KIV-7M link encryptor (the "KIV-7M Contract").

-41-

During the public conference call disclosing this new contract (the "September 29 Call"), defendants Caputo and Mueller touted the benefits of the KIV-7M Contract.  Mr. Caputo stated as follows:

> *Today we have announced that SafeNet has been awarded a $150 million indefinite delivery, indefinite quantity contract by the U.S. Government's Department of Defense for our new KIV-7M top-secret grade Encryptor.*  We're also enthusiastically announcing that we have received the first delivery order against this contract.  *The delivery order valued at about $18 million is now in our backlog….  And based on this firm backlog and a generally positive view across our business, we are today reaffirming our full year guidance for 2005*.
>
> … [W]e're thrilled to be able to announce this contract.  And we want to share its significance with you….  *[I]t's obviously the largest contract in our Company history.  And it's three times larger than we were comfortable in talking about in terms of our expectations*….  We're also excited about the fact that this first order, and we do believe it's the first of what will be several of these orders.  This order at $150 million represents approximately ½ of our six-year forecast for the Link Encryptor version of this product.
>
> ….  And then finally, one other thing that I would like to tell you about, though we cannot be specific with numbers here, although this contract was very, very large, as I mentioned, three times our expectation.  *The unit pricing and hence the margins on this product are much better that previous KIV-7M products.  And as a result, we can look forward to improving margins as we go forward.* (Emphases added).

95.     In reaction to SafeNet's disclosure of the KIV-7M Contract, the market sent SafeNet stock soaring 22%, from $29.70 per share on September 29, 2005 to $36.31 per share by September 30, 2005, on volume of 5,010,800 shares traded, which was more than 13 times the average daily volume during the period from July 1, 2005 through September 29, 2005.

96.     On December 30, 2006, SafeNet increased the prices of the June 1 and September 29, 2005 options that had been issued to defendants Argo, Mueller and Caputo, thereby effectively conceding that these options had been improperly back-dated.

### 3. SafeNet's Misrepresentations Concerning Its Stock Options Grants and Related Accounting

97.     As further detailed below in the section entitled "Class Period False and Misleading Statements" (Section VI, ¶¶ 137 to 211), and in Counts I, V and VI, because SafeNet failed to recognize compensation expenses during the Class Period on the issuance of tens of millions of dollars worth of stock options that were backdated, numerous SafeNet statements made during the Class Period were materially false or misleading, including all of the following: (1) SafeNet's Proxy Statements for the years 2003 through 2005; (2) the Rainbow Registration Statement and Rainbow Proxy/Prospectus, and (3) SafeNet's Form 10-Ks and Form 10-Qs throughout the Class Period.  These documents materially misrepresented the truth or otherwise materially misled investors by representing, *inter alia*, that:

(a)     SafeNet granted its options at prices that were not less than the fair market value on the date of the grant, when in fact they were routinely granted at prices well below the market price on the dates of the grants;

(b)     SafeNet was required under GAAP, including APB No. 25, to recognize any difference in value between the option price and the price of SafeNet stock on the grant date as an expense, when in fact SafeNet failed to do so;

(c)     the ability of option recipients to exercise their options at a profit was dependant on the Company's future successful performance and that stock options were granted in a manner that aligned executives' interests with those of SafeNet's shareholders, when in fact SafeNet executives were being granted "in the money" stock options that included built-in profits and benefits that investors could never enjoy, and that came at the detriment of the Company and the investing public;

(d)      that the Company's internal financial, accounting and disclosure controls were adequately designed and functioning so as to prevent fraud or manipulation, when this was not the case;

(e)      that SafeNet's financial reports and statements fairly presented its financial condition and results in accordance with GAAP, when this was not the case; and

(f)      that SafeNet's stock option plans had been voted for and adopted by its Board and its shareholders, and that therefore the shares issued by the Company to cover options grants were validly issued and would not dilute existing stockholders' ownership stake in SafeNet, when in fact SafeNet options practices routinely violated the terms of SafeNet's stock option plans and excessively diluted existing stockholder equity by allowing option recipients to garner the unearned benefits of options that were "in the money" when issued (whereas in contract, issuance of "at the money" options would have a materially less dilutive effect on other shareholders)

98.      In addition, by not recording appropriate compensation expense on backdated stock option grants, SafeNet's class period financial and other statements also failed to disclose that SafeNet was exposing itself to significant liabilities for unpaid income tax, interest and penalties, as well as the significant cost, expense and collateral damage (in the form of lost goodwill, restatement and investigation costs, and significantly impaired investor confidence) from a massive restatement, internal investigation and multiple government investigations.

99.      The following table shows an estimate of the highly material impact that properly recording compensation expenses would have had on two key metrics of financial results that SafeNet reported during the Class Period based on information produced in defendant Argo's criminal proceedings:

| Operating Income | | | |
|---|---|---|---|
| Year | Reported Operating Income (Loss) (In thousands) | Actual Operating Income (Loss) With Compensation Expenses (in thousands) | Percentage Income Overstated (or Loss Understated |
| 2002 | ($1,544) | ($3,772) | 144% |
| 2003 | ($5,277) | ($8,686) | 65% |
| 2004 | $1,077 | ($1,599) | 248% |
| 2005 | $146 | ($3,020) | 2,168% |

| Net Income | | | |
|---|---|---|---|
| Year | Reported Net Income (Loss) (in thousands) | Actual Net Income (Loss) With Compensation Expenses (in thousands) | Percentage Income Overstated (or Loss Understated |
| 2002 | ($785) | ($2,790) | 355% |
| 2003 | ($6,088) | ($8,263) | 36% |
| 2004 | $2,183 | $631 | 71% |
| 2005 | $3,028 | $1,432 | 53% |

## V.  SAFENET'S WRONGFUL CONDUCT WITH RESPECT TO REPORTING FRAUDULENTLY INFLATED REVENUE (AND FRAUDULENTLY UNDERSTATED EXPENSES) IN CONNECTION WITH THE SALE OF SAFENET'S GOODS AND SERVICES

### A.  Background Regarding SafeNet's Scheme to Inflate Revenue and Manipulate Earnings

100.    In addition to engaging in the improper conduct relating to options backdating discussed above, throughout the Class Period SafeNet and the Officer Defendants also engaged in pervasive improper revenue recognition activities and earnings manipulations to enable the Company to meet Wall Street analysts' expectations.  SafeNet and the Officer Defendants knew or recklessly disregarded that this fraudulent conduct during the Class Period violated GAAP and caused SafeNet's Class Period financial statements to further materially overstate the Company's true revenue and earnings.

101.     SafeNet regularly had trouble meeting earnings expectations during the Class Period.   For example, according to a senior SafeNet technology executive during the Class Period, Confidential Witness No. 1 ("CW 1"), CW 1's division was "not keeping up with its numbers' (*i.e.*, not making its numbers), with the result that during the last two weeks of each quarter SafeNet was "always running around trying to get its revenue to look good for the quarter."   Similarly, according to a former senior SafeNet accounting executive, Confidential Witness No. 2 ("CW 2"), who reported directly to defendant Mueller during the Class Period, there was ***exceptional*** pressure during the Class Period to try close deals and boost revenue -- ***a situation that the witness attributed to defendants Caputo, Argo and Mueller being "in denial" over the erosion in SafeNet's business***.   Similarly, according to Confidential Witness No. 3 ("CW 3"), a former lead cost control and program analyst at SafeNet's Mykotronx division (which handled many of SafeNet's largest long-term contracts), SafeNet was "always understating their budgets and not coming in on budget."   And Confidential Witness No. 4 ("CW 4"), another former senior SafeNet manager who was responsible for trying to ensure that SafeNet's inventory matched up with projected orders every quarter, noted that the pressure to try to meet the quarterly numbers that SafeNet provided to Wall Street during the Class Period was such that at the end of its fiscal quarters the Company would resort to shipping out (and recognizing revenue on) "whatever [product] was not bolted down."

102.     To facilitate reporting artificially inflated earnings and the improper recognition of revenue to meet Wall Street expectations, however, throughout the Class Period the Officer Defendants – Caputo, Argo and Mueller –   caused SafeNet to engage in various accounting manipulations, and established a "tone at the top" that was intolerant of those that questioned their conduct.   For example, according to CW 2, quarter-ends at SafeNet "were unlike anything

[that CW 2] had ever seen," and CW 2 would be told by defendant Mueller to "go back and find new numbers" when the earnings that CW 2 presented were not in-line with expectations; CW 2 would thereafter present multiple "iterations" of "new numbers" until Mueller would "intervene … to get the numbers where they [Mueller, Caputo and Argo] wanted." CW 2 also noted that SafeNet's revenue recognition policies were either non-existent or left purposefully ambiguous and vague to allow Argo and other senior officers to invent revenue justifications on an *ad hoc* basis. CW 2 further explained that these senior Officer Defendants were under pressure because they "made unreasonable promises to the Street [i.e., Wall Street]." Soon after CW 2 was hired in the second half of 2004, CW 2 stated that CW 2 was prevented from "digging in my heels" on SafeNet's numbers and accounting procedures because defendant Mueller cut this witness out of the process of putting SafeNet's financial numbers together. CW 2 was eventually terminated by SafeNet's senior management in July 2005 for "unwillingness to take part in" the improper activities occurring in SafeNet's accounting department.

103. Numerous other witnesses confirmed that defendants Caputo and Argo (with the assistance of their loyalist, defendant Mueller), in the words of CW 1, "could do whatever they wanted." In addition, as noted above and below, several confidential witnesses advised Plaintiffs' counsel that they and/or others were terminated by SafeNet for challenging its improper revenue recognition or other earnings-inflating accounting practices. Similarly, Confidential Witness No. 5 ("CW 5"), a former senior Rainbow executive who participated in the "due diligence" meetings with defendants Caputo and Argo (but who ultimately decided to leave SafeNet shortly after Rainbow merged into it), stated that Caputo and Argo "did whatever they wanted," and further stated that "even if someone told Tony [Caputo] or Carole [Argo] that something was wrong or illegal, the person would have to do it anyway or be fired."

104.    As described in the sections below, the Officer Defendants caused SafeNet to engage primarily in at least the following four accounting practices in violation of GAAP –  in addition to their previously discussed wrongful options-related practices – in order to fraudulently inflate the Company's reported financial performance:  (a) manipulating SafeNet's accounting for long-term development contracts to artificially inflate earnings; (b) improperly recognizing revenue on "bill and hold" transactions; (c) improperly recognizing revenue on the shipment of goods that were unfinished, incomplete or otherwise not ready to be shipped, or that were subject to customer acceptance contingencies or other obligations that precluded revenue recognition at the time of shipment; and (d) selling future royalty payments at a steep discount in order to bolster current earnings.

105.    In addition, as CW 5 also stated, at due diligence meetings in early 2004 preceding the Rainbow acquisition that CW 5 attended with Rainbow's CFO and defendants Caputo and Argo, Rainbow's CFO questioned defendants Caputo and Argo about SafeNet's shipping processes and "how they did their financials."  According to CW 5, Rainbow's CFO was "very outspoken" about how defendants Caputo and Argo should ***not*** be recognizing revenue in the manner they were, but that defendants Caputo and Argo insisted that SafeNet had always recognized revenue the way that defendants Caputo and Argo were doing it, and would continue to do so.  Because CW 5 was not a CPA and not responsible for revenue recognition issues, CW 5 did not recall detailed specifics of this early 2004 discussion; but based on the discussion CW 5 recalled, CW 5 concluded that some of SafeNet's revenue recognition practices were "borderline fraudulent" and "very suspect at best."

**B.**      **SafeNet's Non-Options Accounting Manipulations**

**1.**      **Improper Accounting for Long-Term Development Contracts**

106.    SafeNet derived a material portion of its revenues during the Class Period from certain long-term contracts through which SafeNet developed high assurance encryption technology and other security-related products and services for its customers, including government agencies or divisions.  SafeNet's long term development contracts were for both hardware and software products.

107.    Under GAAP, revenue recognition on SafeNet's long-term development contracts was ultimately governed by American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") No. 81-1 ("SOP 81-1"), *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*, AICPA SOP No. 97-2, *Software Revenue Recognition* ("SOP 97-2").   SOP 97-2 provides the main authoritative guidance regarding revenue recognition for software transactions.  SOP 97-2, however, incorporates SOP 81-1 in certain circumstances.  Specifically, SOP 97-2 states that if an arrangement to deliver software or a software system (either alone or together with other products or services) requires significant production, modification or customization of software – which was typically the case with SafeNet's long-term development contracts – the entire arrangement should be accounted for in conformity with SOP 81-1.

108.    Under SOP 81-1, there are two generally accepted methods for revenue recognition on long-term contracts.  One method is the "completed contract" method, where all revenues, costs and income are recognized only at the completion of the project (which is ordinarily at the end of development).  However, the more prevalent method is the "percentage of completion" method, where the contractor/developer recognizes revenue (and associated costs) over the life of the contract based on the degree of completion.  For example, generally

upon 50% completion of the work called for under a long-term development contract, the contractor (e.g. SafeNet) recognizes 50% of the revenue on the project concurrently with recognizing 50% of the expected total *costs* on the project which results in the contractor recognizing 50% of the estimated total profit (i.e. *earnings*) on the contract.[3]

109.   SafeNet purported to employ the "percentage of completion" method of contract accounting for its long-term development contracts in accordance with SOP 81-1 and SOP 97-2. As explained in each of SafeNet's quarterly and annual reports and filed with the SEC on Forms 10-Q and 10-K, respectively, during the Class Period:

> We recognize revenue and profit as work on long-term contracts progresses using the ***percentage of completion method of accounting, which relies on estimates of total expected contract revenues and costs.*** We follow this method because reasonably dependable estimates of the revenue and costs applicable to various stages of a contract can be made. Because the financial reporting of these contracts depends on estimates, which are assessed continually during the term of the contract, recognized revenues and profit are subject to revisions as the contract progresses to completion. ***Revisions in profit estimates are reflected in the period in which the facts that give rise to the revision become known.*** Accordingly, favorable changes in estimates result in additional profit recognition, and unfavorable changes in estimates result in the reversal of previously recognized revenue and profits. (Emphases added)

110.   Moreover, with respect to certain contracts, SafeNet purported to employ a "percentage of completion" accounting model based on objectively defined contract milestones. As stated in each of SafeNet's quarterly reports filed on Form 10-Q during the Class Period:

> Revenues that are earned under long-term contracts to develop high assurance encryption technology are recognized using … the percentage-of-completion method. ***Progress to completion is principally measured using contract <u>milestones</u>. Management considers contract milestones to be the best available measure of***

---

[3] However, for a contract on which a loss is anticipated, SOP 81-1 requires the contractor to recognize the *entire* anticipated loss as soon as the loss becomes evident.

> *progress on these contracts since each milestone contains*
> *customer-specific acceptance criteria.* (Emphasis added.)

111.    In other words, under this method, SafeNet would recognize a portion of the total expected benefit from a long–term contract – i.e., a portion of the total expected revenue – at such time as certain milestones occurred during the course of product development, on a percentage basis.  For example, if achieving the first milestone (such as obtaining customer acceptance for a particular stage of the contract work) represented 20% completion of the total work to be performed under a long-term contract, SafeNet would book 20% of the total expected revenue upon reaching that first milestone.  That revenue would then be reduced by the proportionate costs to reach that milestone, the difference being the income earned.  Thus, in projecting earnings (which Wall Street analysts and investors would in turn rely on), SafeNet would purport to estimate the future costs of delivering the products and services contemplated under the long-term agreement and then "match" the anticipated benefits of each contract with those estimated costs to determine the gross margin and profitability of the contract.

112.    As represented to investors, under "percentage of completion" accounting based on milestones, SafeNet would only record revenue upon meeting objective milestones as contained in the particular contract.  As each milestone was reached, under GAAP SafeNet was required to revise its estimated total costs to reflect *actual* costs incurred and any other factors that might affect future costs or cost estimates.  Because the expected benefit under a long-term contract was generally fixed, any revision to costs (whether to actual costs related to the current milestone or to estimated costs related to the cost of achieving future milestones including project completion) in a given quarter would have a dollar-for-dollar impact on SafeNet's reported earnings (and a concomitant effect on gross margins) for that quarter.

113.    Moreover, in 2005 (as SafeNet only later disclosed), despite having represented to investors that it employed "percentage of completion" revenue recognition based on milestones, SafeNet abandoned its practice of relying on objective milestones as listed in its contracts, in favor of recognizing revenue on the basis of *costs incurred* in relation to completion of the contract.  As stated in SafeNet's 2005 Form 10-K (filed in March 2006):

> Revenues that are earned under certain long-term contracts to develop high assurance encryption technology are recognized using contract accounting and included in product revenue. Under contract accounting, revenue from these arrangements is recognized using the percentage-of-completion method. ***Progress to completion is measured <u>using</u> either labor hours or contract milestones based on the Company's determination of which would be the best available measure of progress on the contracts.*** (Emphasis added.)

114.    In sum, by not later than 2005 SafeNet had started booking a percentage of the revenue on certain of its large encryption contracts based on the costs incurred criteria, which allowed it to record revenue *before* hitting objective contractual milestones.  In other words, SafeNet's new revenue recognition methodology allowed the Company to book revenue based on percentage of budgeted costs incurred irrespective of having met particular milestones:  for example, if SafeNet estimated that it had incurred 50% of the projects total *estimated* costs, then it could book 50% of the expected revenue.

115.    Because SafeNet determined its own cost estimates, the new methodology gave the Company an increased opportunity -- which it seized -- to inflate its reported earnings by underestimating the total costs of the project, which would result in a lower offset against revenue,  and hence increase reported profits (until such time as the contract was completed). Indeed, as a result of SafeNet's actions, the amount of revenue the Company recognized in connection with work on long-term contracts materially increased during 2005.

116.    Throughout the Class Period, and even before its further loosening of revenue recognition criteria in 2005, the Officer Defendants manipulated SafeNet's contract accounting, and caused SafeNet to overstate its profitability, by overstating its contract revenues and understating its estimated costs to complete such contracts. Specifically, SafeNet "adjusted" downward its initial cost estimates and underestimated costs to complete certain long-term development contracts, enabling it to improperly frontload the recognition of revenue and avoid recognizing losses on unprofitable contracts in violation of GAAP, while also concealing from investors the fact that SafeNet's current earnings figures were inflated -- and that SafeNet's future earnings stream from existing long-term contracts would be far weaker, and possibly even negative, when actual costs would finally be recognized at the back-end of such contracts.

117.    For example, according to Confidential Witness No. 6 ("CW 6"), who served as a director of channel development at SafeNet during the Class Period, whenever SafeNet was short on revenue it would turn to its Mykotronx division, which held a majority of SafeNet's long-term contracts, in order to find revenue that the Company could improperly recognize on open and incomplete contracts where the project was still under development.  Because Mykotronx worked under "top secret" clearance to develop encryption technology required for classified government contracts, it was relatively easy for SafeNet to manipulate its reported level of costs and progress in order to allow the Company to recognize revenue and earnings on those contracts.

118.    Similarly, according to CW 3 (a lead cost and program control analyst at SafeNet's Mykotronx division during the Class Period who was responsible for controlling project costs and schedules, including forecasting costs and earnings for major programs at Mykotronx), SafeNet's use of percentage of completion contract accounting allowed the

Company to misrepresent its progress in completing projects in order to capture more revenue. According to CW 3, SafeNet always had cost overruns on their programs and SafeNet was "always understating their budgets and not coming in on budget"-- "eat[ing] into the profit." However, rather than adjust its estimated costs to reflect higher actual costs, which would have reduced reported margins, profit and earnings, SafeNet would simply record revenue as if it had completed the estimated percentage of the project.  For example, if SafeNet had estimated that it would incur costs of $1,000,000 to complete 20% of a project, it would assume that it had reached 20% completion of the contract in the quarter when it reached $1,000,000 in costs -- ***and would recognize 20% of the revenue on the contract in that quarter*** -- regardless of whether 20% of the project had actually been completed.

119.    Similarly, according to two confidential sources, Confidential Witness No. 7 ("CW 7"), a former SafeNet accounts receivable manager during the Class Period, and CW 4, SafeNet hired a contract employee in the spring of 2005, whose responsibilities included reviewing SafeNet's contracts and its reporting practices under SOP 97-2.  However, according to CW 7, the employee decided to leave the Company shortly after being hired because of a disagreement over SafeNet's practices, including with respect to the application of SOP 97-2. Similarly, CW 4 stated that the employee had complained that SafeNet was unwilling to address SOP 97-2 "issues" with its contracts that needed to be addressed, and confirmed that the employee was unwilling to stay on at SafeNet in light of the Company's existing accounting practices.

120.    CW 7 was also quite familiar with SOP 97-2 and SafeNet's contract accounting methods.  For example, when CW 7 joined SafeNet early in the Class Period, CW 7 brought over from CW 7's prior job at a similar company a checklist that CW 7 had created to assist with the

proper enforcement of and compliance with SOP 97-2.  In contrast to CW 7's prior employer, SafeNet had *no* written SOP 97-2 compliance policies or practices, and accordingly, during CW 7's first quarter at SafeNet, CW 7 required all of CW 7's direct reports to use this checklist. However, when SafeNet's senior management became aware of this SOP 97-2 checklist, CW 7 was *reprimanded* and told to get rid of the checklist.  (This same witness also made clear in multiple interviews that nothing happened at the company without defendant Caputo's and Argo's approval).  Instead, management "never enforced any company-wide policy" with respect to applying or enforcing SOP 97-2, a circumstance that CW 7 characterized as "very uncomfortable and strange."  Similarly, according to CW 2, a former senior SafeNet accounting executive who reported directly to defendant Mueller, SOP 97-2 "was not taken seriously at the company" by either defendant Argo or defendant Mueller.

121.    CW 7 also identified a set of large contracts involving the development and sale of SONET encryptor devices to the U.S. government, on which SafeNet prematurely recognized approximately $12.4 million in revenue in the 2d or 3d quarter of 2004 upon "shipment" to a freight forwarder of the "completed" product (see also discussion below of "bill and hold" transactions at ¶¶ 123 to 128), but then compounded its premature revenue recognition by booking only a fraction of the costs-of-goods-sold associated with the manufacture of this product.  Instead, senior SafeNet management delayed recognizing most of the costs on this project until 2005, when SafeNet reported a large jump in costs.  According to CW 7, defendant Argo was one of the team leaders on this transaction, and Argo and Caputo personally authorized the improper accounting treatment for this contract.

122.    SafeNet subsequently admitted in February 2006 that it had improperly recognized *earnings* on long-term contracts of at least $600,000 in at least the second and third

quarters of 2005.  At that time, the amount of overstated revenue was not disclosed, as SafeNet simply disclosed that it would be restating previously reported earnings to account for an understatement of lease restructuring charges of approximately $700,000, and an understatement of costs in its Classified Government business of approximately $600,000.  For comparison, SafeNet's originally reported operating income for the entirety of 2005 was only $146,000.

### 2.     **Improper Revenue Recognition on "Bill and Hold" Transactions**

123.    A "bill and hold" transaction is a form of sales arrangement in which a seller of a good bills a customer for products, but does not actually ship the product until a later date. Generally, under GAAP, a seller may not recognize revenue on the sale of goods unless and until delivery to the buyer has occurred.  Instead, where the buyer does not take immediate delivery, the seller is permitted to recognize revenue prior to shipment only if certain strict conditions are met.

124.    SEC Staff Accounting Bulletin: No. 101 -- Revenue Recognition in Financial Statements ("SEC SAB 101"), 17 C.F.R. 211, provides that each of the following criteria must be met before a seller can recognize revenue on a bill and hold transaction prior to actual shipment:

(i)     the risk of ownership must have passed to the buyer;

(ii)    the customer must have a fixed commitment to purchase the goods, preferably within written documentation;

(iii)   ***the buyer, not the seller, must request that the transaction be on a bill and hold basis***, and the buyer must have a substantial business purpose for ordering the goods on a bill and hold basis;

(iv)    there must be a fixed schedule for the delivery of the goods, and the date for delivery must be reasonable and must be consistent with the buyer's business purposes;

(v)     the seller must not have retained any specific performance obligations such that the earning process is not complete;

(vi)    the ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

(vii)    ***the equipment [product] must be complete and ready to ship.***

(Emphasis added.)

125.    According to CW 7 (a former SafeNet accounts receivable and credit order manager during the Class Period whose responsibilities included verifying that orders under SafeNet's product contracts were properly documented), SafeNet initiated "bill and hold" transactions so that it could prematurely and improperly recognize revenue when it was needed to make quarter-end numbers. For example, at the end of the second (or third) and fourth quarters of 2004, CW 7 recalled that SafeNet entered into two large bill and hold transactions, including one involving the sale of SONET encryptor devices (manufactured on behalf of SafeNet by a company called Senetas), and another transaction involving a company called Technia, in order to improperly and prematurely recognize revenue in those quarters. However, according to CW 7, the inventory was still being tested at the quarter-end dates that SafeNet "shipped" the product to the "bill and hold area" (which was a sectioned off area of SafeNet's inventory warehouse), and both transactions were structured in this manner by SafeNet in order to allow it to prematurely recognize revenue on the deal. These transactions, in the amounts of approximately $15 million (Senetas) and $2.4 million (Technia), respectively, failed to meet the GAAP criteria that would have allowed SafeNet to recognize revenue when it did at the end of the 2d (or 3d) and 4th quarters of 2004. Indeed, CW 7 later learned that SafeNet had not even completed building the product when it was "shipped" to the "bill and hold" area and recorded as a sale. After CW 7 advised SafeNet's controller, Ron Greenman, that certain units supposedly "sold" had not even been built, Greenman informed CW 7 that defendants Argo and Caputo were nonetheless "OK with and personally handling the deal."

126.    On another occasion, according to CW 7, SafeNet improperly recognized revenue at the end of the 2d quarter of 2005 upon the shipment to a freight forwarder of approximately $800,000 to $1,000,000 of product that had been ordered by the national police force of a Middle Eastern country.  The transaction was structured as a "bill and hold" (with the freight forwarder agreeing to hold the shipment) because SafeNet could not legally ship the product to the customer until the U.S. government issued the required foreign export license for this product. (Moreover, the international SafeNet distributor that had arranged the order, Linquist, had a history of not delivering sensitive equipment to the proper, U.S. government-vetted purchaser). In addition to prematurely recognizing revenue on this "sale" prior to satisfaction of a material contingency (issuance of the foreign export license), this transaction also failed to meet GAAP criteria for revenue recognition by SafeNet in the 2d quarter of 2005 because there was no fixed schedule for delivery of the product at that time.  Moreover, when CW 7 raised objections to SafeNet's improper revenue recognition efforts in connection with this matter with SafeNet's Vice President of Sales, Steve Lesem, who was responsible for this contract, Lesem's response was to berate CW 7 for trying to "hold up the deal."    Thereafter, CW 7 sent an email to defendant Argo and Safenet's general counsel and chief export license compliance officer, Kevin Hicks, describing CW 7's considerable concerns about the deal.  Hicks later told CW 7 that Argo had personally approved the transaction, including the shipping of the product to a freight forwarder pending issuance of an export license, so that the revenue could be booked in the 2d quarter of 2005.  CW 7 was terminated shortly thereafter, on the same day that SafeNet senior management terminated a number of other employees who had dared to "rock the boat."

127.    Similarly, CW 4 (a senior purchasing manager at SafeNet during the latter half of the Class Period who was responsible for managing buyers around the world to try to ensure that

SafeNet had enough inventory in place to meet its quarterly revenue goals, and who reported to SafeNet's Vice President of Worldwide Manufacturing and Operations), was also aware of SafeNet's involvement in "bill and hold" transactions.   For example, CW 4 recalled that SafeNet engineered a "bill and hold" transaction with a contractor that provided SONET encryptors to the Defense Information System Agency ("DISA").   In that transaction, SafeNet invoiced the contractor and recognized revenue on the "sale" of the product at the end of the 4th quarter of 2005.  However, SafeNet did not ship the product before the end of 2005:  instead, SafeNet held the product in a warehouse on the premises of Catalyst Manufacturing Services (the entity that manufactured the product on SafeNet's behalf), which was located in or around Raleigh, NC, as part of the Officer Defendants' scheme to allow the revenue to be booked prematurely in the 4th quarter of 2005.

128.   Similarly, according to Confidential Witness No. 8 ("CW 8"), a former SafeNet financial analyst who focused on Sarbanes Oxley compliance and reported to the VP of Finance, in the winter of 2005/2006 CW 8 overheard another employee discussing how SafeNet had a practice, "especially at the end of the year," of billing customers for product but holding the product for 30 or 60 days.

### 3.       Improper Recognition of Revenue Upon Shipment of Unfinished Product or Product that was Otherwise Not Ready To Be Shipped

129.   During the Class Period, as part of its efforts to meet its revenue and earnings goals and Wall Street analysts' expectations, the Company would also regularly ship unfinished product to its customers at the end of the Company's fiscal quarters to facilitate the premature and improper recognition of revenue on such "sales."   Such "sales" would then have to be reversed in future quarters after SafeNet was forced to accept the return of such product from its customers pursuant to "return merchandise authorizations," or "RMAs."

130.    According to CW 4, SafeNet engaged in the practice of shipping unfinished product to meet its quarterly numbers in every quarter from no later than June 2004 through the end of the Class Period.  As CW 4 recalled, things would get "unethical" at the end of the quarters, when "whatever was not bolted down was shipped."  Indeed, SafeNet would knowingly ship hardware that didn't work, while offering customers discounts on future orders (and assurances that they could later return the product) to incentivize its customers to accept delivery of quarter-end shipments, all so that SafeNet could recognize revenue on the product in the quarter in which it had been prematurely shipped.

131.    Another source, CW 1, was able to recall an even earlier example of SafeNet's practice of shipping unfinished product.  Specifically, according to CW 1, at the end of 2003 SafeNet delivered a product to Cisco that it knew was not ready.  Indeed, the product was delivered *before* the testing phase was complete.  Moreover, the limited testing that CW 1 and the engineers in CW 1's division had actually completed by the end of 2003 had already identified numerous problems with the product.  Although SafeNet knew that the product was not ready, according to CW 1 "SafeNet had to ship the product out before the [end of 2003] deadline so that the Company could recognize revenue on it."  As this witness also noted, Officer Defendants Caputo and Argo (together with director defendant Harrison) basically "decided on everything" and "ran the show" at SafeNet.  Not surprisingly, Cisco, which had an acceptance clause in its contract, had to keep returning the product to get it fixed.

132.    Similarly, Confidential Witness No. 9 ("CW 9"), who served as a Software Quality Engineer in SafeNet's Mykotronx division during the latter part of the Class Period, confirmed that SafeNet did not take proper steps to ensure product quality and was willing to send out products of poor quality "without going through the [quality assurance] steps that the

contract required them to do."    According to CW 9, senior management knew that products were being shipped before they were finished, and put "tremendous pressure" on its engineers to "sign-off" on unfinished products so that they could be shipped and revenue could be prematurely recognized.   For example, CW 9 noted that SafeNet released one of its KIV products to the National Security Association ("NSA") despite knowing of numerous problems with the product.  In another instance, the details of which CW 9 could not recall, senior SafeNet management signed off on the shipment of product that CW 9 had flatly refused to sign off on because CW 9 knew the product was not ready and that testing had not been performed to support a certification of performance under the customer's contract.  In sum, according to CW 9, senior management's view was "Hurry up and get it out the door" -- even if the Company did not have the product to push out the door yet -- and management was content to ship product without putting them through the necessary tests and evaluation procedures that were required under SafeNet's customer contracts.

### 4.    Improper Recognition Of Revenue On Royalty Payments

133.    CW 1 was a senior executive in SafeNet's Embedded Division, which sold chips, integrated circuits and intellectual property to government agencies and financial institutions.  In connection with these sales, SafeNet received an up-front fee and then royalties for a set period of time. According to CW 1, however, SafeNet regularly recognized royalty revenues before it should have, and that "every quarter" until CW 1 left the company in 2005 "there was an issue with how to recognize royalties."  In general, in connection with improperly accelerating the recognition of revenue, at the end of each quarter SafeNet would ask customers to pre-pay or buy the royalties that they owed to SafeNet for future periods in exchange for a significant discount on the royalty amounts owed.  For example, if SafeNet was expecting $100 in royalties over each of the next 4 years, for a total of $400, SafeNet might ask the customer to pre-pay the balance of

the royalty payments due for substantially less than $400 at the end of the current quarter, thereby causing SafeNet to forego the full fair value of the royalty revenue stream to facilitate its improper acceleration of revenue recognition on a smaller amount of total revenue.

134.    SafeNet's royalty pre-payment deals, however, had the effect of improperly misleading investors because the Company accepted terms below the present value of the future payments with the sole motivation of accelerating revenue recognition to improve its current earnings.  Although the Company would recognize a short-term gain, it reduced future expected payments that analysts and investors expected to be realized.

135.    For example, according to CW 1, defendants Caputo and Argo approached clients Cisco and Texas Instruments several times during the Class Period to "play with royalty numbers."  For example, on one occasion at the end of the 4th quarter of 2003, SafeNet needed a few million dollars more in revenue to close the quarter with positive earnings.  According to CW 1, SafeNet approached and made a deal with Texas Instruments, allowing SafeNet to improve its revenue numbers that quarter.

136.    As CW 1 further commented, SafeNet's practice of buying out future years' royalty revenue streams at a discount was simply "a way of fudging the books so that the quarter would look better," but that SafeNet's senior management apparently had decided that "tricks had to be played" to create the appearance that SafeNet was meeting its numbers (when in fact it was not meeting those numbers).  Of course, by in effect recognizing tomorrow's revenue today, SafeNet's actions to improperly accelerate the recognition of revenue simply created more problems, as future shortfalls would have to be made up in future periods, with the result that SafeNet "would have to play [further] games."  A shown in Section VII below, however, these and other accounting games could not continue indefinitely (nor could SafeNet continue

indefinitely) to "recognize tomorrow's revenue to today" indefinitely, and SafeNet was ultimately forced to announce accounting restatements and earnings shortfalls in the first half of 2006.

## VI.   CLASS PERIOD FALSE AND MISLEADING STATEMENTS

137.   On March 31, 2003, SafeNet filed its Form 10-K for the year ended December 31, 2002 (the "2002 Form 10-K") with the SEC.  Officer Defendants Caputo and Argo and Director Defendants Brooks, Harrison, Hunt and Thaw signed the 2002 Form 10-K.  The 2002 Form 10-K reported the following financial results:

- Total Revenue of $32,235,000;

- Operating income (loss) of ($1,544,000);

- Total costs and expenses of $33,779,000;

- Net Income (loss) of ($785,000); and

- Basic net income (loss) per share of ($.10).

138.   Note 2 to SafeNet's financial statements for 2002, as reported in the 2002 Form 10-K, was entitled "Summary of Significant Accounting Policies."   Regarding compensation, Note 2 stated:

> **Employee Stock-Based Compensation**
>
> At December 31, 2002, the Company had five stock-based employee compensation plans, which are described more fully in Note 12.  The Company accounts for those plans using the intrinsic value method prescribed by APB Opinion No. 25, *Accounting for Stock Issued to Employees*, and related Interpretations.  ***No stock-based employee compensation cost is reflected in net income, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant***. (Emphasis added.)

139.   Note 12 to the financial statements for 2002, as disclosed in the 2002 Form 10-K, was entitled "Stock Compensation Plans," and stated as follows:

**Stock Option Plans**

The Company sponsors four stock option plans that provide for the granting of stock options to officers, directors, consultants and employees of the Company. ***Options have been granted with exercise prices that are equal to the fair market value of the common stock on the date of grant*** and, subject to termination of employment, expire seven years from the date of grant. Either incentive stock options or non-qualified stock options may be granted under the plans. (Emphasis added.)

140.     The 2002 Form 10-K was materially false and misleading when issued because, contrary to defendants' public representations, SafeNet in fact did issue, since at least 1999, options that were "backdated," so they were not issued at exercise prices "equal to the fair market value of the common stock on the date of grant" and compensation expenses should have been recorded, and the Company did not in fact account for those options in accordance with APB Opinion No. 25 or GAAP.   Indeed, defendants Caputo and Argo were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the severe risks of lost investor confidence, regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

141.     On April 30, 2003, SafeNet issued to investors SafeNet's definitive proxy statement on Form 14A in connection with the Company's 2003 annual meeting (the "2003 Proxy Statement").   The 2003 Proxy Statement was signed by defendant Argo, by order of the board of directors, including Director Defendants.   Among other things, the 2003 Proxy Statement solicited investors to increase the number of shares in the Stock Option Plan from 1,600,000 to 2,100,000 shares, as follows:

The Company's stockholders approved the 2001 Omnibus Stock Plan (the "2001 Plan") on May 16, 2001. ***The 2001 Plan is intended to provide employees and directors with an incentive to actively contribute to the Company's growth by enabling them to***

> *acquire a proprietary interest in the Company*. The Company's stockholders approved a proposal at the 2002 annual meeting of stockholders to increase the maximum shares available for awards under the 2001 Plan from 1,000,000 to 1,600,000.
>
> We are proposing that the shareholders approve an additional 500,000 shares that may be sold or optioned under the 2001 Plan. (Emphasis added.)

142.     The 2003 Proxy Statement made the following material misstatements regarding the Company's stock option grants and granting practices:

(a)     Under the heading "Executive Compensation," the 2003 Proxy Statement provided a chart listing "Options Grants in Fiscal Year 2002." Footnote 4 to this chart stated as follows:

> The potential realizable value has been calculated in conformity with Security and Exchange Commission proxy statement disclosure rules and is not intended to forecast possible future appreciation of the Common Stock. *No gain to the options is possible without stock price appreciation, which will benefit all shareholders. If the stock price does not increase above the exercise price, compensation to the named executive will be zero*.

(b)     Under the heading "Report of Compensation Committee on Executive Compensation," the 2003 Proxy Statement represented the following:

> The Compensation Committee of the Board of Directors (the "Committee") establishes the general compensation policies of the Company, specific compensation for each executive officer of the Company and administers the Company's stock plans. *The Company's intent as administered through the Committee is to make compensation packages of the executive officers of the Company sufficient to attract and retain persons of exceptional quality to provide effective incentives* to motivate and reward such executives for achieving the scientific, financial and strategic goals of the Company essential to the Company's long-term success and to growth in stockholder value. Consequently, a significant portion of the compensation of the executive officers and directors *is dependent on the Common Stock price performance and maintenance of value in the marketplace*.

*****

-65-

> ***Grants of stock options are designed to align the executive's
> interest with that of the stockholders of the Company …*** Stock
> options are also provided to all new employees as well as
> occasional grants in recognition of superior performance, etc.  The
> overall objective of the stock option program is to cause employees
> to identify with the success of the Company and to incent superior
> performance. (Emphases added.)

      (c)     Under the heading "Potential Limitations on Company Deductions," the

2003 Proxy Statement stated:

> Section 162(m) of the Code denies a deduction to any publicly
> held corporation for compensation paid to certain "covered
> employees" in a taxable year to the extent that compensation to
> such covered employee exceeds $1 million. It is possible that
> compensation attributable to awards, when combined with all other
> types of compensation received by a covered employee from the
> Company, may cause this limitation to be exceeded in any
> particular year.
>
> Certain kinds of compensation, including qualified "performance-
> based compensation," are disregarded for purposes of the
> deduction limitation. In accordance with Treasury regulations
> issued under Section 162(m), compensation attributable to stock
> options and stock appreciation rights will qualify as performance-
> based compensation if the award is granted by a compensation
> committee comprised solely of "outside directors" and either
> (i) the plan contains a per-employee limitation on the number of
> shares for which such awards may be granted during a specified
> period, the per-employee limitation is approved by the
> stockholders ***and the exercise price of the award is no less than
> the fair market value of the stock on the date of grant***, or (ii) ***the
> award is granted (or exercisable) only upon the achievement (as
> certified in writing by the compensation committee) of an
> objective performance goal established in writing by the
> compensation committee while the outcome is substantially
> uncertain***, and the award is approved by stockholders. ***It is
> intended that stock options issued under the 2001 Plan will
> qualify as "performance-based compensation."*** (Emphasis
> added.)

      143.   As set forth herein, during 2002 and since at least 1999, SafeNet issued stock

options that were backdated.   As a result, the 2003 Proxy Statement contained material

misrepresentations and omitted material information because:

(a)     To the extent stock options were "backdated" and priced below fair market value, the executives, directors and employees who received backdated stock options were able to enjoy gain without stock price appreciation;

(b)     The "per share option price" was **not** "the closing price on the grant date," as had been reported;

(c)     Grants ***did not*** "align the executive's interest with that of the stockholders of the Company" because those executives were obtaining financial benefits as a result of cronyism and undisclosed conflicts of interest, and irrespective of any future performance, since the option strike prices already reflected stock appreciation;

(d)     Stock options that were granted at below fair market value or based on performance goals whose outcome was no longer uncertain might not qualify as "performance-based compensation," as was asserted would be the case for options granted under the Stock Option Plan; and

(e)     SafeNet's top executives, including defendants Caputo and Argo, were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the severe risks of lost investor confidence, regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

144.    On May 15, 2003, SafeNet filed its Form 10-Q for the first quarter of 2003 (the "1Q 2003 Form 10-Q") with the SEC.  Defendants Caputo and Argo signed the 1Q 2003 Form 10-Q.  The 1Q 2003 Form 10-Q reported the following financial results:

- Total Revenue of $14,014,000;

- Operating income (loss) of ($9,092,000);

- Total costs and expenses of $23,106,000;

- Net Income (loss) of ($9,656,000); and

- Basic net income (loss) per share of ($1.06).

145.    Note 2 to SafeNet's financial statements for the first quarter of 2003, as reported in the 1Q 2003 Form 10-Q, was entitled "Significant Accounting Policies and Recent Accounting Pronouncements."   Under the heading "Stock Options and Stock Granted to Employees," Note 2 stated:

> The Company records compensation expense for all stock-based compensation plans using the intrinsic value method prescribed by APB Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB No. 25").  Under APB No. 25, compensation expense is recorded over the vesting period to the extent that the fair value of the underlying stock on the date of grant exceeds the exercise or acquisition price of the stock or stock-based award….
>
> At March 31, 2003, the Company has five stock-based employee compensation plans. ***All options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant***. (Emphasis added.)

146.    As set forth herein, during 2003 and since at least 1999, SafeNet issued stock options that were backdated.  As a result, the 1Q 2003 Form 10-Q was materially false and misleading when issued because stock options that were backdated were not, as reported, granted with "an exercise price equal to the market value of the underlying common stock on the date of grant" and compensation expenses should have been recorded, and the Company did not in fact account for those options in accordance with APB Opinion No. 25 or GAAP.  Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

147.    On July 31, 2003, SafeNet filed its Form 10-Q for the second quarter of 2003 (the "2Q 2003 Form 10-Q") with the SEC.  Defendants Caputo and Argo signed the 2Q 2003 Form 10-Q.  The 2Q 2003 Form 10-Q reported the following results:

- Total Revenue of $15,425,000;

- Operating income (loss) of ($1,992,000);

- Total costs and expenses of $17,417,000;

- Net Income (loss) of ($2,243,000); and

- Basic net income (loss) per share of ($0.22).

148.    Note 2 to SafeNet's financial statements for the second quarter of 2003, as reported in the 2Q 2003 Form 10-Q, was entitled "Significant Accounting Policies and Recent Accounting Pronouncements."   Under the heading "Stock Options and Stock Granted to Employees," Note 2 stated:

> The Company records compensation expense for all stock-based compensation plans using the intrinsic value method prescribed by APB Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB No. 25").  Under APB No. 25, compensation expense is recorded over the vesting period to the extent that the fair value of the underlying stock on the date of grant exceeds the exercise or acquisition price of the stock or stock-based award….
>
> At June 30, 2003, the Company has seven stock-based employee compensation plans. ***All options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant***. (Emphasis added.)

149.    As set forth herein, during 2003 and since at least 1999, SafeNet issued stock options that were backdated.  As a result, the 2Q 2003 Form 10-Q was materially false and misleading when issued because stock options that were backdated were not, as reported, granted with "an exercise price equal to the market value of the underlying common stock on the date of

grant" and compensation expenses should have been recorded, and the Company did not in fact account for those options in accordance with APB Opinion No. 25 or GAAP.

150.    On November 14, 2003, SafeNet filed its Form 10-Q for the third quarter of 2003 (the "3Q 2003 Form 10-Q") with the SEC.  Defendants Caputo and Argo signed the 3Q 2003 Form 10-Q.  The 3Q 2003 Form 10-Q reported the following financial results:

- Total Revenue of $17,593,000;

- Operating income (loss) of $2,095,000;

- Total costs and expenses of $15,498,000;

- Net Income (loss) of $1,719,000; and

- Basic net income (loss) per share of $0.13.

151.    Note 2 to SafeNet's financial statements for the third quarter of 2003, as reported in the 3Q 2003 Form 10-Q, was entitled "Significant Accounting Policies and Recent Accounting Pronouncements."   Under the heading "Stock Options and Stock Granted to Employees," Note 2 stated:

> The Company records compensation expense for all stock-based compensation plans using the intrinsic value method prescribed by APB Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB No. 25").  Under APB No. 25, compensation expense is recorded over the vesting period to the extent that the fair value of the underlying stock on the date of grant exceeds the exercise or acquisition price of the stock or stock-based award….
>
> At September 30, 2003, the Company has seven stock-based employee compensation plans. ***All options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant***. (Emphasis added.)

152.    As set forth herein, during 2003 and since at least 1999, SafeNet issued stock options that were backdated.  As a result, the 3Q 2003 Form 10-Q was materially false and misleading when issued because stock options that were backdated were not, as reported, granted

with "an exercise price equal to the market value of the underlying common stock on the date of grant" and compensation expenses should have been recorded, and the Company did not in fact account for those options in accordance with APB Opinion No. 25 or GAAP.

153.    The Rainbow Registration Statement and Rainbow Proxy/Prospectus, filed with the SEC on February 11 and 12, 2004, solicited the approval of the Rainbow Subclass for the Rainbow Acquisition and urged SafeNet shareholders to approve a further expansion of SafeNet's Stock Option Plan, from 2,100,000 shares to 3,000,000 shares.    The Rainbow Proxy/Prospectus contained numerous untrue statements and omissions of material fact, as follows:

(a)    Under the heading "Selected Historical and Pro Forma Financial Information," defendants provided investors with select historical financial information regarding SafeNet, including the following 2003 year-end figures: revenues of $32,235,000, gross profit of $23,272,000; operating expenses of $24,816,000; operating loss of ($1,544,000); loss from continuing operations of ($785,000); and loss per diluted share of ($0.10).    The Rainbow Registration Statement and Rainbow Proxy/Prospectus also said that the select historical information:

> [S]hould be read in conjunction with SafeNet's consolidated financial statements and related notes included in SafeNet's annual reports and other financial information included in SafeNet's filings with the SEC. See "Where You Can Find More Information." The selected historical consolidated balance sheet data of SafeNet at December 31, 2002, 2001, 2000, 1999 and 1998 and the selected historical consolidated statement of operations data of SafeNet for the years then ended have been derived from SafeNet's audited consolidated financial statements previously filed with the SEC and incorporated by reference into this joint proxy statement/prospectus. SafeNet's selected unaudited interim financial data included in this joint proxy statement/prospectus were derived from its books and records and, in the opinion of management, contain all adjustments, consisting only of normal

-71-

recurring adjustments, necessary for the fair presentation of its financial position and results of operations at and for such periods;

(b)      Under the heading "Risk Factors," the defendants who issued the Rainbow Proxy/Prospectus reported that certain Rainbow officers and directors had a conflict of interest with respect to the Rainbow Acquisition because they stood to receive benefits not available to other Rainbow shareholders.   In particular, defendants stated that Rainbow's Chairman, President and CEO, Walter Straub, and one of its directors, Arthur Money, would become directors of SafeNet after the Merger.   Defendants omitted to disclose, however, that these individuals (and all of SafeNet's directors and senior officers) specifically stood to benefit from a continuation of SafeNet's practice of backdating;

(c)      Under the heading "The Merger Agreement" and the subheading "Representations and Warranties," defendants reported that SafeNet had represented and warranted that its publicly issued historical financial statements were prepared in compliance with GAAP and were without material misstatements; and

(d)      Under the heading "Unaudited Combined Condensed Pro Forma Financial Information," defendants reported pro forma financial data relating to SafeNet, assuming the Rainbow Acquisition would be completed.

154.    In addition, SafeNet solicited SafeNet shareholders to approve an increase in the number of shares in the Stock Option Plan from 2,100,000 to 3,000,000 shares as follows:

> SafeNet compensation policy includes grants of options to its employees and directors to attract talented business professionals to join SafeNet. As of October 22, 2003, SafeNet and Rainbow Technologies had approximately 213 and 570 employees, respectively. Following the closing of the proposed merger described in this joint proxy statement/ prospectus, SafeNet will immediately experience an over 200% increase in the number of its employees. Further, as a growth company, SafeNet plans to expand its workforce through new hires. ***Based on SafeNet's compensation policy and the current number of shares of***

> *SafeNet common stock available under the existing 2001 Plan,*
> *SafeNet believes that there are not enough shares of SafeNet*
> *common stock left in the 2001 Plan to meet the needs of its*
> *expanded workforce following the proposed merger.* (Emphasis
> added)

155.    In addition, the Rainbow Registration Statement and Rainbow Proxy/Prospectus made material misstatements regarding the Company's stock option grants and granting practices.  Under the heading "Director and Executive Compensation," defendants provided a chart listing "Options Grants in Fiscal Year 2002."  Footnote 4 to this chart stated as follows:

> The potential realizable value has been calculated in conformity
> with SEC disclosure rules and is not intended to forecast possible
> future appreciation of SafeNet common stock. *No gain to the*
> *options is possible without stock price appreciation, which will*
> *benefit all stockholders. If the stock price does not increase above*
> *the exercise price, compensation to the Named Executive Officer*
> *will be zero.* (Emphasis added.)

156.    As set forth herein, during 2002 and since at least 1999, SafeNet issued stock options that were backdated.  As a result, the Rainbow Registration Statement and Rainbow Proxy/Prospectus contained material misstatements, because to the extent stock options were "backdated" and priced below fair market value, the executives, directors and employees who received those backdated stock options were able to enjoy gain without stock price appreciation and compensation expenses should have been recorded.  The Rainbow Registration and Rainbow Proxy/Prospectus also omitted to state that SafeNet had in the past granted and planned to continue to grant stock options that were backdated and, as a result, SafeNet provided compensation beyond the amounts actually disclosed.  Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.  The Rainbow Registration Statement

and Rainbow Proxy/Prospectus also incorporated by reference numerous SafeNet public filings that materially misstated the nature of SafeNet's stock option granting policies and practices, including the financial effects thereof.  Included in these documents are SafeNet's 8-Ks, 10-Ks and 10-Qs for the years ended December 31, 2002, December 31, 2001 and December 31, 2000, as well as the year end financial results for the year ended December 31, 2003.

157.    Moreover, the Rainbow Registration Statement and Rainbow Proxy/Prospectus representations concerning SafeNet's revenues and gross profit were materially inflated, and its representations concerning SafeNet's losses were materially understated, as a result of SafeNet's improper revenue recognition and other accounting improprieties described at ¶¶ 100 to 136.

158.    On March 10, 2004, SafeNet filed its Form 10-K for the year ended December 31, 2003 (the "2003 Form 10-K") with the SEC.  Officer Defendants Caputo and Argo and Director Defendants Brooks, Harrison, Hunt and Thaw signed the 2003 Form 10-K.  The 2003 Form 10-K reported the following financial results:

- Total Revenue of $66,194,000;

- Operating income (loss) of ($5,277,000);

- Total costs and expenses of $71,471,000;

- Net Income (loss) of ($6,088,000); and

- Basic net income (loss) per share of ($0.54).

159.    Note 2 to SafeNet's financial statements for 2003, as reported in the 2003 Form 10-K, was entitled "Summary of Significant Accounting Policies."   Regarding compensation, Note 2 stated:

> **Employee Stock-Based Compensation**
>
> At December 31, 2003, the Company had five stock-based employee compensation plans, which are described more fully in Note 12.  The Company accounts for those plans using the intrinsic

value method prescribed by APB Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations. ***No stock-based employee compensation cost is reflected in the statements of operations, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant***. (Emphasis added.)

160.    Note 12 to the financial statements for 2003, as reported in the 2003 Form 10-K, was entitled "Stock Compensation Plans and Warrants," and stated:

**Stock Option Plans**

The Company sponsors five stock option plans that provide for the granting of stock options to officers, directors, consultants and employees of the Company. ***Options have been granted with exercise prices that are equal to the fair market value of the common stock on the date of grant*** and, subject to termination of employment, expire seven years from the date of grant. Either incentive stock options or non-qualified stock options may be granted under the plans. (Emphasis added.)

161.    The 2003 Form 10-K was materially false and misleading when issued because, contrary to defendants' public representations, in 2003 and since at least 1999 SafeNet in fact did issue options that were "backdated," so they were not issued at exercise prices "equal to the fair market value of the common stock on the date of grant" and compensation expenses should have been recorded, and the Company did not in fact account for those options in accordance with APB Opinion No. 25 or GAAP.

162.    Moreover, as detailed herein, the 2003 Form 10-K was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

163.    On April 29, 2004, SafeNet and the Director Defendants who were directors of SafeNet at the time issued to investors SafeNet's definitive proxy statement on Form 14A in

advance of the Company's 2004 annual meeting (the "2004 Proxy Statement").  The 2004 Proxy

Statement made the following material misstatements regarding the Company's stock option

grants and granting practices:

(a)    Under the heading "Executive Compensation," defendants provided a

chart listing "Options Grants in Fiscal Year 2003."  Footnote 4 to this chart stated as follows:

> The potential realizable value has been calculated in conformity
> with Securities and Exchange Commission proxy statement
> disclosure rules and is not intended to forecast possible future
> appreciation of the Common Stock. ***No gain to the options is
> possible without stock price appreciation, which will benefit all
> shareholders. If the stock price does not increase above the
> exercise price, compensation to the named executive will be zero***.

(b)    Under the heading "Report of Compensation Committee on Executive

Compensation," defendants represented the following:

> The Compensation Committee of the Board of Directors (the
> "Committee") establishes the general compensation policies of the
> Company, specific compensation for each executive officer of the
> Company and administers the Company's stock plans. ***The
> Company's intent as administered through the Committee is to
> make compensation packages of the executive officers of the
> Company sufficient to attract and retain persons of exceptional
> quality and to provide effective incentives*** to motivate and reward
> such executives for achieving the scientific, financial and strategic
> goals of the Company essential to the Company's long-term
> success and to growth in stockholder value.  Consequently, a
> significant portion of the compensation of the executive officers
> and directors ***is dependent on the Common Stock price
> performance and maintenance of value in the marketplace***.
>
> *****
>
> ***Grants of stock options are designed to align the executive's
> interest with that of the stockholders of the Company*** ...Stock
> options are also provided to all new employees as well as
> occasional grants in recognition of superior performance, etc.  The
> overall objective of the stock option program is to cause employees
> to identify with the success of the Company and to incent superior
> performance. (Emphases added.)

164.    As set forth herein, during 2003 and since at least 1999, SafeNet issued stock options that were backdated.    As a result, the 2004 Proxy Statement contained material misstatements and omitted material information because:

(a)    To the extent stock options were "backdated" and priced below fair market value, the executives, directors and employees who received backdated stock options were able to enjoy gain without stock price appreciation;

(b)    The "per share option price" was ***not*** "the closing price on the grant date," as had been reported; and

(c)    Grants ***did not*** "align the executive's interest with that of the stockholders of the Company" because those executives were obtaining financial benefits as a result of cronyism and undisclosed conflicts of interest, and irrespective of any future performance, since the option strike prices already reflected stock appreciation;

(d)    SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings; and

(e)    SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

165.    The following quarterly financial metrics were reported in the Form 10-Q for the first quarter of 2004 ("1Q 2004 Form 10-Q"), which SafeNet filed with the SEC on May 10, 2004 and was signed by defendants Caputo and Argo:

- Total Revenue of $24,016,000;

- Operating income (loss) of ($855,000);

- Total costs and expenses of $24,871,000;

- Net Income (loss) of ($456,000); and

- Basic net income (loss) per share of ($0.03).

166.    Although the Company did not report that it had granted stock options to certain executives during the first quarter of 2004, as a result of the failure to record a compensation expense for previously backdated options as they vested, these results were materially false and misleading.  Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the severe risks of lost investor confidence, of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

167.    Moreover, as detailed herein, the 1Q 2004 Form 10-Q was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

168.    On August 9, 2004, SafeNet filed its Form 10-Q for the second quarter of 2004 (the "2Q 2004 Form 10-Q") with the SEC.  Defendants Caputo and Mueller signed the 2Q 2004 Form 10-Q.  The 2Q 2004 Form 10-Q reported the following financial results:

- Total Revenue of $54,345,000;

- Operating income (loss) of ($485,000);

- Total costs and expenses of $25,829,000;

- Net Income (loss) of ($408,000); and

- Basic net income (loss) per share of $0.02.

169.    Note 3 to SafeNet's financial statements for the second quarter of 2004, as reported in the 2Q 2004 Form 10-Q, was entitled "Summary of Significant Accounting Policies." Under the heading "Employee Stock-Based Compensation," Note 3 stated:

> As of June 30, 2004, the Company had five stock-based employee compensation plans. The Company accounts for those plans using the intrinsic value method prescribed by APB Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations. ***Compensation cost is reflected in the statements of operations, in general and administrative costs.*** (Emphasis added.)

170.    As set forth herein, during the second quarter of 2004 and since at least 2000, SafeNet issued stock options that were backdated.  As a result, the 2Q 2004 Form 10-Q was materially false and misleading when issued because it failed to disclose this practice or to properly record related compensation expenses, and the Company did not in fact account for those options in accordance with APB Opinion No. 25 or GAAP.   Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the severe risks of lost investor confidence, of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

171.    Moreover, as detailed herein, the 2Q 2004 Form 10-Q was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues,

operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

172.    On November 9, 2004, SafeNet filed its Form 10-Q for the third quarter of 2004 (the "3Q 2004 Form 10-Q") with the SEC.  Defendants Caputo and Mueller signed the 3Q 2004 Form 10-Q.  The 3Q 2004 Form 10-Q reported the following financial results:

- Total Revenue of $59,450,000;

- Operating income (loss) of $1,642,000;

- Total costs and expenses of $57,808,000;

- Net Income (loss) of $996,000; and

- Basic net income (loss) per share of $0.04.

173.    Note 3 to SafeNet's financial statements for the second quarter of 2004, as reported in the 2Q 2004 Form 10-Q, was entitled "Summary of Significant Accounting Policies." Under the heading "Employee Stock-Based Compensation," Note 3 stated:

> As of September 30, 2004, the Company had five stock-based employee compensation plans. The Company accounts for those plans using the intrinsic value method prescribed by APB Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations.

174.    As set forth herein, during 2004 and since at least 2000, SafeNet issued stock options that were backdated. As a result, the 3Q 2004 Form 10-Q was false and misleading because it failed to disclose this practice or to properly record related compensation expenses. Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

175.    Moreover, as detailed herein, the 3Q 2004 Form 10-Q was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

176.    On March 16, 2005, SafeNet filed its Form 10-K for the year ended December 31, 2004 (the "2004 Form 10-K") with the SEC.   Officer Defendants Caputo and Mueller and Director Defendants Brooks, Harrison, Hunt, Thaw, Clark and Money signed the 2004 Form 10-K.  The 2004 Form 10-K reported the following financial results:

- Total Revenue of $201,600,000;

- Operating income (loss) of $1,077,000;

- Total costs and expenses of $200,523,000;

- Net Income (loss) of $2,183,000; and

- Basic net income (loss) per share of $0.10.

177.    Note 2 to SafeNet's financial statements for 2004, as reported in the 2004 Form 10-K, was entitled "Summary of Significant Accounting Policies."   Regarding compensation, Note 2 stated:

> **Employee Stock-Based Compensation**
>
> At December 31, 2004, the Company had five stock-based employee compensation plans, which are described more fully in Note 12. The Company accounts for those plans using the intrinsic value method prescribed by APB Opinion No. 25, *Accounting for Stock Issued to Employees,* and related interpretations. With the exception of unvested stock options assumed in business combinations, ***no stock-based employee compensation cost is reflected in the statements of operations, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant***. (Emphasis added.)

*****

### Recent Accounting Pronouncements

On December 16, 2004, the Financial Accounting Standards Board ("FASB") issued FASB Statement No. 123 (revised 2004), *Share-Based Payment*, which is a revision of FASB Statement No. 123, *Accounting for Stock-Based Compensation*. Statement 123(R) supersedes APB Opinion No. 25, *Accounting for Stock Issued to Employees*, and amends FASB Statement No. 95, *Statement of Cash Flows*. Generally, the approach in Statement 123(R) is similar to the approach described in Statement 123. However, Statement 123(R) requires all share-based payments to employees, including grants of employee stock options, to be recognized in the income statement based on their fair values. Pro forma disclosure is no longer an alternative. The Company expects to adopt Statement 123(R) on July 1, 2005.

***As permitted by Statement 123, the Company currently accounts for share-based payments to employees using Opinion 25's intrinsic value method and, as such, generally recognizes no compensation cost for employee stock options***. (Emphasis added.)

178.    Note 13 to the financial statements for 2004, as disclosed in the 2004 Form 10-K, was entitled "Stock Compensation Plans," and stated as follows:

### Stock Option Plans

The Company sponsors five stock option plans that provide for the granting of stock options to officers, directors, consultants and employees of the Company. ***Options have been granted with exercise prices that are equal to the fair market value of the common stock on the date of grant*** and, subject to termination of employment, expire seven years from the date of grant. Either incentive stock options or non-qualified stock options may be granted under the plans. (Emphasis added.)

179.    As set forth herein, in 2004 and since at least 2000, SafeNet issued stock options that were backdated. As a result, the 2004 Form 10-K was materially false and misleading when issued because stock options that were backdated were not issued at exercise prices "equal to the fair market value of the common stock on the date of grant" and compensation expenses should have been recorded. Indeed, SafeNet's top executives were manipulating the Company's stock

option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

180.    Moreover, as detailed herein, the 2004 Form 10-K was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

181.    On April 29, 2005, SafeNet filed an amendment to the 2004 Form 10-K, filed as Form 10-K/A (the "2004 Form 10-K/A") with the SEC.  Officer Defendants Caputo and Mueller and Director Defendants Brooks, Harrison, Hunt, Thaw, Clark and Money signed the 2004 Form 10-K/A.  The 2004 Form 10-K/A reported the following financial results:

- Total Revenue of $201,600,000;

- Operating income (loss) of $1,077,000;

- Total costs and expenses of $200,523,000;

- Net Income (loss) of $2,183,000; and

- Basic net income (loss) per share of $0.10.

182.    Item 11 of the 2004 Form 10-K/A, entitled "Executive Compensation," included a chart showing the option grants in 2004 to Senior Vice Presidents Fedde and Potts and to Defendants Caputo, Argo and Mueller.  Footnote 4 to this chart stated as follows:

> The potential realizable value has been calculated in conformity with Securities and Exchange Commission proxy statement disclosure rules and is not intended to forecast possible future appreciation of the common stock. ***No gain to the options is possible without stock price appreciation, which will benefit all***

*shareholders. If the stock price does not increase above the exercise price, compensation to the named executive will be zero*. (Emphasis added.)

(a)     Item 11 also included the following statement pertaining to the

compensation of directors:

> After each annual meeting of stockholders, each non-employee director of the Company who attended at least 75% of the aggregate number of meetings of the Board during the previous calendar year and who stood for election at the preceding annual meeting is granted a stock option exercisable for 20,000 shares of common stock. *The per share option price is the closing price on the grant date*. The option has a ten-year term and is fully vested on the grant date.  (Emphasis added.)

(b)     Item 11 also included the following statement under the heading "Report

of Compensation Committee on Executive Compensation":

> *The Compensation Committee of the Board of Directors (the "Committee") reviews and approves the general compensation policies of the Company, specific compensation for each executive officer of the Company, the Company's equity compensation plans and makes recommendations to the Board of Directors regarding these matters.  The Company's policy, as administered through the Committee, is to provide compensation packages to executive officers of the Company sufficient to attract and retain persons of exceptional quality and to provide effective incentives* to motivate and reward such executives for achieving the technical, financial and strategic goals of the Company essential to the Company's long-term success and to growth in stockholder value.  Consequently, a significant portion of the compensation of the executive officers and directors is *dependent on company performance and maintenance of value in the marketplace*.
>
> *****
>
> *Grants of stock options are designed to align the executive's interest with that of the stockholders of the Company*… Stock options are also provided to all new employees as well as occasional grants in recognition of superior performance, etc.  The overall objective of the stock option program is to cause employees to identify with the success of the Company and to incent superior performance. (Emphases added.)

183.    As shown herein, during 2004 and since at least 2000, SafeNet issued stock options that were backdated.  As a result, the 2004 Form 10-K/A was materially false and misleading when issued because, contrary to defendants' public representations:

(a)    To the extent stock options were "backdated" and price below fair market value, the executives, directors and other employees who received backdated stock options were able to enjoy gain without stock price appreciation and related compensation expenses should have been recorded;

(b)    The "per share option price" was **not** "the closing price on the grant date," as had been reported;

(c)    Grants **did not** "align the executive's interest with that of the stockholders of the Company" because those executives were obtaining financial benefits as a result of cronyism and undisclosed conflicts of interest, and irrespective of any future performance, since the option strike prices already reflected stock appreciation;

(d)    SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings; and

(e)    SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

184.    Moreover, as detailed herein, the 2004 Form 10-K/A was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

185.    The following quarterly financial metrics were reported in the Form 10-Q for the first quarter of 2005 ("1Q 2005 Form 10-Q"), which SafeNet filed with the SEC on May 10, 2005 and was signed by defendants Caputo and Mueller:

- Total Revenue of $59,812,000;

- Operating income (loss) of $1,428,000;

- Total costs and expenses of $58,384,000;

- Net Income (loss) of $1,238,000; and

- Basic net income (loss) per share of $0.05.

186.    Although SafeNet did not report that it issued stock options to certain executives during the first quarter of 2005, as a result of the failure to record a compensation expense for previously backdated options as they vested, these results were materially false and misleading. Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

187.    Moreover, as detailed herein, the 1Q 2005 Form 10-Q was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially

inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

188.    On July 6, 2005, SafeNet and the Directors Defendants, who were directors of SafeNet at the time, issued to investors SafeNet's definitive proxy statement on Form 14A in connection with the 2005 annual meeting of shareholders (the "2005 Proxy Statement").  Among other things, the 2005 Proxy Statement solicited investors to increase the number of shares in the Stock Option Plan from 3,000,000 to 6,000,000 shares.  As explained in the 2005 Proxy Statement, "The Company grants options to its employees and directors to maintain a competitive compensation package necessary to attract talented business professionals to join the Company.  Based on this policy and the current number of shares available under the existing plan, there are not enough shares left in the Plan to issue desired grants to employees and directors in the future."  The 2005 Proxy Statement made the following material misstatements regarding the Company's stock option grants and granting practices:

(a)    Under the heading "Executive Compensation," defendants provided a chart listing "Options Grants in Fiscal Year 2004."  Footnote 4 to this chart stated as follows:

> The potential realizable value has been calculated in conformity with Securities and Exchange Commission proxy statement disclosure rules and is not intended to forecast possible future appreciation of the common stock.  ***No gain to the options is possible without stock price appreciation, which will benefit all shareholders. If the stock price does not increase above the exercise price, compensation to the named executive will be zero***. (Emphasis added.)

(b)    Under the heading "Report of Compensation Committee on Executive Compensation," defendants disclosed the following:

> The Compensation Committee of the Board of Directors (the "Committee") reviews and approves the general compensation policies of the Company, specific compensation for each executive officer of the Company, the Company's equity compensation plans

and makes recommendations to the Board of Directors regarding these matters. *The Company's policy, as administered through the Committee, is to provide compensation packages to the executive officers of the Company sufficient to attract and retain persons of exceptional quality and to provide effective incentives* to motivate and reward such executives for achieving the technical, financial and strategic goals of the Company essential to the Company's long-term success and to growth in stockholder value. Consequently, a significant portion of the compensation of the executive officers and directors *is dependent on company performance and maintenance of value in the marketplace*.

*****

*Grants of stock options are designed to align the executive's interest with that of the stockholders of the Company* ...Stock options are also provided to all new employees as well as occasional grants in recognition of superior performance, etc. The overall objective of the stock option program is to cause employees to identify with the success of the Company and to incent superior performance. (Emphases added.)

(c)     Under the heading "Potential Limitations on Company Deductions,"

defendants represented as follows:

Section 162(m) of the Code denies a deduction to any publicly held corporation for compensation paid to certain "covered employees" in a taxable year to the extent that compensation to such covered employee exceeds $1 million. It is possible that compensation attributable to awards, when combined with all other types of compensation received by a covered employee from the Company, may cause this limitation to be exceeded in any particular year.

Certain kinds of compensation, including qualified "performance-based compensation," are disregarded for purposes of the deduction limitation. In accordance with Treasury regulations issued under Section 162(m), compensation attributable to stock options and stock appreciation rights will qualify as performance-based compensation if the award is granted by a compensation committee comprised solely of "outside directors" and either (i) the plan contains a per-employee limitation on the number of shares for which such awards may be granted during a specified period, the per-employee limitation is approved by the stockholders and the exercise price of the award is *no less than the fair market value of the stock on the date of grant*, or (ii) *the*

>*award is granted (or exercisable) only upon the achievement (as certified in writing by the compensation committee) of an objective performance goal established in writing by the compensation committee while the outcome is substantially uncertain*, and the award is approved by stockholders. *It is intended that stock options issued under the 2001 Plan will qualify as "performance-based compensation."* (Emphases added.)

189.    As set forth herein, during 2004 and since at least 1999, SafeNet issued stock options that were backdated.   As a result, the 2005 Proxy Statement contained material misstatements because:

(a)     To the extent stock options were "backdated" and priced below fair market value, the executives, directors and employees who received backdated stock options were able to enjoy gain without stock price appreciation;

(b)     The "per share option price" was ***not*** "the closing price on the grant date," as had been reported;

(c)     Grants ***did not*** "align the executive's interest with that of the stockholders of the Company" because those executives were obtaining financial benefits as a result of cronyism and undisclosed conflicts of interest, and irrespective of any future performance, since the option strike prices already reflected stock appreciation that preceded the grant date or reflected stock appreciation;

(d)     Stock options that were granted at below fair market value or based on performance goals whose outcome was no longer uncertain might not qualify as "performance-based compensation," as was asserted would be the case for options granted under the Stock Option Plan; and

(e)     SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and

others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

190.    A Form 8-K, dated July 26, 2005 and signed by defendant Caputo, informed the market that SafeNet had amended the Company's 2001 Omnibus Stock Option Plan with shareholder approval.  Of particular import, the amended plan provided that all stock options granted under the Plan must have an exercise price of not less than the fair market value of the Company's common stock as of the date of grant.

191.    The Form 8-K, dated July 26, 2005, was materially false and misleading because Defendants failed to disclose that despite prior representations to the contrary (as identified herein), in 2005 and since at least 2001, SafeNet had already granted millions of dollars worth of stock options with exercise prices less than fair market value.  Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

192.    The following quarterly financial metrics were reported in the Form 10-Q for the second quarter of 2005 ("2Q 2005 Form 10-Q"), which SafeNet filed with the SEC on August 9, 2005 and was signed by defendants Caputo and Mueller:

- Total Revenue of $63,498,000;

- Operating income (loss) of ($5,898,000);

- Total costs and expenses of $69,396,000;

- Net Income (loss) of ($3,811,000); and

- Basic net income (loss) per share of ($0.15).

193.    As detailed herein, the 2Q 2005 Form 10-Q was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

194.    As set forth herein, although SafeNet did not report that it issued stock options to its Board and only reported granting 487 options to employees, during the second quarter of 2005 and since at least 2001, SafeNet issued stock options that were backdated to high level executives and others.  As a result, the 2Q2005 Form 10-Q was materially false and misleading because it failed to disclose this practice or to record related compensation expenses, and the Company did not in fact account for these options in accordance with APB Opinion No. 25 or GAAP.  Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, risk less profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

195.    On November 9, 2005, SafeNet filed its Form 10-Q for the third quarter of 2005 (the "3Q 2005 Form 10-Q") with the SEC.  Defendants Caputo and Mueller signed the 3Q 2005 Form 10-Q.  The 3Q 2005 Form 10-Q reported the following financial results:

- Total Revenue of $63,017,000;

- Operating income (loss) of ($441,000);

- Total costs and expenses of $63,458,000;

- Net Income (loss) of $717,000; and

- Basic net income (loss) per share of ($0.03).

196.    Note 3 to SafeNet's financial statements for the third quarter of 2005, as reported

in the 3Q 2005 Form 10-Q, was entitled "Summary of Significant Accounting Policies."   It

stated the following, *inter alia*:

(a)    Under the heading "Employee Stock-Based Compensation," Note 3 stated

as follows:

> As of September 30, 2005, the Company had five stock-based
> employee compensation plans. The Company accounts for those
> plans using the intrinsic value method prescribed by APB Opinion
> No. 25, *Accounting for Stock Issued to Employees*, and related
> interpretations.

(b)    Under the heading "Recent Accounting Pronouncements," Note 3

represented as follows:

> As permitted by Statement 123, the Company currently accounts
> for share-based payments to employees using Opinion 25's
> intrinsic value method and, as such, ***generally recognizes no
> compensation cost for employee stock options***.

197.    As set forth herein, during 2005 and since at least 2001, SafeNet issued stock

options that were backdated.  In particular, SafeNet issued stock options with exercise prices

equal to the closing price on September 29, 2005, the day of the critical announcement of

SafeNet's KIV-7M Contract.  Those options were either backdated.  As a result, the 3Q 2005

Form 10-Q was materially false and misleading because it failed to disclose this practice or to

record related compensation expenses.  Indeed, SafeNet's top executives were manipulating the

Company's stock option plans so as to enrich themselves and attract employees by backdating

the stock options they and others were granted, thus giving recipients an instant, riskless profit,

while exposing the Company to the risks of regulatory investigations, tax penalties, restatements,

and civil and criminal proceedings.

198.    Moreover, as detailed herein, the 3Q 2005 Form 10-Q was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

199.    On March 16, 2006, SafeNet filed its Form 10-K for the year ended December 31, 2005 (the "2005 Form 10-K") with the SEC.   Officer Defendants Caputo and Mueller and Director Defendants Brooks, Harrison, Hunt, Thaw, Clark and Money signed the 2005 Form 10-K.  The 2005 Form 10-K reported the following financial results:

- Total Revenue of $263,061,000;

- Operating income (loss) of $146,000;

- Total costs and expenses of $262,915,000;

- Net Income (loss) of $3,028,000; and

- Basic net income (loss) per share of $0.12.

200.    Note 2 to SafeNet's financial statements for 2005, as reported in the 2005 Form 10-K, was entitled "Summary of Significant Accounting Policies."   Regarding compensation, Note 2 stated:

> **Employee Stock-Based Compensation**
>
> At December 31, 2005, the Company had five stock-based employee compensation plans, which are described more fully in Note 14. ***The Company accounts for those plans using the intrinsic value method prescribed by APB Opinion No. 25***, *Accounting for Stock Issued to Employees*, and related interpretations.   Under the intrinsic value method, stock compensation expense is defined as the difference between the amount payable upon exercise of an option and the quoted market value of the underlying common stock on the date of grant or measurement date. ***Stock-based employee compensation reflected in the statements of operations includes the amortization of***

> *unearned compensation related to unvested options assumed in purchase business combinations as well as the amortization of the intrinsic value of certain options granted to employees with exercise prices below the market value of the underlying common stock on the date of grant.*  Any resulting compensation expense is recognized ratably over the vesting period. (Emphases added.)

201.    Note 14 to the financial statements for 2005, as reported in the 2005 Form 10-K, was entitled "Stock Compensation Plans," and stated as follows:

**Stock Option Plans**

> The Company sponsors five stock option plans that provide for the granting of stock options to officers, directors, consultants and employees of the Company.  *Options have been granted with exercise prices that are equal to, or in some cases below the fair market value of the common stock on the date of grant and, subject to termination of employment, expire seven years from the date of grant.* Either incentive stock options or non-qualified stock options may be granted under the plans. The vesting and exercise periods are determined by the Board of Directors and the lives may not exceed ten years.

202.    The 2005 Form 10-K was materially false and misleading and omitted to state material facts because defendants failed to disclose the extent to which stock options had been backdated and granted, in 2005 and since at least 2001, at exercise prices below the fair market value on the date of the grant (including periods when SafeNet reported that *all* options were granted with prices *equal to* the market price on the date of the grant) and failed to properly record related compensation expenses, and the Company did not in fact account for those options in accordance with APB Opinion No. 25 or GAAP.  Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the severe risks lost investor confidence, of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

203.    Moreover, as detailed herein, the 2005 Form 10-K was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

204.    On May 10, 2006, SafeNet filed its Form 10-Q for the first quarter of 2006 (the "1Q 2006 Form 10-Q") with the SEC.  Defendants Caputo and Argo signed the 1Q 2006 Form 10-Q.  The 1Q 2006 Form 10-Q reported the following financial results:

- Total revenues of $63,475,000;

- Operating income (loss) of ($5,066,000);

- Total costs and expenses of $68,541,000;

- Net Income (loss) of ($2,390,000); and

- Basic net income (loss) per share of ($0.10).

205.     Note 3 to SafeNet's financial statements for the first quarter of 2006, as reported in the 1Q 2006 Form 10-Q, was entitled "Summary of Significant Accounting Policies."  Under the heading "Employee Stock-Based Compensation," Note 3 stated:

> "Effective January 1, 2006, the Company adopted the fair value recognition provisions of Statement of Financial Accounting Standards ("SFAS") No. 123 (revised 2004), "Share-Based Payment" ("SFAS 123R"), using the modified prospective transition method and therefore has not restated results for prior periods. ***Under this transition method, stock-based compensation expense for the first quarter of 2006 includes compensation expense for all stock-based compensation awards granted prior to, but not yet vested as of January 1, 2006***, based on the grant date fair value estimated in accordance with the original provision of SFAS No. 123, "Accounting for Stock-Based Compensation" ("SFAS 123"). . . . ***Prior to the adoption of SFAS 123R, SafeNet recognized stock-based compensation expense using the intrinsic***

-95-

*value method in accordance with Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25")."* (Emphasis added).

206.    Note 15 to SafeNet's financial statements for the first quarter of 2006, as reported in the 1Q 2006 Form 10-Q, was entitled "Stock-Based Compensation."    It repeated the explanation of SFAS 123 and reported:

> "At March 31, 2006, the Company has several stock-based employee compensation plans as described below. ***The total compensation expense related to these plans was $2,110 for the three months ended March 31, 2006. Prior to January 1, 2006, the Company accounted for those plans under the recognition and measurement provisions of APB 25. Accordingly, the Company generally recognized compensation expense only when it granted options with intrinsic value at the grant date. Any resulting compensation expense was recognized ratably over the associated service period, which was generally the option vesting term.***" (Emphasis added).

207.    Note 15 purported to explain SafeNet's stock option plans and repeated that "[t]he exercise price of a stock option generally is equal to the fair market value of SafeNet's common stock on the option grant date." It went on to give an overview of SafeNet's option grants for 2005, including giving ranges of exercise prices and aggregate intrinsic values for the options.

208.    Item 2 to SafeNet's financial statements for the first quarter of 2006, as reported in the 1Q 2006 Form 10-Q, was entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations."   Under the heading "Critical Accounting Policies and Estimates," SafeNet stated:

> "Prior to SFAS 123R adoption, we accounted for share-based payments under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") ***and, accordingly, generally recognized compensation expense only when we granted options with an intrinsic value at the grant date.***" (Emphasis added).

209.    As set forth herein, since at least 1999, SafeNet issued stock options that were backdated and did not record related compensation expenses as required.  As a result, the 1Q 2006 Form 10-Q was materially false and misleading when issued because compensation expenses should have been recorded, SafeNet awarded stock options above "fair market value" and it did not, in fact, "recognize[ ] stock-based compensation expense using the intrinsic value method in accordance with Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25")."   Indeed, SafeNet's top executives were manipulating the Company's stock option plans so as to enrich themselves and attract employees by backdating the stock options they and others were granted, thus giving recipients an instant, riskless profit, while exposing the Company to the risks of regulatory investigations, tax penalties, restatements, and civil and criminal proceedings.

210.    Moreover, as detailed herein, the 1Q 2006 Form 10-Q was materially false and misleading because, *inter alia*, it failed to disclose that the Company's reported revenues, operating income and net income (earnings), as incorporated, were materially and artificially inflated as a result of SafeNet's improper revenue recognition and other accounting improprieties described above in ¶¶ 100 to 136.

211.    Each of SafeNet's financial statements filed with the SEC on Form 10-Q and Form 10-K (and amendments) were signed and certified by defendant Caputo and either defendant Argo or defendant Mueller, in their respective capacity as CEO and CFO as required by the Sarbanes-Oxley Act of 2002 ("Certifications").  Within their Certifications, defendants Caputo and Argo attested that the information contained within each report fairly presented, in all material respects, the financial condition of the Company.   In truth, the Certifications contained within SafeNet's filings and signed by defendants Caputo and Argo were false and

misleading because of the above misstatements and omissions included within those financial

statements.   In addition, defendants Caputo, along with defendant Argo and/or Mueller,

represented that SafeNet had adequate internal control over financial reporting.   In truth,

SafeNet had inadequate internal control over financial reporting, which the Company later

admitted in a Form 8-K/A filed with the SEC on March 13, 2006.

**VII.   THE TRUTH CONCERNING SAFENET'S FRAUDULENT PRACTICES SLOWLY BEGINS TO EMERGE**

      **A.   The February 2, 2006 Disclosure of SafeNet's Need To Restate Its Financials**

212.   On February 2, 2006, Defendants issued (and later filed with the SEC as an

exhibit to a Current Report on Form 8-K signed by defendant Caputo) a press release in which

the Company reported its financial results for the fourth quarter of 2005 and disclosed that

SafeNet's previously disclosed earnings for the second and third quarters of 2005 would be

restated in the near future (the "February 2 Restatement Disclosure").

213.   In the February 2 Restatement Disclosure, SafeNet reported fourth quarter of

$77.1 million and EPS at $0.45, which were below analysts' consensus estimates of $80 million

and $0.55, respectively.   SafeNet reported GAAP income for the year at $4.1 million or $0.16

per diluted share.   The February 2 Restatement Disclosure also stated as follows:

> During the year end audit process, we discovered errors that
> impacted prior quarters but did not materially impact the full year
> results. One error occurred during the second quarter of 2005
> which consisted of an understatement of lease restructuring
> charges of approximately $700,000.   Another error of
> approximately $600,000 was related to an understatement of our
> costs of revenues in our Classified Government business in the
> third quarter of 2005.   These errors will be corrected in a 10-Q/A
> filing shortly.

Notwithstanding SafeNet's false assertion that the "errors" they had discovered "did not

materially impact the full year results," these amounts were material both to SafeNet's

previously reported full year financial results for 2005 and for the second and third quarters of 2005.  In its subsequent earnings conference call that same day, SafeNet also disclosed that its auditors had been reviewing SafeNet's revenue recognition policies, and had concluded that SafeNet needed to defer recognition of $1 million in revenue that the company had originally planned to recognize in the fourth quarter of 2005

214.    As noted above, during the development phase of a long-term contract, if actual costs to date differed from the estimated cost to complete the project, SafeNet, in accordance with GAAP, would adjust its estimated costs to complete the project and account for this change in estimate prospectively in connection with recognizing revenue on the contract in the current and future accounting periods.  However, in this instance, the Company restated its earnings based on an "understatement of our costs of revenues."   Thus, by restating, SafeNet acknowledged that its previously reported costs of revenues was understated, not because of a change in an accounting estimate, but rather due to improper accounting which overstated SafeNet's originally reported earnings.  These "errors" were material to investors because they were not innocent mistakes or differences due to changes in accounting estimates, but rather were restatements of costs that were previously understated by management in order to improve SafeNet's publicly reported earnings.  As such, these restatements related directly to the integrity of SafeNet's management and the reliability of its financial reporting.

215.    For example, as financial analyst firm Glass Lewis & Co. reported on Monday, February 6 in a report titled "SafeNet Stumbles; Observations from 4Q earnings release":

> [W]e feel investors should take note of the following observations from the Company's 4Q earnings release:
>
> (1)    *Stealth Restatement for 3Q '05*:  SafeNet disclosed "an error of approximately $600,000 … related to an understatement of costs of revenues in our Classified Government business" in 3Q

'05. The error will result in a restatement of results, yet the Company has not released a Form 8-K "Non-reliance on previous financials." *According to the earnings press release, the error "did not materially impact full year results." However, the error appears to have reduced 3Q pro-forma EPS by 8% ($0.23 vs. $0.25 previously reported).* Interestingly, the expense understatement occurred in the same revenue segment where a previous adjustment to profitability assumptions resulted in $0.05 of additional EPS in the third quarter. *We are troubled by the fact pattern here; the Company lowers its expense assumptions (increasing EPS) regarding certain government contracts in its initial 3Q release, only to undertake a (stealth?) restatement of these expenses in a later period (lowering EPS)*…

(2)    *Continued revenue recognition concerns*:   During its earnings conference call, the Company disclosed that it and its auditors "have looked closely at revenue recognition policies" and decided to defer $1 million of revenue previously forecasted to be recognized in the fourth quarter.   The revenue will now be recognized ratably over 2006.  This disclosure is another example of the Company's exposure to assumptions-based revenue streams, confirming our belief that investors should closely scrutinize metrics related to revenue recognition at SafeNet…. (Emphases added.)

216.    Similarly, Deutsche Bank expressed concerns about the restatement and SafeNet's

revenue recognition disclosures in a report dated February 2, 2006:

*2Q05 and 3Q05 restatement and revenue recognition issue in 4Q05 concerning*:

In its press release, and not discussed on the call, were two accounting restatements from 2Q05 and 3Q05.  The $700,000 understatement of the lease restructuring charge in 2Q05 is relatively minor, but we are somewhat concerned that the $600,000 understatement in COGS in 3Q05 was not discussed or called out. This artificially inflated a gross margin metric in Q305 that was already below investors' expectations.  While the gross margin improvement the company exhibited in 4Q05 was better than pro forma numbers show because of this adjustment, this issue creates some uncertainty into the financial controls of the company.  In addition, in 4Q05 SafeNet highlighted there was approximately $1 million in deals that they thought they would be able to recognize, but their auditors have subsequently indicated must be deferred. As isolated incidents, neither of these issues is that large, but we

hope that these small accounting issues do not become a pattern for the company.

217.    In response to SafeNet's February 2, 2006 disclosures, SafeNet's stock price fell sharply, dropping 15.2% from $32.72 per share on February 2, 2006 to $27.75 at the close on February 3, 2006 on heavy volume of 5,860,500 shares (which was over 15 times the average reported trading volume for SafeNet shares during the period between October 1, 2005 and February 2, 2006).

218.    SafeNet's subsequent disclosures in February and March of 2006 further confirmed that SafeNet would have to restate prior financial statements.  For example, on February 27, 2006, SafeNet filed with the SEC an amended Form 10-Q for the third quarter of 2005, signed by Caputo and Mueller, which admitted that as to that quarter:

> The Company *restated* its previously issued consolidated financial statements as of and for the three and nine-month periods ended September 30, 2005. *The restated unaudited consolidated financial statements result primarily from an error made in the recognition of costs under certain long-term production contracts.* During the three-month period ended September 30, 2005 the Company failed to properly recognize $731 of costs of product sales related to two long-term production contracts that were completed during the period, which resulted in an *understatement of costs of goods sold and an overstatement of inventory at the balance sheet date.* (Dollar Amounts in Thousands) (Emphases added.)

The effect of this restatement of SafeNet's reported income was material, decreasing reported income for the quarter from $717,000 (or 3 cents per share) to $178,000 (or 1 cent per share), representing approximately a 75% decrease in total reported income for the quarter and increasing the reported net loss for the first nine months of 2005 from $1,856,000 (a loss of 8 cents per share) to $2,395,000 (a loss of 10 cents per share), representing a 25% increase in the reported loss.

219.    Two weeks later, in a press release dated March 13, 2006 (which was attached to SafeNet's Form 8-K/A of the same date) (the "March 13 Form 8-K/A") SafeNet also confirmed that the Company would be restating its financial results for the second quarter of 2005. As the March 13 Form 8-K/A stated:

>    [A]fter further review and discussions with Ernst & Young LLP, the Company's independent registered public accounting firm, in connection with the audit of the Company's financial statements for the year ended December 31, 2005, the Company and its Audit Committee, as well as Ernst & Young LLP, have reexamined this matter and the second quarter Form 10-Q and concluded that the adjustments resulting from such previously disclosed errors are material in relation to previously reported results of operations. Accordingly, the financial statements included in the June 30, 2005 Form 10-Q should no longer be relied upon. As disclosed previously, these errors are principally attributable to the accounting for a restructuring accrual related to the exit of an operating lease approximating $650,000, as well as other individually less material errors approximating $400,000 in the aggregate. The Company expects these adjustments to result in a net loss per common share, on GAAP basis of $0.20 and $0.15 for the three and six months ended June 30, 2005, respectively, rather than a net loss per common share of $0.15 and $0.10, respectively, as reported for such periods in the June 30, 2005 Form 10-Q.

>    The adjustments to second quarter will also result in cumulative adjustments to certain information presented in the September 30, 2005 Form 10-Q for the nine months ended September 30, 2005. As a result of these adjustments, the Company expects that net loss per common share, on a GAAP basis, [will] be $0.14 for the nine months ended September 30, 2005, rather than $0.10 as reported for such period in the September 30, 2005 Form 10-Q/A (Amendment No. 1).

>                                 *****

>    **For the full year 2005, net income per diluted share decreased from $0.16, as previously announced in the press release on February 2, 2006, to $0.12 as a result of the adjustments discussed in this Amendment No. 2 to Form 8-K/A.**  (Emphases added).

220.    As a result of SafeNet's restatement of its second quarter 2005 results (the "2Q 2005 Restatement"), SafeNet's reported net loss per share for the quarter increased from 15 cents to 20 cents per share, representing a 33% adjustment in the Company's net loss per share for that quarter.  The net loss per share for the first six months of 2005 increased from 10 to 15 cents, representing a 50% adverse adjustment in the Company's net loss for that period, and the net loss for the first nine months of 2005 increased from 10 to 14 cents per share, representing a 40% adverse adjustment in the Company's net loss for that time period.  Net income for the year decreased by 25%, from 16 cents to 12 cents per diluted share.

221.    In its March 13 Form 8-K/A, SafeNet also admitted that contrary to the Officer Defendants' prior statements and certifications, material weaknesses in SafeNet's internal controls did indeed exist:

> ***[M]anagement has currently identified a material weakness in internal control as of December 31, 2005.*** A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The material weakness pertains to insufficient staffing and technical expertise in the Company's accounting and financial reporting functions. The inadequate level of staffing and technical expertise results in certain accounting processes and controls around the financial statement close and financial reporting processes not being performed correctly, or on a timely basis. ***As a result of this weakness, material adjustments were identified related to accounting for revenue and costs on long-term contracts, plus other less material adjustments. The lack of sufficient staffing and technical expertise has reduced the effectiveness of the existing accounting and financial reporting function in its monitoring and evaluation of the financial position and operating results of the Company, thereby increasing the risk of a financial statement misstatement.***
>
> The adjustments resulted in the restatement of the Company's financial statements for the three and six month periods ended June 30, 2005 and the three and nine month periods ended September 30, 2005. ***Accordingly, management has determined that this deficiency in controls reflects a material weakness.***

> ***Because of this material weakness, management has concluded***
> ***that the Company did not maintain effective internal control over***
> ***financial reporting as of December 31, 2005*** based on the criteria
> in COSO Internal Control — Integrated Framework. In addition, as
> a result of these findings, management believes that the
> Company's disclosure controls and procedures as of the end of
> second and third quarters and year ended 2005 were ineffective.
> (Emphases added).

However, also on March 13, 2006, the Officer Defendants sought to reassure investors and downplay the significance of SafeNet's internal control weakness by issuing a press release that quoted defendant Caputo as follows: "While we are still in the process of evaluating our internal controls, we have concluded that a material weakness existed as of December 31, 2005 and, therefore, we have already increased accounting personnel and are putting in place a plan to greatly strengthen our internal review function."

222.    On March 16, 2006, SafeNet issued its Form 10-K for the year 2005.  However, for the reasons previously set forth above, this Form 10-K was materially false and misleading.

### B.    The April 6, 2006 Disclosure of the Termination of Defendant Mueller

223.    On April 6, 2006, however, the investing public was rocked by further revelations indicating that the extent of the rot in SafeNet's accounting and the severity of its financial control and reporting problems were significantly greater than had been previously disclosed when SafeNet issued a press release (also filed with the SEC as an exhibit to a Form 8-K the same day and signed by Caputo).  The April 6 press release revealed that the Company had removed defendant Mueller from his position as CFO (and that defendant Argo would be stepping in as interim CFO), and that SafeNet would also be missing its prior earnings forecasts for the first quarter of 2006.

224.    The market reacted swiftly to SafeNet's disclosure of the termination of defendant Mueller as CFO and the news of missed and lower expected earnings for the first quarter of

2006.  In response, SafeNet's stock price fell 19.3%, from $25.97 on April 6, 2006 to $20.96 on

April 7, 2006, on heavy volume of 6,199,600 shares traded (which was over 16 times the average

trading volume in SafeNet shares during the period from December 9, 2005 through April 6,

2006).   As the Associated Press reported later that day, SafeNet shares "hit a 52-week low" after

the Company "delivered a sack of bad news, including the resignation of its chief financial

officer."

225.    The following month, on May 1, 2006, SafeNet filed its Amended Form 10-Q for

the second quarter of 2005, which defendants Caputo and Argo signed (the "Restated 2Q 2005

Form 10-Q").  The Restated 2Q 2005 Form 10-Q stated that:

> During the three-month period ended June 30, 2005 the Company
> failed to properly recognize $642,000 of restructuring costs related
> to an exited leased facility, which resulted in an understatement of
> restructuring expense. The Company also made an error in the
> percentage of completion calculation related to a long-term
> production contract that resulted in an overstatement of revenue for
> the three and six month periods ended June 30, 2006 of $356,000.

The restatement materially affected SafeNet's reported earnings, as it increased SafeNet's

reported loss for the second quarter increasing from $3,811,000 (or 15 cents per diluted share) to

$4,895,000 (or 20 cents per share), and increased its reported loss for the first half of 2005 from

$2,573,000 (or 10 cents per share) to $3,722,000 (or 15 cents per share).   Also on May 1, 2006,

SafeNet filed its Amended Form 10-Q for the third quarter of 2005, which defendants Caputo

and Argo signed (the "Second Restated 3Q 2005 Form 10-Q"), and which disclosed the effect of

SafeNet's second quarter restatement on its reported financial results for the first nine months of

2005.

## C.     The May 18, 2006 Disclosure of Government's Backdating Investigation

226.    Finally, on May 18, 2006, investors were further stunned by SafeNet disclosures

that it had received a subpoena from the United States Attorney's Office for the Southern District

of New York demanding information about the Company's stock option grants, and that the SEC

had also launched an investigation into the Company's "stock option grants to directors and

officers" and "certain accounting policies and practices."  As SafeNet stated in a press release

issues on May 18, 2006:

> SafeNet … today announced that it received a subpoena from the
> office of the United States Attorney for the Southern District of
> New York relating to the Company's granting of stock options.
> The Company also announced that it has received an informal
> inquiry from the Securities and Exchange Commission requesting
> information relating to stock option grants to directors and officers
> of the Company, as well as information relating to certain
> accounting policies and practices.

227.    In response to this latest stunning revelation, SafeNet's stock price plummeted

once again, falling 22.3%, from $19.21 on May 18 to $14.93 at the close on May 19, 2006.  This

stock drop was the second biggest percentage decline of any stock on the NASDAQ on May 19.

This further decline reflected an astonishing drop in SafeNet's common stock from $32.72 per

share on February 2, 2006 to a mere $14.93 in just 2 ½ months – a decline of **over 55%.**

228.    Analysts also reacted negatively to SafeNet's May 18 disclosures.  For example,

an analyst report dated May 18, 2006 and captioned "Stock Option Issues Represent Another

Overhang," Stifel Nicolaus stated:

> After the close, SafeNet announced in a brief press release that it
> has received a subpoena from the U.S. Attorney for the Southern
> District of New York relating to the granting of stock options.
>
> In addition, the company announced that it has received an
> informal inquiry from the SEC also relating to stock option grants.
>
> While the stock option grant issue is new to SafeNet, the news is
> not entirely surprising.  We note that the whole issue of option
> backdating has been a recent focal point of the SEC with
> investigations leading to earnings restatements and executive
> departures for several companies, including Mercury Interactive
> and Comverse Technology.

At this point, it is difficult to say for sure whether SafeNet is guilty of backdating stock options.

*However, in gauging this risk, we believe the market will likely rely heavily on the quality of management and management credibility.*

*Unfortunately for SafeNet, we believe that persistent management credibility concerns along with the recent departure of its CFO will likely cause the market to look at the situation through a "worse case scenario" lens.*

*SFNT shares are down over 16% in after hours [trading]. We believe concerns over yesterday's announcement will serve as incremental overhang on the stock, in addition to the concerns regarding the fundamental outlook for the company.*

*Despite the sharp decline in the shares, we believe it is prudent to remain on the sidelines given the mounting uncertainties with respect to the company.*

229. Similarly, on May 19, 2006, Friedman Billings Ramsay issued an analyst report entitled "SFNT: Receives Stock options Inquiries from SEC: Risk Profile Increases Substantially – Downgrading from Outperform to Market Perform," which stated:

Last night, SFNT received a subpoena from the office of the U.S. Attorney General for the Southern District of NY relating to the company's granting of stock options. In addition, SFNT announced that it has received an informal inquiry from the SEC relating to these stock option grants as well as information relating to certain accounting policies and practices. While SFNT is not alone in the SEC stock option investigation (Comverse is another example), we believe this investigation adds substantially more risk to the story… Every time it appears the bad news is over with SFNT, there is yet another shoe to drop. **With the SEC now knocking on SFNT's door, we encourage investors to stay away from this name in the near-term until the overhang of a potentially prolonged investigation runs its course.** [Emphasis added].

\*\*\*\*\*

*Option Probe could lead down a number of different avenues.* While there were no specific details given about SFNT's option

probe, the nature of an SEC investigation casts a dark cloud over
SFNT's head until resolved.

In an analyst report entitled "Downgrade to NEUTRAL on Stock Option Inquiry Concerns"

issued May 19, 2006, Janney Montgomery Scott also downgraded SafeNet from "buy" to

"neutral," noting that "While we believe SafeNet possesses significant assets and value, we are

lowering our rating to NEUTRAL from Buy, as the risk associated with the government inquiries

outweighs the potential upside from current levels."

## VIII.   POST CLASS PERIOD EVENTS

230.   In the weeks and months following the stunning disclosures of the first half of

2006, events have only confirmed the extent to which SafeNet's accounting could not be relied

upon, the extent to which its senior management lacked integrity, and the extent to which its

historical financial statements were misstated and inflated.

231.   For example, on July 26, 2006, SafeNet issued a press release disclosing that it

would restate, *at the least*, its fourth quarter 2002 earnings because of improper accounting and

recording of prior stock option grants.  As SafeNet stated:

> **Update on Stock Option Granting Issues**
>
> As previously disclosed on June 2, 2006, SafeNet's Board of
> Directors has appointed a special committee of the board to
> investigate the Company's stock option granting practices. The
> special committee has retained independent counsel and forensic
> accountants to assist in its investigation, which is currently in
> progress. In addition, the Company has retained an international
> professional services firm to assist the Company in a review of the
> Company's accounting for stock option grants. That review is also
> ongoing.
>
> ***Based on its review to date, the Company believes that certain
> option grants, including grants to directors, officers and
> employees, were or likely were accounted for using incorrect
> measurement dates under applicable accounting rules in effect at***

*the time*. With respect to one of these grants, made to officers and employees of the Company, including the chief executive officer, in the fourth quarter of 2002, the Company has concluded that material non-cash, stock-based compensation expenses related to this option grant will have to be recorded. Therefore, the Company expects that financial statements for the fourth quarter of 2002 will have to be restated. As a result, the Company, in consultation with the Audit Committee and with the concurrence of its independent registered accounting firm, Ernst & Young LLP has determined that its financial statements and its related audit report of its independent registered accounting firm for the year ended December 31, 2002 should no longer be relied upon. The review by the Company and the investigation by the special committee of the Board of Directors are not yet complete, and accordingly the Company has not yet determined if there are further charges pertaining to the 2002 period or if financial statements from any other reporting periods will require restatement. Because the Company will not file its Form 10-Q for the quarter ended June 30, 2006 until it completes its review of accounting for stock option grants, the Company will not file its Form 10-Q for the second quarter of 2006 on a timely basis.

232.   Three months later, on September 18, 2006, SafeNet filed a Form 8-K with the SEC in which it publicly announced that the Company would actually need to restate its financial statements *for the years 2000 through 2005 and for the first quarter of 2006* (the quarter ended March 31, 2006), and on September 28, 2006, in a Form 8-K/A, SafeNet reconfirmed that its financial statements for 2004 and 2005, and the independent auditor opinions thereon, could not be relied upon.

233.   The following quarter, on January 9, 2007, SafeNet provided further guidance concerning its ongoing accounting review and some of the non-options related accounting improprieties at SafeNet that would require material restatements of the Company's financial statements for 2004 and 2005, and for the First Quarter of 2006.  As SafeNet stated:

These adjustments identified as a result of this review to date include: (1) treatment of non-recurring engineering revenue where there is an undelivered element, (2) timing of software license revenue recognized upon entering into the arrangement where the license includes maintenance, (3) revenue recognized pursuant to a

license agreement with a party whom we also have a development arrangement where fair value of elements to the arrangement could not be reasonably determined, and (4) funded research and development payments received reflected as revenue on a milestone basis.

*See* Form 8-K, filed January 9, 2007.

234.    However, the most dramatic confirmation of Plaintiffs' allegations of accounting fraud against SafeNet have come in criminal proceedings that the United States Attorneys Office launched shortly after the end of the Class Period.  As previously discussed, on July 25, 2007, Michael J. Garcia, the United States Attorney for the Southern District of New York, announced the filing of a criminal indictment against defendant Argo, charging her with securities fraud and ***conspiracy*** to commit securities fraud.  The indictment charged that between 2000 and 2006, Argo and others engaged in an illegal scheme to deceive the investing public about SafeNet's systematic backdating of millions of dollars worth of option grants.  In addition, on August 1, 2007, the SEC announced that it had filed a civil injunctive action against Argo for her role in the backdating and in causing SafeNet to report materially misstated financial results from 2000 through 2006.

235.    On October 5, 2007, defendant Argo pled guilty to committing felony securities fraud in violation of 15 U.S.C. §10(b).  As Argo testified as part of her plea allocution:

In mid-2000 I became responsible for overseeing SafeNet's process for granting and documenting stock options.  Sometime in December 2001 or early January 2002, SafeNet's compensation committee approved a grant of stock options to me and two other individuals, one of whom was the Company's CEO [defendant Caputo].  ***The CEO [defendant Caputo] asked me to report October 1, 2001, as the date on which his options had been approved.  SafeNet's stock price on October 1, 2001 was its lowest stock price in the quarter***.  I agreed to document the CEO's options as if they had been granted on October 1, 2001.  ***I did so, and the compensation committee approved this treatment, even though I and others knew that the compensation committee had not granted the options on that date***.  I similarly documented the

options granted to me and the other individual as if they had been granted on October 1, 2001, even though I knew this was untrue.

By using October 1 as the grant date, SafeNet avoided reporting any compensation expense. I knew that if we had used the correct grant date with the October 1 exercise price, SafeNet would have been required to record the difference between the exercise price and the higher stock price on the actual grant date as a compensation expense in its financial statements. As a result of using October 1, 2001 as the grant date, SafeNet's public filings included inaccurate compensation expense information.… In causing these filings to be inaccurate, I acted willfully and with intent to defraud.

***In the following years, with respect to certain [additional option grants], I and others at SafeNet selected with hindsight grant dates with a low price from within the period when the grant was under consideration.*** As to these grants, the Company did not record a compensation expense. This was wrong, and as a result of my conduct the company's public filings were inaccurate in this respect....

*United States v. Argo,* 07 CR 683 (JSR) (S.D.N.Y.), Transcript of Plea Allocution Proceedings,

dated October 5, 2007 (emphasis added).

236.    The government's Indictment of Argo, at paragraph 27, also confirms that defendant Mueller (as well as Argo and Caputo) was also well aware of and involved in SafeNet's options backdating activities. For example, the indictment quotes a Sept. 15, 2004 e-mail from Argo to recently appointed CFO defendant Mueller:

Our past ***practice*** has been to aggregate options for performance awards or new hires in the quarter and pick the best price after the hire date. We then send the unanimous consent to the comp committee and the options are approved. I think this is a good practice because of the volatility of our stock price. (Emphasis added.)

On January 28, 2008, defendant Argo was sentenced to 6 months in prison and fined $1 million.

The SEC charges against her are still pending.

IX.     **SAFENET'S GAAP VIOLATIONS**

237.    At all relevant times during the Class Period, SafeNet represented that its financial statements as filed with the SEC were prepared in accordance with GAAP.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  As set forth in the Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information  concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future performance, those expectations are commonly based at least partly in evaluations of past performance.

238.    Although SafeNet's financial statements during the Class Period were each represented to have been prepared in accordance with GAAP, in reality those representations were materially false and misleading as Defendants knowingly or recklessly caused SafeNet to issue financial statements that were predicated on fraudulent financial manipulations.   In particular, SafeNet's financial statements artificially and improperly inflated the Company's operating results by employing fraudulent stock options practices and revenue recognition practices – including improperly accounting for backdated stock option grants, manipulating its recognition of revenue, costs and earnings in connection with its improper accounting for long-term development contracts, improperly recognizing revenue on "bill and hold" transactions, improperly recognizing revenue on shipments of product that were unfinished or otherwise not ready to be delivered, and improperly recognizing revenue on accelerated royalty payments.

239.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.   Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.   17 C.F.R. § 210.10-01(a).   Pursuant to the Sarbanes-Oxley Act of 2002 and SEC rules promulgated thereunder, the CEO and CFO of reporting corporations are required to certify the accuracy and completeness of its financial statements.   In addition, proxy statements and annual reports are required to make extensive disclosures regarding executive compensation, including stock holdings and exercised and unexercised stock options.

240.    Under accounting rules in effect prior to approximately 2006, companies that granted stock options with an exercise price below the market price on the day of the grant had recognize and record the difference between the market price and the exercise price as a compensation expenses in their financial statements. *See* APB No. 25.   Throughout the Class Period, SafeNet represented in its financial statements filed with the SEC that it followed APB No. 25 when accounting for its stock option grants.   Unbeknownst to investors, however, SafeNet engaged in options backdating, whereby it granted its employees and directors stock options with exercise prices below the market price on the date those options were granted, yet it failed to record the difference between the market price and exercise price as compensation expenses as required by APB No. 25.

241.    FASB Concept Statement No. 5 generally provides that revenues should not be recognized until they are (a) realized or realizable, and (b) earned.   These conditions for revenue recognition ordinarily are met when assets or services are exchanged for cash or claims to cash,

and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue.  Concepts Statement No. 5 ¶ 83.  Generally, a transfer of risk must occur in order to affect an "exchange" for purposes of revenue recognition under GAAP.  In addition, GAAP provides that profit is deemed to be realized when the collection of the sales price is reasonably assured.  Accounting Principles Board ("APB") Opinion No. 10, ¶ 12.  Further, revenue which arises from circumstances involving uncertainty as to possible gains should not be recognized since to do so may result in gains being recognized on revenue prior to its realization.  FASB Statement of Financial Accounting Standards ("SFAS") No. 5 ¶ 12.

242.    AICPA SOP 81-1 and AICPA SOP No. 97-2, as described herein, provide the relevant GAAP guidance with respect to SafeNet's recognition of revenue on long-term development contracts.  Pursuant to such guidance, there are two generally accepted methods for revenue recognition (depending on the circumstances relating to the specific contract) on long-term contracts: the "completed contract" method; and the "percentage of completion method."  Within its Class Period financial statements, SafeNet purported to employ the "percentage of completion" method.  However, unbeknownst to investors, the Officer Defendants manipulated SafeNet's contract accounting and caused the Company's earnings reported in its Class Period financial statements to be overstated by overstating revenues and understating costs relating to its long-term contracts.   Specifically, SafeNet underestimated initial cost estimates, as well as subsequent cost to complete estimates made during the development phase for certain long-term development contracts, enabling it to improperly frontload the recognition of revenue and earnings and avoid recognizing losses on unprofitable contracts in violation of GAAP.  Such improper accounting manipulations also concealed from investors the fact that: (1) SafeNet's current earnings figures were artificially inflated because total contract cost estimates were

understated, which further caused contract revenues to be front-loaded due to SafeNet's method of recognizing revenues based on the percentage of total costs incurred to date and (2) SafeNet's future earnings on its existing long term contracts would be far weaker, and possibly even negative, as the burden of the higher actual contract costs would be recognized on the back-end of these contracts..

243.    In addition, SEC SAB 101, as defined herein, provides that each of the following criteria must be met before a seller can recognize revenue on a "bill and hold" transaction prior to actual shipment:

    (i)    the risk of ownership must have passed to the buyer;

    (ii)    the customer must have a fixed commitment to purchase the goods, preferably within written documentation;

    (iii)    *the buyer, not the seller, must request that the transaction be on a bill and hold basis*, and the buyer must have a substantial business purpose for ordering the goods on a bill and hold basis;

    (iv)    there must be a fixed schedule for the delivery of the goods, and the date for delivery must be reasonable and must be consistent with the buyer's business purposes;

    (v)    the seller must not have retained any specific performance obligations such that the earning process is not complete;

    (vi)    the ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

    (vii)    *the equipment [product] must be complete and ready to ship.*

However, throughout the Class Period, SafeNet continually requested and caused its customers to enter into "bill and hold" transactions (despite the lack of a substantial business purpose), for which it recognized revenue in its Class Period financial statements in violation of GAAP and SEC SAB 101.  Also, throughout the Class Period, SafeNet continually shipped to customers

products that were not complete and/or ready for delivery and recognized revenue for those shipments in its Class Period financial statements in violation of SEC SAB 101 and FAS 5.

244.    The foregoing accounting improprieties caused SafeNet to present its financial results during the Class Period in a manner which violated numerous provisions of GAAP.  As a result, SafeNet's Class Period financial statements concealed the truth about the Company's revenues, business operations income and net income to the detriment of unsuspecting investors. Moreover, in addition to the accounting violations noted above, SafeNet presented its financial statements in a manner which also violated at least the following provisions of GAAP:

(a) GAAP's requirement that revenue is not to be recognized before the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product. SFAS No. 48, ¶ 6;

(b) The concept that financial reporting should provide information that is useful to present and potential investors and creditors and others making rational investment, credit and similar decisions. FASB Concepts Statement No. 1, ¶ 34;

(c) The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources. FASB Concepts Statement No. 1, ¶ 40;

(d) The concept that financial reporting should provide information about how management of an enterprise has discharged stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

accountability to prospective investors and to the public in general.  FASB Concepts Statement No. 1 ¶ 50;

(e) The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least party on evaluations of past enterprise performance. FASB Concepts Statement No. 1, ¶ 42;

(f) The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting.  FASB Concept Statement No. 2 ¶¶ 58-59; and

(g) The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. FASB Concepts Statement No. 2, ¶ 79.

## X.   ADDITIONAL ALLEGATIONS PERTINENT TO THE OFFICER AND COMPENSATION DEFENDANTS' SCIENTER UNDER COUNTS I THROUGH IV

245.    As alleged herein, defendants SafeNet, the Officer Defendants and the Compensation Committee Defendants acted with scienter in that they knew and/or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false, incomplete and misleading; knew that such statements or documents would be disseminated to the public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

246.     As discussed above, the financial incentives for the Officer Defendants and the Compensation Committee Defendants, who all received substantial stock options, to engage in improper backdating were substantial because, assuming that the value of underlying stock has risen over time, it is obviously much more valuable for a recipient to receive (a) "in the money" options that have been backdated to include a low exercise price from an earlier date than it is to receive (b) "at the money" options that have a much higher exercise price based on the underlying stock's current market value as of the actual date of the options grant.  Moreover, at SafeNet each of the Officer and Compensation Committee Defendants also had substantial financial incentives to avoid properly accounting for backdated "in the money" options because, *inter alia,* adverse investor reaction to disclosure that the company was issuing "in the money" options grants (which would need to be expensed and would have reduced earnings) would have likely terminated the practice of issuing such options.  In addition, given that the Officer Defendants' overall compensation was largely based on SafeNet's financial performance, they had a further incentive to not properly account for SafeNet's options grants, since doing so would have reduced SafeNet's reported earnings and, therefore, the Officer Defendants' performance based compensation.

247.     The Officer Defendants also engaged in a scheme to inflate the price of SafeNet's securities in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) to earn, in the case of the Officer Defendants, lucrative bonuses under SafeNet's bonus plan for "achieving" certain performance levels

248.     The Officer and Compensation Committee Defendants were also motivated to engage in fraud to enhance the value of their personal SafeNet holdings so as to allow for their

profitable insider sales of 471,701 shares of their privately held SafeNet common stock at artificially inflated prices which yielded them total insider selling proceeds in excess of $14.5 million.

249.   Indeed, as set forth above, while the defendants were issuing materially false and misleading statements, the Officer and Compensation Committee Defendants were benefiting from SafeNet's improper activities and false statements as described in this complaint by selling a significant amount of their personal holdings in SafeNet common stock without disclosing the adverse material facts to which they were privy.  Such sales were unusual in their amount and their timing.  The numerous and repeated insider sales of SafeNet common stock by the Officer and Compensation Committee Defendants imposed upon them additional duties of full disclosure of all material facts alleged in this complaint.

250.   The following tables show the heavy insider selling of the Officer and Compensation Committee Defendants during the Class Period:

| *Insider* | *Shares Sold* | *Price Sold* | *Proceeds* | *Transaction Date* |
|---|---|---|---|---|
| ARGO, CAROLE D. | 30,000 | $36.01 | $1,080,165 | 11/30/2004 |
| **ARGO, CAROLE D. Total** | **30,000** | | **$1,080,165** | |
| BROOKS, THOMAS A. | 19,950 | $26.20 | $524,885 | 8/16/2004 |
| BROOKS, THOMAS A. | 6,667 | $32.78 | $218,566 | 6/17/2005 |
| BROOKS, THOMAS A. | 2,000 | $34.35 | $68,700 | 8/1/2005 |
| BROOKS, THOMAS A. | 2,000 | $35.33 | $70,660 | 9/30/2005 |
| BROOKS, THOMAS A. | 2,000 | $36.21 | $72,420 | 10/3/2005 |
| BROOKS, THOMAS A. | 2,000 | $34.29 | $68,580 | 11/16/2005 |
| BROOKS, THOMAS A. | 2,000 | $35.64 | $71,280 | 12/1/2005 |
| **BROOKS, THOMAS A. Total** | **36,617** | | **$1,095,090** | |
| CAPUTO, ANTHONY A. | 100,000 | $23.97 | $2,403,400 | 4/29/2003 |
| CAPUTO, ANTHONY A. | 12,500 | $36.63 | $457,875 | 1/18/2005 |
| CAPUTO, ANTHONY A. | 12,500 | $32.23 | $402,875 | 2/15/2005 |
| CAPUTO, ANTHONY A. | 12,500 | $29.79 | $372,375 | 3/15/2005 |
| CAPUTO, ANTHONY A. | 12,500 | $25.55 | $319,375 | 4/15/2005 |
| CAPUTO, ANTHONY A. | 12,500 | $29.06 | $363,250 | 5/16/2005 |

| | | | | |
|---|---|---|---|---|
| CAPUTO, ANTHONY A. | 12,500 | $32.23 | $402,875 | 6/15/2005 |
| CAPUTO, ANTHONY A. | 50,000 | $33.80 | $1,690,000 | 12/15/2005 |
| CAPUTO, ANTHONY A. | 25,000 | $32.77 | $819,250 | 1/17/2006 |
| CAPUTO, ANTHONY A. | 25,000 | $25.75 | $643,650 | 2/15/2006 |
| **CAPUTO, ANTHONY A. Total** | **275,000** | | **$7,874,925** | |
| CLARK, ANDREW E. | 7,750 | $23.68 | $183,553 | 4/30/2003 |
| CLARK, ANDREW E. | 10,500 | $36.68 | $385,140 | 12/1/2004 |
| CLARK, ANDREW E. | 10,000 | $31.47 | $314,700 | 8/12/2005 |
| **CLARK, ANDREW E. Total** | **28,250** | | **$883,393** | |
| HARRISON, SHELLEY A. | 6,667 | $36.40 | $242,679 | 7/18/2005 |
| HARRISON, SHELLEY A. | 5,000 | $36.82 | $184,100 | 7/25/2005 |
| HARRISON, SHELLEY A. | 5,000 | $33.00 | $165,000 | 8/8/2005 |
| HARRISON, SHELLEY A. | 5,000 | $36.21 | $181,050 | 10/3/2005 |
| HARRISON, SHELLEY A. | 5,000 | $34.40 | $172,000 | 10/11/2005 |
| HARRISON, SHELLEY A. | 5,000 | $31.85 | $159,269 | 1/3/2006 |
| HARRISON, SHELLEY A. | 5,000 | $31.91 | $159,530 | 1/23/2006 |
| **HARRISON, SHELLEY A. Total** | **36,667** | | **$1,263,628** | |
| HUNT, IRA JR. | 8,000 | $36.12 | $288,960 | 1/3/2005 |
| HUNT, IRA JR. | 3,000 | $35.87 | $107,610 | 12/2/2005 |
| **HUNT, IRA JR. Total** | **11,000** | | **$396,570** | |
| MUELLER, KEN | 12,500 | $36.61 | $457,625 | 11/21/2005 |
| **MUELLER, KEN Total** | **12,500** | | **$457,625** | |
| THAW, BRUCE R/FA | 500 | $34.00 | $17,000 | 11/10/2004 |
| THAW, BRUCE R/FA | 500 | $35.00 | $17,500 | 11/11/2004 |
| THAW, BRUCE R/FA | 3,500 | $35.60 | $124,593 | 12/1/2004 |
| THAW, BRUCE R/FA | 1,500 | $37.29 | $55,929 | 12/31/2004 |
| THAW, BRUCE R/FA | 3,000 | $33.98 | $101,940 | 7/1/2005 |
| THAW, BRUCE R/FA | 1,000 | $35.00 | $35,000 | 7/5/2005 |
| THAW, BRUCE R/FA | 1,000 | $36.00 | $36,000 | 7/7/2005 |
| THAW, BRUCE R/FA | 1,000 | $37.00 | $37,000 | 7/11/2005 |
| THAW, BRUCE R/FA | 667 | $36.50 | $24,344 | 7/15/2005 |
| THAW, BRUCE R/FA | 4,000 | $34.62 | $138,480 | 8/2/2005 |
| THAW, BRUCE R/FA | 1,000 | $32.00 | $32,000 | 9/1/2005 |
| THAW, BRUCE R/FA | 1,000 | $33.00 | $33,000 | 9/14/2005 |
| THAW, BRUCE R/FA | 4,000 | $35.83 | $143,320 | 9/30/2005 |
| THAW, BRUCE R/FA | 6,000 | $35.99 | $215,940 | 10/3/2005 |
| THAW, BRUCE R/FA | 1,158 | $32.29 | $37,392 | 11/1/2005 |
| THAW, BRUCE R/FA | 842 | $33.11 | $27,879 | 11/2/2005 |
| THAW, BRUCE R/FA | 1,000 | $34.15 | $34,150 | 11/3/2005 |
| THAW, BRUCE R/FA | 1,000 | $35.00 | $35,000 | 11/17/2005 |

| | | | | |
|---|---|---|---|---|
| THAW, BRUCE R/FA | 1,000 | $36.00 | $36,000 | 11/18/2005 |
| THAW, BRUCE R/FA | 5,000 | $35.67 | $178,350 | 12/1/2005 |
| THAW, BRUCE R/FA | 1,000 | $32.55 | $32,546 | 1/3/2006 |
| THAW, BRUCE R/FA | 1,000 | $33.09 | $33,090 | 1/6/2006 |
| THAW, BRUCE R/FA | 1,000 | $32.04 | $32,040 | 2/1/2006 |
| **THAW, BRUCE R/FA Total** | **41,667** | | **$1,458,492** | |
| **INSIDERS TOTAL** | **471,170** | | **14,509,887** | |

251.     In addition, the Company and Officer and Compensation Committee Defendants were further motivated to commit fraud in order to enable the Company to acquire a number of companies on highly favorable terms.  By maintaining an artificially inflated price for the Company's stock, these Defendants were better able to utilize SafeNet stock as currency in two significant corporate acquisitions which closed during the Class Period.  First, On March 15, 2004, SafeNet acquired Rainbow, as set forth herein, for 10.3 million shares of common stock and 1.944 million options to purchase SafeNet stock.  Based on the market price of SafeNet shares on March 15, 2004, SafeNet effectively sold $377 million shares worth of SafeNet stock at inflated prices to acquire Rainbow.  The following year, on June 1, 2005, SafeNet acquired MediaSentry, Inc., for $14.5 million in cash, 194,000 shares of SafeNet common stock, and options to purchase an additional 35,000 shares of SafeNet stock (the "MediaSentry Acquisition").  Based on the market price of SafeNet shares on June 1, 2005, SafeNet effectively sold $6.1 million shares of SafeNet stock at inflated prices to acquire MediaSentry, Inc.

252.     SafeNet and the Officer Defendants were also particularly motivated to engage in fraud in the second and third quarters of 2005 in order to assure and preserve a large government contract involving the sale of its KIV-7M Link Encryptor product ("KIV-7M").

253.     The KIV-7M was one of the first products available that was fully compliant with the U.S. Government's Cryptographic Modernization Initiative, administered by the National

Security Agency.   After two years of development, the KIV-7M started beta testing in government facilities on May 7, 2005 – in the middle of the second quarter of 2005.  At the time of beta testing, it was critically important for SafeNet to meet its earnings expectations and to appear to be a financially healthy company if it was to be awarded a government contract.

254.    On September 29, 2005, SafeNet was awarded a $150 million contract by the U.S. Department of Defense to supply KIV-7M units.   The contract was the largest in SafeNet's history, and three times the $50 million contract it was hoping to receive.  According to Kaufman Brothers analyst Alan Weinfeld (in a report dated September 30, 2005), that one Department of Defense contract, which would take 2-3 years to complete, would cover half of the Company's six year forecast for the product.

## XI.    CLASS ACTION ALLEGATIONS

255.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") of all persons who purchased or acquired SafeNet securities during the period from March 31, 2003 through May 18, 2006, inclusive (the "Class Period"), including all investors who owned SafeNet stock at the time that SafeNet's 2003, 2004 and 2005 Proxy Statements and the Rainbow Proxy/Prospectus were circulated to solicit shareholder votes on various matters (the "Proxy Subclass").  Plaintiff Golde also brings this action on his own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the sub-class of all persons who acquired SafeNet common stock in exchange for their shares of Rainbow stock as a result of the Rainbow Acquisition (the "Rainbow Subclass," as previously defined).

256.    The Rainbow Subclass asserts claims unique to itself under Sections 11, 12 and 15 of the Securities Act and under Section 14(a) of the Exchange Act as described below and

they do not sound in fraud.  The Rainbow Subclass members are also members of the Class and the Proxy Subclass.

257.    Excluded from the Class, the Proxy Subclass and the Rainbow Subclass are the Defendants herein, members of the family of each of the Individual Defendants, executive officers and/or directors of SafeNet, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

258.    Prior to SafeNet's acquisition and conversion to a private company, SafeNet common stock was actively traded on the NASDAQ electronic exchange, which is an efficient market, throughout the Class Period.  Numerous securities analysts published reports about SafeNet during the Class Period, including analysts from Avondale Partners LLC, Brean Murray Carret & Co., Deutsche Bank Securities, First Analysis, Friedman Billings Ramsey Co., Janney Montgomery Scott, Kaufman Brothers, Legg Mason, Lehman Brothers, Morgan Stanley Co., Morgan Keegan & Co., Pacific Growth Equities, Raymond James, Sterne Agee & Leach, Stifel Nicolaus & Co., Wachovia Securities, and Wedbush Morgan Securities.  Hundreds of thousands of Company shares were traded every day during the Class Period, and over a million SafeNet shares were traded on numerous days.

259.    The members of the Class and Proxy Subclass, as purchasers on the NASDAQ, are so numerous that joinder of all members is impracticable.  While the exact number of members can only be determined by appropriate discovery, Plaintiffs believe that Class and Proxy Subclass members number in the thousands.  As of May 4, 2006, SafeNet had 27,546,926 shares of common stock issued and outstanding.  The members of the Rainbow Subclass are also

so numerous that joinder of all members is impracticable.  The exact number of Rainbow Subclass members can only be determined by appropriate discovery.  As of February 5, 2004, Rainbow had 27,206,602 shares of common stock issued and outstanding.  As a consequence of the Rainbow Acquisition, those shares were exchanged for approximately 10,013,655 shares of SafeNet stock.

260.    Plaintiffs' claims are typical of the claims of the members of the Class and Proxy Subclass.  Plaintiffs and all members of the classes sustained damages as a result of the conduct complained of herein.

261.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and subclasses and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests that are contrary to or in conflict with those of the members of the Class and subclasses that Plaintiffs seek to represent.

262.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class and subclass members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the plaintiff Class and subclass members individually to seek redress for the conduct alleged.

263.    Common questions of law and fact exist as to all members of the Class and subclasses and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class and subclasses are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the documents, releases and public statements made by Defendants omitted to state and/or misrepresented material facts concerning, among other things, the Company's financial results, including its revenues and expenses, the Company's internal controls and financial reporting processes and functions, and the Company's improper practices with respect to the granting of SafeNet stock options;

(c)     whether Defendants acted negligently (with respect to the Securities Act claims and claims under Section 14(a) of the Exchange Act) or knowingly or recklessly (as to the claims brought under Section 10(b) of the Exchange Act) in misrepresenting material facts;

(d)     whether the market price of SafeNet stock during the Class Period was artificially inflated due to the material misrepresentations complained of herein (as to the Section 10(b) claims); and

(e)     whether the members of the Class and subclasses have sustained damages and, if so, the appropriate measure thereof.

264.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

265.     The names and addresses of the record owners of SafeNet shares purchased or acquired during the Class Period are available from the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## XII.   **FRAUD-ON-THE-MARKET DOCTRINE**

266.     At all relevant times, SafeNet's common stock traded in an efficient market for the following reasons, among others:

(a)     SafeNet's common stock met the requirements for public listing and was listed and actively traded on the NASDAQ, a highly efficient market;

(b)      As a regulated issuer, SafeNet filed periodic public reports with the SEC;

(c)      SafeNet regularly issued press releases that were carried by national news wires and that were publicly available and entered the public marketplace; and

(d)      Numerous research analysts and other market professionals followed and publicly reported on SafeNet's public statements.

267.    The market for SafeNet's common stock and other publicly traded securities promptly digested current information with respect to SafeNet from all publicly available sources and reflected such information in the price for SafeNet stock and other securities.  All purchasers of the Company's publicly traded securities during the Class Period suffered similar injury through their purchase of SafeNet securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

**AGAINST SAFENET, THE OFFICER DEFENDANTS AND THE COMPENSATION COMMITTEE DEFENDANTS FOR STOCK OPTION-RELATED MISREPRESENTATIONS IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER**

268.    Plaintiffs repeat and reallege each and every allegation set forth above in ¶¶ 1 to 268, as if set forth fully herein.  Plaintiffs assert this count:

(a)      against SafeNet and defendants Caputo, Argo and Mueller, as to each misleading statement identified in Section VI above;

(b)      against Compensation Committee Defendants Brooks, Hunt and Thaw as to each Form 10-K issued during the Class Period as well as the misleading statements identified in Section VI above; and

(c)      against Compensation Committee Defendant Money as to the Form 10-K issued for the years ended December 31, 2004 and December 31, 2005 as well as the false and misleading statements from the 2004 and 2005 Proxy Statements identified in Section VI above.

269.     Throughout the Class Period, the Defendants named in this Count individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material adverse information about SafeNet, including its reported financial results, financial controls and true financial condition and its improper practices with respect to the granting of stock options to the Company's senior executives, as specified herein.

270.     The Defendants named in this Count employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SafeNet not misleading.  Specifically, Defendants initiated and pursued a scheme and course of conduct which:  (i) concealed the fact that the Company was allowing insiders to manipulate its Stock Option Plan and was misrepresenting its financial results; (ii) maintained Defendants' executive and directorial positions at SafeNet and the profits, power and prestige which Defendants enjoyed as a result of these positions; (iii) deceived the investing public, including shareholders of SafeNet, regarding Defendants' compensation practices, including the granting of stock options through backdating, and regarding SafeNet's financial performance.

271.     The Defendants named in this Count, as the directors and/or top executive officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through

their positions of control and authority as officers and/or directors of the Company, the Officer Defendants and Compensation Committee Defendants were able to and did control the content of the public statements disseminated by SafeNet.  With knowledge of or recklessness as to the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true operations and finances of the Company, the Officer Defendants and Compensation Committee Defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

272.    The Defendants named in this Count acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Officer Defendants constituted the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports, and filings with the SEC.

273.    The Defendants named in this Count also acted with scienter in that they took advantage of the misrepresentations made to investors in order to enrich themselves through continued receipt of backdated stock options.  The Compensation Committee Defendants acted with scienter in that when signing the Form 10-Ks, they either had affirmative knowledge of the stock option grants that had been backdated, or they were reckless as to the truth in that they disregarded their obligations, as members of SafeNet's Compensation Committee, to oversee and ensure the proper implementation of the Stock Option Plan and to ensure the integrity of SafeNet's stock option granting policies and practices.

274.    These Defendants also misused their positions to improperly benefit by their access to inside information, in that they wrongfully caused the Company to issue to them options to purchase SafeNet stock at a materially understated price.  The Officer Defendants' misrepresentations and/or omissions were intentional or reckless and done for the purpose of enriching themselves at the expense of Plaintiffs and the Class.

275.    These Defendants' scienter is also supported by their motive to sell substantial amounts of their SafeNet holdings at inflated prices.  In particular, during the Class Period, the Officer and Compensation Committee Defendants cumulatively sold 406,784 shares for combined proceeds of over $12.4 million.

276.    Throughout the Class Period, the prices of the Company's securities were artificially inflated as a direct result of Defendants' misrepresentations and omissions regarding the Company, including the misrepresentations about its financial condition and results and business condition and results.

277.    The Company's financial condition and stock option related practices were material information to Plaintiffs and the other members of the Class.  In addition, the integrity of management is highly material to investors, and the issuance of stock options through either backdating directly bears on investor confidence in the Company's management.  Had the truth been disclosed to the market during the Class Period, Plaintiffs and the other Class members would have been unwilling to purchase the Company's securities at the prices at which they did purchase them, or at all.

278.    When the truth about the Company was revealed as described above, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant losses to Plaintiffs and the other Class

members.  These price declines occurred as the market fully digested the impact and meaning of Defendants' backdating scheme and its impact on SafeNet.  The losses suffered by Plaintiffs and the other members of the Class following the revelations of the accounting fraud and the Company's improper granting of stock options to senior executives and employees are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's financial condition and business operations.

279.    Defendants' conduct, as alleged herein, proximately caused foreseeable losses and economic harm to Plaintiffs and the other members of the Class.

280.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**AGAINST THE OFFICER DEFENDANTS AND THE COMPENSATION COMMITTEE DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT ARISING FROM STOCK OPTION-RELATED MISREPRESENTATIONS**

281.    Plaintiffs repeat and reallege each and every allegation in ¶¶ 1 to 280 above as if set forth fully herein.

282.    The Officer Defendants and the Compensation Committee Defendants were control persons of SafeNet by virtue of their positions as directors and/or as senior officers of SafeNet and were culpable participants in SafeNet's options-related fraud, as more particularly set forth in and encompassed by the scienter allegations in ¶¶ 245 to 254 herein.

283.    Each of the Officer and Compensation Committee Defendants acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act during the Class Period.  Specifically, defendant Caputo had the power and authority to cause the

Company to engage in the wrongful conduct complained of herein, by virtue of his position as Chief Executive Officer and Chairman of the Board.  Defendant Mueller also had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of his position as Chief Financial Officer.  Likewise, defendant Argo had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of her position as President, Chief Financial Officer and Chief Operating Officer.  The Compensation Committee Defendants had overall responsibility and oversight over SafeNet's business operations in general, and executive compensation and stock option grants in particular. These Defendants were each in a position to control or influence the contents of, or otherwise cause corrective disclosures to have been made in the Company's SEC filings, along with the Company's other public statements that contained materially false and misleading statements that were disseminated during the Class Period.

284.     By reason of the wrongful conduct alleged herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of SafeNet shares during the Class Period.

## COUNT III

**AGAINST SAFENET AND THE OFFICER DEFENDANTS FOR MISREPRESENTATIONS ARISING FROM SAFENET'S NON-OPTIONS RELATED ACCOUNTING FRAUD IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER**

285.     Plaintiffs repeat and reallege each of the allegations set forth above in ¶¶ 1 to 268, as if set forth fully herein.

286.     Throughout the Class Period, SafeNet and the Officer Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate

commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material adverse information about SafeNet, including its reported financial results, financial controls and true financial condition and its improper practices with respect to SafeNet's non-options accounting manipulations as specified herein.  Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SafeNet not misleading.  Specifically, Defendants knew or should have known that their statements concerning the Company's financial results and internal controls throughout the Class Period as filed with the SEC and disseminated to the investing public were materially false, incomplete and misleading.

287.   The Officer Defendants, as the directors and/or top executive officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, the Officer Defendants were able to and did control the content of the public statements disseminated by SafeNet.  With knowledge of or recklessness as to the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true operations and finances of the Company, the Officer Defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

288.   The Officer Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to

disclose the true facts, even though such facts were available to them.  The Officer Defendants constituted the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports, and filings with the SEC.

289.    The Officer Defendants' scienter is also supported by their motive to sell substantial amounts of their SafeNet holdings at inflated prices.  In particular, during the Class Period, the Officer Defendants cumulatively sold 317,500 shares for combined proceeds of nearly $9.41 million.  The Officer Defendants also misused their positions to improperly benefit by their access to inside information, in that they wrongfully caused the Company to issue to them 225,000 options to purchase SafeNet stock at a materially understated price.  The Officer Defendants' misrepresentations and/or omissions were intentional or reckless and done for the purpose of enriching themselves at the expense of Plaintiffs and the Class.

290.    The prices of SafeNet's securities were artificially inflated as a direct result of Defendants' misrepresentations and omissions regarding the Company, including the misrepresentations about its financial condition and results.

291.    The Company's financial condition and performance were material information to Plaintiffs and the other members of the Class.  In addition, the integrity of management is highly material to investors, and the issuance of stock options through either backdating directly bears on investor confidence in the Company's management.  Had the truth concerning SafeNet's non-options accounting practices been disclosed to the market during the Class Period, Plaintiffs and the other Class members would have been unwilling to purchase the Company's securities at the prices at which they did purchase them, or at all.

292.    When the truth about the Company was revealed as described above, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant losses to Plaintiffs and the other Class members.  The declines in the Company's securities prices following the revelations of the accounting fraud and the Company's improper granting of stock options to senior executives and employees and the resulting losses suffered by Plaintiffs and the other members of the Class are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by Defendants, and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's financial condition and business operations.

293.    Defendants' conduct, as alleged herein, proximately caused foreseeable losses and economic harm to Plaintiffs and the other members of the Class.  The totality of the circumstances surrounding the drops of SafeNet's stock price following the disclosures on February 2, 2006, April 7, 2006 and May 18, 2006 combine to negate any inference that the economic loss Plaintiffs and other Class members suffered was caused by changed market conditions, macroeconomic or industry-wide factors, or SafeNet specific facts unrelated to Defendants' fraudulent conduct.

294.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**<u>COUNT IV</u>**

**AGAINST THE OFFICER DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT ARISING FROM SAFENET'S NON-OPTIONS RELATED ACCOUNTING FRAUD**

295.    Plaintiffs repeat and reallege each and every allegation set forth above in ¶¶ 1 to 268 and ¶¶ 285 to 294 above as if set forth fully herein.

296.     The Officer Defendants were control persons of SafeNet by virtue of their positions as directors and/or as senior officers of SafeNet and were culpable participants in SafeNet's accounting fraud, as more particularly set forth in and encompassed by the scienter allegations in ¶¶ 245 to254 herein.

297.     Each of the Officer Defendants acted as a controlling person of the Company within the meaning of Section 20 of the Exchange Act during the Class Period.  Specifically, defendant Caputo had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of his position as Chief Executive Officer and Chairman of the Board.  Defendant Mueller also had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of his position as Chief Financial Officer.  Likewise, defendant Argo had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of her position as President and Chief Operating Officer.  These Defendants were each in a position to control or influence the contents of, or otherwise cause corrective disclosures to have been made in the Company's SEC filings, along with the Company's other public statements that contained materially false and misleading statements that were disseminated during the Class Period.

298.     By reason of the wrongful conduct alleged herein, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of SafeNet shares during the Class Period.

## COUNT V

**AGAINST SAFENET AND THE DIRECTOR DEFENDANTS FOR MISREPRESENTATIONS CONTAINED IN SAFENET'S PROXY STATEMENTS FOR THE YEARS 2003 THROUGH 2005 IN VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER**

299.    This Count is brought pursuant to Section 14(a) of the Exchange Act, on behalf of all Class members who were shareholders of SafeNet common stock at the time of the Proxy Statements for any of the years 2003 through 2005.  This claim is not based on and does not sound in fraud.  Plaintiffs repeat and reallege each and every allegation set forth above in ¶¶ 1 to 244 and ¶¶ 255-267, as if set forth fully herein, except any allegations of fraud or intent, which are not necessary to assert this claim for relief.

300.    In soliciting shareholder approval for various amendments to the Stock Option Plan and as part of the annual proxy solicitation process, SafeNet and the Director Defendants (collectively, the "Proxy Statement Defendants") were negligent and failed to exercise due care in making numerous material misstatements in SafeNet's Proxy Statements during the Class Period in violation of Section 14(a) of the Exchange Act.

301.    Specifically, the Proxy Statement Defendants were negligent and failed to exercise due care in issuing the 2003 Proxy Statement, the Rainbow Proxy/Prospectus, the 2004 Proxy Statement and the 2005 Proxy Statement.

302.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

-136-

303.    SafeNet's Proxy Statements for the years 2003 through 2005 violated Section 14(a) and Rule 14a-9 because they omitted material facts, including the fact that SafeNet was improperly backdating as part of its stock option granting practices.

304.    In the exercise of reasonable care, Defendants should have known that SafeNet's Proxy Statements for the years 2003 through 2005 were materially misleading.

305.    The misrepresentations and omissions in the 2003 through 2005 Proxy Statements were material to Plaintiffs and to other SafeNet investors in voting on each Proxy Statement. The 2003 through 2005 Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option administration, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies, including the 2003 and 2005 amendments to expand the number of shares authorized under the Stock Option Plan.

306.    SafeNet shareholders were damaged as a result of the material misrepresentations and omissions in the 2003 through 2005 Proxy Statements and are therefore entitled to equitable relief and compensatory damages.

## COUNT VI

**ON BEHALF OF THE RAINBOW SUBCLASS AGAINST SAFENET AND THE RAINBOW ACQUISITION DEFENDANTS FOR MISLEADING STATEMENTS CONTAINED IN THE RAINBOW PROXY/PROSPECTUS IN VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER**

307.    This Count is asserted against the Rainbow Acquisition Defendants, on behalf of the Rainbow Subclass for violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, and Rule 14a-9, 17 C.F.R. § 240.14a-9.  This Count does not allege fraud.

308.    The Rainbow Proxy/Prospectus described herein was a proxy solicitation within the meaning of Section 14 of the Exchange Act, and Rule 14a-9 promulgated thereunder.

309.    The defendants named in this Count sought to secure Rainbow shareholder approval of the Rainbow Acquisition by means of the materially false and misleading Rainbow Proxy/Prospectus and/or permitted the use of their names to solicit proxies from Plaintiff Golde and other members of the Rainbow Subclass.

310.    The following facts give rise to a strong inference that each of the defendants named in this Count, acted with the requisite state of mind for liability under Section 14(a) and Rule 14a-9, *i.e.*, negligence, at the time they issued or caused to be issued the Rainbow Proxy/Prospectus or permitted the use of their names in the Rainbow Proxy/Prospectus:  As detailed in  ¶¶ 1 to 244 and  ¶¶ 255-267 above (to the extent that they do not allege fraud), these defendants knew that the Rainbow Proxy/Prospectus contained misstatements of material fact and omitted to state material facts necessary in order to make the statements therein not false or misleading.

311.    On October 22, 2003, SafeNet issued a press release announcing that SafeNet and Rainbow had entered into a definitive merger agreement (the "Merger Agreement"), and that pending satisfaction of typical conditions, including approval of the Rainbow Acquisition by the shareholders of SafeNet and Rainbow, the companies were expected to close the transaction in the first quarter of 2004.   As disclosed to investors in the press release, SafeNet agreed to issue 0.374 share of SafeNet common stock for each outstanding share of Rainbow common stock, representing approximately 43% of the outstanding stock of the combined company after closing of the Rainbow Acquisition.  Prior to the announced Merger Agreement, SafeNet's stock price

closed at $41.02, making the aggregate value of the Rainbow Acquisition approximately $459 million, on a fully diluted basis, when announced.

312.     On October 24, 2008, SafeNet filed with the SEC a Current Report on Form 8-K disclosing the terms of the Rainbow Acquisition and including both the October 22, 2003 press release and the Merger Agreement as attachments.  That same day, SafeNet filed with the SEC on Form 425 a copy of an investor presentation by defendant Caputo and Walter Straub, then CEO and Chairman of Rainbow.  In addition, on October 27, 2003, SafeNet filed with the SEC on Form 425 the transcript of investors conference call held on October 22, 2003 and conducted by, among others, defendants Caputo, and Argo.  Each of these filings discussed the terms of the Rainbow Acquisition and SafeNet's historical financial results, which were false and misleading.

313.     On the following dates, SafeNet filed with the SEC on Forms 425 additional investor presentations conducted by, among others, defendants Caputo and Argo:  November 3, 2003; January 14, 2004; and February 4, 2004.  Also, on November 7, 2003 and November 12, 2003, SafeNet filed with the SEC on Forms 425 transcripts of conference calls held with investors.  Each of these filings discussed the terms of the Rainbow Acquisition and SafeNet's historical financial results, which were false and misleading.

314.     On November 14, 2003, SafeNet filed with the SEC on Form S-4 a registration statement discussing the terms of, and strategic rationale for the Rainbow Acquisition, as well as SafeNet's historical financial results.  On January 15, 2004, SafeNet filed with the SEC on Form S-4/A a first amended registration statement.  Then, on February 11, 2004, SafeNet filed with the SEC on Form S-4/A a second amended registration statement, or the Rainbow Registration Statement, as previously defined herein.  The Rainbow Registration Statement incorporated by reference the Rainbow Proxy/Prospectus, filed with the SEC on Form 424B3 on February 12,

2004.   On February 9, 2004, the last trading day referenced in the Rainbow Registration Statement, the price per share of SafeNet stock closed at $39.99.

315.    As stated herein, the Rainbow Proxy/Prospectus solicited the approval by Rainbow Shareholders of the Rainbow Acquisition, and described the process leading to the Rainbow board's approval of the Merger Agreement and the Exchange Ratio, including, in particular, the review by Rainbow's management and its outside financial advisors of SafeNet's publicly released financial statements.  The Rainbow Proxy/Prospectus also detailed the process through which the Rainbow board of directors (and Rainbow's financial advisors) and SafeNet's board of directors (and SafeNet's financial advisors) established the Exchange Ratio, including their consideration of SafeNet's reported historical financial results and the relative revenues, expenses and income that each company would bring to the combined entity.  The Rainbow Proxy/Prospectus justified the Exchange Ratio on the basis of the relative contributions each company was expected to make to the combined entity.

316.    On March 15, 2004, Rainbow held a Special Meeting of its shareholders to vote on the proposed Rainbow Acquisition.  The Rainbow Acquisition required and received the affirmative vote of a majority of Rainbow shareholders.  Accordingly, the materially false and misleading Rainbow Proxy/Prospectus was an essential link in the accomplishment of the Rainbow Acquisition.

317.    In connection with the Rainbow Acquisition, each share of Rainbow owned by the members of the Rainbow Subclass was exchanged into 0.374 share of SafeNet stock.  On March 16, 2004, the price per share of SafeNet stock closed $37.34.

318.    The Rainbow Acquisition Defendants negligently made numerous material untrue statements and omissions of material fact in the Rainbow Proxy/Prospectus in violation of

Section 14(a) of the Exchange Act, including with respect to the SafeNet's historical financial results and the fact that SafeNet was improperly backdating as part of its stock option granting practices.  In the exercise of reasonable care, the Rainbow Acquisition Defendants should have known that the Rainbow Proxy/Prospectus was materially misleading.

319.    Within the Rainbow Proxy/Prospectus, SafeNet misrepresented its financial results for full years and interim quarterly reporting periods for 2003, 2002, 2001 and 2000 by failing to properly account for its stock options practices and improper revenue recognition practices and thus overstating its revenue, operating income and net income (earnings). Specifically, the Rainbow Proxy/Prospectus contained the following false statements regarding SafeNet's financial results:

- For the year ended December 31, 2003, revenues of $65.8 million, net operating loss of $6.2 million and total net loss of $0.55 per diluted share;

- For the year ended December 31, 2002, revenues of $32.2 million, net operating loss of $1.54 million and total net loss of $0.10 per diluted share;

- For the year ended December 31, 2001, revenues of $16.4 million, net operating loss of $1.45 million and total net loss of $0.01 per diluted share; and

- For the year ended December 31, 2000, revenues of $25.27 million, net operating income of $5.9 million and net income of $1.01 per diluted share.

320.    Within the Rainbow Proxy/Prospectus, SafeNet made false statements regarding its stock options granting policy.  As set forth in the section, "Proposal to Increase the Number of Shares Available for Issuance Under the SafeNet, Inc. 2001 Omnibus Stock Plan," subsection "Nature of Options," the Rainbow Proxy/Prospectus misrepresented to Rainbow shareholders that "The per share price of an incentive stock option grant under the 2001 Plan may not be less

than the fair market value of the SafeNet common stock on the date of the grant." In truth, SafeNet granted stock options below the fair market value of SafeNet common stock on the date of the grants.

321. In addition, the Rainbow Proxy/Prospectus incorporated by reference the following documents filed with the SEC, each of which also contained false and misleading statements regarding SafeNet's financial results and its accounting for stock option grants:

- SafeNet's From 10-K/A for the fiscal year ended December 31, 2002 (File no. 0-20634), filed on February 11, 2003 [sic] (actually filed on February 11, 2004);

- SafeNet's From 10-K/A for the fiscal year ended December 31, 2002 (File no. 0-20634), filed on April 29, 2003;

- SafeNet's From 10-K for the fiscal year ended December 31, 2002 (File no. 0-20634), filed on March 31, 2003;

- SafeNet's From 10-Q/A for the fiscal quarter ended September 30, 2003 (File no. 0-20634), filed on February 11, 2003 [sic] (actually filed on February 11, 2004);

- SafeNet's From 10-Q for the fiscal quarter ended September 30, 2003 (File no. 0-20634), filed on November 14, 2003;

- SafeNet's From 10-Q for the fiscal quarter ended June 30, 2003 (File no. 0-20634), filed on July 31, 2003;

- SafeNet's From 10-Q for the fiscal quarter ended March 31, 2003 (File no. 0-20634), filed on May 15, 2003; and

- SafeNet's definitive proxy statement on Schedule 14A for the 2003 annual meeting of stockholders, filed on April 30, 2003.

-142-

322.     Each of the defendants named in this Count solicited proxies by causing the Rainbow Proxy/Prospectus to be issued and distributed to Rainbow shareholder, by permitting the use of their names in the Rainbow Proxy/Prospectus and by recommending in the Rainbow Proxy/Prospectus that Rainbow shareholders approve the Rainbow Acquisition.

323.     The Rainbow Proxy/Prospectus was materially false and misleading in that it contained false and misleading statements of material facts and failed to disclose material facts necessary to make the statements made not false and misleading, as set forth above.

324.     The misrepresentations and omissions in the Rainbow Proxy/Prospectus were material to Plaintiff Golde and to other members of the Rainbow Subclass in voting on the Rainbow Acquisition.  As a direct and proximate result of the false and misleading Rainbow Proxy/Prospectus, the Rainbow shareholders approved the Rainbow Acquisition and Exchange Ratio and were injured thereby.  Had the Rainbow Acquisition Defendants disclosed this material information, Rainbow shareholders would have rejected the Rainbow Acquisition or demanded an exchange ratio that properly reflected the greater relative value of Rainbow compared to SafeNet than the Exchange Ratio that was approved. Further, disclosure of this material information would have prevented these Defendants from continuing their improper administration of the Stock Option Plan, which they continued through 2005.

325.     As a direct and proximate result of these defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Plaintiff Golde and the other members of the Rainbow Subclass have sustained injury and are therefore entitled to equitable relief and compensatory damages.

<u>**COUNT VII**</u>

**ON BEHALF OF THE RAINBOW SUBCLASS AGAINST SAFENET AND THE RAINBOW ACQUISITION DEFENDANTS FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT**

326.   Plaintiff Golde repeats and realleges each and every allegation set forth above in ¶¶ 307 to 325, as if set forth fully herein.  This Count is brought pursuant to Section 11 of the Securities Act, on behalf of all individuals who exchanged Rainbow shares for SafeNet shares as a result of the Rainbow Acquisition.  This count does not allege fraud.

327.   As set forth in above, the Rainbow Registration Statement made numerous material misrepresentations and omitted to state material facts necessary to make the matters disclosed not misleading, including numerous statements regarding SafeNet's publicly reported historical financial results and description of SafeNet's stock option granting policies and practices.  The misrepresentations and omissions in the Rainbow Proxy/Prospectus were material to Plaintiff Golde and other members of the Rainbow Subclass investors in voting on the Rainbow Acquisition.  As a result of the false and misleading Rainbow Proxy/Prospectus, the Rainbow shareholders approved the Rainbow Acquisition and Exchange Ratio.  Had the truth been disclosed about SafeNet's historical financial results and its improper stock option administration, Rainbow shareholders would have rejected the Rainbow Acquisition or demanded an exchange ratio that properly reflected the greater relative value of Rainbow compared to SafeNet, which would be more favorable to Rainbow shareholders than the Exchange Ratio.  Further, revelations of the truth would have prevented Defendants from continuing their improper administration of the Stock Option Plan, which they continued through 2005.

328.   Although not necessary to plead Plaintiff Golde's prima facie claim, none of the Defendants named in this Count made a reasonable investigation or possessed reasonable

grounds for the belief that the statements contained in the Rainbow Registration Statement and Rainbow Proxy/Prospectus were accurate and complete in all material respects.  Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions alleged herein.  As such, these Defendants can not establish an affirmative defense of adequate due diligence, as defined in Section 11.

329.    At the time they acquired SafeNet shares, neither Plaintiff Golde nor any member of the Rainbow Subclass knew, or by the reasonable exercise of care could have known, of the material misstatements and omissions alleged herein.

330.    In connection with the Rainbow Acquisition and exchange of the SafeNet common stock for Rainbow common stock, SafeNet and the Rainbow Acquisition Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

331.    This claim was brought within one year after the discovery of the untrue statements in the Rainbow Registration Statement and Rainbow Proxy/Prospectus and within three years after the SafeNet common stock was issued to Rainbow Subclass members in connection with the Rainbow Acquisition.  Plaintiff Golde and the other members of the Rainbow Subclass obtained their SafeNet shares before SafeNet made available to its shareholders an earnings statement covering a period of at least 12 months beginning after the effective date of the Rainbow Registration Statement.

332.    By reason of the misconduct alleged herein, SafeNet and the Rainbow Acquisition Defendants violated Section 11 of the Securities Act and are liable to Plaintiff Golde and the other members of the Rainbow Subclass who acquired SafeNet common stock as a result of the Rainbow Acquisition, each of whom has been damaged as a result of such violations.

333.     Members of the Rainbow Subclass were damaged as a result of the material misrepresentations and omissions in the Rainbow Registration Statement and Proxy/ Statement and are therefore entitled to equitable relief and compensatory damages.

## COUNT VIII

### ON BEHALF OF THE RAINBOW SUBCLASS AGAINST DEFENDANTS SAFENET, CAPUTO AND ARGO FOR VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT

334.     Plaintiff Golde repeats and realleges each and every allegation set forth above in ¶¶ 307 to 333, as if set forth fully herein.  This Count is brought for violation of Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against defendants Caputo and Argo, who actively solicited the approval by Rainbow shareholders of the Rainbow Acquisition, including the Exchange Ratio and the exchange of Rainbow shares held by Plaintiff Golde and the other members of the Rainbow Subclass for shares of SafeNet, by means of the Rainbow Proxy/Prospectus.  This count does not allege fraud.

335.     Defendants Caputo and Argo substantially participated in the preparation and dissemination of the Rainbow Proxy/Prospectus for their own financial benefit.  But for their participation in the Rainbow Acquisition, including their solicitations as set forth herein, the Rainbow Acquisition could not and would not have been accomplished.  Specifically, Caputo and Argo:

(a)     met with the senior management of Rainbow to discuss the terms of the Rainbow Acquisition;

(b)     negotiated the terms of the Merger Agreement on SafeNet's behalf, including the Exchange Ratio;

-146-

(c)      solicited and encouraged shareholder approval and market support for the Rainbow Acquisition in numerous investor conferences and through numerous investor slide presentations and conference calls;

(d)      drafted, revised and approved the Rainbow Proxy/Prospectus.   These written materials were calculated to create interest in the Rainbow Acquisition and in SafeNet common stock and were used to assure approval of the Rainbow Acquisition;

(e)      finalized the Rainbow Proxy/Prospectus and caused it to become effective; and

(f)      conceived and planned the Rainbow Acquisition and orchestrated all activities necessary to affect the exchange of SafeNet securities to Rainbow shareholders.

336.    As set forth more specifically above, the Rainbow Proxy/Prospectus included untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

337.    Plaintiff Golde and the other members of the Rainbow Subclass did not know, nor could they have known, of the untruths or omissions contained in the Rainbow Registration Statement and Rainbow Proxy/Prospectus.

338.    The defendants named herein were obligated to make a reasonable and diligent investigation of the statements contained in the Rainbow Registration Statement and Rainbow Proxy/Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.   None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Rainbow

Registration Statement and Rainbow Proxy/Prospectus were accurate and complete in all material respects.

339.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Rainbow Registration Statement and Rainbow Proxy/Prospectus and within three years after the SafeNet common stock was issued to Rainbow Subclass members in connection with the Rainbow Acquisition.

340.    By reason of the misconduct alleged herein, the defendants named in this Count violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff Golde and the other members of the Rainbow Subclass who acquired SafeNet common stock as a result of the Rainbow Acquisition, each of whom has been damaged as a result of such violations.

341.    Plaintiff Golde and the other members of the Rainbow Subclass who acquired SafeNet common stock as a result of the Rainbow Acquisition and continue to hold it hereby seek rescission of their purchases and hereby tender to the defendants named in this Count the common stock in return for the consideration paid for those securities, together with interest thereon.

## <u>COUNT IX</u>

### ON BEHALF OF THE RAINBOW SUBCLASS AGAINST THE RAINBOW ACQUISITION DEFENDANTS FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

342.    Plaintiff Golde repeats and realleges each and every allegation set forth above in ¶¶ 307 to 341, as if set forth fully herein.  This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the members of the Rainbow Subclass who acquired SafeNet common stock as a result of the Rainbow Acquisition pursuant to the Rainbow Registration Statement and Rainbow Proxy/Prospectus.  This claim does not allege fraud.

343.     This claim is asserted against the Rainbow Acquisition Defendants, each of whom was a control person of SafeNet in general and with respect to the Rainbow Acquisition, in particular.

344.     For all the reasons set forth above, SafeNet is liable to Plaintiff Golde and the other members of the Class who received SafeNet common stock as a result of the untrue statements and omissions of material fact contained in the Rainbow Registration Statement and the Rainbow Proxy/Prospectus, pursuant to Sections 11 and 12(a)(2) of the Securities Act, and were damaged thereby.

345.     The Rainbow Acquisition Defendants were control persons of SafeNet by virtue of, among other things, their positions as senior officers and directors of SafeNet, and they were in positions to control and did control the false and misleading statements and omissions contained in the Rainbow Registration Statement and Rainbow Proxy/Prospectus.

346.     In fact, as disclosed in detail in the Rainbow Registration Statement and Rainbow Proxy/Prospectus, the Rainbow Acquisition Defendants actively negotiated the terms of the Rainbow Acquisition, retained outside advisors to assist in structuring and documenting the Rainbow Acquisition and in soliciting the approval by Rainbow shareholders of the Rainbow Acquisition, and met repeatedly to approve SafeNet's pursuit of the Rainbow Acquisition and solicitation of shareholder approval of the Rainbow Acquisition.

347.     None of the Rainbow Acquisition Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Rainbow Registration Statement and Rainbow Proxy/Prospectus were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

348.     This claim was brought within one year after the discovery of the untrue statements and omissions in the Rainbow Registration Statement and Rainbow Proxy/Prospectus and within three years after the SafeNet common stock was sold to the Rainbow Subclass in connection with the Rainbow Acquisition.

349.     By reason of the misconduct alleged herein, for which SafeNet is primarily liable, as set forth above, the Rainbow Acquisition Defendants are jointly and severally liable with and to the same extent as SafeNet, pursuant to Section 15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.     Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.     Awarding Plaintiffs and the members of the Class compensatory damages, including compensatory and other appropriate damages for the Rainbow Subclass;

3.     Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

4.     Awarding injunctive relief in favor of Plaintiffs and the Class against Defendants and all persons acting in concert with them, including a constructive trust over the Individual Defendants' unjust enrichment;

5.     Ordering disgorgement of all stock option proceeds and/or profits obtained through the exercise of stock options granted to the Individual Defendants by virtue of the false and misleading Proxy Statements;

6.     Ordering that all unexercised stock options held by the Individual Defendants be rescinded; and

7.      Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

DATED:          August 1, 2008
                New York, New York

                                **BERNSTEIN LITOWITZ BERGER
                                & GROSSMANN LLP**

By: _____
                                William C. Fredericks (WF-1576)
                                Mark Lebovitch (ML-6654)
                                1285 Avenue of the Americas
                                New York, New York 10019
                                Tel:    (212) 554-1400
                                Fax:    (212) 554-1444


                                **LABATON SUCHAROW LLP**


By: _____

                                Lawrence A. Sucharow (LS-1726)
                                Joel H. Bernstein (JB-0763)
                                Nicole M. Zeiss (NZ-3894)
                                140 Broadway
                                New York, New York 10005
                                Tel.:    (212) 907-0700
                                Fax:    (212) 818-0477

## CERTIFICATE OF SERVICE

I, WILLIAM C. FREDERICKS, an attorney duly admitted to practice in New York, do hereby certify that on this 1st day of August, 2008, I caused the foregoing

- **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS SEEKING MONEY DAMAGES AND EQUITABLE RELIEF**

to be served by overnight delivery and by email on the following:

Irvin Nathan
**Arnold & Porter LLP**
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
(202) 942-5000

*Attorneys for Anthony A. Caputo*

Christian J. Mixter (CM-7422)
**Morgan Lewis & Bockius LLP**
1111 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 739-3000

*Attorneys for Thomas A. Brooks, Ira A. Hunt, Jr., Bruce R. Thaw and Arthur L. Money*

Richard H. Klapper (RK-0069)
**Sullivan & Cromwell LLP**
125 Broad Street
New York, NY  10004-2498
(212) 558-4000

*Attorneys for SafeNet, Inc., Andrew E. Clark and Walter W. Straub*

Douglas J. Davison
**Wilmer Hale**
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

*Attorneys for Carole D. Argo*

Samuel B. Isaacson
**DLA Piper Rudnick Gray Cary US LLP**
203 N. LaSalle Street
Chicago, IL  60601
(312) 368-2163

*Attorneys for Kenneth A. Mueller*



William C. Fredericks
BERNSTEIN LITOWITZ BERGER &
    GROSSMANN LLP
1285 Avenue of the Americas
New York, NY  10019
Tel:    (212) 554-1405