UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, PLYMOUTH COUNTY RETIREMENT SYSTEM, STATE-BOSTON RETIREMENT SYSTEM, and MICHAEL GOLDE, On Behalf of Themselves and All Others Similarly Situated, | Lead Case No. 06 Civ. 5797 (PAC) |
| Plaintiffs, | |
| v. | |
| SAFENET, INC., ANTHONY A. CAPUTO, KENNETH A. MUELLER, CAROLE D. ARGO, THOMAS A. BROOKS, IRA A. HUNT, Jr., BRUCE R. THAW, ARTHUR L. MONEY, SHELLEY A. HARRISON, and ANDREW E. CLARK | |
| Defendants. | |

**LEAD PLAINTIFFS' CONSOLIDATED OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS THE
<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ........................................................................... 1

I.   STATEMENT OF FACTS ........................................................................... 7

    A.   BACKGROUND ................................................................................ 7

    B.   DEFENDANTS' FRAUDULENT ACCOUNTING ............................ 8

        1.   Defendants' Options Backdating Manipulations ...................... 8

        2.   SafeNet's and the Officer Defendants' Non-Options Accounting
            Manipulations ...................................................................... 13

    C.   THE TRUTH BEGINS TO EMERGE ............................................. 15

    D.   POST-CLASS PERIOD EVENTS:  SAFENET ADMITS THAT ITS
        FINANCIALS GOING BACK TO *2000* MUST BE RESTATED, AND
        ARGO PLEADS GUILTY TO FELONY SECURITIES FRAUD ............ 17

II.  ARGUMENT ............................................................................................ 19

    A.   The Complaint States §10(b) Claims Against SafeNet and the Officer
        and Compensation Committee Defendants ....................................... 19

    B.   The Complaint Sufficiently Pleads *Scienter* ................................. 20

        1.   Plaintiffs Allege Strong Circumstantial Evidence of the Officer and
            Compensation Defendants' Conscious Misbehavior or
            Recklessness With Respect to the Options Backdating Aspects of
            the Fraud ............................................................................ 21

            (a)   Argo's Indictment and Guilty Plea .............................. 21

            (b)   The Officer Defendants' Executive Positions and Defendants'
                Failure to Monitor and/or Investigate ........................... 24

            (c)   The Size and Duration of the Options Fraud ................. 26

            (d)   The Circumstances of the Officer Defendants' Involuntary
                Departure From the Company ....................................... 27

        2.   Plaintiffs Allege Strong Circumstantial Evidence of the Officer
            Defendants' Conscious Misbehavior or Recklessness With Respect
            to the Improper Revenue Recognition Aspects of the Fraud ............. 27

(a)   The Confidential Witnesses' Accounts of Defendants'
Improper Accounting Practices.................................................27

(b)   SafeNet's Admitted Need To Restate Its Financials.....................30

(c)   The "Core Operations Doctrine" Supports an Inference of
Scienter ....................................................................................30

3.   Plaintiffs' Motive and Opportunity Allegations Provide Additional,
Independent Grounds For Strongly Inferring Defendants' *Scienter*.....................31

(a)   Motive ........................................................................................31

(b)   Opportunity ................................................................................33

4.   Summary .......................................................................................34

C.   The Complaint Adequately Alleges Loss Causation .................................34

1.   *Dura* and Rule 8's Notice Pleading Standard ......................................35

2.   Plaintiffs More Than Adequately Allege At Least "Some
Connection" Between the Fraud and a Decline in SafeNet's Stock
Price ................................................................................................36

3.   Defendants' Argument That The Complaint Must Allege a "True
Corrective Disclosure" Is Without Merit ..............................................39

4.   Defendants' Theoretical Argument That Plaintiffs Suffered No
Loss Is Without Merit .......................................................................43

5.   Defendants' Argument That The Complaint Fails to Parse the
Supposed Impact of "Confounding Factors" Is Without Merit ................44

6.   Defendants' Arguments Based On Post-Class Period Stock
Movements (or Lack Thereof) Do Not Refute Loss Causation................45

D.   The Complaint States Claims Under §§ 11, 12(a) and 14 of the
Securities Act .........................................................................................46

1.   *Scienter* Is Not an Element of §§ 11, 12(a)(2) or 14(a) Claims...............46

2.   Loss Causation is Not an Element of §11 Claim ...................................47

3.   Plaintiffs Sufficiently Allege Loss Causation under §14(a) ..................48

4.   Plaintiffs Sufficiently Allege Transaction Causation for § 14 (a)
Claim................................................................................................48

E.    The Complaint States Claims for Control Liability ...................................................49

CONCLUSION .................................................................................................................50

# TABLE OF AUTHORITIES

## CASES

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
544 F. Supp. 2d 199 (S.D.N.Y. 2008)....................................................................27

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)....................................................................48

*ATSI Commc'ns v. Shoar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....................................................................19, 20, 31

*Adair v. Kaye Kotts Assocs.*,
1998 WL 142353 (S.D.N.Y. Mar. 27, 1998) ........................................................48

*In re Amaranth Natural Gas Commodities Litig.*,
2008 WL 4501247 (S.D.N.Y. Oct. 6, 2008) ..........................................................31

*In re American Express Co. Sec. Litig.*,
2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008).......................................................27

*In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................................................................27

*In re Avista Corp. Sec. Litig.*,
415 F. Supp. 2d 1214 (E.D. Wash 2005) ...............................................................43

*In re Bradley Pharms., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) ..............................................39, 41, 42, 43, 46

*Brayton v. Ostrau*,
561 F. Supp. 156 (S.D.N.Y. 1983).........................................................................49

*In re Bristol Myers Squibb Co. Sec. Litig.*,
2008 WL 3884384 (S.D.N.Y. Aug. 20, 2008).............................................20, 32, 33

*In re Bristol-Myers Squibb Sec. Litig.*,
2005 WL 2007004 (D.N.J. Aug. 17, 2005) ....................................................40, 46

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) ....................................................................42

*City of Brockton Ret. Sys. v. Shaw Group, Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y 2008)......................................................................20

*In re Complete Mgmt. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)................................................................30

*In re Comverse Tech., Inc. Sec. Litig.*,
    543 F. Supp. 2d 134 (E.D.N.Y. 2008) ...........................................................34

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ........................................................................38

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005).............................................................................. *passim*

*In re eSpeed Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)............................................................44

*Emergent Capital Inv. Mgmt. LLC, v. Stonepath Group*,
    343 F.3d 189 (2d Cir. 2003)............................................................................35

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    411 F. Supp. 2d 377 (S.D.N.Y. 2006)............................................................47

*Freeland v. Iridium World Commc'ns, Ltd.*,
    233 F.R.D. 40 (D.D.C. 2006)..........................................................................40

*Gebhardt v. ConAgra Foods, Inc.*,
    335 F.3d 824 (8th Cir. 2003) ...................................................................35, 45

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ........................................................................35

*In re Global Crossings, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004)......................................................26, 49

*Grace v. Rosenstock*,
    228 F.3d 40 (2d Cir. 2000)........................................................................48, 49

*Hall v. Children's Place Retail Stores, Inc.*,
    2008 WL 2791526 (S.D.N.Y. July 18, 2008) ........................................19, 40, 41

*Henry v. Daytop Vill., Inc.*,
    42 F.3d 89 (2d Cir.1994).................................................................................47

*In re IPO Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)......................................................36, 50

*In re IPO Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008)......................................................................31, 33, 44

*Jacobs v. Coopers & Lybrand, LLP*,
  1999 WL 101772 (S.D.N.Y.  Mar. 1, 1999) ..........................................................................50

*In re Juniper Networks, Inc. Sec. Litig.*,
  542 F. Supp. 2d 1037 (N.D. Cal. 2008) ..........................................................................42, 45

*Koppel v. 4987 Corp.*,
  167 F.3d 125 (2d Cir. 1999)....................................................................................................48

*Lanza v. Drexel & Co.*,
  479 F.2d 1277 (2d Cir. 1973)..................................................................................................50

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)........................................................................................36, 40, 44

*Leykin v. AT & T Corp.*,
  216 F. App'x 14, 17 (2d Cir. 2007)........................................................................................49

*Levine v. AtriCure, Inc.*,
  508 F. Supp. 2d 268 (S.D.N.Y. 2007)....................................................................................48

*M'Baye v. N.J. Sports Prod., Inc.*,
  2007 WL 431881 (S.D.N.Y. Feb. 7, 2007)............................................................................47

*Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.*,
  2008 WL 905188 (E.D.N.Y. Mar. 31, 2008)..........................................................................47

*McCabe v. Ernst & Young LLP*,
  494 F.3d 418 (3d Cir. 2007)....................................................................................................35

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
  65 F.3d 1044 (2d Cir.1995)......................................................................................................48

*Medis Investor Group v. Medis Techs.,Ltd.*,
  No. 07-3230, 2008 WL 3861364 (S.D.N.Y. Aug. 18, 2008)............................................25, 31

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)....................................................................................47

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ....................................................................................30

*Middlesex Ret. Sys. v. Quest Software Inc.,*
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................22, 26, 34

*In re Monster Worldwide, Inc. Sec. Litig.,*
    No. 07-2237, 2008 WL 623339 (S.D.N.Y. Mar. 4, 2008) ......................26

*In re Motorola Sec. Litig.,*
    505 F. Supp. 2d 501 (N.D. Ill. 2007) ..................................................39

*Nat'l City Golf Fin. v. Higher Ground Country Club Mgm't Co., LLC,*
    2008 WL 904728 (S.D.N.Y. Apr. 3, 2008).............................................12

*In re Openwave Sys. Sec. Litig.,*
    528 F. Supp. 2d 236 (S.D.N.Y. 2007)........................................... *passim*

*In re Parmalat Sec. Litig.,*
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)..................................................46

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
    446 F. Supp. 2d 163 (S.D.N.Y. 2006)...........................................33, 50

*Plymouth County Ret. Ass'n v. Schroeder,*
    2008 WL 4254151 (E.D.N.Y. Sept. 5, 2008) .......................................25

*In re Refco, Inc. Sec. Litig.,*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................47

*Roth v. Jennings,*
    489 F.3d 499 (2d Cir. 2007)................................................................12

*Rudolph v. UTStarCom,*
    2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) ....................................42

*In re Seitel Inc. Litig.,*
    447 F. Supp. 2d 693 (S.D. Tex. 2006) ................................................46

*Suez Equity Investors L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001).................................................................38

*In re Take-Two Interactive Sec. Litig.,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)......................................... *passim*

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,*
    2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005).......................................28

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007) ........................................................ *passim*

*In re Time Warner, Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) ..........................................................32, 33

*In re Tommy Hilfiger Sec. Litig.*,
   2007 WL 5581705 (S.D.N.Y. July 20, 2007) ......................32, 39, 43

*In re UnitedHealth Group PSLRA Litig.*,
   2007 WL 1621456 (D. Minn. June 4, 2007).................................42

*In re WRT Energy Sec. Litig.*,
   2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005)..............................48

*Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger*,
   423 F.3d 145 (2d Cir. 2005).........................................................50

*Weiss v. Amkor Tech. Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007) ...........................................43

*In re Winstar Commc'ns*,
   2006 WL 473885 (S.D.N.Y. Feb 27, 2006)..................................38

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)..........................................50

*In re Zoran Corp. Derivative Litig.*,
   511 F. Supp. 2d 986 (N.D. Cal. 2007)....................................24, 25

## STATUTES AND RULES

Fed. R. Civ. P. 8..........................................................................35

Fed. R. Civ. P. 8(a) ..................................................................6, 35

Fed. R. Civ. P. 8(d)(2)..................................................................47

Fed. R. Civ. P. 8(d)(3)..................................................................47

Fed. R. Civ. P. 12(b)(6)...........................................................19, 47

Lead Plaintiffs submit this memorandum in opposition to the separate motions to dismiss filed by SafeNet, Inc. ("SafeNet" or the "Company"), the three "Officer Defendants" (consisting of SafeNet's former President and CFO, Carole Argo ("Argo"), its former CEO Anthony Caputo ("Caputo") and its former CFO Kenneth Mueller ("Mueller")), and the Compensation Committee Defendants (consisting of former directors who served on SafeNet's Compensation Committee).[1]

## PRELIMINARY STATEMENT

This is a case of egregious and largely admitted accounting fraud. As detailed in the Consolidated Amended Complaint ("Complaint"), the fraud extended over a multi-year period, involved a host of accounting manipulations ranging from the backdating of stock options to various improper revenue recognition practices, and ultimately forced SafeNet to ***admit*** that its previously filed financial statements for the years 2000 through 2005 (and for the first quarter of 2006) were materially false and misleading. ¶¶ 1-3, 61-136, 231-33.[2] ***Indeed, the facts alleged herein have already produced a guilty plea to felony securities fraud by SafeNet's former President, COO and CFO, defendant Argo, in connection with an ongoing Justice Department and SEC investigation.*** ¶¶ 1, 57-60, 234-36. As news of problems with SafeNet's accounting was disclosed beginning in February 2006, stunned investors saw the value of their SafeNet shares plummet by ***more than 50%***, from $32.72 on February 2, 2006 to $14.93 on May 19, 2006 (the first trading day after the Class Period). ¶ 9. Meanwhile, the Officer Defendants -- Argo, Caputo and Mueller -- were enriching themselves by pocketing millions of dollars' worth of secretly backdated stock options, and by selling over $9.4 million of their personal holdings of

---

[1] This brief also addresses the arguments for dismissal tendered by defendants Andrew Clark and Shelley Harrison -- two former SafeNet directors who did *not* serve on SafeNet's Compensation Committee. These two Director Defendants are sued only in connection with their role in signing (a) false proxy solicitations in violation of § 14(a) of the Securities Act and (b) a false registration statement/prospectus (the "Rainbow Proxy/Prospectus") in violation of §§ 11 & 12(a)(2) of the Securities Act, which SafeNet sent to shareholders of Rainbow Technologies, Inc. ("Rainbow") to solicit their approval of SafeNet's acquisition of Rainbow in March 2004.

[2] Citations to "¶ ___" are to paragraphs in the Complaint.

SafeNet stock at inflated prices.  ¶ 1.  SafeNet's directors -- notably those who sat on its

Compensation Committee and who personally approved SafeNet's backdated option grants --

similarly collected millions in backdated options and reaped millions in insider selling.

Given SafeNet's admitted need to restate its financial statements, Defendants do not

seriously dispute that the Complaint adequately alleges that they signed or otherwise participated

in making materially false or misleading statements concerning SafeNet's options practices and

its financial condition and performance.  The Complaint specifically identifies the date and

content of each of the Defendants' false and misleading statements (¶¶ 137-211, 318-23).  It also

details SafeNet's myriad fraudulent accounting practices, which included:

- improperly accounting for ***backdated stock option grants***;

- manipulating its recognition of costs, revenue and earnings in connection with its ***improper accounting for long-term development contracts***;

- improperly recognizing revenue on ***"bill and hold" transactions***;

- improperly recognizing revenue on ***shipments of product that were unfinished*** or otherwise not ready to be delivered; and

- improperly recognizing revenue on ***accelerated royalty payments***.

In addition, the Complaint explains how each of these manipulations violated Generally

Accepted Accounting Principles ("GAAP").  *See, e.g.*, ¶¶ 4-7, 42-47 (explaining how SafeNet's

issuance of "in-the-money" options, which were "backdated" to earlier dates when SafeNet's

shares traded at a lower price, was not only flatly contrary to SafeNet's public disclosures

concerning its options grants, but also triggered clear-cut accounting rules that required SafeNet

to recognize compensation expense in connection with such option grants).  The Complaint even

alleges how the estimated impact of just the options-backdating aspect of the fraud was to

overstate SafeNet's reported operating income (or understate SafeNet's reported operating loss) by *144%* in 2002, *65%* in 2003, *248%* in 2004, and a staggering *2,168%* in 2005.  ¶¶ 98-99.[3]

Although each Defendant (or group of Defendants) asserts a different mix of arguments, in essence their motions boil down primarily to issues of (1) *scienter*, and (2) loss causation.

Numerous cases have held that a pattern of suspiciously timed option grants (as here) is sufficient on its own to allege *scienter* on the part of the issuing company and its senior officers. In the wake of Argo's recent guilty plea to felony securities fraud, however, there can no longer be any serious doubt that SafeNet's backdating manipulations were the product of ***deliberate fraud*** on the part of SafeNet's top executives (the Officer Defendants), or that the Compensation Committee Defendants were at least ***recklessly indifferent*** to the Officer Defendants' backdating manipulations.  For example, as Argo testified when allocuting to her guilt under §10(b):

> In mid-2000 I became responsible for overseeing SafeNet's process for granting and documenting stock options.  Sometime in December 2001 or early January 2002, SafeNet's compensation committee approved a grant of stock options to me and two other individuals, one of whom was the Company's CEO.  *The CEO [**defendant Caputo**] asked me to report October 1, 2001, as the date on which his options had been approved.  SafeNet's stock price on October 1, 2001 was its lowest stock price in the quarter*.  I agreed to document the CEO's options as if they had been granted on October 1, 2001.  ***I did so, <u>and the compensation committee approved this treatment</u>, even though I <u>and others</u> knew that the compensation committee had <u>not granted the options on that date</u>***.  I similarly documented the options granted to me and the other individual as if they had been granted on October 1, 2001, even though I knew this was untrue.
>
> By using October 1 as the grant date, SafeNet avoided reporting any compensation expense.  ***I knew that if we had used the correct grant date with the October 1 exercise price, SafeNet would have been required to record the difference between the exercise price and the higher stock price on the actual grant date as a compensation expense in its financial statements***.  As a result of using October 1, 2001 as the grant date, SafeNet's public filings included inaccurate compensation

---

[3]  These numbers must be estimated because, even though SafeNet has repeatedly stated that it would issue a formal restatement of its historical financial statements, SafeNet has been able to avoid having to do so because it successfully engineered a deal in 2007 with a venture capital firm as part of a "going private" transaction.

expense information…. ***In causing these filings to be inaccurate, I acted willfully and with intent to defraud.***

***In the following years, with respect to certain [additional option grants], I and others at SafeNet selected with hindsight grant dates with a low price from within the period when the grant was under consideration***. As to these grants, the Company did not record a compensation expense. This was wrong, and as a result of my conduct the Company's public filings were inaccurate…

¶ 235, quoting *United States v. Argo*, 07 CR 683 (JSR) (S.D.N.Y.), Transcript of Plea Allocution Proceedings, dated October 5, 2007 (emphasis added).

Indeed, given this allocution, Argo and SafeNet ***concede*** that the Complaint adequately alleges the requisite "strong inference" that they acted with *scienter*, as required to state a claim under §10(b) with respect to the options backdating aspects of the alleged fraud (SafeNet Brief at 19, fn.8). However, Argo's allocution also implicates Caputo and the Compensation Committee Defendants in willful (or at least reckless) misconduct -- and the Complaint further alleges (a) how the Compensation Committee Defendants knowingly and repeatedly signed backdated "unanimous written consents" ("UWCs") that approved the issuance of backdated options, (b) how they were themselves significant beneficiaries of backdated options, and (c) how they were plainly chargeable with knowledge of the Company's false SEC disclosures concerning SafeNet's option grants (which repeatedly and falsely represented that all options granted by SafeNet had exercise prices "equal to the market value of the underlying common stock on the date of the grant").[4]  ¶¶ 7, 139, 145, 160, 178.  *See also* ¶ 236 (citing 2004 email from Argo to Mueller advising him of SafeNet's "practice" of issuing backdated options).

With respect to Plaintiffs' "non-options backdating" allegations under §10(b) -- which are asserted only against SafeNet and the three Officer Defendants -- these defendants all cite

---

[4]  *See, e.g.,* SafeNet's Forms 10-K for 2002-2004 (signed by defendants Caputo (all), Argo (2002 and 2003), Mueller (2004), and Compensation Committee Defendants Brooks (all), Thaw (all), Hunt (all) and/or Money (2005).

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) for the proposition that these claims are not adequately supported by factual allegations giving rise to a "strong inference" of *scienter*, as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

In *Tellabs*, however, the Supreme Court emphasized that even under the PSLRA courts must "accept all factual allegations in the complaint as true" and then determine "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of *scienter*, not whether any individual allegation, scrutinized in isolation, meets that standard." 127 S. Ct. at 2509 (emphasis in original). Here, Plaintiffs describe with particularity how SafeNet artificially inflated its reported revenue and earnings by manipulating its accounting for long-term contracts, engaging in "bill and hold" transactions, improperly recognizing revenue on shipments of product that were unfinished or otherwise not ready to be delivered, and selling future royalty payments at steep discounts to bolster current earnings. ¶¶ 106-136. Indeed, as a former senior SafeNet accounting executive confirmed, SafeNet's CFO, defendant Mueller, would tell him to "go back and find new numbers" when the Company's earnings figures fell below expectations, and Mueller would "intervene … to get the numbers where [Mueller, Caputo and Argo] wanted." ¶¶ 8, 102. As this same executive stated, the steps taken at quarter-ends at SafeNet to "make the numbers" were "unlike anything I had ever seen," and a product of the Officer Defendants being "in denial" over the erosion in SafeNet's business during the Class Period. ¶ 101. Similarly, other confidential sources link Caputo, Argo and Mueller to authorizing, *e.g.,* the improper recognition of millions in revenue on "bill and hold" transactions and shipments of unfinished SafeNet product that was not ready to be delivered, with several sources (including the executive cited above) noting that they or others were fired by the Defendants for challenging SafeNet's improper accounting practices and inadequate controls. ¶¶ 102-03, 105, 120-21, 125-27, 131-36.

The Complaint's *scienter* allegations are further supported by, *inter alia*, the Officer Defendants' significant insider stock sales (¶ 250); SafeNet's and senior management's motive to inflate the Company's stock price for use as "currency" in closing two major corporate acquisitions during the Class Period (¶ 251); the timing of defendant Mueller's termination as SafeNet's CFO just before the end of the Class Period (¶ 223); and the compelling evidence of their own willful or reckless misconduct over a multi-year period as to the options backdating aspect of the fraud.  As in *Tellabs*, when evaluated in their totality, the resulting inference that the Officer Defendants acted with *scienter* "need not be irrefutable," *Tellabs*, 127 S. Ct. at 2510, but it is certainly "at least as likely as any plausible opposing inference."  *Id*. at 2513.

Defendants' other main argument is that Plaintiffs fails to adequately plead loss causation under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  However, as *Dura* holds, the pleading of loss causation is governed by the liberal notice pleading standards of Fed. R. Civ. P. 8(a).  Here, Plaintiffs' allegations of a decline in the price of SafeNet stock in response to a series of partial disclosures involving issues with SafeNet's accounting are typical of the kind of loss causation allegations that courts routinely find sufficient to defeat a motion to dismiss.  Although Defendants effectively ask this Court to require Plaintiffs to allege that the disclosures that caused SafeNet's share price to drop were disclosures of the specific fraudulent acts alleged in the Complaint, *Dura* did not establish any such requirement.  As detailed in §II.C below, Plaintiffs adequately allege that on each of the three key disclosure dates, the price of SafeNet's shares was reacting to disclosure of new information concerning the integrity of its management, its improper accounting and/or the true financial condition of the Company (which had been concealed by prior, inflated financial statements) -- as opposed to reacting to "unrelated" or "confounding" news about the Company.  *Cf. Dura*, 544 U.S. at 342 (contrasting hypothetical

losses that might occur "after the truth makes its way into the marketplace" to the lack of any such losses if the investor sells "before the relevant truth begins to leak out").

For the reasons summarized above and set forth in further detail below, Defendants' various motions to dismiss should be denied in their entirety.

## I.   STATEMENT OF FACTS

### A.   BACKGROUND

SafeNet develops, markets, and sells a variety of data encryption and information security products and services that are used to protect and secure digital identities and communications. ¶ 25.  During the Class Period (March 31, 2003 through May 18, 2006), SafeNet and the Officer Defendants reported financial results that created the false impression that SafeNet was achieving strong earnings and revenue growth.  For example, SafeNet reported increasing revenues of $32.2 million, $66.2 million, $201.6 million and $263.0 million for fiscal years 2002, 2003, 2004 and 2005, respectively, against total expenses of $33.8 million, $71.5 million, $200.5 million and $262.9 million for those same years -- a roughly ***six-fold*** growth in both revenues and expenses over this period.  ¶¶ 137, 158, 176.

Fueled by its self-proclaimed "strong" results, the price of SafeNet stock rose to Class Period highs of over $40 per share, or more than double SafeNet's share price at the start of the Class Period.  ¶ 2.  SafeNet's purportedly strong financial performance and rising share price also allowed Defendants to significantly expand the Company's business on highly favorable terms by enabling it to finance two major corporate acquisitions using SafeNet's increasingly valuable shares as currency.  For example, in October 2003, SafeNet announced that it would acquire Rainbow Technologies, Inc. ("Rainbow") as part of a $450 million stock-for-stock merger transaction whereby SafeNet effectively sold 10.3 million shares of its own stock (which traded at the lofty price of $42.95 per share the day before the transaction was announced) to

acquire all of Rainbow's outstanding shares.  ¶ 14.  In June 2005, Defendants again took

advantage of SafeNet's purportedly strong performance and resulting high stock price to acquire

another company, MediaSentry, Inc., for a combination of cash and SafeNet shares.  ¶ 251.

### B.    DEFENDANTS' FRAUDULENT ACCOUNTING

As the Company has since admitted, however, SafeNet's financial statements from 2000

through 2005, plus the first quarter of 2006 -- ***more than six full years, or 25 consecutive***

***quarters*** -- were all materially false and riddled by myriad accounting improprieties.  ¶¶ 9-10,

232.  Defendants' accounting manipulations, although part of a common scheme orchestrated

primarily by defendants Caputo and Argo, can be divided into two general categories: (a) the

options backdating manipulations (in which both the Officer Defendants and Compensation

Committee Defendants actively participated); and (b) the non-options accounting manipulations

(for which only SafeNet and the Officer Defendants are alleged to be liable).

### 1.    Defendants' Options Backdating Manipulations

Options grants are typically used as currency to attract and retain valuable employees in a

competitive marketplace.  Customary option grants (known as "at the money" options) give the

recipient (such as a corporate officer or employee) the right to acquire company stock in the

future at an "exercise price" (or "strike price") that is equal to the price at which the stock is

trading on the day of the grant.  Thus, if the stock price increases over time, the option recipient

will be able to profit by the amount of the increase (and conversely will gain nothing if the stock

price remains flat or falls).  "At the money" options also provide certain benefits for the issuing

company and its public shareholders, because (1) they closely align the interests of recipients

(who gain nothing unless the company's share price increases) with those of public shareholders;

and (b) unlike payments of cash compensation, the issuing company is ***not*** required to record any

compensation expense in connection with issuance of such options.  ¶¶ 4, 43.

However, the options granting process can be abused by "backdating," which refers to the practice whereby a company issues options (and fixes their terms) on a given date, but the options -- instead of being given an exercise price that is *equal* to the price of the company's stock on the date that the options are actually issued -- are *backdated* to an earlier date when the company's shares traded at a *lower* (and often much lower) price.  Options that are backdated so that their exercise price is below the stock's market price on the date of issuance are "*in* the money" options because, in contrast to "at the money" options (which can be exercised for a profit *only* if the value of the underlying stock increases), "in the money" options are issued with embedded intrinsic value.  This intrinsic value is equal to the difference between (a) the exercise price (which has been backdated to a date when the stock was trading at a relatively low price) and (b) the market price on the date that the option was actually issued.  ¶ 4.

Not surprisingly, because of the obvious difference between being issued, *e.g.,* (i) an "at the money" option to buy 25,000 shares at the current market price (say, $20) and (ii) an "in the money" option to buy the same 25,000 shares at a lower price (say $10) at which the shares had traded weeks or months earlier, both the SEC and GAAP require companies to treat grants of "in the money" options very differently than "at the money" options.  Specifically, where a company issues "*in* the money" options, the SEC and GAAP consider the difference between the value of the option based on the "exercise price" and the value based on the price of the stock on the grant date to be a form of compensation to the option recipient that ***must be expensed*** and accounted for as a compensation cost -- which in turn reduces a company's reported net income and earnings per share.  ¶ 43 (citing Accounting Principles Board Opinion ("APB") No. 25).  Accordingly, failing to record this intrinsic value of "in the money" option grants will ***understate*** compensation cost and ***overstate*** earnings in the year of the grant (and in future years during the

vesting period of the options) and may also trigger serious adverse tax consequences and I.R.S. penalties.  ¶¶ 5, 44, 50, 164(d-e).

To avoid any doubt as to what date should be used to determine whether an options grant is "in the money" and whether compensation cost must be recognized, APB No. 25 also contains provisions defining a stock option's "measurement date."  Paragraph 10(b) of APB No. 25 clearly defines the "measurement date" as "the first date on which are known ***both*** (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price if any" (emphasis added).  Accordingly, even if documents related to an options grant are dated as of an earlier date or otherwise manipulated to reflect an earlier date -- i.e., even if the options are backdated -- the "measurement date" as a matter of GAAP does not occur until the date that the terms of options award, including the number of options awarded, the option recipients and the options' exercise price, are all known and fixed.  ¶ 45.

SafeNet's stock options were purportedly issued pursuant to written plans (the "Option Plans") that were publicly filed with the SEC, ratified by SafeNet's board and approved by its shareholders.  ¶¶ 42, 47.  SafeNet's Option Plans provided that they were to be administered by the Compensation Committee, which had the ultimate authority to grant option awards.  ¶ 48. The Option Plans further provided that the exercise price for SafeNet grants "shall be determined by the [Compensation] Committee, but in no event shall be less than 100% of the fair value of [SafeNet's] Common Stock on the Grant Date."  ¶ 48.  *Similarly, SafeNet's Class Period SEC filings (which were signed by both the Compensation Committee and Officer Defendants) repeatedly assured investors that "all options issued [by SafeNet] had an exercise price equal to the market value of the underlying common stock on the date of the grant"* (¶¶ 138, 145, 159, 177), *and that "no gain to the options [granted under the Plans] is possible without stock*

*price appreciation, which will benefit all shareholders."* ¶¶ 47, 142, 155, 163, 188.

However, prior to and during the Class Period, defendants Caputo, Argo and (during his June 2004 to April 2006 tenure) Mueller, with the knowledge and approval of the Compensation Committee Defendants, repeatedly caused SafeNet to issue backdated "in the money" options, and to fail to recognize compensation expense in connection with those option grants in violation of GAAP. *Moreover, to maximize the fruits of their backdating activities and conceal them from SafeNet's auditors, analysts and investors, the Officer and Compensation Committee Defendants routinely backdated SafeNet's options grants and accompanying Unanimous Written Consents (UWCs) by papering them as if they had been issued on prior "grant dates" on which SafeNet's stock price had closed at or near a periodic low point.* ¶¶ 6-7, 71, 78, 84, 89.

Evidence cited in the Argo Indictment confirms the extent to which backdating was a pervasive part of SafeNet's compensation practices from 2000 through 2005. For example, when defendant Mueller took over as CFO in 2004, Argo sent him an email on September 15, 2004 that advised him to backdate the 100,000 options he received upon his hire to the low price for the quarter, $22.19 (SafeNet's closing price on July 28, 2004). As Argo's email explained:

> Our past *practice* has been to aggregate options for performance awards or new hires in the quarter and *pick the best price after the hire date*. We then send the unanimous consent to the Comp Committee and the options are approved. I think this is a good practice because of the volatility of our stock price. Who wants to have an option priced on your start date and then have the option underwater a month later when you are notified of the award price. ¶ 89 (emphasis added).

The then-members of the Compensation Committee -- defendants Money, Thaw and Brooks -- did not approve Mueller's July 2004 option grant until months later, when they each signed a UWC that was backdated to July 28, 2004. By October 9, 2004, when the last Compensation Committee member signed the UWC, SafeNet's stock price had jumped to $28.45. As a result, Mueller and others who received options "granted" on July 28 received an immediate 28% gain

upon their issuance, and SafeNet should have, but failed to, record an expense of $1,139,320 on these "in the money" grants.  ¶¶ 88-89; *see also* ¶¶ 92-94 (describing further 50,000 in backdated Mueller stock options "granted" in September 2005).

The Complaint similarly identifies numerous occasions when the other two Officer Defendants and the Compensation Committee Defendants arranged to have the Company issue themselves lucrative backdated stock options.  For example, Caputo and Argo received hundreds of thousands of stock options that were backdated to show bogus "grant dates" of July 30, 1999, October 11, 2000, April 3, 2001, May 16, 2001, February 27, 2003, July 17, 2003, May 19, 2004, June 1, 2005 and September 29, 2005.  ¶¶ 64, 67, 71, 72, 82, 84, 88, 94[5]; *see also Argo Indictment,* Gardner Decl. Ex. B at ¶¶ 52-54.[6]  The Compensation Committee Defendants – in addition to approving hundreds of thousands of backdated options for others – also issued themselves hundreds of thousands of options, many of which were backdated to be immediately "in the money."  ¶¶ 31-36.  For example, Defendants Brooks, Hunt and Thaw had the "good fortune" of issuing themselves (and their fellow directors) 10,000 options each which were dated as of February 27, 2003, *which was the date on which SafeNet shares closed at their lowest price ($16.47) for all of 2003.*  ¶¶ 80-83.  *Equally telling is the fact that the full extent to which the Officer and Compensation Committee Defendants lined their own pockets by issuing themselves options during the Class Period was concealed, because (as SafeNet has admitted in post-Class Period SEC filings) all Defendants violated §403 of the Sarbanes-Oxley Act by failing to properly report most of the option grants at issue in this case.*  ¶ 59-60.

---

[5]  *See also* Gardner Ex. E (set of price graphs illustrating how SafeNet's "fortuitously" timed options grants to the Individual Defendants were repeatedly dated on the days when SafeNet shares traded at quarterly or yearly lows.

[6]  A court can take judicial notice of the contents of court documents as well as SEC filings (also submitted herewith as exhibits to the Gardner Declaration).  *See Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007) (judicial filings); *Nat'l City Golf Fin. v. Higher Ground Country Club Mgm't Co., LLC,*  2008 WL 904728, at *8 (S.D.N.Y. Apr. 3, 2008) (SEC filings).

2.    **SafeNet's and the Officer Defendants' Non-Options**
      **Accounting Manipulations**

In addition to engaging in improper conduct relating to options backdating as discussed

above, throughout the Class Period SafeNet and the Officer Defendants also engaged in

pervasive improper revenue recognition activities and other earnings manipulations.   As detailed

in the Complaint, this aspect of the fraud included the following manipulations:

●   **Improper Accounting for Long-Term Contracts**.   Much of SafeNet's business
    involved long-term contracts, where the seller recognizes revenue (and associated costs)
    over the life of the contract (¶¶ 8, 106-115, describing  "percentage of completion"
    principles under GAAP's SOP 97-2).  Fairly applied, this allows a company to recognize,
    *e.g.*, 20% of the revenue on a project when it has incurred 20% of the estimated total
    contract completion costs.   However, the Officer Defendants manipulated SafeNet's
    long-term contract accounting, and caused it to overstate its profitability, by artificially
    "adjusting" downward its cost estimates for completing contracts.  This enabled SafeNet
    to improperly frontload the recognition of revenue and defer recognition of losses, while
    simultaneously concealing from investors that SafeNet's current earnings figures were
    inflated -- and that SafeNet's *future* earnings from existing long-term contracts would be
    far weaker (and possibly negative) when SafeNet's actual costs were finally recognized at
    the back end.  ¶¶ 116-118.  Specifically, although SafeNet constantly lowballed its initial
    estimated  contract  completion  costs  and  repeatedly  experienced  cost  overruns,
    Defendants would simply record revenue as if there were no cost overrun issues.  Thus, if
    SafeNet had initially estimated it would cost $1 million to complete 20% of a project, it
    would assume that it had reached 20% completion of the contract in the quarter when it
    reached $1 million in expended costs -- *and would recognize 20% of the revenue on the*
    *contract in that quarter* -- regardless of whether 20% of the project had actually been
    completed based on *bona fide* project cost figures.   ¶ 118.   Examples of such
    manipulations, such as those involving a large SONET encryptor contract that Argo and
    Caputo personally supervised, are pled at ¶¶ 116-121.  SafeNet later admitted in February
    2006 that it had *inflated its total reported earnings for all of 2005 by over 400%* due to
    improper recognition of costs and revenue on long term contracts.  ¶ 122.

●   **Improper Recognition of Revenue on Bill and Hold Transactions**.  A "bill and hold"
    transaction is a sales arrangement in which a seller bills a customer for product before the
    product is actually shipped.  ¶ 123.  GAAP generally precludes recognition of revenue on
    such arrangements, requiring the product to be actually shipped to the buyer before
    recognizing any revenue.   ¶¶ 123-124.   However, as the Complaint details, SafeNet
    regularly engaged in bill and hold transactions (including several that Caputo and Argo
    personally handled or authorized) so that SafeNet could prematurely recognize revenue
    when needed to make quarter-end numbers.  ¶¶ 121, 125-127.

●   **Improper Recognition of Revenue on Shipment of Unfinished Product**. Beginning as
    early as 2003, SafeNet also engaged in the practice of shipping unfinished product to

meet its revenue recognition and earnings goals. As a result, SafeNet prematurely recognized revenue upon shipment of the product – even though the "sales" would have to be reversed in future quarters when SafeNet would be forced to take back and replace the defective product. ¶ 129. As detailed in the Complaint, several confidential sources confirmed that SafeNet would ship product at the end of each quarter "without going through the [quality assurance] steps that [SafeNet's] contract[s] required [it] to do" so that revenue could be prematurely recognized (¶ 132), and that as a result, at quarter's end, "whatever wasn't bolted down was shipped." ¶ 130. Similarly, a former SafeNet executive described how at the end of 2003, SafeNet delivered to Cisco -- one of SafeNet's most important clients -- product that senior management knew was not ready, and that had not passed even minimal initial testing, "so the Company could recognize revenue on it." ¶ 131; *see also* ¶ 132 (describing "tremendous pressure" placed on SafeNet engineers to "sign-off" on shipments of unfinished product).

●    **<u>Undisclosed Acceleration of Revenue Recognition on Royalty Payments</u>**. When the Officer Defendants were unable to meet quarterly numbers through the foregoing manipulations, they would mortgage SafeNet's stream of future royalty revenues from prior licensing transactions. Specifically, in connection with its sales of computer chips, integrated circuits and intellectual property, SafeNet typically received both an up-front fee and a stream of future royalty payments going forward. However, when needed to make its numbers, unbeknownst to investors, SafeNet's senior management would ask its customers to pre-pay or buy-out the royalties they owed to SafeNet at a steep discount to their present value. Although this allowed SafeNet to report inflated revenues in the short-term, it did so at the expense of future payments that analysts and investors had built into their assessment of SafeNet's value. ¶¶ 133-36.

The Officer Defendants were also able to further their fraud by implementing woefully inadequate accounting controls that made it much easier for them to "cook the books." For example, they never implemented written or Company-wide SOP 97-2 compliance practices, and actually reprimanded a SafeNet accounting manager when they became aware that this manager was using a check-list that the manager had used in a prior similar job to ensure compliance with SOP 97-2. ¶ 120. Similarly, other sources confirmed how Caputo, Argo and Mueller dominated SafeNet, overrode its internal accounting controls, and set a "tone at the top" that called for meeting earnings expectations by any means necessary and that did not tolerate those who questioned their conduct. ¶¶ 101-102. For example, Mueller would regularly tell one of his senior subordinates to "go back and find new numbers" when they were not in line with expectations, and would "intervene … to get the numbers where [Mueller, Caputo and Argo]

14

wanted." ¶¶ 8, 102.   The Complaint also describes how SafeNet terminated several employees during the Class Period for challenging the Company's improper accounting practices (¶¶ 102-3), while another quit shortly after being hired rather than go along with such practices.  ¶ 119.

In sum, as stated by a former senior Rainbow executive who decided to leave SafeNet shortly after it acquired Rainbow, Caputo and Argo (with the help of their loyalist, Mueller) "could do whatever they wanted," and "even if someone told Tony [Caputo] or Carole [Argo] that something was wrong or illegal, the person would have to do it anyway or be fired."  ¶ 103.

As result of Defendants' myriad accounting manipulations, SafeNet's Class Period financial statements were materially false and misleading, and the truth concerning the erosion in SafeNet's business and its actual financial condition and performance was concealed.

### C.   THE TRUTH BEGINS TO EMERGE

Investors did not begin to become aware of significant accounting problems and unethical behavior at SafeNet until February 2, 2006.  On that date, SafeNet disclosed after the close of the market that it had identified certain "errors" in its previously reported financial statements for the 2d and 3d quarters of 2005 (including an "error" in its accounting for certain government contracts that would reduce 3d Q 2005 EPS by 8%), that its auditors had been "looking closely at the Company's revenue recognition practices" and had required SafeNet to defer recognition of $1 million in revenue that it had originally planned to recognize in the fourth quarter of 2005, and that SafeNet had also missed analysts' consensus earnings per share numbers by $0.10 (or nearly 20%).  In response, SafeNet's stock price fell ***15.2%*** in heavy trading, closing at $27.75 on February 3, 2006 compared to $32.72 at the close on February 2, 2006.  ¶¶ 212-17.

Analysts understood these disclosures to reveal problems with the integrity of SafeNet's management and revenue recognition practices.  As one analyst wrote on Monday, February 6:

> SafeNet disclosed "an error of approximately $600,000…related to an under-statement of costs of revenues"….   Interestingly, the expense understatement occurred in the same revenue segment where a previous adjustment to profitability assumptions resulted in $0.05 of additional EPS in the third quarter.  ***We are troubled by the fact pattern here; [SafeNet] lowers its expense assumptions (increasing EPS) regarding certain government contracts in its initial 3Q release, only to undertake a (stealth?) restatement of these expenses in a later period (lowering EPS)***….  ***<u>Continued revenue recognition concerns</u>***:   During its earnings conference call, [SafeNet] disclosed that it and its auditors "have looked closely at revenue recognition policies" and decided to defer $1 million of revenue previously forecasted to be recognized in the fourth quarter.  The revenue will now be recognized ratably over 2006.  ***This disclosure is another example of SafeNet's exposure to assumptions-based revenue streams, confirming our belief that investors should closely scrutinize metrics related to revenue recognition at SafeNet***. ¶ 215 (emphasis added); *see also* ¶¶ 213-216.

In late February 2006 SafeNet reiterated the existence of "errors" in its "recognition of costs under certain long-term production contracts" in 2005 (¶ 218), and in March admitted that it "did not maintain effective internal control over [its] financial reporting as of December 31, 2005." ¶ 221.  At the same time, however, Caputo downplayed the significance of any accounting issues by reassuring investors that SafeNet had "already increased accounting personnel and is putting in place a plan to greatly strengthen our internal review function."  ¶ 221.

On April 6, 2006, however, the investing public was rocked by further revelations indicating that the extent of SafeNet's accounting, financial control and management integrity problems were significantly greater than had been previously disclosed.  These new disclosures included SafeNet's announcement that it had ***terminated*** Mueller as CFO (and that COO Argo would be stepping in as interim CFO), and that it would also miss its prior earnings forecast for the first quarter of 2006.  The market reacted swiftly to the news of Mueller's firing and SafeNet's second consecutive earnings miss, as SafeNet's share price fell another 19.3%, from $25.97 on April 6, 2006 to $20.96 on April 7, 2006, on heavy volume.  ¶ 224.

Finally, on May 18, 2006, SafeNet announced that it had received a subpoena from the U.S. Attorney's Office for the Southern District of New York ("USAO") demanding information

about its stock option grants, and that the SEC had launched an investigation into its "stock option grants to directors and officers" and "certain accounting policies and practices."  ¶ 226. In response to this latest revelation, SafeNet's shares plummeted a further 22.3%, from $19.21 on May 18 to $14.93 at the close on May 19, 2006 -- *a decline that was the second biggest percentage decline of any stock on the NASDAQ on that date*.  ¶ 227.  As one analyst report noted in summarizing the market's sharp re-evaluation of SafeNet's shares, "Every time it appears that the bad news is over with SFNT, there is yet another shoe to drop.  **With the SEC now knocking on SFNT's door, we encourage investors to stay away from this name in the near-term until the overhang of a potentially prolonged investigation runs its course."**  ¶ 229.

   **D.   POST-CLASS PERIOD EVENTS:  SAFENET ADMITS THAT ITS FINANCIALS GOING BACK TO *2000* MUST BE RESTATED, AND ARGO PLEADS GUILTY TO FELONY SECURITIES FRAUD**

   In subsequent weeks and months, investors' concerns about the nature and extent of the rot at SafeNet were only confirmed.  For example, in July 2006, SafeNet confirmed that it had improperly accounted for backdated stock option grants issued to its officers and directors, and that it would have to further restate its previously reported financial results going back to 2002 to address this issue.  Two months later, in September 2006, SafeNet publicly announced that its stock option manipulations went back even earlier, to 2000, and that its ongoing "special committee" investigation had determined that grants between 2000 and 2005 likely had been improperly accounted for.  SafeNet also announced in September that it intended to restate its financial statements for the years 2000-2005, and for the first quarter of 2006.  ¶¶ 230-32.

   The next month, in October 2006, SafeNet announced that it had terminated both Argo and Caputo.  ¶¶ 26-27.  Tellingly, all three of the terminated Officer Defendants (including Mueller) agreed to pay back money to the Company, and to cancel or re-price their previously granted options.  *See* Gardner Decl. Exhs. C and D.

In January 2007, SafeNet reported additional details concerning its upcoming restatement when it confirmed that -- in addition to correcting its fraudulent accounting for backdated options and 2005 revenue recognition issues -- it would also have to expand its restatement to correct further revenue recognition problems in its financial statements for FY 2004, FY 2005 and the 1st quarter of 2006. ¶ 207. However, notwithstanding SafeNet's repeated representations that it would issue restated historical financial statements, it was ultimately able to avoid having to do so, because in early 2007 it entered into a deal under which it was acquired and "taken private" by a venture capital firm (which freed SafeNet from SEC reporting requirements). ¶ 11.

In July 2007, the USAO indicted Argo for securities fraud and conspiracy to commit securities fraud for her role in knowingly preparing false financial statements. The Indictment identified numerous examples of options backdating from 2000 to 2006 that Argo participated in, and further charged that during this period "*Argo **and others known and unknown**, engaged in an illegal scheme to deceive … shareholders …* concerning SafeNet's systematic backdating of option grants and SafeNet's failure to record and report compensation expense in connection with those backdated stock option grants," Indictment, Gardner Decl. Ex. B at ¶ 14 (emphasis added). The Indictment further detailed how the backdating scheme financially benefited Argo and her co-conspirators by giving them not only the benefit of lucrative "in the money" options, but also by fraudulently inflating SafeNet's reported earnings, which in turn inflated their performance-based bonuses and other compensation from 2000 to 2004. *See id.*, ¶¶ 9, 18, 29.

Having charged Argo with conspiracy, it would appear that the government's criminal investigation into the activities of Argo's as yet un-named co-conspirators -- who presumably include *at least* defendants Caputo and Mueller -- is ongoing. ¶ 12. As to Argo, however, the outcome of the government's case is known: in October 2007, Argo allocuted to the roles that

she, Caputo and the Compensation Committee members played in connection with improper

options backdating, and pled guilty to felony securities fraud.  In January 2008, Judge Rakoff

sentenced Argo to a $1 million fine and a six month term in federal prison.  ¶¶ 58, 235-36.

## II.   ARGUMENT

Under Fed. R. Civ. P. 12(b)(6), the reviewing court must accept as true all well-pled

allegations in the complaint.  *Tellabs*, 127 S. Ct. at 2509.  In addition the court "must 'accept as

true all of the factual allegations contained in the complaint' and draw all inferences in the light

most favorable to the non-moving party."  *Hall v. Children's Place Retail Stores, Inc.*, 2008 WL

2791526, at *3 (S.D.N.Y. July 18, 2008) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955,

1964 (2007)).  As set forth below, Plaintiffs plainly state valid claims against each Defendant.

### A.   The Complaint States §10(b) Claims Against SafeNet
### and the Officer and Compensation Committee Defendants

To plead a §10(b) claim, a plaintiff must allege:  (i) a misrepresentation or omission;

(ii) of material fact; (iii) made with *scienter*; (iv) in connection with the purchase or sale of a

security; (v) upon which plaintiff relied; and (vi) that proximately caused plaintiff's injury.  *ATSI*

*Commc'ns v. Shoar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).  Only the third and sixth of

these elements (*scienter* and loss causation) are seriously contested here[7] - and SafeNet and Argo

do not even contest *scienter* as to the options backdating aspects of the alleged fraud.

---

[7]  Picking six random allegations, Caputo argues that Plaintiffs somehow fail to allege that "statements specifically attributable to Mr. Caputo were false." Caputo Br. at 15-16.  Caputo, however, completely ignores the section of the Complaint entitled "Class Period False and Misleading Statements," which identifies SafeNet's numerous false and misleading Class Period SEC filings -- all of which were *signed by Caputo*. *See* ¶¶ 137, 144, 147, 150 153, 158, 168, 172, 176 181, 185, 190, 192, 195, 199, 204 and 211.

In connection with the non-backdating aspect of the fraud, Mueller asserts that the Complaint does not adequately allege that SafeNet's financial statements were false because it "does not specify which improper practices are reflected in the financial statements and whether they are material." Mueller Br. at 11. However, Plaintiffs plainly plead which financial statements are false and why (¶¶ 109, 110, 121, 125-127, 130, 133, 218).  Plaintiffs also allege that these statements were "materially" false (¶¶ 214, 218), as evidenced by SafeNet's admissions that it needs to issue a restatement to correct numerous past improper accounting practices (¶¶ 122, 213, 215, 218).

**B.**    **The Complaint Sufficiently Pleads *Scienter***

To determine whether a complaint pleads the requisite "strong inference" of *scienter*, a court must review all of the plaintiffs' factual allegations ***in their totality***, rather than parse individual allegations in piece-meal fashion. *Tellabs,* 127 S. Ct. at 2509; *In re Bristol Myers Squibb Co. Sec. Litig.*, 2008 WL 3884384, at *16 (S.D.N.Y. Aug. 20, 2008). The inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of the competing inferences." *Tellabs*, 127 S. Ct. at 2510. Instead the inquiry is as follows: "[w]hen the allegations are ***accepted as true and taken collectively***, would a reasonable person deem the inference of *scienter **at least*** as strong as any opposing inference?" *Id.* at 2511 (emphasis added); *see also City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y 2008) (under *Tellabs,* a "tie… goes to the plaintiff").

In this Circuit, a "strong inference" of *scienter* can be established at the pleading stage by alleging either (a) facts showing that defendants had motive and opportunity to commit fraud; or (b) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI*, 493 F.3d at 99. Since *Tellabs*, the Second Circuit has similarly re-affirmed that a plaintiff may establish *scienter* by alleging facts showing that defendants "(1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; ***or*** (4) failed to check information they had a duty to monitor." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)).

1.       **Plaintiffs Allege Strong Circumstantial Evidence of the Officer and Compensation Defendants' Conscious Misbehavior or Recklessness With Respect to the Options Backdating Aspects of the Fraud**

(a)       **Argo's Indictment and Guilty Plea**

Based on Argo's allocution to acting "willfully and with intent to defraud" with respect to backdating matters, neither she nor SafeNet (as her employer) contest *scienter* as to themselves. However, the Complaint's allegations based on the Argo Indictment and Argo's Allocution to securities fraud (Gardner Decl. Exs. A and B) also suffice, standing alone, to support a strong inference that Caputo, Mueller and the Compensation Committee Defendant *also* acted knowingly (or at least recklessly) with respect to the options backdating aspects of the fraud.

First, Argo's allocution details how, in **December 2001 or January 2002,** the Compensation Committee had approved a large grant of options to Caputo and Argo, and how **Caputo asked Argo to backdate his grant to October 1, 2001, which was the date on which SafeNet traded at its lowest point in the quarter.**  Argo's Allocution further details how she "agreed to document [Caputo's] options as if they had been granted on October 1, 2001," and how "[Argo] and the **Compensation Committee approved** this treatment, even though [Argo] and others **knew** that the compensation committee had not granted the options on that date." ¶ 235; Allocution at ¶ 17-18.  Caputo's active and knowing participation in *initiating* backdating for his own personal benefit could hardly be more clearly alleged – and the complicity of the Compensation Committee Defendants is equally plain in that they "approved this treatment" and, furthermore, plainly did so by approving (in December 2001 or later) paperwork that Argo admitted was backdated on its face to show a bogus "grant date" from months earlier.

Similarly, the Complaint and the Argo Indictment further implicate the Compensation Committee Defendants by making it clear that they signed **numerous** backdated UWCs that "bore the dates that Argo and her co-conspirators had selected for the option grants" – thereby

creating a fraudulent paper trail to make it appear that the options had been approved and issued

on earlier dates (when SafeNet's stock price was trading at a lower price), rather than on the date

on which the options were actually approved.  Indictment at ¶¶ 25, 33.  For example, the

backdated papers that the Compensation Committee *also* signed and approved included

(1)  a backdated UWC allegedly approving another large options grant to Caputo on October 8, 2002 (when SafeNet traded at $13.75) – even though the committee did not approve the grant until October 24 (when SafeNet share price had increased *36%* to $18.75) – thereby allowing Caputo to receive 100,000 in-the-money options with an immediate intrinsic value of ***$500,000*** (¶ 78; Indictment at ¶ 43);

(2)  a backdated UWC allegedly approving options grants to Argo (and others) on July 17, 2003 (when SafeNet traded at $31.35) – even though the committee did not execute the UWC until nearly two months later on September 15, 2003 (when SafeNet's share price had increased nearly *25%* to $38.85) – thereby allowing Argo alone to receive in-the-money options with immediate intrinsic value of ***$75,000*** (¶ 84, Indictment at ¶ 50); and

(3)  a backdated UWC allegedly approving options grants to Mueller on July 28, 2004 (when SafeNet traded at $22.19)– even though the committee did not execute the UWC until more then ten weeks later on October 9, 2004 (when SafeNet's share price had increased *28%* to $28.45) – thereby allowing Mueller to receive 100,000 in-the-money options with immediate intrinsic value of ***$626,000*** (¶ 89, Indictment ¶ 53).

*See also* ¶ 90.  Such specific allegations of their repeated signing of backdated paperwork refutes

any suggestion that the Compensation Committee Defendants were "unaware" of backdating.[8]

Third, the Complaint details the contents of Argo's September 2004 email to Mueller,

which advised him that it was SafeNet's "***practice***" to "aggregate options for performance

awards and new hires in the quarter ***and pick the best price,***" and to "then to send the unanimous

consent[s] to the ***comp committee***" for approval after-the-fact. ¶ 236.  This allegation alone

similarly raises a strong inference of *scienter* as to Mueller.

---

[8]  A review of the suspicious timing of other options grants to the Officer and Compensation Committee Defendants, among others, as set forth in the Complaint (at ¶¶ 62-94) and also as graphically illustrated in Gardner Decl. Ex. E, clearly shows a pattern that supports a strong inference, pre-discovery, that numerous other option grants issued and approved from 1999 to 2005 were similarly backdated.  *See, e.g., Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1181 (C.D. Cal. 2007) (graphs showing allegedly backdated grants over time "len[t] substantial support to the notion that no amount of 'highly technical' accounting treatments can obscure the obvious that someone at Quest was engaging in substantial, prolonged, and ***intentional*** backdating of stock options") (emphasis added).

Given these damning facts, Defendants attempt to argue that there is nothing illegal about issuing backdated in-the-money options, provided that they are properly accounted for.  This "argument," however, ignores the fact that the very *raison d'etre* of backdating is to allow options to be issued on "in-the-money" terms that are highly favorable to the option recipient ***while simultaneously creating a paper trail of backdated documentation whose only utility is to (a) allow the company to "justify" not recording compensation expense on them, and (b) help conceal the resulting fraudulent accounting from being subsequently discovered.*** [9]  Indeed, courts have repeatedly agreed that the primary reason to backdate options is to facilitate the fraudulent accounting for such options. *See, e.g.*, *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 241-42 (S.D.N.Y. 2007) (backdating options gave the recipients "an instant opportunity for profit" while allowing the company to materially underreport compensation expenses and artificially inflate EPS); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 294-95 (S.D.N.Y. 2008) (backdated options could not have been procured if compensation expenses and earnings were accurately reported).  As stated in the Argo Indictment, "[p]roper accounting reporting of these in-the-money options would have alerted regulators, investors, SafeNet's auditors and others of the backdating."  Indictment ¶ 17.

Similarly, any argument that any defendant here did not understand the proper accounting treatment for options is disingenuous (*see* Comp. Com. Br. at 3).  It was no accident that, ***for nearly six years,*** these defendants repeatedly authorized options to be "issued" as of dates when SafeNet traded at historic low points, and repeatedly executed UWC's that they *knew* on their face were part of a backdated paper trail, in blissful ignorance of the likelihood – if not near

---

[9]  *See also* Testimony Concerning Options Backdating Before the U.S. Senate Committee on Banking, Housing and Urban Affairs (Sept. 6, 2006) (statement by Christopher Cox, SEC Chairman), available at http://www.sec.gov/news/testimony/2006/ts090606cc.htm (the "purpose of disguising an in-the-money option through backdating is to allow the person who gets the option grant to realize larger potential gains -- without the company having to show it as compensation on the financial statements").

certainty – that this backdated paperwork would be used to "justify" fraudulent accounting treatment of those options that would significantly inflate SafeNet's reported earnings.  There is simply no other reason to prepare and sign a backdated UWC.  *See In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 996 (N.D. Cal. 2007).  The role of Caputo, Mueller and the Compensation Committee Defendants in intentionally documenting numerous backdated options thus plainly supports a strong inference of *scienter*, and even if they did not "know" the relevant (and clear-cut) GAAP rules for accounting for options – which is most unlikely since they all signed Form 10-K's describing APB No. 25 (*e.g., ¶* 177), Mueller was CFO, and defendants Brooks, Hunt and Money also served on SafeNet's Audit Committee (¶¶ 31-32, 33) – their role in backdating documents was a blatant "red flag" evidencing reckless misconduct.

Finally -- as if any further showing were required – the Compensation Committee Defendants have no real explanation for how they could have repeatedly signed SEC filings (*see* ¶¶ 26-34), whose accuracy they attested to, that ***falsely*** represented that all of the options granted by SafeNet had exercise prices "equal to the market value of the underlying common stock on the date of the grant" (¶¶ 7, 139, 145, 160, 178), and that "no gain to the options is possible without stock price appreciation, which will benefit all shareholders."  ¶¶ 142, 155, 163, 182, 188.  Having knowingly signed backdated UWCs authorizing backdated option grants, their making of such false and misleading statements was patently reckless, at best.

### (b)     The Officer Defendants' Executive Positions and Defendants' Failure to Monitor and/or Investigate

Caputo's and Mueller's positions in the Company add to the inference of *scienter* against them, especially since they signed statements that materially misrepresented the Company's financial condition as a result of their backdating scheme.  *See Openwave*, 528 F. Supp. 2d at 250 (finding participation in fraud where defendants signed statements that materially

24

misrepresented company's financial condition as a result of backdating scheme).  As alleged, Caputo and Mueller both signed, and in some cases certified as true, Forms 10-Q and 10-K filed with the SEC during the Class Period.  These filings contained materially false information regarding the Company's option grants.  ¶¶ 26, 28, 137-140, 144-152, 158-187, 192-211.  At the time Caputo and Mueller signed these respective filings, each had been participating in the backdating scheme, knowing that on the actual grant dates the quoted market price of the Company stock was above the option price.  ¶¶ 61-96.[10]

The Officer and Compensation Committee Defendants' *scienter* can also be inferred from their "fail[ure] to check information they had a duty to monitor" and their failure to investigate. *Medis Investor Group v. Medis Techs.,Ltd.*, No. 07-3230, 2008 WL 3861364, at *4 (S.D.N.Y. Aug. 18, 2008) (citing *Dynex*, 531 F.3d at 194); *Plymouth County Ret. Ass'n v. Schroeder*, 2008 WL 4254151, at *18 (E.D.N.Y. Sept. 5, 2008) (directors "had a duty to investigate whether [their] statements were accurate").  For example, the Compensation Committee Defendants were responsible for ensuring that the exercise price for granted options were not less than 100% of the fair-market value of SafeNet's stock price on the date that each option was actually granted, in accordance with SafeNet's Option Plans.  ¶¶ 42-52.  Further, as Audit Committee members, Brooks, Money and Hunt had the additional duty to monitor the exercise prices and dates of granted options and to disclose any non-compliance with SafeNet's Option Plans or proper options accounting guidelines.  Given these duties, these Defendants were, at the very least, reckless in not knowing that there was rampant, improper backdating of options at SafeNet and that this rampant backdating would have significant financial consequences.  *See Take-Two*, 551

---

[10] "When a corporate Officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." *Zoran*, 511 F. Supp. 2d at 1013 (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000)).

F. Supp. 2d at 300-01; *see also Openwave*, 528 F. Supp. 2d at 250 (failure to fulfill a "duty to monitor" the exercise dates of options gives rise to inference of *scienter*).

**(c)**      **The Size and Duration of the Options Fraud**

The options backdating aspects of the fraud were perpetuated ***over at least a six year period (2000-2005), and involved the issuance of hundreds of thousands of backdated options*** to numerous persons, including hundreds of thousands to the Officer and Compensation Committee Defendants themselves.[11]  ¶¶ 64-94.  The massive scope of the backdating scheme – both in terms of duration and sheer number of affected stock options and option recipients – further supports a strong inference of *scienter*.[12]  *See In re Monster Worldwide, Inc. Sec. Litig.*, No. 07-2237, 2008 WL 623339, at *2 (S.D.N.Y. Mar. 4, 2008); *In re Global Crossings, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 347 (S.D.N.Y. 2004) ("the scope of the fraud alleged may appropriately be considered in determining whether *scienter* has been adequately pled."). Similarly, the financial impact of just the options aspects of the alleged fraud on SafeNet's reported earnings was enormous, as it caused the Company's reported operating income to be overstated (or its operating loss to be understated) by ***144%*** in 2002, ***65%*** in 2003, ***248%*** in 2004, and a staggering ***2,168%*** in 2005.  ¶¶ 98-99.

---

[11]  As the Complaint alleges, the Officer and Compensation Committee Defendants received backdated options on *numerous* occasions – with exercise prices that matched the Company's lowest share price for the month, quarter and/or year.  Specifically: (1) Caputo received 690,000 backdated options over nine grant dates; (2) Mueller received 150,000 backdated options over two grant dates; (3) Brooks received 40,000 backdated options over four grant dates; (4) Hunt received 65,000 backdated options over six grant dates; (5) Thaw received 65,000 backdated options over six grant dates; and (6) Money received option grants on four occasions (however, because Money failed to file appropriate Forms with the SEC there is no public information on the date his options were granted). *See* Gardner Decl. Exs. E-K; *see also Quest*, 527 F. Supp. 2d at 1182 (finding "extremely fortunate [grant] dates give rise to a strong inference that backdating occurred and that it was done intentionally").

[12]  Thus the sheer volume of backdated options, the temporal length of the fraud and the receipt of numerous backdated options by these Defendants renders unavailing the Compensation Committee Defendants' argument (Br. at 18-19) that Plaintiffs somehow "fail[ ] to place any of the grants in context" by failing to allege that the number of backdated grants was significant compared to any "properly issued" grants that may have been made during the same period.  *See also Take-Two*, 551 F. Supp. 2d at 296 (finding failure to maximize profit by backdating all options does not undermine showing of motive or other *scienter* given the large number of backdated options).

26

**(d)     The Circumstances of the Officer Defendants'
Involuntary Departure From the Company**

The inference of *scienter* as to Argo, Caputo and Mueller is further strengthened not only

by the fact that they were forced to resign as the scandal was breaking or shortly thereafter but

also by the fact that each was forced to surrender much of the ill-gotten benefits they received

through their fraud.  *Take-Two*, 551 F. Supp. 2d at 294.  Indeed, upon their departure, SafeNet

cancelled and re-priced all three defendants' stock options and forced them to repay over $1.6

million.[13]  *See* Gardner Decl. Exs. C and D.

**2.     Plaintiffs Allege Strong Circumstantial Evidence of the Officer
Defendants' Conscious Misbehavior or Recklessness With Respect to
the Improper Revenue Recognition Aspects of the Fraud**

**(a)     The Confidential Witnesses' Accounts of Defendants'
Improper Accounting Practices**

The Complaint recounts numerous Confidential Witnesses ("CWs") who confirm that the

Officer Defendants were at the very heart of widespread improper revenue recognition practices,

and thus were well aware that they and SafeNet were misrepresenting to investors the

Company's financial results.  This CW information serves as an adequate basis to infer *scienter*

as to the Officer Defendants (and SafeNet) in connection with their revenue recognition and cost

deferment practices.[14]  *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*, 324

---

[13]  Specifically, the settlement agreements provided: (1) for Caputo - the cancellation of certain of his options, an increase in strike price of other options and ***the payment of $1.5 million*** to the Company; (2) for Mueller -  his ***payment of $15,000*** to the Company and the cancellation of certain options granted to him; and (3) for Argo - the cancellation of certain of her options, an increase in strike price of other options and ***the payment of $100,000*** to the Company.

[14]  The Officer Defendants challenge Plaintiffs' reliance on confidential witnesses.  *See* Mueller Br. at 2; Caputo Br. at 15.  In this Circuit, however, a complaint may rely on confidential sources so long as they are described with sufficient particularity to support the probability that a person in the position occupied would possess the information alleged.  *See 380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 224 (S.D.N.Y. 2008) (citation omitted); *see also In re American Express Co. Sec. Litig.*, 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008) (collecting cases considering confidential sources, post-*Tellabs*).  Here, the Complaint identifies nine CWs by position, explaining why each was in a position to know the information supporting the allegations of fraud, including: evidence of defendants' direct participation in improper accounting practices, details of their direct contact and interaction with defendants, and explanations of how they gained an understanding of what defendants

*( continued…)*

27

F. Supp. 2d 474, 493 (S.D.N.Y. 2004) (crediting former employee statements on a motion to dismiss); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 2148919, at *13 (S.D.N.Y. Sept. 6, 2005) (same).

Here, the detailed accounts of Plaintiffs' CWs confirm that the Officer Defendants (*see* ¶¶ 101-136) were actively involved in SafeNet's revenue and earnings manipulations.  For example, CW 2, who reported directly to defendant Mueller, recounted that he was told on several occasions by Mueller to "go back and find new numbers" when the Company's earnings fell short of expectations; and that when CW 2 wouldn't accede to improper accounting methods, CW 2 was cut out of the process of preparing financial results by Mueller and was eventually fired.  ¶ 102.  Similarly, CW 5, a senior Rainbow executive who participated in "due diligence" meetings with Caputo and Argo, confirmed that Rainbow's CFO was "very outspoken" to Caputo and Argo about how they should not be recognizing revenue in the manner they were during merger talks with SafeNet.  ¶¶ 104-05.  Nonetheless, Caputo and Argo responded that they would continue to recognize revenue their way.  ¶ 105.

Numerous other CWs confirmed that the Officer Defendants engaged in improper accounting needed to meet revenue or earnings targets.  For example, CW 7, CW 4, and CW 8 (a financial analyst who focused on Sarbanes-Oxley compliance and reported directly to the Vice President of Finance), confirmed three specific examples of improper "bill and hold" transactions initiated by the Officer Defendants.  ¶¶ 125-128.   In fact, CW 7 attempted to raise issues with a certain bill and hold transaction where revenue was recognized on products not yet built, only to be told that Argo and Caputo were "ok with and personally handling" the transaction.  ¶ 125.  CW 7 was terminated shortly thereafter after continuing to raise questions

*(… continued)*
knew about the improper accounting practices.  *See* ¶¶ 100-136.  That level of particularity is sufficient to show these confidential witnesses were in a position to possess the information alleged.

about the accounting for this transaction.  ¶ 126.  Another former employee, who was hired specifically to review SafeNet's accounting practices, also complained of improper accounting treatments, and left her position with the Company when those complaints were ignored by senior management.  ¶ 118.

       In addition to manipulating bill and hold transactions, the Complaint alleges how the Officer Defendants were involved in improper recognition of revenue on SafeNet's long-term contracts, which were at the core of SafeNet's operations.  According to CW 6, who served as a director of channel development at SafeNet, the Company repeatedly manipulated its accounting for long-term contracts in its top-secret Mykotronx division whenever it was short on revenue. ¶ 117.  Similarly, CW 3, who was a lead cost and program control analyst responsible for *forecasting earnings* for major projects at SafeNet's Mykotronx division, alleges that SafeNet's method of long-term contract accounting allowed it to inflate its reported earnings and accelerate revenue recognition.  ¶ 118.   CW 7, an accounts receivable manager familiar with GAAP for revenue recognition on long-term development contracts, also described a $12.4 government contract, for which Argo was one of the "team leaders," and how Argo and Caputo personally authorized the improper accounting treatment for this transaction under which the recognition of the true costs on this project were deliberately deferred.  ¶¶ 118, 121.  In addition to the above accounting improprieties, Plaintiffs' sources also recounted how Caputo and Argo approached customers during the Class Period, including Cisco and Texas Instruments, to improperly "play with the royalty numbers" by selling future expected royalty payments at a steep discount so that SafeNet could prematurely recognize revenue.  ¶¶ 134-135.

       The Officer Defendants' admitted failure to implement adequate internal accounting

controls further adds to the strong inference of scienter.[15]   Indeed, not only did SafeNet lack

written or company-wide SOP 97-2 compliance practices (a situation that accounting manager

CW7 described as "very uncomfortable and strange"), but CW7 also detailed how s/he was

actually ***reprimanded*** when senior management became aware that s/he was using a check list

that s/he had used in a prior job to ensure compliance with GAAP.  Similarly, former accounting

executive CW2 who reported to Mueller stated that neither Mueller or Argo "took SOP 97-2

seriously."  ¶120.  That Defendants fired various accounting employees for refusing to go along

with their inappropriate accounting is further evidence of their *scienter*.  ¶¶ 102-103, 119.

### (b)      SafeNet's Admitted Need To Restate Its Financials

SafeNet's admissions that it would need to restate its financial statements for 2004, 2005

and the first quarter of 2006 to correct for its past improper accounting for long-term contracts

and other revenue recognition and earnings manipulations (¶¶ 212, 218) further support a strong

inference of *scienter* against the Officer Defendants.  *See In re MicroStrategy, Inc. Sec. Litig.*,

115 F. Supp. 2d 620, 635 (E.D. Va. 2000) (although admissions of GAAP violations alone does

not establish *scienter*, they have "significant inferential weight in the *scienter* calculus"); *see also*

*In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001) (allegations of

GAAP violations "may be one of several 'red flags' that support an inference of *scienter*.")[16].

### (c)      The "Core Operations Doctrine" Supports an Inference of Scienter

Courts have also repeatedly held that improper accounting and the resulting false and

---

[15]   Indeed, SafeNet admitted that its internal controls over revenue recognition were inadequate, ¶ 221, thus further supporting a strong inference that the Officer Defendants acted with *scienter*.  *See Hall*, 2008 WL 2791526, at *10 (citing *In re Veeco Inst. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006)) (a "failure to maintain sufficient internal controls to avoid fraud is … indicative of *scienter*").

[16]   That Argo (and SafeNet) admit their *scienter* as to the options backdating aspects of the fraud (and that the *scienter* of Caputo and Mueller is firmly pled as well), further supports the inference that these defendants were equally capable of acting knowingly (or at least recklessly) with respect to the other aspects of the alleged fraud.

misleading financial statements concerning information that is critical to a company's core operations is attributable the company and its officers. *See Medis*, 2008 WL 3861364, at *8. Here, the fact that accounting improprieties involved SafeNet's critical long-term contracts for its core products further support a strong inference of *scienter*.

### 3.   Plaintiffs' Motive and Opportunity Allegations Provide Additional, Independent Grounds For Strongly Inferring Defendants' *Scienter*

The Officer and Compensation Committee Defendants also had sufficient motive and opportunity to commit the alleged fraud, as evidenced by: (1)  the concrete benefits that each received, and (2) their means and prospects of achieving these concrete benefits as a result of their roles and duties at SafeNet. *See ATSI*, 493 F.3d at 99.

### (a)   Motive

As Plaintiffs allege, the Officer and Compensation Committee Defendants had clear motive to commit the alleged fraud, as evidenced by the respective concrete benefits they received, including the intrinsic value of backdated options, the proceeds of their lucrative insider stock sales, and the benefits arising from their use of inflated SafeNet shares as currency to acquire other companies.  *See In re Amaranth Natural Gas Commodities Litig.*, 2008 WL 4501247, at *8 (S.D.N.Y. Oct. 6, 2008) (explaining that sufficient motive allegations entail concrete benefits resulting from the fraud); *In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 286 (S.D.N.Y. 2008) (same).

Each of the Officer and Compensation Committee Defendants was granted at least tens of thousands of backdated options on multiple occasions.  Backdated options are inherently concrete benefits "because they represent a species of compensation different from the one ordinarily accumulated by corporate officers and directors:  In distinction to standard stock options, ***the returns on backdated options are immediate and risk-free***." *Openwave*, 528

F. Supp. 2d at 249-50; *see also Take-Two*, 551 F. Supp. 2d at 294 (holding defendants' receipt of backdated options provided "ample motive to commit fraud").[17]

Necessarily, Defendants' backdating activities involved statements that misrepresented its compliance with SafeNet's Options Plans and overstated SafeNet's earnings.  ¶¶ 97-99. These fraudulent statements were integral to the options aspect of the fraud, because it is likely that none of the Defendants (or other SafeNet employees) could have received backdated options in the absence of such fraudulent statements.  *Take-Two*, 551 F. Supp. 2d at 294.  As in *Take-Two*, had SafeNet properly reported earnings during the Class Period (by treating backdated options as compensation expenses) "questions naturally would have arisen regarding [the Company's] compliance with its options plans, thereby potentially upsetting the entire options-backdating scheme."  *Id.* at 294-95.  In sum, the Officer and Compensation Committee Defendants each had significant motive to make fraudulent statements regarding SafeNet's Option Plans compliance and earnings in order to conceal and perpetuate the backdating scheme in which they all participated and benefited[18].  *Id.* at 295, citing *Openwave*, 528 F. Supp. 2d at 249-50 (defendants who received backdated options had motive to perpetuate securities fraud).

Specifically, the defendants sold over 471,000 shares of their personal holdings in SafeNet for proceeds of over $14.5 million, $9.4 million of which was collected by the Officer

---

[17]  Defendant Caputo asserts that because certain backdated options were issued prior to the start of the Class Period, those option grants should be deemed irrelevant.  *See* Caputo Br. at 12.  However, as Judge Cote explained in *Openwave,* the improper accounting for backdated option grants affects all subsequent financial statements until those options are fully vested (which typically occurred over four years at SafeNet).  528 F. Supp. 2d at 250.  Moreover, as in *Openwave*, each of the Officer Defendants – including Caputo – continued to work for SafeNet through the Class Period, "and the inference of *scienter* extends from their pre-class period receipt of the options into the class period during which the fraud is alleged to have continued."  *Id.*

[18]  Likewise, the Officer Defendants had equally strong motive to issue fraudulent financial statements with the intent to conceal and further the other aspects of the alleged accounting fraud, which included improper revenue recognition practices and accounting improprieties in violation of GAAP.  *See* ¶¶ 245-54; *Bristol Myers Squibb*, 2008 WL 3884384, at *18 ("the Second Circuit has found scienter sufficiently alleged where there was a strong motive not to disclose fraud") (citing *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993)); *see also In re Tommy Hilfiger Sec. Litig.*, 2007 WL 5581705, at *4 (S.D.N.Y. July 20, 2007) (finding GAAP violations coupled with intent to further tax fraud scheme sufficient to allege scienter).

Defendants. ¶ 250.  *See Tellabs*, 127 S.Ct. at 2509 ("personal financial gain may weigh heavily

in favor of a *scienter* inference").  Furthermore, SafeNet was able to use its artificially inflated

stock price as "currency" to acquire two other corporations during the Class Period, including

Rainbow, which it acquired for $10.3 million SafeNet shares valued at $377 million.  ¶ 251.  *See*

*IPO,* 544 F. Supp. 2d at 293 (finding sufficient inference of *scienter* against those defendants that

used their securities as currency to acquire other corporations); *Bristol Myers Squibb*, 2008 WL

3884384, at *19 (finding *scienter* against officer defendant at the "very heart" of a fraudulent

accounting scheme to misstate earnings and to maintain an artificially inflated company stock

price).

Finally, by engaging in a scheme to misstate earnings, SafeNet was able to portray itself

as a healthy company meeting expectations and secure a much-needed government contract in

the third quarter of 2005 -- the largest in the Company's history.  ¶¶ 252-53.  Indeed, it was only

after that contract failed to provide an immediate boost to Company's earnings that SafeNet

revealed that it would have restate its earnings due to "errors."

#### (b)  **Opportunity**

Here, there can be little doubt that both the Officer Defendants had the opportunity to

commit the alleged fraud, by virtue of their high-ranking management positions and control over

the options process at the Company.  *See* ¶¶ 26-30, 48-49. *See Pension Comm. of the Univ. of*

*Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006)

("courts often assume that corporations, corporate officers, and corporate directors would have

the opportunity to commit fraud if they so desired.") (citing *Time Warner*, 9 F.3d at 269

(assuming defendants had opportunity to manipulate stock).

Similarly, each of the Compensation Committee Defendants had sufficient opportunity to

perpetuate the alleged backdating fraud.  *See Take-Two*, 551 F. Supp. 2d at 297-98 (noting the

"oft-cited" presumption that corporate directors have the opportunity to commit fraud).  The Compensation Committee Defendants were members of the committee that played a central role in SafeNet's options granting process and had the ultimate authority and responsibility both for awarding stock options and for determining their exercise price in compliance with SafeNet's Stock Option Plans.[19]  ¶¶ 31-39, 47-52, 61-96; *see also Quest*, 527 F. Supp. 2d at 1183 (finding that defendants knew or should have known of the company's backdating practices because defendants' "respective positions on the Compensation Committee, Audit Committee, as CFOs, etc." gave them knowledge of the option grant process).

### 4. Summary

In sum, for all the foregoing reasons – particularly when viewed in their totality as required by *Tellabs* - the Complaint adequately alleges *scienter* as to all aspects of the fraud with respect to SafeNet and the Officer Defendants, and with respect to the options backdating aspects of the fraud with respect to the Compensation Committee Defendants.  *See, e.g., Dow*, 411 F.3d at 1024 (allegations of domineering top management, defendants' suspicious stock sales, stock-for-stock acquisitions, and specific allegations of individual defendants' roles in accounting improprieties all combined to support strong inference of *scienter*).

### C. The Complaint Adequately Alleges Loss Causation

The Complaint also more than adequately alleges "loss causation," *i.e.*, that Defendants' stock option backdating and related accounting fraud inflated the value of SafeNet shares during

---

[19] In addition, Brooks, Money and Hunt were also members of SafeNet's Audit Committee, which oversaw the accounting treatment of stock options.  ¶¶ 31-39.  This dual control of granting *and* overseeing the accounting for stock options provided ample opportunity for these Compensation Committee Defendants to backdate options and perpetuate the fraudulent accounting of them.  *See Quest*, 527 F. Supp. 2d at 1183 (noting such dual positions gave defendants "detailed knowledge of when the options were actually granted"); *In re Comverse Tech.., Inc. Sec. Litig.*, 543 F. Supp. 2d at 134, 143 (E.D.N.Y. 2008) (finding *scienter*, after noting that certain defendants were members of the Compensation and Audit Committees and therefore had significant familiarity with the accounting rules applicable to stock options).

the Class Period, and that the disclosure of negative information relating to the fraud or its

consequences removed that inflation, causing Plaintiffs damages.

### 1. ***Dura* and Rule 8's Notice Pleading Standard**

To prevail on a § 10(b) claim, a plaintiff must show that "defendant's misrepresentation

… proximately caused the plaintiff's economic loss." *Dura,* 544 U.S. at 346.  At the pleading

stage, however, the Supreme Court held that loss causation allegations are governed by the

notice pleading standards of Rule 8(a)(2).  *Id.* at 356.  In accord with Rule 8, *Dura* further stated

that at the pleading stage a securities fraud plaintiff need only "provide a defendant with ***some***

***indication*** of the loss and the causal connection that the plaintiff has in mind," and that §10(b)'s

loss causation requirement is "not meant to impose a great burden upon a plaintiff."  *Id.* at 347

(emphasis added).  In sum, in accord with Rule 8, a plaintiff need only provide a short and plain

statement giving "notice of what the relevant economic loss *might be* or of what the causal

connection *might be* between the loss and the misrepresentation."  *Id.* (emphasis added).[20]

Not surprisingly, numerous courts have held that loss causation issues are rarely

appropriate for resolution on a motion to dismiss under Rule 8.  *See, e.g., Emergent Capital Inv.*

*Mgmt. LLC, v. Stonepath Group*, 343 F.3d 189, 197 (2d Cir. 2003) (loss causation "is a matter of

proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss"); *In re Gilead Scis.*

*Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("so long as the plaintiff alleges facts to support

a theory that is not facially implausible, the court's skepticism is best reserved for later stages of

the proceedings when the plaintiff's case can be rejected on evidentiary grounds"); *McCabe v.*

---

[20] The *Dura* Court did not attempt to set out what specific events or disclosures need to be alleged to show the cause of the plaintiff's loss.  *Id.* at 346 ("We need not, and do not, consider other proximate cause or loss-related questions").

*Ernst & Young LLP,* 494 F.3d 418, 427 n.4 (3d Cir. 2007) (same).[21]  Similarly, other courts have

noted that disputed loss causation issues are best resolved with the help of expert testimony

based on a full record, rather than on the pleadings.  *See, e.g., Gebhardt v. ConAgra Foods, Inc.*,

335 F.3d 824, 831-32 (8th Cir. 2003) (declining to resolve disputed loss causation issues "absent

sufficient facts and **expert** testimony, which cannot be considered at this [12(b)(6)] procedural

juncture").  In sum, dismissal on loss causation grounds in this Circuit is only appropriate in the

rare situation where a plaintiff fails to plead *any* facts supporting causation.  *Lentell v. Merrill

Lynch & Co.,* 396 F.3d 161, 172-77 (2d Cir. 2005).

**2.      Plaintiffs More Than Adequately Allege At Least "Some Connection"
Between the Fraud and a Decline in SafeNet's Stock Price**

Consistent with *Dura* and Rule 8, Plaintiffs allege both that SafeNet's stock price was

inflated due to defendants' alleged misrepresentations ***and*** that Plaintiffs suffered losses as the

market responded to disclosures of the fraud or its consequences.

As discussed above, the Complaint alleges in detail the numerous elements of

Defendants' fraudulent course of conduct that caused SafeNet's reported financial statements to

be materially inflated and misrepresented its options granting practices.  As shown below, the

Complaint also specifically identifies a series of three partial disclosures relating to Defendants'

fraudulent conduct that caused SafeNet's stock price to decline, as follows:

- After the close of the market on February 2, 2006 the Company announced that: (i) the
Company's previously disclosed earnings for the second and third quarters of 2005
needed to be restated to correct for, *inter alia,* a $600,000 understatement in the
recognition of costs under certain long-term government contracts; (ii) the Company
would miss analysts' consensus earnings estimates for the fourth quarter of 2005; and
(iii) the Company's auditors had been reviewing SafeNet's revenue recognition policies

---

[21]   *See also In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 374 n.136 (S.D.N.Y. 2003) (Scheindlin, J.) ("Unless a
plaintiff pleads decisive supervening causes for its loss and thus pleads itself out of court, the requirement that a
court draw all factual inferences in favor of a plaintiff at the motion to dismiss stage will usually preclude any
finding of a supervening cause. . . . While plaintiffs' losses may not be attributed to the instances of misconduct they
have broadly alleged, I am unable to conclude that they cannot be attributed to the alleged fraud").

and had required SafeNet to defer recognition of $1 million in revenue that the Company had originally planned to recognize in the fourth quarter of 2005.  ¶¶ 212-14.  In response to these disclosures, SafeNet's stock price declined 15.2% (from $32.72 per share at the close on February 2 to $27.75 on February 3), on heavy volume.  ¶ 217;

- On April 6, 2006 SafeNet announced that it would be missing its prior earnings forecasts for the first quarter of 2006 and that it had terminated defendant Mueller as CFO, indicating that SafeNet's accounting, financial control and reporting problems were even more serious than previously reported.  ¶¶ 223-24.  In response, SafeNet shares declined 19.3% (from $25.97 on April 6 to $20.96 on April 7), again on heavy volume.  ¶ 224; and

- On May 18, 2006, SafeNet announced that the Company had received a subpoena from the USAO for the Southern District of New York demanding information about the company's stock options grants, and that the SEC had also demanded information "relating to stock option grants to directors and officers of the company, as well as information relating to certain accounting policies and practices."  In response, SafeNet's stock price declined a further 22.3% (from $19.21 at the close on May 18, 2006 to $14.93 on May 19), on exceptionally heavy volume.  ¶ 226-27.

Defendants do not (and cannot) dispute that each of these disclosures had a prompt and material adverse impact on SafeNet's stock price.

On their face, each of the alleged partial disclosures was also related to the alleged fraud or its consequences.  For example, as the Complaint alleges, analyst reports issued after the February 2 disclosures confirm that the market was concerned that SafeNet's disclosures of the need to restate its accounting for certain contracts and of its auditor scrutiny of certain revenue recognition issues raised broader questions about the Company's revenue recognition practices. *E.g.* ¶ 216 (analyst report noting that neither of these items might have been "large" as "isolated incidents," but together raised concern as to whether they were becoming part of a "pattern"). Similarly, the disclosures of earnings misses in both February and April can plausibly be construed as partial disclosures related to the alleged fraud, as a company's actions to prematurely recognize revenue in prior periods (as alleged here) will often result in a situation where the company will ultimately have to disclose an earnings shortfall. ¶ 136.  In other words, a defendant's past practice of "recognizing tomorrow's income today" can certainly manifest

itself, at least initially, in the form of a disclosure of a significant current earnings miss, rather than in the form of a disclosure of past acts of fraud.  *See, e.g., In re Daou Sys., Inc.,* 411 F.3d 1006, 1026 (9th Cir. 2005) (sharp price decline in response to company's announcement of earnings miss adequately alleged causal connection to underlying revenue recognition fraud).[22] Similarly, investors understand that the termination of a company's CFO (particularly in the wake of recent prior disclosures raising questions about the integrity of management's accounting practices) is typically a "red flag" signal of serious accounting issues, even if the news is unaccompanied by specific disclosures that explicitly link the dismissal to specific acts of misconduct.  *See, e.g., In re Winstar Commc'ns*, 2006 WL 473885, at *14 (S.D.N.Y. Feb 27, 2006) ("the market may learn of possible fraud [from] a number of sources:  e.g. […] analysts questioning financial results, resignation of CFO's or auditors…") (quoting *In re Enron Corp. Sec. Derivative & ERISA Litig*., 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005)).  Moreover, with respect to the May 18 disclosures of the government investigations into SafeNet's options backdating practices, there can be no serious dispute that analysts and the market as a whole reacted in sharply negative fashion to disclosure of sudden and very serious concerns that SafeNet had lied about its past options practices, that it would have to restate its financials to properly account for prior backdated option grants, and that it could well face civil sanctions from the SEC as well as criminal prosecution.

---

[22]  Similarly, the Second Circuit has recognized that loss causation can be found where damages were caused by an event that is not a disclosure of any fraud at all, but is the disclosure of events or circumstances that the fraud itself foreseeably caused.  For example, in *Suez Equity Investors L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), plaintiffs alleged that defendants had failed to disclose that the company's CEO lacked appropriate management ability and in fact had a previous record of business failures.  Plaintiffs alleged that they incurred losses when the company disclosed that it was filed for bankruptcy.  Although was no "corrective disclosure" of the CEO's woeful qualifications until after the bankruptcy, the disclosure of the foreseeable consequences of the CEO's lack of experience (i.e., the bankruptcy) and resulting losses -- rather the disclosure of the CEO's checkered past – provided the requisite causal connection.  *Id.* at 95-98 (and summarizing Second Circuit case law).

**3.      Defendants' Argument That The Complaint Must
Allege a "True Corrective Disclosure" Is Without Merit**

Nonetheless, Defendants contend that Plaintiffs fail to plead loss causation under *Dura*

because the Complaint fails to identify a "true corrective disclosure" that "reveal[ed] the fraud."

SafeNet Br. at 10.  As to options backdating, Defendants argue that the partial disclosures relied

upon did not explicitly reference SafeNet's financial statements or reveal that SafeNet would

have to restate its prior accounting for options, and were therefore not "corrective."  As to the

non-backdating aspects of the fraud, Defendants argue that the disclosures relied upon did not

specifically disclose the same improperly accounted for transactions, or all of the same types of

accounting improprieties, identified in the Complaint, and disclosed a more narrow restatement

than Defendants later admitted was required, and thus were also not corrective.

Nothing in *Dura,* however, provides any support for Defendants' theory that a plaintiff

must plead a corrective disclosure as to ***each particular accounting machination*** that was used

to artificially inflate SafeNet's reported results, together with a corresponding stock drop.  To the

contrary, *Dura* did not establish any requirements as to the particular form or quality of the

disclosures.  *See In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) ([*Dura*]

did not, however, indicate what form a disclosure must take, how completely it should reveal

previously misrepresented or concealed information, or how specifically it must refer to that

information"); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 827-28 (D.N.J. 2006)

(same).  Moreover, instead of speaking in terms of disclosures in which "all is revealed," *Dura*

noted that loss causation can be established by evidence of shares being sold after "the relevant

truth begins to leak out," and that a complaint need only provide "some indication of the loss and

causal connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 342, 347;  *see also Tommy

Hilfiger*, 2007 WL 5581705, at *3 ("[P]laintiff must establish that his losses were attributable to

*some form* of revelation to the market of the wrongfully concealed information") (emphasis added) (quoting *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 2319118, at *23 (S.D.N.Y. Sept. 21, 2005)).

Post-*Dura* cases in the Second Circuit and elsewhere have also rejected the argument advanced by Defendants here that proof of loss causation requires evidence specifically identifying or explicitly correcting a previous representation, or expressly disclosing the particular fraudulent scheme the plaintiff alleges.  A corrective disclosure need not be an explicit correction of defendants' false statements; instead, a "misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."  *Lentell*, 396 F.3d at 173 (explaining loss causation is established when a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security). Moreover, loss causation can plainly be premised on partial revelations that do not uncover the complete extent of the falsity of a specific prior statement.  *See Take-Two*, 551 F. Supp. 2d at 283. (explaining disclosure must simply reveal "at least part of the falsity of the misstatement"). In other words, there is simply no requirement that a corrective disclosure be "the linguistic mirror image of the alleged fraud."  *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *20 (D.N.J. Aug. 17, 2005).  "Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures."  *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006).

Judge Scheindlin's recent decision in *Children's Place* is instructive.  There, the court upheld a complaint alleging the defendants had engaged in a manipulative scheme to artificially inflate financial results by failing to disclose (i) significant problems with an agreement to

acquire Disney stores and sell Disney related merchandise, (ii) violations of the company's

internal control policies, and (iii) improper backdating of its stock option grants.  In discussing

loss causation collectively, Judge Scheindlin found that the "allegations in the Complaint, ***taken***

***as a whole*** and drawing all reasonable inferences in plaintiffs' favor, are adequate to plead that

the Company's financial statements were materially misstated and the market was not informed

of the nature and extent of [its] problems," and that "[a] reasonable inference can be drawn from

the facts and circumstances outlined above that disclosing the company's alleged fraud in July

and August of 2007 caused the stock price to fall and resulted in economic loss."  2008 WL

2791526, at *11 (emphasis added).

　　*Bradley* also provides useful analysis.  There, plaintiffs alleged that the defendants

engaged in a sham sale to inflate the company's quarterly income.  On the last day of the class

period the company announced that the SEC was investigating whether there had been

"violations of the federal securities laws," and that the SEC had sought information "with respect

to revenue recognition and capitalization of certain payments."  421 F. Supp. 2d at 824-25.

Defendants argued that the press release was not corrective because it did not specifically

mention the sham transaction alleged in the complaint, and involved only a "generally worded"

SEC inquiry into revenue recognition issues.  The court, however, disagreed:

> Our securities laws do not operate in a vacuum.  Defendants' contention that the
> announcement of the SEC inquiry did not satisfy *Dura's* "revelation of the truth"
> requirement fails to acknowledge the significance of the market reaction to the
> February 28, 2005 disclosure.  On February 28, 2005, immediately after Bradley
> disclosed the news of the SEC investigation and announced that the Company would
> delay the release of its earnings for 2004, Bradley's stock price dropped $3.50 per
> share, or 26.4%.  As the Complaint alleges, the number of Bradley shares traded on
> February 28 reached 2,709,200, reflecting an unusually high volume of trading
> activity. * * *
>
> As the Supreme Court noted in *Dura*, "pleading rules are not meant to impose a great
> burden upon a plaintiff."  *Dura*; 125 S. Ct. at 1634.  As Plaintiffs have alleged that
> the price of Bradley's stock dropped after the truth regarding Defendants' alleged

misrepresentations became known, this Court finds that they have pled, at this stage of the litigation, sufficient facts to satisfy the loss causation requirement and to provide Defendants "with some indication of the loss and the causal connection that [they have] in mind." *Id*.

Here, as in *Bradley,* allegations of disclosures of government investigations, combined with an accompanying significant stock drop on heavy volume, satisfy Rule 8's pleading standard.

With respect to the option backdating aspects of the alleged fraud, many courts have found allegations of loss causation to be adequately pled based on disclosures of government options backdating investigations similar to those alleged here. *See, e.g., Openwave*, 528 F. Supp. 2d at 253-54 (announcements that the SEC was investigating company's stock option grant practices and that company had received subpoenas from two United States Attorneys concerning option grants sufficient to plead loss causation).[23]

Apparently recognizing that courts routinely find loss causation on disclosures of governmental investigations, Defendants suggest that for such allegations to be sufficient there must be "multiple disclosures during the purported class period of some aspect of the alleged fraud that reinforce one another." SafeNet Br. at 13. However, none of Defendants' cases holds that multiple class period disclosures are necessary when basing loss causation on the existence of a governmental investigation. To the contrary, cases in this Circuit and elsewhere have found loss causation based upon a single class period disclosure of a governmental investigation. *See Take-Two*, 551 F. Supp. 2d at 286-87 (loss causation properly predicated upon single disclosure that SEC was conducting informal investigation into the company's historic stock option grants,

---

[23] *See also Rudolph v. UTStarCom*, 2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) (announcement of internal investigation into stock option grants, without any disclosure that prior financial statements would need to be revised, sufficient to plead loss causation); *Take-Two*, 551 F. Supp. 247 (disclosure of SEC investigation into company's option grants sufficient to plead loss causation); *In re Juniper Networks, Inc. Sec. Litig*., 542 F. Supp. 2d 1037, 1049 (N.D. Cal. 2008) (reports that identified Juniper as a high risk for options backdating and announcements that its prior financial statements could not be relied upon adequately alleged loss causation); *In re UnitedHealth Group PSLRA Litig*., 2007 WL 1621456 (D. Minn. June 4, 2007) (*Wall Street Journal* article reporting that United Health executives had received backdated options sufficient to plead loss causation);

which was followed by significant negative market reaction);[24] *Tommy Hilfiger*, 2007 WL 5581705, at *3 (loss causation properly predicated upon single disclosure that USAO had served subpoenas on company, followed by significant stock drop); *Bradley*, 421 F. Supp. 2d at 827-28 (loss causation properly predicated on single disclosure that SEC was conducting an informal inquiry into the company's "revenue recognition and capitalization of certain payments," followed by significant stock price drop); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 255-56 (D. Mass. 2006) (loss causation properly predicated upon single disclosure of an SEC investigation followed by a stock drop).

Here, moreover, analysts tied SafeNet's stock drop to concerns about accounting related issues and investigations. For example, in response to the February 2 disclosures, analysts focused on SafeNet's "stealth restatement for 3Q 05" and "continued revenue recognition" concerns (¶ 215), and raised concerns about "artificially inflated" financials. ¶ 216. *See also* ¶ 228 (analyst comment in response to May 18 disclosure stating "we believe that persistent management credibility concerns along with the recent departure of its CFO will likely cause he market to look at the situation through a 'worst case scenario' lens").

In sum, the disclosures of SafeNet's accounting improprieties, CFO firing, and government investigations into SafeNet's options and other accounting practices have the requisite causal connection to Defendants' misconduct to plead causation under Rule 8.

### 4.      Defendants' Theoretical Argument That Plaintiffs Suffered No Loss Is Without Merit

Despite Plaintiffs' detailed allegations of price inflation and subsequent deflation directly caused by the fraud, Defendants also argue that the Complaint somehow does not allege that

---

[24]   In *Take-Two*, on grounds equally applicable here, Judge Kram also distinguished two of the cases on which Defendants rely, namely *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214 (E.D. Wash 2005) and *Weiss v. Amkor Tech. Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007). *See Take-Two*, 551 F. Supp. at 288-89.

Plaintiffs actually suffered a loss, because some theoretical class member who bought at the very beginning of the Class Period and sold on a fortuitous day might have made a profit.  SafeNet Br. at 16.  Defendants hypothetical fact-intense scenarios are inappropriate on a motion to dismiss.

However, a plaintiff need not sell his shares after the disclosure of the fraud in order to suffer a loss.  *See IPO,* 544 F. Supp. 2d at 289 (only materialization of the risk is necessary).  Defendants argument also ignores that after each disclosure that Plaintiffs rely on, SafeNet's stock price fell significantly (15.2% on February 3, 2006, 19.3% on April 7, 2006, and 22.3% on May 19, 2006), a decline of over 55% in just over 2 ½ months.  ¶ 227.

> **5.    Defendants' Argument That The Complaint Fails to Parse the Supposed Impact of "Confounding Factors" Is Without Merit**

Defendants next assert that to plead loss causation, Plaintiffs must "disaggregate the confounding factors," and must establish the amounts of loss attributable solely to disclosures relating to Defendants' fraudulent conduct (as opposed to losses that might conceivably attributable to disclosures of unrelated facts).  *See* SafeNet Br. at 16-17.

In so arguing, Defendants rely heavily on Judge Rakoff's comments at Argo's sentencing that, for purposes of imposing a criminal sentence, he could not determine on the record before him the extent to which Argo's options backdating misconduct had caused investors to suffer damages.  SafeNet Br. at 7-8, 16.   However, the record before Judge Rakoff was devoid of any expert testimony on loss causation submitted by the Government, leaving the Court to consider only Argo's unrebutted submissions on this issue.[25]   In these circumstances, and in the criminal context, Judge Rakoff's decision that he could not reliably determine the extent to which Argo's backdating related misconduct had caused investor losses was entirely understandable – but says

---

[25] In this regard, the financial inability of defendant Argo to make restitution to investors for their losses in more than a token amount doubtless influenced the prosecution's decision as to whether it was an appropriate use of the government's limited resources to obtain a comprehensive expert analysis of loss causation issues.

nothing as to the adequacy of Plaintiffs' *pleading* of loss causation allegations in this civil action, or how a jury would evaluate Plaintiffs' expert opinions on a fully developed factual record.

Indeed, in the civil context, it is well-established  that a corrective disclosure need not reveal "the precise loss attributable to [the] fraud." *See Lentell*, 396 F.3d at 177.  Similarly, "a plaintiff is not required to plead that her economic loss was caused *solely* by the alleged fraudulent scheme." *In re eSpeed Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006) (emphasis in original); *see also Openwave*, 528 F. Supp. 2d at 253 (whether decline in price was attributable to disclosure of backdating scheme or "was attributable to some other cause… is a matter for proof at trial."); *Juniper*, 542 F. Supp. 2d at 1049 ("while it may be true that other factors contributed to the decline in the price of Juniper's stock, [p]laintiffs' allegations give [d]efendants fair notice of the grounds upon which the § 10(b) claim rests").  Instead, decisions as to whether particular disclosed matters were viewed by the market as related or unrelated to the fraud, and any issues as to the extent to which losses were attributable to "confounding factors," are appropriately deferred to summary judgment or trial, after development of a full factual record and accompanying expert testimony.  *See, e.g., Gebhardt,*  335 F.3d at 831-32.

### 6.    Defendants' Arguments Based On Post-Class Period Stock Movements (or Lack Thereof) Do Not Refute Loss Causation

Defendants observe generally that after SafeNet announced it would need to restate its financials, two months after the end of the Class Period, the stock ticked upward.  SafeNet Br. at 6.  Defendants fail to explain, however, why their post-Class Period disclosures of wrongdoing, and the market's flat response, are material to losses Plaintiffs suffered during the Class Period.

The market's reaction to SafeNet's post-Class Period announcements about the need to restate confirms that the Company's earlier disclosures fully corrected Defendants' prior statements concerning the integrity of SafeNet's financial statements.  Moreover, the partial

disclosures during the Class Period ***created the expectation*** that SafeNet, like many others, would be forced to restate and recognize a material reduction of its previously reported income. *See In re Seitel Inc. Litig.*, 447 F. Supp. 2d 693, 711-13 (S.D. Tex. 2006) (denying motion to dismiss where stock did not drop on announcement of restatement, but did drop due to other disclosures).  Here, SafeNet's earlier corrective disclosures resulted in predictable market declines, as the efficient market effectively signaled that it understood that these initial disclosures foreshadowed expanded restatements and likely civil and criminal proceedings. "[T]hat the stock price fell without more complete and detailed disclosure, if anything, only goes to show that the tip of the iceberg was enough [to] cause the loss." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *21 (D.N.J. Aug. 17, 2005).  Simply put, by the time SafeNet got around to announcing the expected restatement, they were merely confirming the material risks that investors had anticipated from the earlier disclosures.[26]

### D.      The Complaint States Claims Under §§ 11, 12(a) and 14 of the Securities Act

#### 1.      *Scienter* Is Not an Element of §§ 11, 12(a)(2) or 14(a) Claims

Plaintiffs bring §11 and §14(a) claims against SafeNet and Caputo, Argo, Brooks, Thaw, Hunt, Harrison and Clark (the "Rainbow Acquisition Defendants"), and §12(a)(2) claims against SafeNet, Caputo and Argo.  These Defendants argue that these claims are based in fraud and thus subject to Rule 9(b) heightened pleading standard, and that Plaintiffs must thus plead *scienter*.

Defendants' argument, however, ignores the text of the Complaint.  Plaintiffs plead fraud

---

[26]  *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) ("That the true extent [of] the fraud was not revealed to the public until February—after Parmalat shares were worthless and after the close of the Class Period—is immaterial where, as here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder and bondholder value.") (emphasis added); *see also Bradley*, 421 F. Supp. 2d at 829 ("A comparison of the price and trading volume reactions surrounding both the February 28 and April 27 disclosures . . . suggest that the market corrected the price of Bradley's stock price when the truth began to leak out on February 28, 2005 and that by the time Bradley announced its restatement of earnings in April 2005 [after the class period], the market had already incorporated that the previously released financial statements could not be relied upon.") (emphasis added).

and negligence as ***alternative theories***, limiting the alternative negligence allegations only to claims with respect to misstatements and omissions in the prospectus, registration statement and proxies.  Plaintiffs carefully excluded any allegations or language asserting or implying that Defendants had any fraudulent intent - and only alleged that they were negligent - with respect to the offering materials and proxy statements.  ¶¶ 299, 307, 310, 326, 334.  The mere inclusion of allegations of fraudulent conduct ***alleged in separate claims*** does not automatically ground all of Plaintiffs' claims in fraud or subject them to Rule 9(b).  *In re Refco, Inc. Sec. Litig.,* 503 F. Supp. 2d 611, 632-33 (S.D.N.Y. 2007) (pleading one claim in fraud does not forfeit plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence); *M'Baye v. N.J. Sports Prod., Inc*., 2007 WL 431881, at *11 (S.D.N.Y. Feb. 7, 2007) (same).[27] This is especially true for Harrison and Clark, against whom no fraud claims are asserted.

Defendants do not dispute that Plaintiffs adequately allege that they acted negligently as to the §§11, 12(a)(2) and 14(a) claims.  Moreover, even if the Court were to find that these claims are based in fraud and are subject to Rule 9(b), Plaintiffs submit that they have still amply pled *scienter* as to the Officer and Compensation Committee Defendants.  *See* § II.B. *supra*.

## 2. <u>Loss Causation is Not an Element of §11 Claim</u>

Despite Defendants' assertion, loss causation is not an element of a Section 11 claim under the Securities Act.[28] *In re Flag Telecom Hldgs., Ltd. Sec. Litig*., 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006) ("A plaintiff need only plead a material misstatement or omission in the registration statement to establish a prima facie fraud claim under § 11 of the Securities Act; a

---

[27]  Rule 8(d)(2) provides: "a party may set forth two or more statements of a claim…alternatively…, either in a single count…or in separate ones."  The Court may consider alternate claims, and as long as any claim is sufficient, the pleading is sufficient.  *Id.*  In addition, pursuant to Rule 8(d)(3), a party may also state as many separate claims as the party has regardless of consistency.  *See Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.* 2008 WL 905188, at *7 n.9 (E.D.N.Y. Mar. 31, 2008); *Henry v. Daytop Vill., Inc*., 42 F.3d 89, 95 (2d Cir.1994).

[28]  Plaintiffs concede that, unlike §11, loss causation is an element of a claim under §12(a)(2), but note that they satisfy loss causation with respect to their §12(a)(2) claims for the same reasons as set forth in § II.C. *supra*.

plaintiff is not required to plead loss causation."); *Adair v. Kaye Kotts Assocs.*, 1998 WL 142353, at *7 (S.D.N.Y. Mar. 27, 1998) ("Loss causation is not an element of a § 11 claim.") (collecting cases).[29]

### 3.      Plaintiffs Sufficiently Allege Loss Causation under §14(a)

A plaintiff must adequately allege loss causation to state a §14(a) claim. *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000). Loss causation is adequately alleged "when the plaintiff points to a material violation of the proxy rules in a situation where shareholder approval was necessary for a company to complete an allegedly unfavorable transaction." *Koppel v. 4987 Corp.,* 167 F.3d 125, 137 (2d Cir. 1999).

Here loss causation is established because the false proxy statements prompted shareholders approval of the Rainbow Acquisition and allowed unfavorable option grants to continue. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 231 (S.D.N.Y. 2004) (§14(a) loss causation satisfied where defendants' actions artificially propped up the price of securities that were purchased or otherwise acquired by class members pursuant to merger proxy). Plaintiffs thus sufficiently allege loss causation as a result of the 2003 through 2005 Proxy Statements and the Rainbow Proxy/Prospectus. *See, e.g.,* ¶¶ 306, 325.

### 4.      Plaintiffs Sufficiently Allege Transaction Causation for § 14 (a) Claim

Transaction causation is an element of a § 14(a) claim, and is shown "where the

---

[29] Defendants cite *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-55 (S.D.N.Y. 2003) for the proposition that Plaintiffs cannot recover for a decline in the market caused by factors other than the disclosure of the alleged misstatements to the market. The decision in *Merrill* is questioned by the court in *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 273-74 (S.D.N.Y. 2007) on this very issue (noting that the *Merrill* court cited no other cases in which a Rule 12(b)(6) motion to dismiss was granted based on the absence of loss causation in a § 11 claim). Further, on reconsideration in *In re WRT Energy Sec. Litig.*, 2005 WL 2088406, at *1 (S.D.N.Y. Aug. 30, 2005), the court vacated its earlier decision on a Rule 12(b)(6) motion and allowed plaintiffs to assert a § 11 claim for damages for declines in share value *prior to the first alleged disclosure*. Thus, § 11 can be said to create a factual presumption that "any decline in value is ... caused by the misrepresentation in the registration statement." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048 (2d Cir.1995).

challenged proxy statement 'was an essential link in the accomplishment of the transaction.'" *Grace*, 228 F.3d at 47.  Count V of the Complaint asserts that "the 2003 through 2005 Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option administration," and that "revelations of the truth would have immediately thwarted a continuation of shareholder's endorsement of the directors' positions, the executive officers' compensation and [SafeNet's] compensation policies including the 2003 amendments to expand the number of shares authorized under the stock option plan."  ¶ 305. These allegations are sufficient.  *See Brayton v. Ostrau*, 561 F. Supp. 156, 162 (S.D.N.Y. 1983) (transaction causation should be sustained when it challenges a transaction which was the subject of the proxy materials, such as approval of a merger or the election of corporate directors).

Count VI of the Complaint similarly alleges that the Rainbow Proxy/Prospectus misrepresented SafeNet's financial results (¶¶ 319, 321) and stock option granting policy (¶¶ 320, 321), and justified the Board's acceptance of the exchange ratio for the merger agreement on the basis of these misrepresentations.  ¶ 315.  Thus, there can be no legitimate dispute that this proxy and prospectus were an "essential link" in the completion of the merger.

## E.   The Complaint States Claims for Control Liability

A claim under Sections 15 or 20(a), requires allegations of (a) a primary violation by a controlled person, and (b) direct or indirect control by the defendant of the primary violator.  *See Global Crossing*, 322 F. Supp. 2d at 349.[30]

The first prong is satisfied, as here, by pleading a §10(b) or §14(a) claim for a §20(a) violation, and a §11 or §12(a)(2) claim for a §15 violation.  *Leykin v. AT & T Corp.*, 216 F.

---

[30]  Plaintiffs bring §15 claims against the Rainbow Acquisition Defendants; they also bring §20(a) claims against the Officer and Compensation Committee Defendants for their role in the options backdating and (with respect to the Officer Defendants only) non-options aspects of the alleged accounting fraud.

App'x 14, 17 (2d Cir. 2007); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1298 (2d Cir. 1973).  The

second prong, control over a primary violator, may be established by showing that the defendant

possessed "the power to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise."  *Waldman ex rel.*

*Elliott Waldman Pension Trust v. Riedinger*, 423 F.3d 145, 151 (2d Cir. 2005).[31]

Only Harrison and Clark contest that they are "controlling persons."  However, both

served as directors of the Company, and during the Class Period signed SafeNet's Form 10-Ks

and authorized and permitted the use of their names in the 2003-2005 proxies.  ¶¶ 35, 36.  *See*

*Jacobs v. Coopers & Lybrand*, LLP, 1999 WL 101772, at *9 (S.D.N.Y. Mar. 1, 1999) (common

sense to presume that person who signs his name to a report has some measure of control over

those who write report).  Plaintiffs also allege that Clark and Harrison, as Rainbow Acquisition

Defendants, were in the position to (and did) control the issuance of false and misleading

statements in the Rainbow Proxy/Prospectus; and negotiated the terms of the acquisition and met

repeatedly to "approve SafeNet's pursuit of the Rainbow Acquisition and solicitation of

shareholder approval of the acquisition."  ¶ 346.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.

---

[31]  Second Circuit law is unsettled as to whether "culpable participation" must also be pled to allege a §20(a) claim.  *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414-16 (S.D.N.Y. 2003) (discussing conflict and finding no state of mind required); *Pension Comm.*, 446 F. Supp. 2d at 190-91 (plaintiff need not affirmatively plead culpability or *scienter* on part of control person).  However, even if pleading culpable participation *is* required to state a §20(a) claim, it should not be equated to pleading *scienter*.  *See, e.g., IPO*, 241 F. Supp. 2d at 392-97 ("although the meaning of 'culpable participation' is unclear, there is strong reason to believe it is not the same as *scienter*"); *WorldCom*, 294 F. Supp. 2d at 415, 419-20 (pleading of control person claims governed by Rule 8 pleading standard).  In any event, as set forth above, the Complaint adequately alleges the §20(a) defendants' culpability.  *See* § II. B., *supra*.

DATED:      New York, New York
                November 14, 2008

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

By:   /s/  William C. Fredericks
William C. Fredericks (WF-1576)
1285 Avenue of the Americas
New York, New York 10019
Tel:   (212) 554-1400
Fax:   (212) 554-1444

**LABATON SUCHAROW LLP**

By:   /s/ Jonathan Gardner
Lawrence A. Sucharow (LS-1726)
Jonathan Gardner (JG-8512)
Serena Richardson (SR-1120)
140 Broadway
New York, New York 10005
Tel.:   (212) 907-0700
Fax:   (212) 818-0477

*Co-Lead Counsel to Lead Plaintiffs*