USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 5, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

POLICE AND FIRE RETIREMENT SYSTEM OF          :
THE CITY OF DETROIT, PLYMOUTH COUNTY
RETIREMENT SYSTEM, STATE-BOSTON               :
RETIREMENT SYSTEM, and MICHAEL GOLDE,
On Behalf of Themselves and All Others         :
Similarly Situated,
                                               :
               Plaintiffs,                                    06 Civ. 5797 (PAC)
                                               :
       -against-                                              OPINION & ORDER
                                               :

SAFENET, INC., ANTHONY A. CAPUTO,             :
KENNETH A. MUELLER, CAROLE D. ARGO,
THOMAS A. BROOKS, IRA A. HUNT, Jr., BRUCE     :
R. THAW, ARTHUR L. MONEY, SHELLEY A.
HARRISON, and ANDREW E. CLARK,                :

               Defendants.                     :

-----------------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

       The Police and Fire Retirement System of Detroit, Plymouth County Retirement System,

the State-Boston Retirement System, and individual plaintiff Michael Golde ("Plaintiffs")

instituted this securities-fraud class action against SafeNet Inc., six of the company's former

directors, and three of its former officers ("Defendants").  The Consolidated Amended Class

Action Complaint ("Complaint" or "CAC"), which is 349 paragraphs and 151 pages long,

alleges that SafeNet repeatedly issued financial, proxy, and registration statements which were

materially false with regard to stock-options backdating and non stock-options revenue

recognition.  Plaintiffs claim that the stock-option and revenue-recognition frauds inflated the

value of SafeNet's shares, until the news of the improper accounting practices emerged, which

caused the share price to plummet.  Plaintiffs bring nine causes of action, which include claims under: (1) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); (3) Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9(a); (4) Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k & 77l; and (5) Section 15 of the Securities Act, 15 U.S.C. § 77o.  Defendants move to dismiss the Complaint under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  For the reasons that follow, the Defendants' motions to dismiss are GRANTED in part and DENIED in part.

## BACKGROUND

### I.  The Parties

Plaintiffs purportedly represent all persons or entities that purchased or acquired SafeNet stock during an extended 37-and-one-half month period running from March 31, 2003 through May 18, 2006 (the "class period").  Plaintiffs include three public pension funds which purchased nearly 264,000 shares of SafeNet common stock during the class period, plus one individual Plaintiff, Michael Golde, who purchased shares of common stock in Rainbow Technologies, Inc. ("Rainbow"), and exchanged his Rainbow shares for SafeNet stock when SafeNet acquired Rainbow (the "Rainbow acquisition") on March 15, 2004. (See CAC ¶¶ 20-24.)  Golde also purchased additional shares of SafeNet stock following the Rainbow acquisition.

Defendant SafeNet develops, markets, and sells hardware and software information security products and services used to protect digital communications and identities.  During the class period SafeNet was a publicly traded company, but in April 2007 it was acquired by Stealth Acquisition Corporation and is now privately held. (Id. ¶ 25.)

Defendant Anthony Caputo was SafeNet's Chief Executive Officer and Chairman of the Board of Directors.  He resigned from all company positions on October 18, 2006.  Defendant Carole Argo was Senior Vice President and Chief Financial Officer of SafeNet from June 1999 through June 2004.  From June 2004 through the end of the class period, she also was SafeNet's President and Chief Operating Officer, and beginning in April 2006 Argo was the acting interim Chief Financial Officer.  Argo also resigned from all company positions on October 18, 2006.  Defendant Kenneth Mueller was SafeNet's Senior Vice President, Chief Financial Officer and Treasurer for approximately 22 months from June 2004 until April 6, 2006, when he resigned from the company. (Id. ¶¶ 26-28.)  The Complaint collectively refers to Caputo, Argo, and Mueller as the "Officer Defendants."

The Complaint also groups together various members of SafeNet's Board of Directors.  Defendant Thomas Brooks was a SafeNet director and a member of the Compensation Committee and Audit Committee.  Ira Hunt was a director and a member of the Audit Committee and Compensation Committee until 2004.  Bruce Thaw was a director and a member of the Compensation Committee since 2004.  Arthur Money joined the Board of Directors as part of the Rainbow acquisition and was a member of the Audit Committee and Compensation Committee after March 16, 2004. (Id. ¶¶ 31-34.)  The Complaint collectively refers to Brooks, Hunt, Thaw, and Money as the "Compensation Committee Defendants."  Defendants Shelley Harrison and Andrew Clark were not on the Compensation Committee, but signed various proxy and registration statements as SafeNet directors.  The Compensation Committee Defendants, together with Harrison and Clark, are collectively referred to as the "Director Defendants."

Finally, the Complaint also groups the individuals who signed the registration statement related to the Rainbow acquisition.  These Defendants—Caputo, Argo, Brooks, Thaw, Hunt, Harrison, and Clark—are referred to as the "Rainbow Acquisition Defendants." (Id. ¶ 40.)

## II. The Allegations[1]

The Complaint, although it stretches an extraordinary 151 pages, essentially alleges that Defendants made false and misleading statements in filings with the Securities and Exchange Commission ("SEC") and in registration, prospectus, and proxy statements.[2]  Those false statements related to: (1) SafeNet's accounting practices for backdated stock-options grants; (2) SafeNet's accounting practices for recognizing revenue in product sales, unrelated to the stock-options backdating practices.

The Complaint contains nine counts naming different combinations of defendants:

Count One: Against SafeNet, the Officer Defendants, and the Compensation Committee Defendants for stock-option misrepresentations in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

Count Two: Against the Officer Defendants and the Compensation Committee Defendants for violations of Section 20(a) of the Exchange Act, relating to stock-options misrepresentations.

---

[1]     The allegations in this section are taken entirely from the Amended Class Action Complaint, unless otherwise noted.

[2]     The allegedly false and misleading statements were contained in public filings from 2002 to 2006, including SEC Form 10-Ks, 10-Qs, and 8-Ks, SafeNet proxy statements, and a registration statement and proxy/prospectus connected with the Rainbow acquisition on March 15, 2004. (CAC ¶¶ 137-211.)  The allegedly false and misleading public statements about SafeNet's stock-options accounting practices were contained within: (1) SafeNet's proxy statements for the years 2003 to 2005; (2) the Rainbow registration statement and proxy/prospectus; and (3) SafeNet's Form 10-K and 10-Q filings during the class period. (Id. ¶ 97, ¶¶ 137-211.) The allegedly false statements about the non stock-options revenue recognition practices were contained within the Rainbow registration statement and proxy/prospectus, and within Form 10-K and 10-Q filings in 2003 through 2006. (Id. ¶¶ 157, 162, 167, 175, 180, 184, 187, 193, 198, 203, 210.)

Count Three: Against SafeNet and the Officer Defendants for misrepresentations related to non stock-options revenue-recognition practices in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

Count Four: Against the Officer Defendants for violations of Section 20(a) of the Exchange Act, relating to non stock-options revenue-recognition practices.

Count Five: Against SafeNet and the Director Defendants for misrepresentations in SafeNet proxy statements in violation of Section 14(a) of the Exchange Act and Rule 14a-9.

Count Six: Against SafeNet and the Rainbow Acquisition Defendants for misleading statements in the Rainbow proxy in violation of Section 14(a) of the Exchange Act and Rule 14a-9.

Count Seven: Against SafeNet and the Rainbow Acquisition Defendants for violations of Section 11 of the Securities Act.

Count Eight: Against SafeNet, Caputo, and Argo for violations of Section 12(a)(2) of the Securities Act.

Count Nine: Against the Rainbow Acquisition Defendants for violations of Section 15 of the Securities Act.

### a.  Stock Options Backdating

The Complaint alleges that SafeNet, through its officers and the Compensation Committee Defendants, issued hundreds of thousands of improperly accounted-for stock options grants.  Under the accounting rules in effect prior to 2006, public companies could grant stock options to employees without recording the grant as a compensation expense, as long as the exercise price of the stock options was at or above the market closing price for the stock on the day the options were granted (so-called "at the money" options).  If the exercise price for the

stock options on the date selected was lower than the stock price on the award date (called "in the money" options), then the difference had to be recorded as a compensation expense. (Id. ¶ 43.)  Accurate accounting of the compensation expense reduces the company's net income. (Id.)  Backdating to an earlier date when the stock price was lower than the price on the record date has two results.  First, the company's compensation expenses are lower than they ought to be, which has the effect of artificially inflating income.  Second, the recipient of the backdated—in the money—options has a jump start on the market because of the low exercise price.

The Compensation Committee administered SafeNet's stock option plans and had the ultimate authority to grant the option awards. (Id. ¶ 48.)  The plans provided that the Compensation Committee determined the exercise price of an option grant, which "in no event shall be less than 100% of the fair market value of [SafeNet's] Common Stock on the Grant Date." (Id.)  The Compensation Committee approved option grants through Unanimous Written Consents ("UWCs") signed by Compensation Committee members. (Id. ¶ 49.)  The Compensation Committee, however, took a secondary role in the granting of options; the Complaint alleges that the Officer Defendants generally initiated and oversaw the stock options grant process, selected the grant dates and exercise prices, selected the number of options granted, and provided the names of option recipients. (Id.)

In its proxy filings, SafeNet maintained that its stock options plan was "designed to align the executive's interests with that of the stockholders of the Company," and that "[n]o gain to the options . . . is possible without stock price appreciation, which will benefit all shareholders.  If the stock price does not increase above the exercise price, compensation to the named executive will be zero." (Id. ¶ 47.)  The allegations related to the false 10-K filings are repetitive, and one allegation will suffice as an exemplar.  Plaintiffs allege, for instance, that in its 2003 Form 10-K,

signed by Argo, Caputo, Brooks, Harrison, Hunt, and Thaw, SafeNet stated that "[o]ptions have been granted with exercise prices that are equal to the fair market value of the common stock on the date of grant."  Plaintiffs allege that this form "was materially false and misleading when issued because . . . SafeNet in fact did issue options that were 'backdated,' so they were not issued at exercise prices 'equal to the fair market value of the common stock on the date of grant' and compensation expenses should have been recorded." (Id. ¶¶ 158-61.)

On October 5, 2007, Defendant Argo pled guilty to a single count of securities fraud in the Southern District of New York.  In her plea allocution before Judge Rakoff, Argo stated that in mid-2000 she became responsible for overseeing SafeNet's stock options program. (Id. ¶ 58.) She stated that in December 2001 or January 2002, the Compensation Committee approved a grant to her and to two other individuals, including Caputo, and that Caputo asked Argo to report October 1, 2001, as the date of approval for the stock options.  SafeNet's stock was at its lowest price for the quarter on October 1, 2001, and Argo admitted that she agreed to document Caputo's options as if they had been granted on that day, and the Compensation Committee approved that treatment. (Id.)  Argo stated that she also documented the grant to herself and to another person as being granted on October 1, 2001, even though she and others knew that the Compensation Committee had not granted the options then. (Id.)  Further, Argo stated that in following years, she and others backdated options grants while taking into consideration dates with low exercise prices.  Because SafeNet did not record a compensation expense for these grants, SafeNet's public filings were incorrect. (Id.)

In addition to Argo's plea to a single count of securities fraud, the Complaint alleges that SafeNet made suspiciously timed grants to officers and employees from 1999 through 2005. Using charts and graphs to illustrate the dates of options grants, the Complaint alleges that

SafeNet employees received hundreds of thousands of options grants on dates where SafeNet stock was trading at particularly low prices. (See id. ¶¶ 62-94.)[3]  Plaintiffs allege that if SafeNet had properly recorded its compensation expenses during the class period, the company's actual net income would have been 355% lower in 2002, 36% lower in 2003, 71% lower in 2004, and 53% lower in 2005. (Id. ¶ 99.)

### b.  Non Stock-Options Revenue-Recognition Accounting Manipulations

Plaintiffs allege that during the class period, SafeNet and the Officer Defendants "engaged in pervasive improper revenue recognition activities and earnings manipulations to enable the [c]ompany to meet Wall Street analysts' expectations." (Id. ¶ 100.)  The Complaint cites several confidential witnesses to allege that Argo, Caputo, and Mueller exerted substantial, unchecked pressure to make quarterly and annual earnings figures match Wall Street's expectations. (Id. ¶ 101-03.)  The alleged manipulations fell into four categories:

1.  <u>Improper accounting for long-term development contracts</u>.  SafeNet stated in public SEC filings that it used an accounting method called "percentage of completion," where it recognized revenue over the life of a long-term contract based on the degree of completion. Under this principle, SafeNet should have been recording revenue as the company hit certain completion milestones.  Naturally, the revenue booked would have to be offset by the actual costs incurred in meeting those milestones.  The Complaint alleges that SafeNet later disclosed that it actually booked revenue on a "costs incurred" basis, which meant that it booked revenue based on a percentage of budgeted costs incurred.  By underestimating the total cost of a project, SafeNet could book revenue based on when those costs occurred.  Since there would be a smaller

---

[3]        To take only a small sample of the allegations, the Complaint alleges that SafeNet issued the following suspiciously timed grants: 30,000 options to Argo backdated to July 30, 1999, at a price of $17.50.  A little more than a week later the price increased to $23.06 (CAC ¶¶ 62-64); 148,000 options to several officers, including Caputo and Argo, backdated to October 11, 2000, at a price of $24.125, the lowest closing price for the third quarter of 2000. (Id. ¶¶ 65-67.)  Eight days later the stock price was at $39.50.

offset in recorded costs, SafeNet's total reported profit increased.  In this way SafeNet frontloaded revenue and hid costs on long-term projects until later dates. (Id. ¶¶ 106-22.)

2. Improper revenue recognition on "bill and hold" transactions.  In bill and hold transactions a company bills a customer for products, but does not ship the products until a later date.  The Complaint alleges that such a transaction is only allowed under certain conditions, including that the buyer must request the transaction and the product must be ready to ship at the time of billing.  SafeNet allegedly recognized revenue under a bill and hold method when the products were still in the testing stage or were otherwise unavailable for shipping. (Id. ¶¶ 123-28.)

3. Improper recognition of revenue upon shipment of unfinished products.  In addition to billing for incomplete and unshipped products, the Complaint alleges that SafeNet shipped some unfinished products to customers at the end of fiscal periods to recognize revenue on such "sales," even though SafeNet would have to accept the return of those products and reverse the sales in future quarters. (Id. ¶¶ 129-32.)

4. Improper recognition of revenue on royalty payments.  Plaintiffs allege that SafeNet improperly accelerated the collection of royalties by asking companies to prepay longterm royalties in return for an overall discount on the amount owed.  Plaintiffs allege that this harmed investors who anticipated higher future royalty revenues. (Id. ¶¶ 133-36.)

**c.  Misstatements Related to the Rainbow Acquisition**

Plaintiffs allege that SafeNet's misstatements specifically harmed shareholders of Rainbow stock.  Plaintiffs allege that SafeNet was able to complete the Rainbow acquisition on certain financial terms by misleading Rainbow shareholders about SafeNet's stock-options granting and revenue recognition practices.

The Rainbow acquisition involved a stock-based merger where Rainbow shareholders exchanged each share in their company for 0.374 SafeNet shares, receiving 43% of the total shares of the combined companies. (Id. ¶ 14.)  Plaintiffs allege that that the defendants who signed the Rainbow registration and proxy/prospectus "solicited the affirmative vote of Rainbow's shareholders in favor of the Rainbow Acquisition and caused the [merger at the 0.374 exchange rate] by issuing a materially false and misleading registration statement . . . which incorporated a false and misleading joint proxy statement/prospectus." (Id. ¶ 15.)  The Rainbow registration statement and proxy/prospectus, filed with the SEC on February 11 and 12, 2004, allegedly contained false statements about SafeNet's financial condition and about the company's practice in granting stock-options. (Id. ¶¶ 153-57.)

### III. The Alleged Disclosures of the Fraud During the Class Period

Plaintiffs allege that the truth about SafeNet's backdating and improper revenue recognition practices emerged in three corrective disclosures during the class period: SafeNet press releases dated February 2, 2006, April 6, 2006, and May 18, 2006.  SafeNet's stock dropped immediately after each press release.

On February 2, 2006, SafeNet issued a 12-page press release reporting its year-end and fourth-quarter financial results for 2005. (Id. ¶ 212; Declaration of Andrew Reynard ("Reynard Decl.") Ex. 1.)  At page eight, the release announced that SafeNet would be restating its previously disclosed earnings for the second and third quarters of 2005.  The release stated:

> During the year end audit process, we discovered errors that impacted prior quarters but did not materially impact the full year results.  One error occurred during the second quarter of 2005 which consisted of an understatement of lease restructuring charges of approximately $700,000.  Another error of approximately $600,000 was related to an understatement of our costs of revenues in our Classified Government business in the third quarter of 2005.  These errors will be corrected in a 10-Q/A filing shortly.

(CAC ¶ 213; Reynard Decl. Ex. 1 at 8.)

Plaintiffs also allege that during a conference call that same day, SafeNet disclosed that its auditors had reviewed SafeNet's revenue recognition policies and concluded that the company needed to defer recognition of $1 million in revenue that SafeNet had planned to recognize in the fourth quarter of 2005. (CAC ¶ 213.)  SafeNet's stock fell 15.2% on February 3, 2006, from $32.72 to $27.75, on a heavy volume of trading. (Id. ¶ 217.)

On April 6, 2006, SafeNet announced in a press release that CFO Mueller was "leaving the company as of today." (Id. ¶ 223; Reynard Decl. Ex. 2.)  The release stated that Argo would step in as the interim CFO and continue as SafeNet President.  The release also revised SafeNet's projection for 2006 first quarter revenues to $63 to $65 million, down from the company's February 2, 2006 projection of $65 to $69 million.  In a separate news release on that day, SafeNet announced that it was abandoning a proposed acquisition of nCipher plc because regulatory authorities in the United Kingdom requested further review of the deal. (Reynard Decl. Ex. 3.)  SafeNet stock fell 19.3% on April 7, from $25.97 to $20.96, again on a heavy volume of trading. (CAC ¶ 224.)

On May 18, 2006, the last day of the class period, SafeNet issued a press release stating that:

> [SafeNet] received a subpoena from the office of the United States Attorney for the Southern District of New York relating to the Company's granting of stock options.  The Company also announced that it has received an informal inquiry from the Securities and Exchange Commission requesting information relating to stock option grants to directors and officers of the Company, as well as information relating to certain accounting policies and practices.

(CAC ¶ 226; Reynard Decl. Ex. 4.)

SafeNet's stock dropped 22.3% on May 19, from $19.21 to $14.93, the second-largest percentage decline of any stock on the NASDAQ market on that day. (CAC ¶ 227.)

**IV. Alleged Post Class-Period Disclosures**

Two months after the end of the class period (May 18, 2006), SafeNet disclosed that it would have to restate its financial statements for the years 2000 through 2005 and for the first quarter of 2006 because of likely accounting errors related to stock-options backdating. (CAC ¶¶ 231-32.) On July 26, 2006, SafeNet disclosed that certain options grants were improperly accounted-for, and that, at a minimum, the company would restate its fourth quarter 2002 earnings. (CAC ¶ 231; Reynard Decl. Ex. 6 at 1-2.) SafeNet's stock price rose by 8.2% the next day, from $15.61 a share to $16.89. (See Reynard Decl. Ex. 5.) On January 9, 2007, SafeNet filed a Form 8-K announcing that the company had made adjustments relating to certain revenue-recognition accounting practices, including:

> (1) treatment of non-recurring engineering revenue where there is an undelivered element, (2) timing of software license revenue recognized upon entering into the arrangement where the license includes maintenance, (3) revenue recognized pursuant to a license agreement with a party whom we also have a development arrangement where fair value of elements to the arrangement could not be reasonably determined, and (4) funded research and development payments received reflected as revenue on a milestone basis.

(CAC ¶ 233.)

On July 25, 2007, the United States Attorneys Office for the Southern District of New York ("SDNY") filed a criminal indictment against Argo, charging her with securities fraud and conspiracy to commit securities fraud relating to the options backdating scheme. The SEC filed a civil injunctive action against Argo on August 1, 2007. (CAC ¶ 234.) Argo pled guilty to securities fraud on October 5, 2007, and she was sentenced to six months in prison and fined $1 million on January 28, 2008. (Id. ¶¶ 235-36.)

## DISCUSSION

### I.  Motion to Dismiss Standard

When considering a motion to dismiss made pursuant to Federal Rule of Civil Procedure

12(b)(6), the court "is to accept as true all facts alleged in the complaint" and "draw all

reasonable inferences in favor of the plaintiff." Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d

229, 237 (2d Cir. 2007).  But "threadbare recitals of a cause of action's elements, supported by

mere conclusory statements . . . are not entitled to the assumption of truth.  While legal

conclusions can provide the complaint's framework, they must be supported by factual

allegations." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).  To avoid dismissal, the complaint

must contain "enough facts to state a claim to relief that is plausible on its face," i.e. facts that

"nudge[] [the plaintiff's] claims across the line from conceivable to plausible." Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007).

When deciding a motion to dismiss, a court may consider documents attached as exhibits

to the complaint and documents incorporated into the complaint by reference, as well as

"documents that are integral to the plaintiff's claims, even if not explicitly incorporated by

reference, and matters of which judicial notice may be taken." In re Gildan Activewear, Inc. Sec.

Litig., No. 08 Civ. 5048 (HB), 2009 WL 1919618, at *4 n.3 (S.D.N.Y. July 1, 2009); see also

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); De Jesus v. Sears,

Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996).

### II.  Pleading Standards Under Rule 9(b) and the PSLRA

In addition to the threshold pleading requirements of Federal Rule of Civil Procedure 8(a)

and the Twombly "plausibility" standard, securities fraud claims under section 10(b) and Rule

10b-5 must also meet the heightened pleading standards set forth in Federal Rule of Civil

Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified at 15 U.S.C. § 78u-4(b).  Rule 9(b) requires that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud."  See Fed. R. Civ. P. 9(b).  This particularity requirement applies in full force to claims of securities fraud arising under section 10(b) because it "serves to provide a defendant [in a securities fraud case] with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."  ATSI Commc'ns, 493 F.3d at 99 (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)).

A plaintiff in a securities fraud suit must also comply with the exacting pleading requirements of the PSLRA, which was enacted by Congress in 1995 "[i]n order to curtail the filing of meritless lawsuits."  Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (quotations and citations omitted).  The PSLRA requires "plaintiffs to state with particularity both the facts constituting the alleged [securities fraud] violation" and the other elements of the 10(b) cause of action.  Tellabs, Inc., v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).  In order to effectuate Congress' intent to eliminate baseless lawsuits through the application of rigorous pleading standards, the PSLRA mandates that a plaintiff alleging a section 10(b) action must: (1) specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(1) and (2).  While courts normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, "the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." ECA &

<u>Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.</u>, 553 F.3d 187, 196 (2d Cir.

2009) (internal quotations and citation omitted).

### III. Elements of the Various Causes of Action

#### a.  Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful "for any person, directly or

indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance" in violation of the rules set forth by the

Securities and Exchange Commission for the protection of investors. 15 U.S.C. § 78j.  Rule 10b-

5, promulgated thereunder, makes it unlawful for "any person, directly or indirectly, . . . [t]o

make any untrue statement of a material fact or to omit to state a material fact necessary in order

to make the statements made, in the light of the circumstances under which they were made, not

misleading." 17 C.F.R. § 240.10b-5.

In order to state a claim for relief under Section 10(b) and Rule 10b-5, plaintiffs must

allege that "in connection with the purchase or sale of securities, the defendant[s], acting with

scienter, made a false material representation or omitted to disclose material information and that

the plaintiff[s'] reliance on defendant's action caused [the plaintiff] injury." <u>Edison Fund v.

Cogent Inv. Strategies Fund, Ltd.</u>, 551 F. Supp. 2d 210, 220 (S.D.N.Y. 2008) (quotations and

citations omitted); <u>see also</u> <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 172 (2d Cir.

2005) (plaintiffs must allege that the defendants "'(1) made misstatements or omissions of

material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon

which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury'")

(quoting <u>In re IBM Sec. Litig.</u>, 163 F.3d 102, 106 (2d Cir. 1998)).

### b.  Section 14(a) and Rule 14a-9

Section 14(a) of the Exchange Act bars the dissemination of proxy statements "'in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" Schiller v. Tower Semiconductor, Ltd., 449 F.3d 286, 290 (2d Cir. 2006) (quoting 15 U.S.C. § 78n(a)).  Rule 14a-9 provides that proxy statements are not to be "'false or misleading with respect to any material fact.'" Id. at 290-91 (quoting 17 C.F.R. § 240.14a-9(a)).  The SEC promulgated Rule 14a-9 "with the goal of preserving for all shareholders who are entitled to vote . . . the right to make decisions based on information that is not false or misleading." United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1197-98 (2d Cir. 1993).

To state a claim under Section 14(a), a plaintiff must allege that: "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." In re Marsh & McLennan Cos. Sec. Litig., 536 F. Supp. 2d 313, 320-21 (S.D.N.Y. 2007).  An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Seinfeld v. Gray, 404 F.3d 645, 650 (2d Cir. 2005); In re Marsh & McLennan, 536 F. Supp. 2d at 321.

While "[t]here is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a) . . . [w]hen plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory." In re JPMorgan Chase Sec. Litig., 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (internal citations omitted).

###### c.   Section 11 and 12(a)(2)

Section 11(a) of the Securities Act "imposes civil liability on issuers and other signatories of a registration statement if the registration statement contains material misstatements or omissions and the plaintiffs acquired the securities without knowledge of such misrepresentations." McMahan & Co. v. Wherehouse Entm't, 65 F.3d 1044, 1047 (2d Cir. 1995).  "A plaintiff need only plead a material misstatement or omission in the registration statement to establish a prima facie fraud claim under Section 11 of the Securities Act; a plaintiff is not required to plead loss causation." In re Flag Telecom Holdings, Ltd. Sec. Litig., 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006); see also Levine v. AtriCure, Inc., 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007) ("Loss causation . . . is not an element of a § 11 claim under the Securities Act.")  A defendant, however, may raise the affirmative defense of negative causation to Section 11 claims.  Negative causation is different than loss causation; negative causation "occurs where a defendant proves that the decline in the value of the security in question was not caused by the material omissions or misstatements in the registration statement [and that the] plaintiff is not entitled to recover any damages." In re Flag Telecom, 411 F. Supp. 2d at 383 (quotation and citation omitted).  The defendant bears a heavy burden of proving that "the decline in stock price was caused by factors other than the misstatement(s) in the registration statement." Id.

Section 12(a)(2) of the Securities Act is essentially the same as Section 11, except that it applies to prospectuses, while Section 11 applies to registration statements.  Claims under Sections 11 and 12(a)(2) of the Securities Act are subject to the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure if grounded in negligence, and subject to the heightened requirements of Rule 9(b) if grounded in fraud. Rombach, 355 F.3d at 171 ("[W]hile a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2),

claims that do rely upon averments of fraud are subject to the test of Rule 9(b).")  Even where a plaintiff claims to bring a negligence action, a court may apply Rule 9(b) pleading requirements where the "wording and imputations of the complaint are classically associated with fraud." Id. at 172.  Finally, while plaintiffs need not plead loss causation under Section 11, plaintiffs must plead loss causation under Section 12(a)(2). See Yung v. Lee, 432 F.3d 142, 146 n.3 (2d Cir. 2005) ("[T]he PSLRA added a subsection to Section 12 addressing loss causation."); In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 588 (S.D.N.Y. 2006) ("Congress added an express loss causation provision to § 12 of the 1933 Act through the adoption of the Private Securities Reform Act of 1995.").

**d.  Sections 15 and 20(a)**

Section 20(a) of the Exchange Act provides for control person liability for underlying Section 10(b) and Rule 10b-5 securities law violations.[4]  "The provisions of section 15 of the Securities Act are essentially parallel, providing control person liability for claims brought under sections 11 and 12, and its terms are interpreted in the same manner as those of section 20(a)." In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004).  To state a claim under 20(a) or Section 15, "plaintiffs must allege (a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." Id.  Section 20(a) also contains the additional requirement that "plaintiff allege culpable participation in some meaningful sense by the controlling person in the fraud." Id. (internal quotation omitted).  The PSLRA's heightened pleading standards apply to Section 20(a) claims. Lapin v. Goldman Sachs Group, Inc., 506 F.

---

[4]      15 U.S.C. § 78t(a) states that:

> every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Supp. 2d 221, 246 (S.D.N.Y. 2006) ("[I]n order to withstand a motion to dismiss, a section 20(a)

claim must allege, at a minimum, particularized facts of the controlling person's conscious

misbehavior or recklessness."); <u>see</u> <u>also</u> <u>In re Global Crossing</u>, 322 F. Supp. 2d at 349.

## IV. Application to Defendants

### a.   Claims Under Section 10(b) and Rule 10b-5

Plaintiffs bring claims under Section 10(b) and Rule 10b-5 against: (1) SafeNet (Counts

One and Three); (2) the Compensation Committee Defendants (Count One); Caputo (Counts One

and Three); (4) Argo (Counts One and Three); and (5) Mueller (Counts One and Three).  Count

One relates to misrepresentations in relation to the alleged stock-options backdating, and Count

Three relates to misrepresentations in relation to the alleged fraudulent revenue-recognition

accounting practices.  Defendants argue that Plaintiffs fail to plead loss causation and scienter.

### i.   Loss Causation

To state a claim under Section 10(b), a plaintiff must allege loss causation. <u>See</u> <u>Lentell</u>,

396 F.3d at 172; <u>In re Openwave Sys. Sec. Litig.</u>, 528 F. Supp. 2d 236, 252 (S.D.N.Y. 2007).

The Supreme Court has defined loss causation as "a causal connection between the material

misrepresentation and the loss." <u>Dura Pharms. Inc. v. Broudo</u>, 544 U.S. 336, 342 (2005).  To

plead loss causation, a plaintiff must "link the defendant's purported material misstatements or

omissions with the harm ultimately suffered." <u>In re Bristol Myers Squibb Co. Sec. Litig.</u>, 586 F.

Supp. 2d 148, 163 (S.D.N.Y. 2008); <u>see</u> <u>also</u> <u>Dura</u>, 544 U.S. at 345 (securities statutes do not

exist to provide investors with broad insurance against market losses, "but to protect them

against those economic losses that misrepresentations actually cause").  If the relationship

between the plaintiff's loss and the information concealed or misstated by the defendant "is

sufficiently direct, loss causation is established, but if the connection is attenuated, or if the

plaintiff fails to demonstrate a causal connection between the content of the alleged

misstatements or omissions and the harm actually suffered, a fraud claim will not lie." In re

Bristol Myers, 586 F. Supp. 2d at 163 (quoting Lentell, 396 F.3d at 174).

While plaintiffs cannot simply plead an "artificially inflated purchase price" to establish

loss causation, see Dura, 544 U.S. at 347, allegations of significant price drops in response to

disclosures of the alleged omissions or misstatements can establish loss causation. See In re

Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 282 (S.D.N.Y. 2008); In re Openwave

Sys., 528 F. Supp. 2d at 252-53; In re Tommy Hilfiger Sec. Litig., No. 04 Civ. 7678, 2007 WL

5581705, at *2-3 (S.D.N.Y. July 20, 2007); Lapin, 506 F. Supp. 2d at 231, 243.

SafeNet argues that the three disclosures alleged by Plaintiffs were not adequate

"corrective disclosures" because they did not reveal the fraud underlying Plaintiffs' Complaint.[5]

The February 2, 2006, press release contained eight pages of text (plus four pages of financial

statements) and focused on SafeNet's fourth-quarter and year-end results and business highlights

for 2005. (See Reynard Decl. Ex. 1.)  According to Plaintiffs, the critical nugget is on page eight,

where SafeNet reports that it had "discovered errors that impacted prior quarters but did not

materially impact the full year results." (Id.)  The two errors were the understatement by

$700,000 of a lease restructuring charge and an understatement by $600,000 of costs of revenues

in SafeNet's Classified Government business. (Id.)  Plaintiffs also allege that during a conference

call on February 2, 2006, SafeNet reported that it would defer $1 million in revenue because of a

review of SafeNet's revenue recognition policies. (CAC ¶ 213.)  The February 2 release and the

conference call are completely silent on stock-options backdating, and the references to

accounting changes in the release and the conference call do not reveal with any specificity to

---

[5]       All other Defendants adopt SafeNet's arguments on failure to allege loss causation.

investors that SafeNet was involved in the kind of widespread revenue recognition accounting fraud that Plaintiffs allege.

While SafeNet's stock dropped from $32.72 to 27.75 (15.2%) following these disclosures, market analysts did not react too negatively to the news.  The Complaint recites the reaction of a Deutsche Bank analyst to the February 2, 2006 disclosure: "[a]s isolated incidents, neither of these issues is that large, but we hope that these small accounting issues do not become a pattern for the company." (Id. ¶ 216 (emphasis added).)

The February 2, 2006, disclosure did not reveal to investors that SafeNet's statements about its accounting practices were false, and this disclosure cannot serve as a foundation to plead loss causation. See In re Take-Two, 551 F. Supp. 2d at 283 ("[A] particular disclosure constitutes a sufficient foundation for loss causation allegations only if it somehow reveals to the market that a defendant's prior statements were not entirely true or accurate."); In re Tellium, Inc. Sec. Litig., No. 02 Civ. 5878 (FLW), 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005) ("Dura itself makes clear that loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud.").  Nor do the pleadings explain why the disclosure on page eight—as opposed to all the other information in the extended 12-page press release—caused the price decline.

The April 6, 2006 disclosure announced that the Chief Financial Officer, Mueller, was leaving the company and that the previous guidance on first quarter revenues was being revised to $63 to $65 million, down from $65 to $69 million. (Reynard Decl. Ex. 2.)  The press release gave no reason for Mueller's departure.  A second release issued the same day announced that SafeNet would not pursue an expected acquisition of nCipher. (Id. Ex. 3.)  SafeNet's stock fell from $25.97 to $20.96 (19.3%) the next day.

The announcement of Mueller's departure was not tied to any fraud, omission, or misstatement, and it certainly made no reference to stock-options backdating or to revenue recognition irregularities.  Standing alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation. See In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) ("[A] director's resignation cannot constitute a corrective disclosure when the resignation is not connected to the alleged fraud.").  Mueller's resignation was just another item of news for SafeNet which had to be disclosed but is wholly unrelated to the fraud that Plaintiffs plead in the Complaint.  To prove loss causation, "plaintiffs must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price." Id. (quoting Dura, 544 U.S. at 343); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007) (noting that plaintiffs failed to allege loss causation because they did not "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant's] misstatements").  Certainly SafeNet's stock price declined following the April 6 press releases, but Plaintiffs have failed to show how the April 6 disclosure is related to the fraud claims and why the April 6 disclosure they focus on caused the decline, as opposed to the simultaneous disclosure of the collapse of the nCipher transaction.

While SafeNet's stock losses following the February 2, 2006 and April 6, 2006 disclosures were significant, the losses were not out of line with previous stock movements. SafeNet develops products and systems related to digital communications security; it is a start-up company, growing by the introduction of new, sophisticated technology products and by acquisitions.  It is a participant in a fast-moving and volatile industry.  SafeNet's stock prices were prone to rapid fluctuations.  For instance, on February 19, 2003, the stock dropped from

$22.86 to $17.30 (24.3%); on October 23, 2003, it dropped from $41.02 to $31.38 (23.4%); on

April 5, 2004, it dropped from $38.45 to $31.65 (17.7%); on April 30, 2004, it dropped from

$26.60 to $21.50 (19.2%); and on September 30, 2005, the stock rose from $29.70 to $36.31

(22.3%). (See Reynard Decl. Ex. 5.)  Given this history of SafeNet stock-price volatility, the

declines on February 3, 2006 (15.2%), and April 7, 2006 (19.3%) are not atypical.  Even when

the decline is measured from February 3, 2006 to April 7, 2006, the overall share-price reduction

of 32% is not atypical compared with the 48% reduction from February 12, 2004 ($41.22) to

April 30, 2004 ($21.50); or to the 31% drop during the four-and-one-half month period from

December 29, 2004 ($37.65) to April 18, 2005 ($25.95).

      The final alleged corrective disclosure is SafeNet's press release of May 18, 2006, when

SafeNet announced that it had received a subpoena from the SDNY related to the company's

stock options program, and that the SEC had sent SafeNet a formal inquiry into its stock options

program and "certain accounting policies and practices." (Id. Ex. 4.)  There were no other

disclosures in the May 18, 2006 release, and SafeNet stock dropped 22.3% the following day.

SafeNet argues that the announcement of an investigation, without more, is legally insufficient to

plead loss causation.  To support this proposition SafeNet relies chiefly on two cases.[6]

      In In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142 (C.D. Calif. 2007), the

potential corrective disclosure included the defendant's SEC filing stating that the SEC had

asked the company to voluntarily provide information and documents relating to stock options

grants. Id. at 1162.  The SEC filing announcing the investigation also stated that the request for

---

[6]     SafeNet also relies on two other cases which are not on point because the disclosures were either about internal company investigations, see Weiss v. Amkor Tech., Inc., 527 F. Supp. 2d 938, 947 (D. Ariz. 2007), or because the disclosures revealed no factual information relating to the fraud alleged in the complaint. See In re Avista Corp. Sec. Litig., 415 F. Supp. 2d 1214, 1220 (E.D. Wash. 2005).  In this case there is a disclosure about external government investigations and the disclosure relates directly to the alleged options backdating misstatements.

information should not be construed as an indication that a violation had occurred. Id.  The court

held that plaintiffs had not pled loss causation based on the information in the SEC filing and an

announcement of an internal investigation because "'the mere existence of [an] investigation

cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or

its senior management.'" Id. (quoting City of Austin Police Ret. Sys. v. ITT Educ. Serv., Inc.,

388 F. Supp. 2d 932, 942 (S.D. Ind. 2005)).  Hansen is similar to this case because in both cases

the companies notified the public that it was under investigation by the SEC.

Likewise, the court in In re Maxim Integrated Prods., Inc. Sec. Litig., No. C 08-00832

JW, 2009 WL 2136939 (N.D. Cal. July 16, 2009), found that company disclosures regarding an

SEC investigation and subpoenas from the U.S. Attorneys Office of the Northern District of

California did not reveal the alleged fraud because the disclosures "do not themselves indicate

anything more than a 'risk' or 'potential' that Defendants engaged in widespread fraudulent

conduct." Id. at *6.

Plaintiffs assert that one disclosure of a government investigation is enough to adequately

plead loss causation.  They rely on In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247

(S.D.N.Y. 2008).[7]  There, the court found that a single notice that the SEC was conducting an

informal, non-public investigation into certain stock options grants, coupled with a 7.5% stock

price drop the next day, created a sufficient causal connection to plead loss causation. Id. 286-87.

The facts of this case are almost the same as to In re Take-Two.  The May 18 disclosure

clearly stated that the SDNY and the SEC were investigating SafeNet's stock-options program.

This information could signal to any astute investor that SafeNet may have failed to properly

---

[7]      Plaintiffs cite to other cases that are not directly on point. See In re Tommy Hilfiger, 2007 WL 5581705, at
*3 (noting that "the truth here was revealed not in a neat and tidy single disclosure, but occurred through a series of
disclosing events.") (emphasis added); In re Bradley Pharms., Inc. Sec. Litig., 421 F. Supp. 2d 822, 828-29 (D.N.J.
2006) ("The revelation of the 'truth' . . . did not take the form of a single, unitary disclosure, but occurred through a
series of disclosing events.") (emphasis added).

account for its executive compensation, and the market promptly reacted.  The day after the May 18 release SafeNet stock fell 22.3%, a price drop greater than what was found to sufficiently show loss causation in In re Take-Two.  See In re Take-Two, 551 F. Supp. 2d at 287 (finding allegation of 7.5% drop in share price sufficient and that "[o]ther courts have found that similar allegations of significant stock drops in response to announced SEC investigations are sufficient to plead loss causation under the framework established by Dura and its progeny").  As for Plaintiffs' allegations relating to misrepresentations in the stock-options backdating program, the May 18 release alone suffices to show a sufficiently direct "causal connection between the material misrepresentation and the loss." Dura, 544 U.S. at 342.  At this stage in the proceeding, Plaintiffs "need only plead that Defendants' fraudulent behavior concealed facts or circumstances which, when revealed, contributed to the loss." In re Bristol Myers, 586 F. Supp. 2d at 166.[8]  Plaintiffs have done so with respect to their allegations of misrepresentations in the stock-options program.

Plaintiffs' allegations relating to the non stock-options fraudulent revenue recognition accounting practices do not satisfy the pleading requirements under Dura and its progeny.  While the May 18, 2006 release directly mentions the investigations into the "Company's granting of stock options" (see Reynard Decl. Ex. 4), the release's reference to an SEC investigation into "certain accounting policies and practices" is too vague.  This non-specific language does not provide notice to an investor that SafeNet had engaged in the type of specific fraudulent

---

[8]     SafeNet also argues that Plaintiffs cannot adequately plead loss causation without specifying the actual losses suffered by the Plaintiffs, i.e. that they suffered a realized loss. See In re Estee Lauder Cos. Sec. Litig., No. 06 Civ. 2505 (LAK), 2007 WL 1522620, at *1 (S.D.N.Y. May 21, 2007).  Other courts have held that a plaintiff must only plead an economic loss, i.e. that the disclosures caused the stock price to decline. See, e.g., In re Daou Sys., Inc. Sec. Litig., 411 F.3d 1006, 1027 (9th Cir. 2005); Semerenko v. Cendant Corp., 223 F.3d 165, 185-86 (3d Cir. 2000); Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649 (7th Cir. 1997).  Plaintiffs may plead loss causation at this stage without specifying the realized loss caused by SafeNet's disclosures. See In re Tommy Hilfiger, 2007 WL 5581705, at *3; In re Worldcom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2005 WL 2319118, at *23 (S.D.N.Y. Sept. 21, 2005).

accounting practices that Plaintiffs allege.  Plaintiffs have not adequately pled a causal connection between the mention of an investigation into "certain accounting policies and practices" and the subsequent stock selloff.  Simply put, the May 18 disclosure did not alert investors to any fraud related to the non stock-options fraudulent revenue-recognition accounting practices alleged by Plaintiffs. See In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 679 (S.D.N.Y. 2007) ("Without providing a nexus between the alleged fraud and their losses, either by demonstrating the materialization of a concealed risk or the existence of a corrective disclosure, the plaintiffs fail to plead loss causation.").

The Court's holding that the May 18, 2006 release is an adequate corrective disclosure for loss causation purposes is not undermined by the fact that SafeNet's stock price rose when the alleged fraud was fully disclosed on July 26, 2006, after the end of the class period.  By that time the market had corrected itself following the May 18, 2006 release, and the rise in stock price on July 27, 2006, signals only that investors already knew of and were accounting for the possibility that SafeNet had made fraudulent misstatements about its stock-options program. See In re Take-Two, 551 F. Supp. 2d at 289 (noting that a lack of negative stock-price reactions to subsequent corrective disclosures could signal that "the market already had taken account of such information"); In re Bradley Pharms., 421 F. Supp. 2d at 829 (noting that a stock rise upon the release of later information "suggest[s] that the market corrected the price of Bradley's stock price when the truth began to leak out on February 28, 2005 and that by the time Bradley announced its restatement of earnings in April 2005, the market had already incorporated that the previously released financial statements could not be relied upon").

The May 18, 2006 disclosure is adequate to plead loss causation for the claim in Count One related to stock-options backdating, but is inadequate for the claims related to non stock-

options fraudulent revenue recognition.  As Plaintiffs have not pled loss causation as to these claims, Counts Three and Four are dismissed.

### ii.  Scienter

In order to establish liability under section 10(b) and Rule 10b-5, a plaintiff must also prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  Such allegations must be stated with particularity, and, pursuant to the PSLRA, the plaintiff must put forth "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  Indeed, it is not enough "that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." Tellabs, 551 U.S. at 314.  Instead, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent" in order to survive a motion to dismiss. Id.

Prior to the passage of the PSLRA, the Second Circuit held that a plaintiff adequately pled scienter either by: (1) alleging facts showing defendants had both motive and opportunity to commit fraud; or (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. ATSI Commc'ns, 493 F.3d at 99; see also Novak, 216 F.3d at 307-08.  However, the Second Circuit has noted that the PSLRA does not precisely adopt that two-pronged standard, and "Congress's failure to include language about motive and opportunity suggests that we need not be wedded to these concepts in articulating the prevailing standard." Novak, 216 F.3d at 310; South Cherry St., LLC v. Hennessee Group LLC, No. 07-3658-cv, 2009 WL 2032133, at *10 (2d Cir. July 14, 2009) ("[U]nder the PSLRA, litigants and courts need not and should not employ or rely on magic words such as 'motive and opportunity' with respect to

intent.") (quotations and citations omitted).  Instead, the Second Circuit has held that "at least"

four circumstances may give rise to a strong inference of the requisite scienter, including where

the complaint adequately alleges that defendants: "(1) benefitted in a concrete and personal way

from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had

access to information suggesting that their public statements were not accurate; or (4) failed to

check information they had a duty to monitor." ECA, 553 F.3d at 199 (citing Novak, 216 F.3d at

311) (internal quotations omitted); see also South Cherry St., 2009 WL 2032133 at *10-11.  In

determining whether a plaintiff has pled facts that present an inference of scienter at least as

likely as any opposing inference, a court must consider all the alleged facts, taken collectively,

"'not whether any individual allegation, scrutinized in isolation, meets that standard.'" South

Cherry St., 2009 WL 2032133 at *12 (quoting Tellabs, 551 U.S. at 323).  The Court now

addresses the adequacy of the allegations of scienter against each Defendant.

### 1.  SafeNet

SafeNet does not challenge the Plaintiffs' allegation of scienter in Count One, which

relates to the stock-options backdating (see SafeNet Memorandum of Law ("SafeNet Mem.") 19

n.8); instead it argues that Plaintiffs have not properly alleged SafeNet's scienter for the non

stock-options allegations in Count Three.  As the Court has already found that Plaintiffs fail to

properly plead loss causation for their claims of non stock-options accounting fraud, SafeNet's

challenge on scienter is moot.  Accordingly, as for the claims against SafeNet under Section

10(b) and Rule 10b-5, the Court finds that Plaintiffs have adequately alleged loss causation and

scienter as to Count One.

## 2.  Compensation Committee

As to the Count One claims against the Compensation Committee Defendants, the Complaint alleges that they were either "actively complicit in, or at least recklessly indifferent to, SafeNet's fraudulent backdating activities." (CAC ¶ 7.)  Plaintiffs allege that the Compensation Committee Defendants knowingly—or recklessly—participated in the alleged options backdating fraud by approving the options grants through their signatures on UWCs. (Id.) Plaintiffs also allege that the Compensation Committee had the motive to perpetuate the options backdating scheme because they were recipients of improperly accounted-for options grants. (Id. ¶¶ 31-34.)[9]

The Compensation Committee Defendants argue that Plaintiffs fail to plead scienter because the most plausible inference from the alleged facts is that the defendants did not know— nor did they have any reason to know—of SafeNet's failure to properly record compensation expenses for the in-the-money portion of the backdated stock option grants.

While the Complaint purports to allege that the Compensation Committee Defendants had the motive and opportunity to commit fraud because they benefitted from the stock-options backdating and rise in SafeNet's stock price, Plaintiffs acknowledged at oral argument that their focus of the scienter allegations is on the reckless behavior of all Defendants in failing to uncover and account for the stock options backdating. (See Transcript of July 8, 2009 Oral Argument ("Tr.") 68:18-24.)[10]

---

[9]       Brooks allegedly received at least 70,000 options to purchase SafeNet stock and sold 36,617 shares during the class period, for total proceeds of $1.09 million (CAC ¶ 31); Hunt allegedly received at least 60,000 shares and sold 11,000, for proceeds of $396,570 (id. ¶ 32); Thaw allegedly received at least 60,000 shares and sold 41,667, for proceeds of $1.45 million (id. ¶ 33); and Money is only alleged to have received an unidentified amount of stock options and is not alleged to have sold any options during the class period. (Id. ¶ 34.)

[10]      Plaintiffs stated: "[W]e really bank the case on the clear circumstantial evidence of reckless or conscious misbehavior in the options context." (Tr. 68:18-20.)

Allegations of scienter based on recklessness typically survive a motion to dismiss "when [plaintiffs] have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quoting Novak, 216 F.3d at 308); see also In re Carter-Wallace Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (defining recklessness as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it") (quotation and citation omitted).

The evidence of the Compensation Committee Defendants' conscious misbehavior or recklessness, according to Plaintiffs, includes Defendant Argo's plea allocution, where she stated that she backdated one options grant to Defendant Caputo in late 2001 or early 2002, and that "the compensation committee approved this treatment, even though I and others knew that the compensation committee had not granted the options on that date." (CAC ¶ 235.)  Further, the Complaint quotes a section of the Argo indictment which cites an e-mail sent from Argo to Defendant Mueller, stating that "[o]ur past practice has been to aggregate options for performance awards or new hires in the quarter and pick the best price after the hire date.  We then send the unanimous consent to the comp committee and the options are approved." (Id. ¶ 236 (emphasis added).)  Plaintiffs argue that this shows the "complicity" of the Compensation Committee Defendants.

Plaintiffs' chief allegation on the options backdating is that the compensation expense was not properly recorded or accounted for.  But the Compensation Committee is not responsible

for accounting.  Plaintiffs ask the Court to infer scienter because of the Compensation

Committee's position within the company, not because of any specific allegations within the

Complaint.  The Court must refuse this request.

Courts may not infer scienter "solely from the fact that, due to the defendants' board

membership or executive managerial position, they had access to the company's internal

documentation as well as any adverse information." In re Winstar Commc'ns., Nos. 01 Civ.

3014, 01 Civ. 11522 (GBD), 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006).  Instead, courts

require "'specific allegations of various reasonably available facts, or 'red flags,' that should

have put the officers on notice' that the public statements were false." In re Refco, Inc. Sec.

Litig., 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (quoting Goplen v. 51job, Inc., 453 F. Supp. 2d

759, 774-75 (S.D.N.Y. 2006)).

Here, the Plaintiffs cannot point to specific red flags, other than the Compensation

Committee Defendants' position within the company, to show that Brooks, Hunt, Thaw, or

Money were ever aware that SafeNet was failing to properly account for the backdated stock

options.  Plaintiffs do not even attempt to distinguish between the mental states of the four

individuals, instead referring to the Compensation Committee Defendants as a group, even

though the individuals joined the Board of Directors and Compensation Committee at different

times.  If anything, the Complaint alleges that the Compensation Committee Defendants had

little role to play in the granting of stock options, other than signing off on the consent forms that

the Officer Defendants presented to them.  To wit, the Complaint states that

> [a]lthough the Compensation Committee had the authority to administer
> SafeNet's stock option programs under the relevant stock option plans, the Officer
> Defendants generally initiated and oversaw the option grant process as to
> Company officers and employees, provided the names of option recipients and the
> number of options granted, selected the purported "grant dates" (and thus the
> exercise prices), and facilitated the approval process for option grants by, among

other things, obtaining the consent of the Compensation Committee Defendants
for the option grants.

(CAC ¶ 49.)

In other words, according to Plaintiffs, the Officer Defendants controlled the alleged

backdating scheme and the Compensation Committee Defendants only participated in the final

step of signing off on the grants.  Plaintiffs cannot successfully plead scienter based only on

allegations related to the Compensation Committee's title and job responsibilities. In re Refco,

503 F. Supp. 2d at 653 ("Mere membership in a committee with oversight responsibilities . . . is

not enough to give rise to an inference of recklessness."); In re WorldCom, Inc. Sec. Litig., No.

02 Civ. 3822 (DLC), 2003 WL 23174761, at *6 (S.D.N.Y. Dec. 3, 2003) ("The Amended

Complaint's allegations reveal at most an Audit Committee that accepted too readily the reports

given to it by management . . . and that was anemic in its oversight function.  The allegation that

a defendant generally failed to perform a job well, however, is not a substitute for the

particularized pleading that a defendant knowingly or recklessly engaged in fraud."); Jacobs v.

Coopers & Lybrand, No. 97 Civ. 3374 (RPP), 1999 WL 101772, at *16 (S.D.N.Y. Mar. 1, 1999)

("[J]ust because a defendant is a director and member of the company's audit committee does

not lead automatically to an inference that the person acted with conscious disregard of a known

risk as opposed to with gross negligence or even negligence.").

The Complaint fails to specify how each of the Compensation Committee Defendants

were reckless, what they each knew about the alleged accounting deficiencies, and how they

knew about these deficiencies.  In short, the Complaint fails to allege scienter against the

Compensation Committee Defendants and the Count One claims under Section 10(b) and Rule

10b-5 must fail as to these defendants.

### 3.  Caputo and Argo

The Complaint alleges that Caputo, the former SafeNet CEO and Chairman of the Board of Directors, "improperly caused SafeNet to grant him 300,000 'in the money' options to purchase SafeNet stock at low exercise prices . . . and failed to properly disclose the nature of these grants to the investing public." (CAC ¶ 26.)  He also allegedly "authorized or approved the issuance of false financial statements" and had sales proceeds of $7.87 million from his backdated options.  Caputo signed the false Rainbow registration statement and all the class period Form 10-Ks and 10-Qs. (Id.)  Caputo also allegedly chose the date for one of his allegedly backdated stock-option grants. (Id. ¶ 58.)

Caputo argues that Plaintiffs fail to allege his mental state with specificity and that the Complaint assumes his involvement because of his position at SafeNet.[11]  Caputo also argues that the timing and amount of his stock sales do not raise an inference of scienter.  Caputo's arguments are unavailing.  Unlike the Plaintiffs' approach with the Compensation Committee Defendants, where liability was alleged based on the Directors' positions at SafeNet, here the Complaint alleges that "the Officer Defendants generally initiated and oversaw the option grant process," (CAC ¶ 49) and that Caputo himself chose the date for one of his backdating options grants. (Id. ¶ 58.)  Further, the Complaint alleges a pattern of grants to Caputo that were suspiciously timed based on their occurrence at particularly low points in SafeNet's stock price (id. ¶¶ 65-67, 68-72, 76-77, 80-83), and that Caputo signed every false 10-K and 10-Q form during the class period. (Id. ¶ 26, Sec. VI.)

---

[11]     Caputo also argues that the Court should dismiss the claims against him because Plaintiffs only allege six specific statements by Caputo and Plaintiffs fail to specify how each statement is misleading.  In making this argument Caputo seems to ignore an entire section of the Complaint that identifies and outlines the numerous allegedly false and misleading SEC filings signed by him. (See CAC Sec. VI, ¶¶ 137-211.)  These filings count as false statements for claims under Section 10(b) and Rule 10b-5.  See In re Openwave Sys., 528 F. Supp. 2d at 250.

The Complaint adequately pleads Caputo's conscious misbehavior or recklessness for the purposes of alleging scienter.  The Complaint alleges that Caputo knew that he was receiving backdated stock options and signed false SEC documents that failed to properly account for the options grants.  Plaintiffs adequately allege that Caputo either actually knew of these misstatements or should have known, and such pleading is sufficient to survive a motion to dismiss. In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001) ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business.").  The Court cannot accept Caputo's argument that his stock sales were not suspicious because they were consistent over the 37-month class period. (See CAC ¶ 250 (alleging that Caputo sold 100,000 shares in 2003, 125,000 in 2005, and 50,000 in 2006).)  The facts that make Caputo's stock sales suspicious have nothing to do with the regularity of his sales and have everything to do with the fortuitously low stock prices and dates at which SafeNet continuously granted his options. See Middlesex Ret. Sys. v. Quest Software Inc., 527 F. Supp. 2d 1164, 1182 (C.D. Cal. 2007) (noting that allegations of stock sales by insiders on "extremely fortunate dates give rise to a strong inference that backdating has occurred and that it was done intentionally.")

Caputo urges that many of the relevant allegations involve actions taken before the class period, and that these pre-class actions cannot support allegations of scienter during the class period.  But courts in this district addressing stock-options backdating claims have held that receipt of stock options before the class period is not the issue for allegations of scienter; the issue is whether plaintiffs have pled material misrepresentations during the class period. See In re Openwave Sys., 528 F. Supp. 2d at 250 ("[I]t is irrelevant that the options were received

before the class period.  The accounting for the backdated options affected every financial statement until those options vested . . . Plaintiff has pleaded that during the class period, each of these defendants signed statements that materially misrepresented certain aspects of Openwave's practices.")  In this case, Plaintiffs have adequately pled that during the class period, Caputo signed and caused to be issued SEC filings with material omissions about SafeNet's executive compensation.  It is of no consequence that some of allegations against Caputo relate to pre class-period events.

For the reasons discussed, the Plaintiffs have properly pled their Section 10(b) and Rule 10b-5 claims in Count One against Caputo.

The allegations against Argo are essentially the same as against Caputo, as the Complaint alleges her involvement in nearly every aspect of the options backdating and subsequent misrepresentations. (See, e.g., CAC ¶¶ 6, 15, 27, 30, 49, 58, 71, 73, 83, 140, 143, 161, 164.)  Due to her plea allocution in the criminal case, Argo does not contest that Plaintiffs plead scienter against her as to the allegations regarding the stock-options backdating scheme.[12]  Argo's motion to dismiss the Section 10(b) and Rule 10b-5 claims in Count One is dismissed.

### 4.  Mueller

Mueller worked at SafeNet as the CFO for 22 months from June 2004 until April 6, 2006. (CAC ¶ 28.)  The alleged backdating scheme started in 1999, long before he arrived. During Mueller's relatively brief stint there were just three of the 14 allegedly improperly accounted-for backdated stock-option grants. (Id. ¶¶ 62-94.)  Mueller's alleged involvement with the backdating scheme was that he signed false SEC forms for financial periods in 2004 and 2005, and that he allegedly had proceeds of $457,625 from the sale of SafeNet stock. (Id. ¶¶ 28,

---

[12]    Argo adopts all of SafeNet's scienter arguments, and SafeNet does not challenge the scienter allegations relating to stock-options backdating. (See SafeNet Mem. 19 n.8).

250.) The SDNY indictment against Argo quotes the September 15, 2004 e-mail from Argo to a recently appointed Mueller stating that: "[o]ur past practice has been to aggregate options for performance awards or new hires in the quarter and pick the best price after the hire date.  We then send the unanimous consent to the comp committee and the options are approved." (Id. ¶ 236.)  Plaintiffs argue that this e-mail shows that Mueller knew of and participated in the failure to properly account for the backdated options grants.  The remainder of the allegations against Mueller pertain to the non stock-options accounting claims (id. ¶¶ 101-03, 120), which the Court has already found to be inadequately pled.

Mueller argues that Plaintiffs have failed to adequately plead scienter, specifically that none of the allegations about Mueller's involvement rise to the level of fraud.  Mueller's brief time as SafeNet's CFO weighs against his knowing involvement in what Plaintiffs attempt to portray throughout the Complaint as a widespread agreement among the company's officers and directors to fraudulently fail to account for stock-options grants. See In re Openwave Sys., 528 F. Supp. 2d at 251-52 (dismissing claims against company CEO who had been in position for only half of alleged period of options backdating, and after the majority of the backdating was completed).  More damaging to Plaintiffs' allegations is the complete lack of specific pleading as to Mueller's involvement with a plan to issue backdated stock options and the failure to account for the grants.  Again, Plaintiffs' inclusion of Mueller in this case is more directed toward their allegations of non stock-options accounting fraud.

The Section 10(b) and Rule 10b-5 claims in Count One against Mueller are dismissed.

### b.  Claims Under Section 14(a) and Rule 14a-9

Counts Five and Six of the Complaint allege violations of Section 14(a) of the Exchange Act and Rule 14a-9, related to alleged misrepresentations and misleading statements in SafeNet

proxy statements and the Rainbow proxy/prospectus.  The Complaint brings claims against SafeNet and all the Director Defendants under Counts Five and Six,[13] and against Caputo and Argo under only Count Six.

Count Five alleges that SafeNet was "negligent and failed to exercise due care in issuing the 2003 Proxy Statement, the Rainbow Proxy/Prospectus, the 2004 Proxy Statement and the 2005 Proxy Statement" because SafeNet omitted material facts about the options backdating. (CAC ¶¶ 301-03.)  Plaintiffs claim that the misrepresentations in the proxy statements were material to SafeNet investors voting on each proxy statement and were an "essential link in the accomplishment" of the stock-options backdating scheme, because knowledge of the truth of the omissions would have "immediately thwarted a continuation of shareholders' endorsement of the directors' positions." (Id. ¶ 305.)

Count Six alleges that SafeNet, Caputo, Argo, and the Director Defendants (except for Money) "sought to secure Rainbow shareholder approval of the Rainbow acquisition by means of the materially false and misleading Rainbow Proxy/Prospectus and/or permitted the use of their names to solicit proxies from Plaintiff Golde and other members of the Rainbow Subclass." (Id. ¶ 309.)  Plaintiffs allege that SafeNet misrepresented its financial results for the years 2000 to 2003 within the Rainbow proxy/prospectus "by failing to properly account for its stock options practices and improper revenue recognition practices." (Id. ¶ 319.)  Further, the Complaint alleges that Plaintiffs would have rejected the Rainbow acquisition or demanded an adjusted exchange ratio had Plaintiffs known of the misrepresentations in the Rainbow proxy/prospectus. (Id. ¶ 324.)  The allegations against Harrison and Clark are based on their signing various SafeNet Form 10-Ks during the class period, and that they "authorized and

---

[13]     Defendant Money is not included in Count Six because he joined SafeNet after the Rainbow acquisition.

permitted the use of [their] name[s]" in SafeNet proxies. (Id. ¶¶ 35-36.)  Plaintiffs state that

Counts Five and Six allege negligence, rather than fraud. (Id. ¶¶ 299, 307.)

 The first issue is whether the Court will hold Plaintiffs' claims to the heightened pleading

standard for fraud under Rule 9(b) of the Federal Rules of Civil Procedure, despite Plaintiffs'

specific assertion that the claims sound in negligence. See In re JPMorgan Chase, 363 F. Supp.

2d at 636 ("When plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct,

they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a

fraud theory.") (internal citations omitted).  Plaintiffs' attempt to fall into the lower pleading

standard for negligence actions is unavailing.  The basis for Plaintiffs' claims is that SafeNet

officers and directors failed to properly disclose that they were backdating stock options and

using improper revenue-recognition accounting methods, and that they did so to enrich

themselves by inflating SafeNet stock prices.  This is essentially a fraud claim, and Plaintiffs will

not be allowed to reclassify their claims to avoid the pleading standards of Rule 9(b). See In re

AXIS Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Because the

sole allegations supporting the falsity element of the Section 11 and Section 12(a)(2) claims are

all inextricably intertwined with the allegations underlying plaintiffs' fraud claims . . . these

claims undisputedly sound in fraud.")[14]  The Court will review Plaintiffs' allegations in Counts

Five and Six under the heightened standard of Rule 9(b).

 Actions brought under Section 14(a) that are based on material misrepresentations in

proxy materials "'should be sustained only when [they] challenge[] a transaction which was the

subject of the proxy materials, such as approval of a merger agreement or the election of

corporate directors.'" Fisher v. Kanas, 467 F. Supp. 2d 275, 282 (E.D.N.Y. 2006) (quoting

Brayton v. Ostrau, 561 F. Supp. 156, 162 (S.D.N.Y. 1983)).  In other words, the challenged

---

[14] The same reasoning applies equally to a claim under Section 14(a).

proxy statements must be "an essential link in the accomplishment of the transaction." Grace v. Rosenstock, 228 F.3d 40, 47 (2d Cir. 2000).

Under this standard, Plaintiffs' allegations in the fifth claim are insufficient as against all Defendants.  The fifth claim alleges that the misrepresentations in the 2003 to 2005 proxy statements convinced shareholders to endorse "the directors' positions, the executive officers' compensation and the Company's compensation policies, including the 2003 and 2005 amendments to expand the number of shares authorized under the Stock Option Plan." (CAC ¶ 305.)  The Court must reject this sort of vague pleading under Rule 9(b) standards.  It is far too general and there is no essential link from the misstatements to the shareholder approval sought. In fact, there is no allegation of a transaction at all in Count Five, other than the amendments to expand the number of shares under the stock option plan. See Brayton, 561 F. Supp. at 162 ("A Section 14 action based on an alleged material misrepresentation or omission in proxy materials . . . should be sustained only when it challenges a transaction which was the subject of the proxy materials, such as approval of a merger agreement or the election of corporate directors.").

As to the claim in Count Six against SafeNet, Caputo, and Argo, however, Plaintiffs' claims are adequate because they allege an appropriate, specific transaction that was affected by the misrepresentations.  Plaintiffs allege that the omissions in the Rainbow proxy/prospectus were "an essential link in the accomplishment of the Rainbow Acquisition" because they would have affected the Plaintiffs' decision to agree to the transaction. (CAC ¶¶ 316, 324.)  Plaintiffs allege that Rainbow proxy/prospectus presented a false snapshot of SafeNet's financial position and "justified the Exchange Ratio" that would govern the merger with Rainbow. (Id. ¶ 315.) This is precisely the type of essential link and the type of transaction contemplated under a Section 14(a) claim. See Fisher, 467 F. Supp. 2d at 282.  As already discussed, Plaintiffs have

adequately alleged scienter against Caputo and Argo for their involvement in the misrepresentations regarding the stock-options grants.  Plaintiffs adequately plead Section 14(a) and Rule 14a-9 claims against SafeNet, Caputo, and Argo based on misleading statements in the Rainbow proxy/prospectus.

The claims in Count Six fail against the Director Defendants, however, because Plaintiffs seem to include Harrison, Clark, and the members of the Compensation Committee for no reason other than their signatures on SafeNet proxies.  As the Court has found that Plaintiffs' Section 14(a) claims are based in fraud, Plaintiffs must meet the higher pleading standard of Rule 9(b).  Plaintiffs fail to meet that standard by simply alleging that the Corporate Director Defendants had the requisite state of mind because they signed certain documents or because of their positions, rather than alleging with more specificity their knowledge of the allegedly fraudulent stock-options accounting.  See DiVittorio v. Equidyne Extractive Indus., 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."); In re Openwave Sys., 528 F. Supp. 2d at 252 ("Plaintiff merely alleges that Covert has served as Openwave's CFO and executive vice-president since October 2005, and before that as a director and chairman of the audit committee . . . and that he signed various financial statements.  These allegations are insufficient to infer scienter."); In re Elan Corp. Sec. Litig., No. 02 Civ. 865 (RMB)(FM), 2004 WL 1305845, at *16 (S.D.N.Y. May 18, 2004) (dismissing Section 14(a) claim for failure to set forth facts relating to defendants' mental state).  Plaintiffs do not adequately plead scienter for their Section 14(a) claims against the Director Defendants and the claims cannot stand.

### c. Claims Under Sections 11 and 12(a)(2)

Counts Seven and Eight allege violations of Sections 11 and 12(a)(2) of the Securities Act, related to the Rainbow registration statement and the Rainbow proxy/prospectus, respectively. (CAC ¶¶ 327, 334.)  The Complaint brings claims under Count Seven (Section 11) against SafeNet, Caputo, Argo, and the Director Defendants (except Money), and under Count Eight (Section 12(a)(2)) against only SafeNet, Caputo, and Argo.

Plaintiffs allege that the misleading statements in the registration statement "regarding SafeNet's publicly reported historical financial results and description of SafeNet's stock option granting policies" resulted in Rainbow shareholders approving the Rainbow acquisition. (Id. ¶ 327.)  While Plaintiffs again state that these claims do not allege fraud, the Court applies the heightened pleading standard of Rule 9(b) for the same reasons as before. See Rombach, 355 F.3d at 171 ("[T]he heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud."); see also In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 596 (S.D.N.Y. 2007) (finding that Section 11 claim sounded in fraud when registration statements filed with SEC "contained 'untrue statements of material fact or omitted to state facts required to be stated therein or necessary to make the statements therein not misleading'") (quoting underlying complaint).

SafeNet argues that the Section 11 and 12(a)(2) claims fail because the Complaint, on its face, alleges that SafeNet "did not reveal any facts to indicate that the Rainbow Proxy/Prospectus or Registration Statement may have contained misstatements until at least July 26, 2006," which would be after the end of the class period. (SafeNet Mem. 24.)  This is essentially a negative causation defense, but at this stage in the litigation SafeNet fails to meet its burden to negate causation. See In re Fuwei Films Sec. Litig., No 07 Civ. 9416 (RJS), 2009 WL 2005291, at *19

(S.D.N.Y. July 10, 2009) ("Given the burden on Defendants to establish an affirmative defense such as negative causation, the Court finds that dismissal on this ground is more properly considered on a motion for summary judgment."); Levine v. AtriCure, Inc., 594 F. Supp. 2d 471, 474 (S.D.N.Y. 2009) (noting the affirmative defense that exists when a plaintiff "plead[s] itself out of court by unintentionally alleging facts (taken as true) that establish an affirmative defense").

Plaintiffs have not pled SafeNet's affirmative defense in this case, because SafeNet is incorrect that no relevant facts were revealed until after the end of the class period.  Plaintiffs properly allege that the May 18, 2006 disclosure of the SDNY and the SEC investigations into the company's stock-options granting procedures revealed that SafeNet's prior statements about the company's financial condition were suspect, and caused a subsequent financial loss.

As for the Section 11 and 12(a)(2) claims against Caputo and Argo, they argue that Plaintiffs fail to allege scienter.  The Court has already discussed why Plaintiffs have properly pled scienter against Caputo and Argo as to the Section 10(b) claims, and the same reasoning applies to the claims in these counts.  Accordingly, Plaintiffs have properly pled their Section 11 and 12(a)(2) claims against SafeNet, Caputo, and Argo in Counts Seven and Eight.

The Section 11 claim fails as against the Director Defendants, however, because Plaintiffs fail to specify any details about Harrison's, Clark's, or the Compensation Committee's knowing participation in making the alleged fraudulent misrepresentations in the Rainbow registration statement.  As the Section 11 claims are based in fraud, Plaintiffs must allege their fraudulent intent with more specificity. See In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig., No. 03 Civ. 8208 (RO), 2006 WL 1008138, *6 n.12 (S.D.N.Y. Apr. 18, 2006)

("When Section 11 and 12(a)(2) claims sound in fraud, however, the scienter requirements of Rule 9(b) of the Federal Rules of Civil Procedure apply.").

### d.   Control Person Liability under Section 20(a) and Section 15

Plaintiffs bring claims under Count Two (Section 20(a) of the Exchange Act) against the Compensation Committee Defendants, Caputo, Argo, and Mueller.  Plaintiffs also name Caputo, Argo, and Mueller in Count Four, again for violations of Section 20(a), relating to the non stock-options accounting fraud.  Plaintiffs bring claims under Count Nine (Section 15 of the Securities Act) against the Director Defendants (except Money), Caputo, and Argo.  While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage. See In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005).

As an initial matter, the claims under Count Four must be dismissed, because Plaintiffs have not adequately alleged a primary violation of Section 10(b) and Rule 10b-5 for the non stock-options revenue recognition fraud alleged in Count Three. See ECA, 553 F.3d at 207 ("[H]aving found that Plaintiffs failed to state a claim under sections 10(b) . . . their control person liability claim pursuant to . . . section 20 of the Exchange Act must also fail for want of a primary violation.").

As to Count Two, Plaintiffs have adequately alleged a primary violation of Section 10(b) and Rule 10b-5 for the stock-options related claims.  Plaintiffs have not, however, adequately alleged that either the Compensation Committee Defendants or Mueller had any "culpable participation" in the alleged stock-options misrepresentations. In re Global Crossing, 322 F. Supp. 2d at 349; see also Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V., 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) ("Director status alone does not establish control person liability.")

For the reasons already mentioned in the discussion on scienter, the weight of the allegations is that neither the Compensation Committee members nor Mueller had any significant knowledge or role in the backdating practice.  As to Caputo and Argo, however, Plaintiffs have alleged such culpable participation in the stock-options misrepresentations.  Further, there is no question that Caputo and Argo are "control persons" under the law.  Plaintiffs allege that Caputo requested that Argo backdate at least one options grant, and that Argo complied by submitting the backdated grant to the Compensation Committee.  This pleading is adequate to allege that Caputo and Argo had the power to direct actions at SafeNet in regard to the stock options program, and it is entirely fair to presume that Caputo and Argo had similar control over the accounting procedures for the backdated grants.  See In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) ("Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.") (internal quotations and citation omitted).

Culpable participation is not an element for claims under Section 15 of the Securities Act, see In re Fuwei Films, 2009 WL 2005291, at *10, but Plaintiffs still fail to adequately allege that the Director Defendants are control persons for purposes of this claim.  If anything, the SafeNet directors are alleged to be only passive players in any scheme to defraud, and the Director Defendants are not liable under Section 15 simply because of their titles within the company.  See Sloane Overseas Fund, 941 F. Supp. at 1378 ("[W]hen a defendant does not clearly occupy control status, the plaintiff must plead facts from which control status can be inferred, e.g., that defendant had power, pursuant to an agreement to control the primary violator or aided the primary violator in perform[ing] some culpable conduct linking the defendant to the primary

violation for which relief is sought.").  As for Caputo and Argo, the Complaint adequately alleges their ability to influence the policies and decision-making at SafeNet.  As the Plaintiffs have properly alleged a primary violation of Sections 11 and 12(a)(2), the Section 15 control-person claim against Caputo and Argo survives the motion to dismiss.

## **CONCLUSION**

To summarize the Court's holdings as to each defendant:

SafeNet's motion to dismiss Counts One, Six, Seven, and Eight is DENIED, and its motion to dismiss Counts Three and Five is GRANTED.

The Compensation Committee Defendants' (Brooks, Hunt, Thaw, and Money) motion to dismiss Counts One, Two, Five, Six, Seven, and Nine is GRANTED.  The Compensation Committee Defendants are dismissed from the case.

Directors Harrison and Clark's motion to dismiss Counts Five, Six, Seven, and Nine is GRANTED.  Harrison and Clark are dismissed from the case.

Caputo's motion to dismiss Counts One, Two, Six, Seven, Eight, and Nine is DENIED, and his motion to dismiss Counts Three and Four is GRANTED.

Argo's motion to dismiss Counts One, Two, Six, Seven, Eight, and Nine is DENIED, and her motion to dismiss Counts Three and Four is GRANTED.

Mueller's motion to dismiss Counts One, Two, Three, and Four is GRANTED.  Mueller is dismissed from this case.

The Clerk of the Court is directed to close out the motions on the docket numbered 55, 59, 63, 66, and 68.  The remaining parties should appear for a scheduling conference in this case at 3:30 p.m. on September 15, 2009, in courtroom 20C.  Prior to the conference the parties

should meet and confer, and then prepare and submit for Court approval a Civil Case

Management Plan.

Dated: New York, New York
      August 5, 2009

                          SO ORDERED

                          PAUL A. CROTTY
                          United States District Judge